No. 24-542

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

KIM RHODE, ET AL.,
*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,
*Defendant and Appellant.*

———————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:18-cv-00802-BEN-JLB
The Honorable Roger T. Benitez, Judge

———————————

**APPELLANT'S OPENING BRIEF**

———————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
JOHN D. ECHEVERRIA
*Supervising Deputy Attorneys General*
CHRISTINA R.B. LÓPEZ
MEGHAN H. STRONG
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

May 24, 2024

## TABLE OF CONTENTS

Page

Introduction ....................................................................................................1

Jurisdictional statement .................................................................................3

Statement of the issues ..................................................................................4

Addendum of statutory provisions ................................................................4

Statement of the case .....................................................................................5

    A.    California's ammunition background check requirements ...................5

    B.    Procedural history ...............................................................................10

        1.    Pre-*Bruen* proceedings ...........................................................10

        2.    Post-*Bruen* proceedings ..........................................................12

Summary of the argument ............................................................................15

Standard of review .......................................................................................17

Argument ......................................................................................................18

I.    California's ammunition background check requirements comport
with the Second Amendment ...............................................................18

    A.    Plaintiffs have not established that the ammunition background
check requirements regulate conduct presumptively protected
by the Second Amendment ................................................................18

        1.    The ammunition background check requirements are
presumptively lawful .............................................................20

        2.    The ammunition background check requirements are not
abusive ...................................................................................25

    B.    California's ammunition background check requirements are
consistent with historical tradition ...................................................27

        1.    Throughout American history, governments have
required individuals to demonstrate eligibility to possess
and carry firearms .................................................................29

        2.    The ammunition background check requirements are
relevantly similar to that historical tradition of firearms
regulation ..............................................................................33

i

**TABLE OF CONTENTS**
**(continued)**

Page

　　　3.　The district court applied a flawed historical analysis..............35

II.　Sections 30312 and 30314 do not violate the dormant Commerce
　　Clause.............................................................................................38

　　A.　The face-to-face transaction requirement does not discriminate
　　　　against interstate commerce ................................................39

　　B.　The face-to-face transaction requirement should be upheld
　　　　under *Pike* .........................................................................42

III.　Section 30314 is not preempted by federal law ...........................47

Conclusion ..............................................................................................51

Statement of related cases .....................................................................52

Certificate of compliance .......................................................................53

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Altria Group, Inc. v. Good*
555 U.S. 70 (2008)...................................................................47

*Antonyuk v. Chiumento*
89 F.4th 271 (2d. Cir. 2023) ................................................37

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris*
729 F.3d 937 (9th Cir. 2013) ...............................................38

*Atkinson v. Garland*
70 F.4th 1018 (7th Cir. 2023) ..............................................22

*Black Star Farms LLC v. Oliver*
600 F.3d 1225 (9th Cir. 2010) .............................................41

*City & Cnty. of San Francisco v. Garland*
42 F.4th 1078 (9th Cir. 2022) ..............................................17

*Coalition of N.J. Sportsmen v. Florio*
744 F. Supp. 602 (D.N.J. 1990) ..........................................50

*CTS Corp. v. Dynamics Corp. of Am.*
481 U.S. 69 (1987)...............................................................46

*Dean Milk Co. v. Madison*
340 U.S. 349 (1951)..............................................................40

*District of Columbia v. Heller*
554 U.S. 570 (2008)................................................... *passim*

*Exxon Corp. v. Governor of Maryland*
427 U.S. 117 (1978)..............................................................45

*Fresno Rifle & Pistol Club, Inc. v. Van de Kamp*
746 F. Supp. 1415 (E.D. Cal. 1990) ...................................50

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Granholm v. Heald*
    544 U.S. 460 (2005)............................................................40

*Int'l Franchise Ass'n, Inc. v. Seattle*
    803 F.3d 389 (9th Cir. 2015) ..............................................39

*Jackson v. City & Cnty. of San Francisco*
    746 F.3d 953 (9th Cir. 2014) ..................................... 19, 21, 24

*McDonald v. City of Chicago*
    561 U.S. 742 (2010)........................................................ 18, 28

*McRorey v. Garland*
    99 F.4th 831 (5th Cir. 2024) ......................................... 22, 26

*Medtronic, Inc. v. Lohr*
    518 U.S. 470 (1996)............................................................47

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*
    567 F.3d 521 (9th Cir. 2009) ..................................... *passim*

*Nat'l Pork Producers Council v. Ross*
    598 U.S. 356 (2023)................................................... *passim*

*Nat'l Pork Producers Council v. Ross*
    6 F.4th 1021 (9th Cir. 2021) ..............................................44

*New York State Firearms Ass'n v. James*
    2024 WL 1932050 (W.D.N.Y. May 2, 2024)....................34

*New York State Rifle & Pistol Ass'n v. Bruen*
    597 U.S. 1 (2022)...................................................... *passim*

*Pike v. Bruce Church, Inc.*
    397 U.S. 137 (1970)................................................... *passim*

*Rhode v. Becerra*
    445 F. Supp. 3d 902 (S.D. Cal. 2020)..................... 11, 42, 46

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Schaffer ex rel. Schaffer v. Weast*
   546 U.S. 49 (2005) ............................................................................18

*Silvester v. Harris*
   843 F.3d 816 (9th Cir. 2016) ............................................................21

*South Dakota v. Wayfair, Inc.*
   585 U.S. 162 (2018) ................................................................ *passim*

*Teixeira v. Cnty. of Alameda*
   873 F.3d 670 (9th Cir. 2017) .................................................. *passim*

*Truesdell v. Friedlander*
   80 F.4th 762 (6th Cir. 2023) ....................................................... 43, 44

*UFO Chuting of Haw., Inc. v. Smith*
   508 F.3d 1189 (9th Cir. 2007) .........................................................45

*United States v. Daniels*
   77 F.4th 337 (5th Cir. 2023) ...........................................................28

*United States v. Duarte*
   ___F.4th ____, 2024 WL 2068016 (9th Cir. May 9, 2024) ..............20

*United States v. Jackson*
   69 F.4th 495 (8th Cir. 2023) ...........................................................28

*United States v. Libertad*
   681 F. Supp. 3d 102 (S.D.N.Y. 2023) ............................................23

*United States v. Perez-Garcia*
   96 F.4th 1166 (9th Cir. 2024) ........................................... 28, 29, 35

*Vincent v. Garland*
   80 F.4th 1197 (10th Cir. 2023) .......................................................22

v

## TABLE OF AUTHORITIES
### (continued)

Page

STATUTES AND BILLS

#### Federal

United States Code, Title 18
§ 921(a)(3) ...............................................................48
§ 921(a)(17)(A) .........................................................48
§ 922(a) .......................................................................5
§ 922(g) .......................................................................5
§ 922(g)(5) .................................................................28
§ 922(t)(1) ....................................................................5
§ 926A ................................................................ *passim*
§ 927 ..........................................................................48

Act of July 13, 1892
27 Stat. 116 ...............................................................33

#### California

Cal. Penal Code
§ 26150 .........................................................................5
§ 26202 .........................................................................5
§ 26500 .........................................................................5
§ 27545 .........................................................................5
§ 27585(a) .....................................................................5
§ 28180(a) .....................................................................7
§ 28220 .........................................................................5
§ 29800 .........................................................................5
§ 30305(a)(1) ...............................................................5
§ 30312 .......................................................... 10, 14, 23
§ 30312(a)(1) ...............................................................7
§ 30312(a)(2) ..................................................... *passim*
§ 30312(a)-(b) ..............................................................4
§ 30312(b) .......................................................... 9, 39, 40
§ 30312(d) .....................................................................4
§ 30314 ............................................................... *passim*
§ 30314(a) ..................................................................4, 9
§ 30314(c) .....................................................................4

vi

# TABLE OF AUTHORITIES
## (continued)

Page

§ 30342(a) ................................................................................6
§ 30352 ............................................................................. 4, 11
§ 30352(a)-(b) ..........................................................................7
§ 30352(c) ................................................................................7
§ 30365(a) ................................................................................4
§ 30370 ........................................................................ 7, 10, 23
§ 30370(a)(1) ...........................................................................8
§ 30370(a)(3) ...........................................................................7
§ 30370(a)-(e) ..........................................................................4

Cal. Welf. & Inst. Code
§ 8100 ......................................................................................5
§ 8103 ......................................................................................5

2016 Cal. Stat., Ch. 55 (Senate Bill 1235) ...............................6

2016 California Proposition 63
§ 13 .........................................................................................6
§ 2(5) .......................................................................................6
§ 2(7) ............................................................................... 6, 46

**Colorado**

Colo. Rev. Stat. § 18-12-205 ....................................................5

**Connecticut**

Conn. Gen. Stat.
§ 29-28 .....................................................................................5
§ 29-38m ..................................................................................6
§ 29-38n ...................................................................................6

**Delaware**

Del. Code Ann. tit. 11, § 1441 ..................................................5

**District of Columbia**

D.C. Mun. Regs. tit 24, § 2338 .................................................5

**TABLE OF AUTHORITIES**
**(continued)**

Page

**Hawaii**

Haw. Rev. Stat. Ann. § 134-9 ..................................................................5

**Illinois**

1881 Ill. Laws. 73 ...................................................................................33

430 Ill. Comp. Stat
    65/4 ....................................................................................................6
    65/2(a)(2) ............................................................................................6
    66/35 ..................................................................................................5

**Maryland**

Md. Code. Ann., Public Safety § 5-3055....................................................5

**Massachusetts**

Mass. Gen. Laws Ann. Chapter 140
    § 131....................................................................................................5, 6
    § 131A.................................................................................................6

**Michigan**

Mich. Comp. Laws Ann. § 28.422............................................................5

**Minnesota**

Minn. Stat. Ann. § 624.714......................................................................6

**Nevada**

Nev. Rev. Stat. Ann. § 202.366 ...............................................................6

**New Jersey**

N.J. Stat. Ann.
    § 2C:58-3 .............................................................................................6
    § 2C:58-3.3 ..........................................................................................6
    § 2C:58-4 .............................................................................................6

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**New Mexico**

N.M. Stat. Ann. § 29-19-5 ...........................................................................6

**New York**

N.Y. Penal Law
    § 400.00.............................................................................................6
    § 400.02.............................................................................................6
    § 400.03.............................................................................................6

**North Carolina**

N.C. Gen. Stat. § 14-415.13 ..........................................................................6

**Oregon**

Or. Rev. Stat. § 166.291 ...............................................................................6

**Pennsylvania**

18 Pa. Cons. Stat. Ann. § 6109 .....................................................................6

**Virginia**

Va. Code Ann. § 18.2-308.04 ........................................................................6

**Washington**

Wash. Rev. Code Ann. § 9.41.070 ..................................................................6

**Wisconsin**

Wis. Stat. Ann. § 175.60 ..............................................................................6

**REGULATIONS**

Cal. Code Regs., Title 11
    § 4263(a) ................................................................................ 9, 11, 45
    § 4282(b) ....................................................................................... 8, 26
    § 4283(b) ....................................................................................... 7, 26
    § 4284.............................................................................................7
    § 4285.............................................................................................7

## TABLE OF AUTHORITIES
### (continued)

Page

§ 4280-4289 ...................................................................................................7

OTHER AUTHORITIES

132 Cong. Rec. H4102-03 (1986)..................................................... 48, 50

4 *Journals of the Continental Congress 1774-1789* (Worthington Chauncey Ford ed., 1906) ................................................................................29

Act of 1776, *in 7 Records of the Colony of Rhode Island & Province Plantations in New England* (Bartlett ed., 1862) ......................................................30

Act of 1777, ch. 6, *in 24 The State Records of North Carolina* (Clark ed., 1905) ...........................................................................30

Act of Dec. 1775, *in The Public Records of the Colony of Connecticut from May, 1775 to June, 1776 inclusive* (Charles J. Hoadly ed., 1890) ................ 29, 30, 33

Act of June 13, 1777, ch. 756, *in 9 The Statutes at Large of Pennsylvania from 1682 to 1801* (1903)..................................................................30

Act of May 1, 1776, ch. 21, *in The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* (1886).........................................30

Act of May 1777, ch. 3, *in 9 The Statutes at Large, being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (Hening ed., 1821) ................................................................30

Act of Sept. 20, 1777, ch. 40 § 20, *in Acts of the General Assembly of the State of New Jersey* (1777) ........................................................ 29, 30

California Department of Justice, Automated Firearms System Personal Information Update, https://tinyurl.com/2rkss72e.............................................27

California Department of Justice, Frequently Asked Questions: Ammunition Purchases, https://tinyurl.com/yt9vhx4p ...........................................9

# INTRODUCTION

Background checks have long been used to prevent persons who are legally prohibited from possessing firearms from doing so. The Supreme Court has endorsed background checks as a legitimate means "to ensure" that "those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). The Court has also recognized that the Second Amendment does not bar "laws imposing conditions and qualifications on the commercial sale of arms," which are "presumptively lawful." *Heller*, 554 U.S. at 626-627 & n.26. Consistent with those principles, state and federal law have for decades required licensed vendors to conduct background checks and to comply with related regulatory requirements for firearms sales.

In 2016, California voters decided that vendors should also conduct background checks for ammunition transactions, to ensure that those who buy rounds for firearms are legally authorized to do so. To carry out that objective, voters established a background check regime for ammunition transactions that is identical in all material respects to the requirements that apply to firearms transactions in the State. Both require vendors to conduct background checks before transferring firearms or ammunition. Both also place certain processing

1

requirements on all transactions, including transactions between residents and out-of-state vendors, to prevent evasion of the background check requirement.

For the same reasons that firearm background check requirements comport with the Second Amendment, ammunition background check requirements likewise comport with the Second Amendment. But the district court nonetheless concluded that the ammunition background check requirements were unconstitutional on their face. The court did not take issue with—and plaintiffs did not challenge—the State's authority to disqualify certain individuals from possessing firearms and ammunition, but held that the Second Amendment confers a right to purchase ammunition without submitting to a background check. That analysis is at odds with the text of the Second Amendment, history, and Supreme Court precedent. The challenged background checks do not infringe presumptively protected conduct. Even if plaintiffs could establish that their claim implicates a right protected by the Second Amendment, the challenged provisions are consistent with "the Nation's historical tradition" of restricting firearms acquisition and carriage to persons who are not law-abiding or responsible, and adopting screening mechanisms to enforce those underlying restrictions. *Bruen*, 597 U.S. at 24. Further, while *Bruen* preserved constitutional challenges to background check requirements that are applied in an abusive manner, there is no record support for

the court's conclusion that California's ammunition background check requirements belong in that category.

Plaintiffs' separate claims that aspects of California's ammunition background check requirements violate the dormant Commerce Clause and are preempted by federal law also fail. California's transaction processing requirements do not discriminate in favor of in-state ammunition vendors. Plaintiffs also have not shown that the challenged requirements impose a substantial burden on interstate commerce, let alone a burden that is clearly excessive when compared to their benefits. In enjoining those provisions, the district court failed to act with the "'extreme caution'" that courts must take before "[p]reventing state officials from enforcing a democratically adopted state law." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023). And because California's requirements do not conflict with a federal safe harbor for the interstate transportation of firearms, they are not preempted.

The district court's judgment should be reversed and the case remanded for entry of judgment in favor of the Attorney General.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over plaintiffs' federal constitutional and preemption claims under 28 U.S.C. § 1331. The district court declared California's ammunition background check requirements unconstitutional and

3

permanently enjoined the Attorney General from enforcing those provisions on January 30, 2024. 1-ER-33–34; *see* 1-ER-2 (citing Cal. Penal Code §§ 30352, 30370(a)-(e), 30312(a)-(b), (d), 30314(a), (c), 30365(a)). The Attorney General appealed on the same day. 4-ER-680. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether California's ammunition background check requirements violate the Second Amendment.

2.     Whether California's laws requiring ammunition transfers to take place in face-to-face transactions by licensed vendors violate the dormant Commerce Clause.

3.     Whether California's law requiring residents bringing ammunition into the State to first deliver that ammunition to a licensed vendor for processing in a face-to-face transaction are preempted by 18 U.S.C. § 926A.

## ADDENDUM OF STATUTORY PROVISIONS

An addendum of pertinent statutory provisions has been filed with this brief. Ninth Cir. R. 28-2.7.

## STATEMENT OF THE CASE

**A.   California's Ammunition Background Check Requirements**

Federal and state law have long prohibited certain groups of people from possessing firearms and ammunition, including felons, certain noncitizens, and the severely mentally ill.  *See, e.g.*, 18 U.S.C. § 922(g); Cal. Penal Code §§ 29800, 30305(a)(1); Cal. Welf. & Inst. Code §§ 8100, 8103.  To enforce the firearm prohibitions, federal law requires licensed firearm dealers to conduct background checks to confirm that purchasers are eligible to possess firearms, and state law has further supplemented those requirements.  18 U.S.C. § 922(t)(1).  In California, commercial vendors must obtain state and federal licenses to sell firearms, and must conduct a background check for each sale.  Cal. Penal Code §§ 26500, 28220; 18 U.S.C. § 922(a), (t)(1).  Transactions between private parties must be processed through licensed firearms dealers, and residents may not import firearms into the State without having the firearms first delivered to a licensed dealer, for transfer after a background check.  Cal. Penal Code §§ 27545, 27585(a).  Many States, including California, also require residents to pass a background check before they may obtain a license to carry their firearms in public.[1]

---

[1] *See* Cal. Penal Code §§ 26150, 26202; Colo. Rev. Stat. § 18-12-205; Conn. Gen. Stat. § 29-28; Del. Code Ann. tit. 11, § 1441; D.C. Mun. Regs. tit 24, § 2338; Haw. Rev. Stat. Ann. § 134-9; 430 Ill. Comp. Stat. 66/35; Md. Code Ann., Pub. Safety § 5-305; Mass. Gen. Laws ch. 140, § 131; Mich. Comp. Laws Ann. § 28.422;

In 2016, California voters enacted Proposition 63 to address "loopholes" in the State's gun safety regime. Prop. 63 § 2(5); *see* 2016 Cal. Stat., Ch. 55 (SB 1235).[2] Among other measures, voters decided that California law should "require background checks for ammunition sales just like gun sales, and stop both from getting into the hands of dangerous individuals." Prop. 63 § 2(7). Five other States require residents to pass a background check or obtain a license (which requires passing a background check) before they may purchase ammunition. *See* Conn. Gen. Stat. §§ 29-38m, 29-38n; 430 Ill. Comp. Stat. 65/2(a)(2), 65/4; Mass. Gen. Laws ch. 140, §§ 131, 131A; N.J. Stat. Ann. §§ 2C:58-3, 2C:58-3.3; N.Y. Penal Law §§ 400.02, 400.03.

Proposition 63's ammunition background check requirements closely track the background check requirements that apply to firearms transactions in the State. Under Proposition 63, any person that sells more than 500 rounds of ammunition in any 30-day period must obtain a license. Cal. Penal Code § 30342(a). All

---

Minn. Stat. Ann. § 624.714; Nev. Rev. Stat. Ann. § 202.366; N.J. Stat. Ann. § 2C:58-4; N.Y. Penal Law § 400.00; N.M. Stat. Ann. § 29-19-5; N.C. Gen. Stat. § 14-415.13; Or. Rev. Stat. § 166.291; 18 Pa. Cons. Stat. Ann. § 6109; Va. Code Ann. § 18.2-308.04; Wash. Rev. Code Ann. § 9.41.070; Wis. Stat. Ann. § 175.60.

[2] Proposition 63 included a provision allowing the Legislature to amend the law. Prop. 63 § 13. While the initiative was circulating, the Legislature enacted Senate Bill 1235, which prospectively amended Proposition 63. 2016 Cal. Stat., Ch. 55 § 19. References to Proposition 63 in this brief are to the law as amended by Senate Bill 1235.

ammunition sales must be processed by licensed vendors. *Id.* § 30312(a)(1). If neither party to a sale is a licensed ammunition vendor, the seller must deliver the ammunition to a licensed vendor to process the transaction. *Id.* § 30312(a)(2). For each transaction, the vendor must conduct a background check. *Id.* §§ 30352(c), 30370; *see* Cal. Code Regs., tit. 11, §§ 4280-4289. Vendors must also record certain information about the transaction, including the purchaser's identifying information and the amount of ammunition acquired, and submit that information to the California Department of Justice. Cal. Penal Code § 30352(a)-(b).

There are two primary types of background checks that purchasers may request.[3] The Basic Check currently costs $19, and authorizes a single transaction for any quantity of ammunition. Cal. Penal Code § 30370(a)(3); Cal. Code Regs., tit. 11, § 4283(b). To run a Basic Check, the vendor submits the purchaser's identifying information to a website, usually by swiping a California driver's license or other government ID through a magnetic reader. *See* Cal. Penal Code § 28180(a). The system then compares the purchaser's identifying information against four state databases. 4-ER-616. If the database search produces a hit,

---

[3] In addition to these methods, California residents may purchase ammunition if they hold a valid certificate of eligibility, which is a license required for selling or manufacturing firearms and ammunition, among other activities. Cal. Code Regs., tit 11, § 4285. Residents may also purchase both firearms and ammunition in a single transaction by passing a firearms background check. *Id.* § 4284.

reflecting that the purchaser may be prohibited from possessing ammunition, a Department of Justice analyst separately reviews the purchaser's information to confirm that the purchaser is prohibited. *Id*. If the database search does not result in a hit, then the transaction is automatically approved, and the vendor may proceed with the sale. *Id*. On average, a Basic Check takes five to six days to process. 3-ER-417–418.

The Standard Check currently costs $1, and provides a streamlined option for purchasers who have an up-to-date entry in the Department of Justice's Automated Firearms System (AFS), which maintains certain firearms ownership records. Cal. Penal Code § 30370(a)(1); Cal. Code Regs., tit 11, § 4282(b). Residents who own firearms that have not been included in the AFS can create an entry by submitting a Firearms Ownership Report to the Department of Justice. 4-ER-619. Because the Standard Check requires the system to query fewer databases to establish the purchaser's eligibility, and does not require any manual record review, it can be processed in a matter of minutes. *See* 3-ER-410. Like the Basic Check, a Standard Check authorizes a single transaction, for any quantity of ammunition.

Under either background check, purchasers who are determined to be prohibited from possessing ammunition are notified by letter, which includes information about how they may contest that designation. 3-ER-543–544; *see* 3-ER-547; 3-ER-549 (sample letters). Purchasers may also be "rejected" from the

8

Standard Check, meaning that their name, address, date of birth, or ID number does not match a current AFS entry.  3-ER-412.  Purchasers may obtain information about the rejection through the Department's website, and may also update their AFS records online so that they may use Standard Checks in the future.  *See* California Department of Justice, Frequently Asked Questions: Ammunition Purchases, https://tinyurl.com/yt9vhx4p.  Alternatively, purchasers rejected from the Standard Check may buy ammunition by passing a Basic Check.

Proposition 63 also established several requirements designed to prevent individuals from circumventing the background check requirement.  California Penal Code Section 30312 requires licensed vendors to process all ammunition transfers in "a face-to-face transaction."  Cal. Penal Code § 30312(b).  Firearm owners may still purchase ammunition "over the Internet or through other means of remote ordering," but the ammunition must be processed by a licensed vendor for delivery in a face-to-face transaction, rather than direct delivery to the purchaser's residence.  *Id.*  Similarly, Section 30314 requires residents who purchased ammunition in other States to first deliver the ammunition to a licensed vendor for processing before bringing it into the State.  *Id.* § 30314(a).  Vendors may charge purchasers an administrative fee to defray the costs of processing such ammunition.  *Id.* § 30312(a)(2); *see* Cal. Code Regs. tit 11, § 4263(a).

9

In the first six months of 2023, 99.2 percent of all ammunition eligibility checks were Standard Checks. 3-ER-409. More than 99 percent of all ammunition background checks were completed in less than one minute, and more than 88 percent were approved in less than one minute. 3-ER-411. Approximately 11 percent of purchasers who requested a Standard Check were rejected. Of those purchasers, over 60 percent successfully purchased ammunition within the same six-month period. *See* 3-ER-415. Since the ammunition background check requirements took effect in 2019, they have prevented hundreds of prohibited persons from purchasing ammunition. *See* 3-ER-422; 3-ER-430; 4-ER-579; 4-ER-583.

## B. Procedural History

### 1. Pre-*Bruen* proceedings

Plaintiffs are California residents, out-of-state ammunition vendors, and an association of California firearm owners. 4-ER-649–656. They assert that California's ammunition background check requirements violate the Second Amendment individually and because of their cumulative effect. Those provisions include: the requirement to perform a background check, Cal. Penal Code § 30370; requirement that all ammunition sales be conducted in face-to-face transactions, *id.* § 30312; prohibition on importing ammunition acquired out-of-state without first delivering the ammunition to a licensed vendor for processing

10

and a face-to-face delivery, *id.* § 30314; recordkeeping and reporting requirements imposed on licensed vendors, *id.* § 30352; and authorization of licensed vendors to charge a fee to store ammunition, Cal. Code Regs, tit. 11, § 4263(a). *See* 4-ER-670–674.[4]  Plaintiffs also allege that the face-to-face transaction requirement codified in California Penal Code Sections 30312 and 30314 violates the dormant Commerce Clause and that Section 30314 is also preempted by 18 U.S.C. § 926A. 4-ER-668–670; 4-ER-676.  They requested a declaration that the requirements are unlawful, and a permanent injunction barring their enforcement.

The district court preliminarily enjoined the challenged provisions. *Rhode v. Becerra*, 445 F. Supp. 3d 902 (S.D. Cal. 2020).  The court concluded that the ammunition background check requirements likely violate the Second Amendment, and that plaintiffs were also likely to succeed on their dormant Commerce Clause claims. *Id.* at 948, 953.  The Attorney General appealed, and a divided panel of this Court granted a stay pending appeal.  No. 20-55437, C.A. Dkts. 4, 13.[5]

---

[4] This brief refers to the regulations collectively as the "ammunition background check requirements."

[5] Unless otherwise specified, "Dkt." refers to the district court docket below in No. 3:18-cv-00802, and "C.A. Dkt." refers to the docket in this Court in No. 24-542. Pincites are to the pagination included in the ECF header for the docket entry.

## 2.    Post-*Bruen* proceedings

While the appeal was pending, the Supreme Court issued *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). *Bruen* announced a constitutional framework for evaluating Second Amendment claims that is "centered on constitutional text and history." *Id.* at 22. Under *Bruen*, the initial inquiry is whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If so, "the Constitution presumptively protects that conduct," and "the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

Following *Bruen*, this Court vacated the district court's preliminary injunction in its entirety and remanded for further proceedings. No. 20-55437, C.A. Dkt. 110. On remand, the district court consolidated a hearing in this matter with hearings in three other matters involving Second Amendment challenges to California's firearms and ammunition regulations. *See* Dkts. 77, 78.[6] The district court ordered the parties across all matters to submit additional briefing relevant to *Bruen*'s standards. *See* 4-ER-693–694.

The district court then set a new hearing on plaintiffs' motion for a preliminary injunction. 3-ER-503. The court stated that it intended to consolidate

---

[6] The other three matters are also currently pending on appeal. *See Miller v. Bonta*, No. 23-2979; *Duncan v. Bonta*, No. 23-55805; *Fouts v. Bonta*, No. 24-1039.

the hearing with a trial on the merits, but also ordered the parties to be prepared to address "[w]hether additional discovery is necessary, and if so, the specific discovery needed." 3-ER-504. At the hearing, the district court reiterated that it was "considering dealing with this case in one fell swoop, that is, doing [the] preliminary injunction order along with [a] trial on the merits or using a summary judgment procedure," but ultimately allowed the parties to engage in discovery, and to file additional declarations. Dkt. 91 at 2-3; *see* 4-ER-694–695 (July 17, 2023 minute entry). The parties then submitted final briefs summarizing their legal contentions, and each side requested that the court enter judgment in their respective favor. Dkt. 103 at 33; Dkt. 104 at 26.

In January 2024, the district court permanently enjoined the ammunition background check requirements. 1-ER-3–34. As to *Bruen*'s threshold inquiry, the district court reasoned that "acquiring ammunition is conduct covered by the plain text of the Second Amendment." 1-ER-10. The court acknowledged that *Heller* had recognized certain measures to be presumptively lawful, including "conditions and qualifications on the commercial sale of arms," *see* 554 U.S. at 627, but concluded that "ammunition regulations are not among them." 1-ER-13. The court alternatively held that any applicable presumption had been rebutted, because the 11 percent rate of Standard Check rejections demonstrated that the ammunition background check requirements had been put to "abusive ends." 1-ER-18; *see* 1-

13

ER-14–18.  With respect to *Bruen*'s historical inquiry, the district court concluded that the State had failed to identify sufficient historical analogues to the challenged provisions, and concluded that they "have no historical pedigree."  1-ER-33.

Turning to plaintiffs' dormant Commerce Clause claim, the district court held that the requirement to transfer ammunition in a face-to-face transaction constituted "purposeful discrimination" against out-of-state ammunition vendors. 1-ER-30; *see* Cal. Penal Code §§ 30312, 30314.  Finally, the court held that California Penal Code Section 30314 was preempted by 18 U.S.C. § 926A, a federal statute that provides a safe harbor for the interstate transportation of certain firearms.  The court reasoned that California's requirement that residents bring ammunition obtained out of the State to licensed vendors for processing "conflict[s] with and stand[s] as an obstacle to" the purposes of the safe harbor, "which include the free transport of firearms and ammunition across state lines." 1-ER-30–31.

The Attorney General appealed and sought a stay pending appeal in this Court.  A motions panel of this Court granted a stay.  C.A. Dkt. 8.

14

## SUMMARY OF THE ARGUMENT

The threshold inquiry under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) is whether plaintiffs have carried their burden to establish that the Second Amendment protects their proposed course of conduct. Plaintiffs do not dispute the principle that certain individuals are legally ineligible to purchase ammunition. But plaintiffs claim a Second Amendment right to purchase ammunition without first submitting to California's background check requirements. That claim is untenable. The Second Amendment does not give plaintiffs a right to purchase ammunition without administrative checks to guard against the acquisition of ammunition by prohibited persons. The Supreme Court has endorsed background checks as a condition for public carry licenses, and there is no reason to apply a different rule for ammunition transactions. And while the Supreme Court did not "rule out" that "lengthy" processing times or "exorbitant" fees might in certain circumstances amount to the denial of a Second Amendment right, the record does not support the district court's view that California's ammunition background checks present constitutional concerns.

Although this Court does not need to go any further to reverse the district court, this Nation's historical tradition also demonstrates that the ammunition background check requirements are constitutional. Throughout history, legislatures have disarmed certain classes of individuals who would present a

15

danger to themselves and the community if allowed to possess firearms or ammunition. Background checks are "relevantly similar" to other historical screening mechanisms, including founding-era oaths used to enforce disarmament requirements, and Reconstruction-era licensing requirements for firearms and other deadly weapons. In addition, the related requirements that the State uses to ensure an effective background check system—including vendor licensing and recordkeeping requirements—are all longstanding features of firearms regulation.

Plaintiffs' dormant Commerce Clause claim also fails. The core concern of that doctrine is to prohibit protectionist measures that benefit in-state economic interests by discriminating against out-of-state competitors. But California's requirements apply evenhandedly. All vendors, regardless of location, may sell ammunition remotely to consumers, so long as the final delivery occurs through a licensed ammunition vendor in a face-to-face transaction, following a background check. Plaintiffs also have not met their burden of demonstrating that those requirements substantially burden interstate commerce, and there is therefore no need to conduct the balancing inquiry set out in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Even if the Court were to conduct that inquiry, plaintiffs have not shown that any burden on interstate commerce is "clearly excessive" in relation to the benefits of the challenged provisions. *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 173 (2018).

16

Finally, federal law does not preempt California Penal Code Section 30314, which requires residents to deliver ammunition purchased from other States to a licensed vendor within California for processing and a background check. Plaintiffs contend that the statute is preempted by a federal law that provides a limited safe harbor for the interstate transportation of firearms. 18 U.S.C. § 926A. The safe harbor does not apply to ammunition. Even if it did, the safe harbor incorporates—rather than displaces—the legal requirements of the destination State. There is no indication, either in the statutory text or legislative history, that Congress intended the statute to broadly preempt state and local regulation of firearms and ammunition.

## STANDARD OF REVIEW

The Attorney General appealed after the district court granted summary judgment to plaintiffs. While the parties did not formally style their submissions as summary judgment briefs, both sides requested judgment as a matter of law based on their post-*Bruen* briefing and the state of the evidentiary record following discovery. Dkt. 103 at 33; Dkt. 104 at 26. The district court then entered judgment in plaintiffs' favor on all claims, without holding an evidentiary hearing or conducting a trial. This Court reviews "the legal conclusions supporting declaratory judgments and permanent injunctions granted at summary judgment de

17

novo." *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022).

## ARGUMENT

### I. CALIFORNIA'S AMMUNITION BACKGROUND CHECK REQUIREMENTS COMPORT WITH THE SECOND AMENDMENT

The Second Amendment codifies a right that, "like most rights, . . . is not unlimited.'" *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)); *see also McDonald v. City of Chicago*, 561 U.S. 742, 789 (2010). The Supreme Court has described the right as belonging only to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. *Bruen* reiterated that limitation numerous times in describing the Second Amendment's scope. *See Bruen*, 597 U.S. at 9, 15, 26, 29-31, 34, 38, 60, 70-71, & nn.8-9. The Court has also emphasized that governments may "impos[e] conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-627. Applying those principles and *Bruen*'s framework, California's ammunition background check requirements comport with the Second Amendment.

### A. Plaintiffs Have Not Established That the Ammunition Background Check Requirements Regulate Conduct Presumptively Protected by the Second Amendment

The threshold question under *Bruen* is whether plaintiffs have carried their burden of establishing that "the Constitution presumptively protects" their

18

proposed course of conduct. *Bruen*, 597 U.S. at 24; *cf. Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005). To answer that question, courts must consider whether the "Second Amendment's plain text covers [the] conduct," in light of "the normal and ordinary meaning of the Second Amendment" as well as its "historical background." *Bruen*, 597 U.S. at 20, 24 (internal quotation marks omitted).

While the plain text of the Second Amendment does not explicitly refer to ammunition, that does not end the matter. This Court has held that the Second Amendment protects "ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc). For instance, "'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), *abrogated on other grounds by Bruen*, 597 U.S. 1.

Plaintiffs do not dispute that California may prohibit certain individuals from possessing ammunition consistent with the Second Amendment. They instead allege that the requirement to submit to a background check, and the channeling of ammunition sales through licensed vendors for face-to-face transactions, impose burdens that infringe their constitutional rights. For instance, plaintiffs allege that they would have ammunition shipped directly to their homes but for California's

19

face-to-face transaction requirement. *See, e.g.*, 4-ER-650 ("But for [the challenged provisions], Plaintiff Rhode would immediately resume receiving ammunition via direct shipments to her home"); 4-ER-653 (Plaintiff Welvang "would immediately purchase, and continue to purchase, ammunition for self-defense and other lawful purposes via direct shipment to her home from out of state ammunition vendors or through brick and mortar retail stores in California and other states"). The Second Amendment does not confer any such right.

### 1.   The ammunition background check requirements are presumptively lawful

Plaintiffs cannot show that the Constitution presumptively protects a right to purchase ammunition without complying with any background check requirements. Indeed, those requirements fall within a class of regulations that the Supreme Court has declared to be presumptively lawful.[7] In *Heller*, the Court

---

[7] A recent decision issued by a three-judge panel of this Court held that "'[s]imply repeat[ing] *Heller*'s language' about the 'presumptive[] lawful[ness]' of felon firearm bans will no longer do after *Bruen*." *See United States v. Duarte*, ___F.4th ____, 2024 WL 2068016, at *7 (9th Cir. May 9, 2024) (internal quotation marks omitted). Rather, the decision states that courts must assess whether "*any* regulation infringing on Second Amendment rights . . . is consistent with this nation's historical tradition of firearm regulation." *Id.* But *Duarte* involved only prohibitions on the possession of firearms by felons, an issue that is not presented in this case, and the Court did not address the constitutionality of licensing or background check laws. Moreover, the United States recently filed a petition for rehearing en banc in *Duarte* and asked for "expedite[d] consideration," No. 22-50048, C.A. Dkt. 72 at 7; the response to that petition is currently due by May 30, 2024. C.A. Dkt. 73. To the extent this Court views *Duarte* as controlling the

20

identified a non-exhaustive list of regulations, including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," and "conditions and qualifications on the commercial sale of arms," which comport with the Second Amendment. 554 U.S. at 626-627 & n.6; *see also Bruen*, 597 U.S. at 70 (reaffirming that the Second Amendment right is "subject to certain reasonable, well-defined restrictions"). Accordingly, "[t]o determine whether a challenged law falls outside the historical scope of the Second Amendment," this Court must "ask whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*." *Jackson*, 746 F.3d at 960; *see Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016), *abrogated on other grounds by Bruen*, 597 U.S. 1 (Thomas, C.J., concurring) (10-day waiting period after firearms purchase set presumptively lawful condition); *Teixeira*, 873 F.3d at 690 (Owens, J., concurring) (zoning requirements for firearms dealers set presumptively lawful conditions).

Consistent with this understanding of the Second Amendment's scope, the Supreme Court has also endorsed the use of "background check[s]" and other measures that are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38

---

analytical framework for assessing the constitutionality of background checks at the time it considers this appeal, the Attorney General preserves this argument for potential future review.

21

n.9.  *Bruen* considered New York's licensing requirement for the public carry of firearms.  *Id.* at 13-14.  The Court invalidated one aspect of New York's scheme—the requirement that an applicant demonstrate a "special need for self-defense" to obtain a license, which prevented "law-abiding citizens with ordinary self-defense needs" from exercising their right to public carry.  *Id.* at 11, 60; *see id.* at 76 (Alito, J., concurring) (noting that this requirement made it "virtually impossible for most New Yorkers" to carry firearms in public).  The Court contrasted that requirement with "shall-issue" licensing regimes, which require applicants to "undergo a background check or pass a firearms safety course" to obtain a license.  *Bruen*, 597 U.S. at 38 n.9.  Without performing any historical analysis, the Court explained that such requirements are consistent with the Second Amendment, because "they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry."  *Id.* (internal quotation marks omitted); *see also id.* at 80 (Kavanaugh, J., concurring) (shall-issue regimes "may require . . . a background check" and states employing such laws "may continue to do so").  Courts have understood *Bruen* and *Heller* to indicate that "background checks . . . are presumptively constitutional."  *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024); *see also Vincent v. Garland*, 80 F.4th 1197, 1201-1202 (10th Cir. 2023); *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023).

Those principles, taken together, establish that California's ammunition background check requirements are also presumptively constitutional. The core requirement of the challenged laws is to require licensed vendors to perform background checks before transferring ammunition. Cal. Penal Code § 30370; *see supra* pp. 6-9. In addition, the challenged laws channel ammunition transfers through licensed vendors, and require those vendors to hand over ammunition in face-to-face transactions. Cal. Penal Code §§ 30312, 30314, 30370. Such requirements "backstop[]" the background check scheme "by ensuring that individuals can't dodge their home-state's . . . requirements simply by obtaining [ammunition] from out of state," or through remote ordering. *United States v. Libertad*, 681 F. Supp. 3d 102, 112 (S.D.N.Y. 2023) (upholding federal criminal prohibition on interstate transfers of firearms by unlicensed parties). Like the firearms background checks endorsed in *Bruen*, California's ammunition background check requirements do not operate on their face to prevent any person from keeping or bearing arms, but set conditions on ammunition transactions to "ensure only that those" purchasing ammunition are "in fact, 'law-abiding, responsible, citizens.'" *Bruen*, 597 U.S. at 38 n.9. And because the remaining recordkeeping and fee requirements likewise impose only related conditions on ammunition transactions, they also do not regulate conduct presumptively protected by the Second Amendment.

23

The district court distinguished the ammunition background check requirements from the regulations endorsed in *Heller*, reasoning that "[w]hatever firearm regulations may be thought of as presumptively lawful under *Heller*, ammunition regulations are not among them." 1-ER-13. The court relied on *Jackson*'s statement that "*Heller* does not include ammunition regulations in the list of 'presumptively lawful' regulations." *Id.* (quoting *Jackson*, 746 F.3d at 968). But *Jackson* could not have superseded *Heller*'s statement that its list "d[id] not purport to be exhaustive." 554 U.S. at 627 n.26. And *Jackson* considered a different type of regulation altogether: a *ban* on the sale of a particular type of ammunition. 746 F.3d at 962. It did not consider any requirement setting only a "condition" on ammunition sales, or a regulation designed to screen out those who are not "'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9.

The district court did not identify any other reason why the constitutional inquiry should differ where a regulation concerns ammunition background checks, rather than firearm background checks. Nor is there an evident justification for applying a *more* stringent analysis to regulations addressing ammunition, rather than firearms. That result would be anomalous, given that the Second Amendment does not explicitly protect ammunition, which instead falls within the Second Amendment's "ancillary" protection for "rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira*, 873 F.3d at 677.

24

###### 2.     The ammunition background check requirements are not abusive

The district court held in the alternative that even if the ammunition background check requirements could be considered presumptively lawful, any presumption "ha[d] been overcome," because the system had been "put to abusive ends." 1-ER-18. The court relied on *Bruen*'s statement that it would not "rule out" that an otherwise presumptively lawful regulation might implicate protected conduct "where, for example, lengthy wait times . . . or exorbitant fees deny ordinary citizens" their Second Amendment rights. 597 U.S. at 38 n.9. But that observation could not support the district court's facial invalidation of California's ammunition background check requirements. *See, e.g.*, *id.* at 80 (Kavanaugh, J., concurring) (referring to such challenges as "as-applied challenges" for licensing regimes that "do[] not operate in [a constitutional] manner in practice"). In any event, the record does not reflect that the ammunition background check requirements are anywhere near abusive.

While the district court gave plaintiffs the opportunity to submit declarations describing their alleged injuries with particularity, no plaintiff described the kind of oppressive conduct that *Bruen* suggested might give rise to a constitutional claim. *See* 2-ER-51–98. The record does not reveal any abusive conduct, either. The challenged provisions offer two primary mechanisms for satisfying the background check requirement, and both allow the purchase of any quantity of

25

ammunition in a single transaction. Neither imposes an exorbitant fee: the Basic Check costs $19, and the Standard Check costs $1 under current regulations. Cal. Code Regs., tit. 11, §§ 4282(b), 4283(b). Nor do the requirements produce unreasonable wait times. The Basic Check can usually be completed within five or six days. 3-ER-417, 3-ER-431; *cf. McRorey*, 99 F.4th at 840 ("[T]here is some point at which a background check becomes so lengthy that it is 'put towards abusive ends' . . . [b]ut a period of 10 days does not qualify." (internal quotation marks omitted)). And firearm owners who wish to purchase ammunition more quickly may use the expedited Standard Check, which can be completed within minutes. 3-ER-410; 3-ER-422. In the first six months of 2023, the overwhelming majority of ammunition background checks conducted were Standard Checks. 3-ER-409. Taking all types of background checks into account, over 99 percent of all background checks were completed in less than one minute, and over 88 percent of all purchasers were approved in less than one minute. 3-ER-411.

The district court focused narrowly on the rejection rates for Standard Checks. *See* 1-ER-15-16. But those rates do not support a constitutional violation. The district court noted that 11 percent of individuals were rejected following a Standard Check in the first six months of 2023. 1-ER-15. Of that proportion, 85 percent were rejected because the purchasers' name or address did not match a current AFS entry, or because the purchaser could not be associated with an AFS

26

entry at all. 3-ER-414. The remaining 15 percent of rejections were due to other mismatches. *See* 3-ER-423–425. But a rejection from the Standard Check is not a determination that the purchaser is ineligible to possess ammunition: it only means that the purchaser cannot use the expedited process that the State makes available for those with up-to-date AFS records. *See* 3-ER-412. Those who are rejected from the Standard Check may alternatively purchase ammunition by requesting and passing a Basic Check. They may also continue to use the Standard Check after updating their AFS records online; the Department's website provides instructions on how to do so. *See* California Department of Justice, Automated Firearms System Personal Information Update, https://tinyurl.com/2rkss72e.

The record reflects that many purchasers who were rejected from the Standard Check were able to purchase ammunition at a later date. 3-ER-415. While the record is unclear as to why others did not, those rejections could not possibly support the court's holding that the ammunition background check requirements facially violate the Second Amendment.

### B. California's Ammunition Background Check Requirements Are Consistent with Historical Tradition

Even if this Court were to hold (or assume) that the Second Amendment protects a right to purchase ammunition without complying with the State's ammunition background check requirements, those provisions are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear

27

arms." *Bruen*, 597 U.S. at 20.  As the Supreme Court has recognized, legislatures

may disarm certain individuals consistent with the Second Amendment.  *See id.* at

38 n.9; *see also United States v. Perez-Garcia*, 96 F.4th 1166, 1189 (9th Cir.

2024); *United States v. Daniels*, 77 F.4th 337, 353 (5th Cir. 2023); *United States v.

Jackson*, 69 F.4th 495, 504 (8th Cir. 2023).  That includes, for instance,

"longstanding prohibitions on the possession of firearms by felons and the

mentally ill," *Heller*, 554 U.S. at 626, and restrictions on noncitizens, 18 U.S.C.

§ 922(g)(5).  The challenged provisions are an essential means for the government

to determine whether an individual falls within such a group.  And they are directly

analogous to the regulatory requirements that legislatures have adopted throughout

history to ensure that those who obtain firearms and ammunition may lawfully

possess it.

    The historical analysis required by *Bruen* is not meant to impose "a regulatory

straightjacket."  597 U.S. at 30.  The Second Amendment does not bind

governments to the same forms of regulations that were adopted in the past, but

allows "state and local experimentation."  *McDonald*, 561 U.S. at 785.  To ensure

that flexibility, *Bruen* does not require the government to identify a "historical

*twin*" or a "dead ringer," but allows the government to justify a regulation by

establishing that it falls within a historical tradition of regulations that are

28

"relevantly similar," meaning that they "impose a comparable burden on the right of armed self-defense" that is "comparably justified."  597 U.S. at 29-30.

> **1.    Throughout American history, governments have required individuals to demonstrate eligibility to possess and carry firearms**

Historical analogues confirm that the challenged provisions comport with the Second Amendment.  The relevant historical tradition dates back to before the founding.  At the start of the Revolutionary War, the Continental Congress recommended the disarmament of loyalists and those "notoriously disaffected to the cause of America."  4 *Journals of the Continental Congress 1774-1789* 205 (Worthington Chauncey Ford ed., 1906); *see Perez-Garcia*, 96 F.4th at 1186-1189.  Many colonies followed suit, and enacted disarmament provisions.  *See, e.g.*, Act of Dec. 1775, *The Public Records of the Colony of Connecticut from May, 1775 to June, 1776 inclusive* 193 (Charles J. Hoadly ed., 1890) (disarming any person "duly convicted" of "libel or defam[ation]" of "the resolves of the Honorable Congress of the United Colonies, or the acts and proceedings of the General Assembly of this Colony").

These disarmament provisions often applied to ammunition as well as firearms.  For instance, a New Jersey statute authorized officials to seize "all of the Arms, Accoutrements, and Ammunition which they own or possess" from "Persons as they shall judge disaffected."  Act of Sept. 20, 1777, ch. 40 § 20, *Acts*

*of the General Assembly of the State of New Jersey* 90 (1777). A Rhode Island law

authorized confiscation of "all arms, ammunition, and war like stores" from

loyalists. Act of 1776, 7 *Records of the Colony of Rhode Island & Province*

*Plantations in New England* 567 (Bartlett ed., 1862).

To carry out those measures, colonial legislatures also enacted regulatory

requirements that were designed to determine whether individuals were prohibited

from possessing arms. In 1777, Pennsylvania required all "male white inhabitants"

to "take and subscribe" to a loyalty oath before a justice of the peace. Act of June

13, 1777, ch. 756, 9 *The Statutes at Large of Pennsylvania from 1682 to 1801* 111

(1903). The justices were also required to "keep fair registers of the names and

surnames of the person so sworn or affirmed," and those who "refus[ed] or

neglecte[d] to take and subscribe the said oath" were to be "disarmed by the

lieutenant or sub-lieutenants of the cities or counties respectively." 9 *Statutes at*

*Large of Pennsylvania* 112-113. Connecticut, Massachusetts, Rhode Island, North

Carolina, New Jersey, and Virginia all required similar oaths.[8]

---

[8] Act of Dec. 1775, *The Public Records of the Colony of Connecticut from May,*
*1775 to June, 1776 inclusive* 193; Act of May 1, 1776, ch. 21, §§ 1-2, 5 *The Acts*
*and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-81
(1886); Act of 1776, 7 *Records of the Colony of Rhode Island & Province*
*Plantations in New England* 567; Act of 1777, ch. 6, § 9, 24 *The State Records of*
*North Carolina* 89 (Clark ed., 1905); Act of Sept. 20, 1777, ch. 40 § 20, *Acts of the*
*General Assembly of the State of New Jersey* 90; Act of May 1777, ch. 3, 9 *The*

During Reconstruction, legislatures continued to establish eligibility criteria that residents were required to satisfy before they could lawfully keep and bear arms. Such criteria included additional loyalty oaths: citizens in the former Confederate states were required to take "ironclad" loyalty oaths before they could exercise important rights and privileges. *See* 3-ER-366–370; 3-ER-370 (noting that Tennessee "impose[d] ironclad oaths vigorously" and "restrict[ed] . . . gun-access generally to those who took the ironclad oath"). The "[n]ames of oath-takers were recorded in a log book" that "acted in effect as a database for local law enforcement officers of who could be entrusted with the privileges of citizenship," including "the purchase and sale of firearms and ammunition." 3-ER-372.

In addition to loyalty oaths, 19th century legislatures also established eligibility criteria targeted at identifying those who were not law-abiding, responsible citizens more generally. That development was spurred in part by an influx of "cheap, prolific, [and] reliable" handguns, which created new threats to public safety. 2-ER-104. By the 1880s, "gunmakers had completed the transition from craft to industry," and the rise of handgun mail-order purchasing "brought cheap handguns to buyers' doors." *Id.* Throughout this period, State and local legislatures required residents to acquire licenses after satisfying "review criteria as

---

*Statutes at Large, being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619* 281-283 (Hening ed., 1821).

31

conducted by local officials" before they were entitled to publicly carry deadly weapons.  2-ER-110.

For instance, an 1876 Hyde Park, Illinois ordinance banned the concealed carry of firearms "except by written permission of the Captain of Police."  2-ER-183–184; *see also* 2-ER-265 (Salt Lake City ordinance declaring the concealed carry of deadly weapons unlawful "without the permission of the mayor first had and obtained"); 2-ER-209 (similar St. Louis ordinance); *see* 2-ER-112–120.  An 1881 New York ordinance authorized the issuance of licenses to carry pistols "of any description" to residents and non-residents alike, if the individual presented himself to a local officer for examination, and the local officer was "satisfied that the applicant is a proper and law abiding person."  2-ER-227–228; *see also* 2-ER-244 (1898 Oregon City ordinance authorizing the mayor to grant permission to concealed carry "when upon proper representation . . . it appears to him necessary or prudent to grant such permission").  During the same period, many jurisdictions also adopted surety laws "that required certain individuals to post bond before carrying weapons in public," as a method of insurance for any ensuing breaches of the peace.  *Bruen*, 597 U.S. at 55; *see id.* at 55-60 & n.23 (collecting examples).

In addition to these eligibility criteria, founding and Reconstruction-era regulations imposed other conditions on the commercial market for firearms and ammunition more generally.  *See Teixeira*, 873 F.3d at 685 (describing colonial-era

regulations on the sale and transfer of arms). Such laws included colonial and state regulations that required vendors who manufactured or sold gunpowder to obtain a license. *See*, *e.g.*, 2-ER-198 (1651 Massachusetts statute requiring individuals to obtain "license . . . from some two of the Magistrates" to export gunpowder out of the colony, "upon penalty of forfeiting all such powder"); Act of Dec. 1775, ch. 526, *Public Records of the Colony of Connecticut* 191 (prohibiting the export of gunpowder manufactured in the colony "without the licence of the General Assembly or his Honor the Governor and Committee of Safety"). And as firearms became more lethal and widely available towards the end of the 19th century, legislatures required commercial firearms sellers to obtain certain identifying information from purchasers and to keep records available for inspection. *See*, *e.g.*, 1881 Ill. Laws. 73, 73-74 (requiring "all persons dealing in deadly weapons" to "keep a register of all such weapons sold or given away by them"); Act of July 13, 27 Stat. 116, 116-117 (1892) (federal law requiring firearm sellers in the District of Columbia to "keep a written register of the name and residence of every purchaser" and make the same available for police inspection); *see* 2-ER-125–126.

**2.     The ammunition background check requirements are relevantly similar to that historical tradition of firearms regulation**

The operative question is whether California's ammunition background check requirements are "relevantly similar" to our Nation's historical tradition of

regulation. *Bruen*, 591 U.S. at 29.  Under this inquiry, the "*central* considerations"
are "whether modern and historical regulations impose a comparable burden on the
right of armed self-defense" and "whether that burden is comparably justified." *Id.*
(internal quotation marks omitted).

California's ammunition background check requirements fit within this
historical tradition.  They impose a minimal burden on lawful purchasers' right to
keep and bear arms for lawful self-defense, as they require only minor fees and
short wait times.  *Supra* pp. 7-8.  That burden is no more severe than the burdens
imposed on lawful purchasers by founding and Reconstruction-era laws.  And the
administrative conditions that California's laws establish to ensure the effective
operation of its background check scheme—such as vendor licensing and
recordkeeping requirements—are similar to other regulatory requirements that
governments have adopted throughout history.  *Supra* pp. 32-33.  Finally, the
ammunition check requirements are also comparably justified.  Similar to their
historical predecessors, they impose incidental requirements on purchasers and
vendors in order to prevent prohibited persons from acquiring ammunition.  *Cf.*
*N.Y. State Firearms Ass'n v. James*, 2024 WL 1932050, at *6-9 (W.D.N.Y. May 2,
2024) (holding that New York's ammunition background check requirements were
supported by historical tradition).

34

### 3.   The district court applied a flawed historical analysis

The district court invalidated the ammunition background check requirements after applying a fundamentally flawed historical analysis.  For instance, while the district court recited *Bruen*'s instruction that the government need not identify "a historical twin" or "a dead ringer for historical precursors," it did not apply that guidance.  1-ER-19.  The district court acknowledged that "since the Founding, some citizens were dangerous and presented a risk of armed violence to others."  1-ER-21.  And the court also observed that "[b]ackground checks in some form must have been performed in the many nineteenth century cases where licenses were required for carrying concealed firearms."  1-ER-22; *see also id.* (noting that there were "a lot of" nineteenth century firearm licensing schemes).  The court nonetheless concluded that those precursors could not support California's restrictions, because the Attorney General did not produce an example of a "historical law that required a citizen to pass a background check in order to purchase ammunition."  1-ER-21 (emphasis added).

As this Court recently explained, *Bruen* does not require courts to "isolate each historical precursor and ask if it differs from the challenged regulation in some way."  *Perez-Garcia*, 96 F.4th at 1191.  Rather, a court must "examine the historical evidence as a whole" and "determin[e] whether it establishes a tradition of permissible regulation . . . and whether the historical precedent and the modern

regulation are 'relevantly similar.'" *Id.* (quoting *Bruen*, 597 U.S. at 27). The Attorney General presented evidence of a historical tradition of requiring individuals to satisfy requirements designed to confirm their legal eligibility to possess weapons. While that tradition includes regulations that applied to ammunition, *see supra* pp. 29-30, restrictions that applied exclusively to firearms imposed comparable burdens and were supported by comparable justifications, and therefore are relevantly similar to California's ammunition background check requirements.

The district court's unduly strict understanding of *Bruen* led it to overlook other evident similarities between historical laws and the challenged provisions. For instance, the district court set aside founding-era disarmament laws because they "served to distinguish among the people within a new state" and "those who still considered themselves subjects of King George with no interest in becoming new citizens." 1-ER-27. Because "individuals who refused to pledge their allegiance were considered non-citizens," they were not entitled to the "rights and privileges" of citizenship, including the right to keep and bear arms. *Id.* That analysis misses the point. What matters is that at the founding, the early States believed they retained authority to subject *all* residents—loyal and disloyal—to an oath as a condition of possessing firearms and ammunition. The ammunition background check requirements operate in a similar manner: they require *all*

36

purchasers to submit to background checks to confirm that they are part of the

"law-abiding, responsible" populace that is entitled under the Constitution to keep

firearms and ammunition for lawful self-defense. *Bruen*, 597 U.S. at 26.

The court also discounted laws enacted after the ratification of the Fourteenth

Amendment in 1868, including the licensing requirements for firearms and deadly

weapons (*see supra* pp. 31-32) as too late to shed light on the Second

Amendment's scope. *See* 1-ER-19–20.  That ignores *Bruen*'s teaching that post-

ratification evidence can "settle the meaning" of the Constitution.  *Bruen*, 597 U.S.

at 36 (internal quotation marks omitted); *Heller*, 554 U.S. at 605 (explaining that

inquiry into post-ratification evidence "is a critical tool of constitutional

interpretation").  Just as it is "implausible that the public understanding" of the

right to keep and bear arms "would arise" only in 1791, it is equally "implausible"

that it "would promptly dissipate whenever [the founding] era gave way to

another." *Antonyuk v. Chiumento*, 89 F.4th 271, 304 (2d. Cir. 2023).

Finally, the district court's repeated suggestion that a permitting requirement

would be preferable to a background check requirement for each transaction is

irrelevant.  *See* 1-ER-6, 1-ER-23, 1-ER-33.  If anything, the district court's belief

that an ammunition permitting regime would "clearly be a more reasonable

constitutional approach," 1-ER-6—but that the challenged ammunition background

check regime is "an outlier that our ancestors would have never accepted," 1-ER-

28—demonstrates the rigidity of the court's analysis. By according constitutional significance to minor variations in policy, the district court improperly constrained the State from regulating firearms and ammunition, and in precisely the way that the Supreme Court warned against. *See Bruen*, 597 U.S. at 30.

## II. SECTIONS 30312 AND 30314 DO NOT VIOLATE THE DORMANT COMMERCE CLAUSE

The district court enjoined enforcement of California Penal Code Sections 30312 and 30314, which require ammunition transfers in the State to take place in face-to-face transactions with licensed vendors. The court concluded that those requirements discriminate against out-of-state ammunition vendors in violation of the dormant Commerce Clause. The court's analysis misapplies the law and misreads the record.

Although the Commerce Clause is a positive grant of power to Congress, it has also been recognized "as a self-executing limitation" on the States' authority to discriminate against interstate commerce. *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris*, 729 F.3d 937, 947 (9th Cir. 2013). The "dormant" Commerce Clause "prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (internal quotation marks and alterations omitted).

This "antidiscrimination principle" is "the 'very core' of [the Supreme Court's] dormant Commerce Clause jurisprudence." *Id.*

Given that focus, the first question in addressing any dormant Commerce Clause challenge is whether the challenged statute discriminates against out-of-state entities in favor of in-state interests. *See Int'l Franchise Ass'n, Inc. v. Seattle*, 803 F.3d 389, 399 (9th Cir. 2015). "Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Nat'l Pork*, 598 U.S. at 390.

### A.  The Face-to-Face Transaction Requirement Does Not Discriminate Against Interstate Commerce

Plaintiffs' claim that the challenged provisions impermissibly discriminate against out-of-state commerce in violation of the dormant Commerce Clause is meritless. A statute that treats in-state and out-of-state entities alike is not discriminatory. *See Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009). The challenged laws require all ammunition transfers to a transferee in California to be processed in a face-to-face transaction following a background check, regardless of the vendors' location. Cal. Penal Code § 30312(b). Out-of-state vendors may still sell ammunition to California residents; if they do not have a physical presence and license in California, the law requires that they deliver the ammunition to a licensed

39

ammunition vendor for delivery to the transferee in a face-to-face transaction. *Id.*

§ 30312(a)(2), (b). That is not a special condition that applies only to out-of-state

vendors. *All* in-state licensed vendors are required to conduct transactions face-to-

face. *Id.* § 30312(b). And like out-of-state vendors, in-state vendors that lack a

license—including private individuals, businesses that sell fewer than 500 rounds

of ammunition per month, and those who lack a brick-and-mortar location at which

to process sales—must also have their ammunition transfers processed through

licensed vendors. *See id.* § 30312(a)(2).

The district court's contrary holding misunderstands the face-to-face

transaction requirement. The court concluded that the challenged laws were

"much like" the laws considered in *Granholm v. Heald*, 544 U.S. 460 (2005). 1-

ER-29. *Granholm* addressed state laws that authorized "in-state wineries to sell

wine directly to consumers in th[e] state" but "prohibit[ed] out-of-state wineries

from doing so." 544 U.S. at 466. It was "evident that the object and design" of the

laws at issue was "to grant in-state wineries a competitive advantage over wineries

located beyond the States' borders." *Id.* The Court concluded that such

"differential treatment between in-state and out-of-state wineries constitute[d]

explicit discrimination against interstate commerce." *Id.* at 467; *see also Dean*

*Milk Co. v. Madison*, 340 U.S. 349, 352-353 (1951) (invalidating ordinance that

40

prohibited the sale of pasteurized milk within city limits unless it was processed within five miles of the city center).

But unlike the laws at issue in *Granholm*, California law imposes uniform requirements on in-state and out-of-state vendors. Under Section 30312(b), no vendor anywhere in the United States, whether in or out of California, may ship ammunition directly to the consumer, because all transfers must take place in face-to-face transactions with licensed vendors. And because California law offers a mechanism for all unlicensed vendors (including out-of-state vendors) to satisfy that requirement—delivery to a licensed vendor for processing—there is no differential treatment that would implicate the dormant Commerce Clause. This Court upheld a similar regulatory requirement in *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1234-1235 (9th Cir. 2010). That case considered an Arizona law that authorized direct shipments of wine to Arizona residents "only if the consumer is physically present at the winery when he buys the wine." *Id.* at 1228. The Court upheld the law, explaining that States may "limit direct shipment[s]" consistent with *Granholm,* "so long as the limitations treat in-state and out-of-state wineries in the same manner." *Id.* at 1234. The court concluded that Arizona's law was constitutional because it "treat[ed] in-state and out-of-state wineries the same" and did not impose any "differential treatment." *Id*. The same is true here.

41

### B.    The Face-to-Face Transaction Requirement Should Be Upheld Under *Pike*

Plaintiffs argued below that the face-to-face transaction requirement failed the balancing framework set out in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). The district court concluded that plaintiffs were likely to succeed as to that claim in its preliminary injunction order, and incorporated that analysis into its final judgment.  *See* 1-ER-29 ("readopt[ing]" reasoning "set out more fully" in *Rhode*, 445 F. Supp. 3d at 948-953).

Under *Pike*, "[s]tate laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 172 (2018).  In *National Pork*, the Supreme Court emphasized that "'no clear line' separates the *Pike* line of cases from [the Court's] core antidiscrimination precedents."  598 U.S. at 377.  The *Pike* inquiry examines whether a law's practical effects "disclose the presence of a discriminatory purpose."  *Id.*  In this manner, a *Pike* analysis can "smoke out . . . hidden protectionism" that may not be evident on a law's face.  *Id.* at 379 (internal quotation marks omitted); *see also id.* at 393 (Barrett, J., concurring in part).

While the five justices in the *National Pork* majority did not agree on a single approach to *Pike* claims "premised on . . . nondiscriminatory burdens," 598 U.S. at 379 (internal quotation marks omitted), all agreed that such challenges face a high

bar, and should rarely succeed. A *Pike* claim proceeds in two steps. First, plaintiffs must establish that the law at issue causes a "substantial burden" on interstate commerce, which is "[a] critical requirement for proving a violation of the dormant Commerce Clause." *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1148. If that requirement is satisfied, courts proceed to the second step, and evaluate whether the burden is "clearly excessive" in relation to the law's local benefits. *Wayfair*, 585 U.S. at 173.[9] The Supreme Court has not invalidated a law through *Pike* balancing in over 30 years. *See Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023).

1. In this case, there is no need to conduct *Pike* balancing, because plaintiffs have not shown that the challenged statutes impose a "substantial burden" on interstate commerce. Plaintiffs argued before the district court that California's in-state purchasing requirements "preclude out-of-state vendors . . . from accessing California's ammunition market" unless they "obtain the consent of their California-based competitors," and "are willing to pay the price their in-state competitors have complete discretion to set." Dkt. 104 at 23.

---

[9] *National Pork* did not disturb this Circuit's longstanding two-step framework for *Pike* claims. Of the five justices in the majority, four ultimately applied a standard that is identical in all material respects to the standard applied by this Court. *See id.* at 383-385 (plurality opinion). Three of those five would have gone even further, barring *Pike* claims altogether when the benefits and burdens of a challenged law are "incommensurable." *Id.* at 382.

43

This Court has concluded that allegations of far more burdensome effects did not establish a cognizable burden under *Pike*. For instance, *National Pork* considered allegations that "producers w[ould] have to expend millions in upfront capital costs and adopt a labor-intensive method of production," or risk "los[ing] business with packers that are supplying the California market." *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1033 (9th Cir. 2021). Both this Court and a plurality of the Supreme Court rejected those allegations as insufficient to establish a substantial burden. *See id.* at 1032-1033; 598 U.S. at 383-387. Those respective analyses demonstrate the heavy burden that a plaintiff must satisfy before *Pike* balancing is necessary. *See Truesdell*, 80 F.4th at 776 ("If the allegations in *National Pork Producers* did not show a substantial burden, then, the evidence in this case cannot either.").

In any event, neither of plaintiffs' claimed burdens is supported by the record. Plaintiffs have not shown that out-of-state vendors have been unable to obtain the consent of in-state vendors to process their transactions; indeed, both out-of-state vendor plaintiffs acknowledge that they continued to sell ammunition to California customers in the months directly after the background check requirement took effect, although in lower numbers. *See* 2-ER-65; 2-ER-67. And there is no truth to plaintiffs' argument below that California law gives in-state licensed vendors complete discretion to set fees. Section 30312(a)(2) authorizes licensed vendors to

44

charge the *purchaser* an "administrative fee . . . in an amount to be set by the Department of Justice" for processing those transactions.  Cal. Penal Code § 30312(a)(2).  That fee "shall not exceed five dollars" if the purchaser is present for immediate delivery of the ammunition.  Cal. Code Regs. tit 11, § 4263(a).  If the purchaser is not immediately available, the vendor may charge "an additional storage fee as agreed upon with the purchaser prior to the vendor receiving the ammunition." *Id.*

At most, the evidence suggests that out-of-state vendors—like the plaintiffs in *National Pork*—have incurred additional expenses by virtue of the face-to-face transaction requirement.  That does not give rise to a constitutional claim, however, because "the dormant Commerce Clause does not protect a particular company's profits." *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1153 n.11 (citing *Exxon Corp. v. Governor of Maryland*, 427 U.S. 117, 127 (1978)).

2.  Because plaintiffs did not establish a substantial burden on interstate commerce, there is no need for this Court to conduct any judicial balancing.  *See, e.g.*, *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1156.  But even if this Court were to consider whether the face-to-face transaction requirement is "clearly excessive" in relation to its benefits, *Wayfair*, 585 U.S. at 173, the challenged provisions should be upheld.

45

Plaintiffs also face a heavy burden at second stage of the *Pike* inquiry.  A law's burdens are clearly excessive under *Pike* only if they "so outweigh the putative benefits as to make the statute unreasonable or irrational."  *UFO Chuting of Haw., Inc. v. Smith*, 508 F.3d 1189, 1196 (9th Cir. 2007) (internal quotation marks omitted).  And in conducting that inquiry, courts may not "second-guess the empirical judgments of lawmakers concerning the utility of legislation."  *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987) (citation omitted).

Plaintiffs cannot meet that burden.  The challenged provisions are part of a comprehensive ammunition background check system, which seeks to prevent ammunition from being transferred to those who are prohibited from possessing it.  *See* Prop. 63 § 2(7).  The public safety concerns that motivated the State's adoption of that system are unquestionably legitimate.  *See Rhode*, 445 F. Supp. 3d at 935 (district court's acknowledgement that "[f]ew would dispute that the state has a legitimate interest in increasing public safety and preventing crime").  The face-to-face transaction requirement is an essential part of the ammunition background check regime:  it imposes a condition on all transactions to ensure that background checks are conducted by licensed vendors who are able to visually confirm the purchaser's identity.  Plaintiffs have not shown that those benefits "relate to goals that evidence an impermissible favoritism of in-state industry" or that they are "illusory."  *Chuting*, 508 F.3d at 1196.  And while *Pike*'s inquiry considers a

46

regulation's "*putative* local benefits" and not its "actual benefits," *see Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1155, the record reflects that the ammunition background check requirements have prevented hundreds of prohibited persons from acquiring ammunition since they took effect, and likely have deterred many more. *See* 3-ER-422; 3-ER-430; 4-ER-579; 4-ER-583.

## III. SECTION 30314 IS NOT PREEMPTED BY FEDERAL LAW

The district court also held that the federal Firearm Owners' Protection Act, 18 U.S.C. § 926A, preempts Section 30314's requirement that California residents bring ammunition acquired outside of the State to licensed vendors for processing. 1-ER-30–33; *see* Cal. Penal Code § 30314. Congressional intent is "'the ultimate touchstone' in every pre-emption case." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). And here, statutory text and legislative history provide no indication that Congress intended to give section 926A the broad preemptive effect that the district court ascribed to it.

Section 926A provides that "any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm" may "transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm." 18 U.S.C. § 926A. Firearms must be kept unloaded during travel,

47

and "neither the firearm nor any ammunition being transported" may be kept

"readily accessible . . . from the passenger compartment of such transporting

vehicle." *Id.* Section 926A further requires "[t]hat in the case of a vehicle without

a compartment separate from the driver's compartment the firearm or ammunition

shall be contained in a locked container other than the glove compartment or

console." *Id.* The statute is governed by a savings clause, which directs that state

laws are preempted only if they present a "direct and positive conflict" with federal

law. 18 U.S.C. § 927.

As an initial matter, Section 926A does not provide a safe harbor for the

transportation of ammunition. The plain text of the safe harbor only authorizes the

interstate transportation of firearms. 18 U.S.C. § 926A; *see* 18 U.S.C. § 921(a)(3),

(a)(17)(A) (defining "firearm" and "ammunition" separately). The district court

based its preemption holding on a clause in Section 926A that imposes storage

requirements for "any ammunition being transported" with a firearm. 18 U.S.C.

§ 926A. But that language only describes a necessary condition for the safe harbor

to apply, which prevents the firearm from being readily used during travel. It does

not extend the safe harbor to include the transportation of ammunition. *See* 132

Cong. Rec. H4102-03 (1986) (noting that Section 926A was designed "to protect

law enforcement officers who may be making traffic stops by requiring that the

48

weapon be unloaded and clarifying that it not be readily accessible" (statement of Rep. Hughes)).

Even assuming that Section 926A covers ammunition, it still would not conflict with Section 30314.  Section 926A does not authorize unfettered transportation of ammunition across state lines.  It only authorizes transportation between States where the traveler "may lawfully possess and carry" the firearm (or ammunition).  18 U.S.C. § 926A.  The district court identified a conflict on the theory that "[w]hen a law-abiding California resident buys ammunition outside of the state and brings it back into California" without first delivering it to a licensed vendor, "[California Penal Code Section 30314] prohibits the conduct," even if the resident had complied with Section 926A's storage requirements.  1-ER-31–32. But because California residents may not "lawfully possess" ammunition that has not been processed through a licensed vendor for delivery in a face-to-face transaction following a background check, Section 926A would not apply by its own terms.  18 U.S.C. § 926A.  By contrast, if a resident complies with California's in-state processing and face-to-face delivery requirements, he may "lawfully possess" that ammunition consistent with the safe harbor.

For the same reasons, Section 30314 does not present any obstacle to federal objectives.  While the relevant statutory text is alone sufficient to reflect Congress's intent, legislative history also confirms that the Section 926A's drafters

49

intended to preserve the States' authority to enforce reasonable regulations for their residents. *See* 132 Cong. Rec. H4102-03 (a person is "only entitled to take advantage" of the safe harbor if "the possession is lawful where the traveler starts and is lawful in the destination State" (statement of Rep. Hughes)); *see id.* ("The safe harbor provision itself does not modify the State or local laws at the place of origin or the jurisdiction where the trip ends in any way." (statement of Rep. McCollum)). Consistent with that intent, courts considering similar challenges have not interpreted Section 926A to facially invalidate state regulations. *See Fresno Rifle & Pistol Club, Inc. v. Van de Kamp*, 746 F. Supp. 1415, 1427 (E.D. Cal. 1990) (California's ban on the importation of assault weapons was not preempted by Section 926A); *Coalition of N.J. Sportsmen v. Florio*, 744 F. Supp. 602, 609-610 (D.N.J. 1990) (New Jersey's regulation of large-capacity magazines and assault weapons was not preempted by Section 926A).

50

## CONCLUSION

The judgment of the district court should be reversed, and this Court should

remand for entry of judgment in favor of the Attorney General.

Dated:  May 24, 2024             Respectfully submitted,

                         */s/ Mica L. Moore*

                         ROB BONTA
                         *Attorney General of California*
                         MICHAEL J. MONGAN
                         *Solicitor General*
                         HELEN H. HONG
                         *Principal Deputy Solicitor General*
                         THOMAS S. PATTERSON
                         *Senior Assistant Attorney General*
                         MICA L. MOORE
                         *Deputy Solicitor General*
                         R. MATTHEW WISE
                         JOHN D. ECHEVERRIA
                         *Supervising Deputy Attorneys General*
                         CHRISTINA R.B. LÓPEZ
                         MEGHAN H. STRONG
                         *Deputy Attorneys General*
                         *Attorneys for Defendant and Appellant*

51

## STATEMENT OF RELATED CASES

The Attorney General is not aware of any related cases.

Dated:  May 24, 2024          */s/ Mica L. Moore*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** <u>No. 24-542</u>

I am the attorney or self-represented party.

**This brief contains <u>11,282 words,</u>** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** <u>*/s/ Mica L. Moore*   </u>                    **Date:** <u>May 24, 2024</u>