No. 24-542

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

KIM RHODE, *et al.*,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,

*Defendant-Appellant.*

On Appeal from the United States District Court,
Southern District of California
No. 3:18-cv-00802-BEN-JLB (Benitez, J.)

## BRIEF OF BRADY CENTER TO PREVENT GUN VIOLENCE AND GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, N.E., Suite 400
Washington, DC 20002
(202) 370-8100

Esther Sanchez-Gomez
William T. Clark
GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE
268 Bush Street #555
San Francisco, CA 94104

May 31, 2024

Michael K. Plimack
Nathan E. Shafroth
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
mplimack@cov.com
(415) 591-6000

Hassan Ahmad
Tori N. Keller
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, DC 20001

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Neither *Amici* has a parent corporation or stock.  Therefore, no publicly held corporation owns ten percent or more of their stocks.

*/s/ Michael K. Plimack*

COVINGTON & BURLING LLP
Michael K. Plimack

*Counsel for* Amici Curiae

May 31, 2024

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................... i

TABLE OF CONTENTS ........................................................ ii

TABLE OF AUTHORITIES ..................................................... iii

INTEREST OF *AMICI CURIAE* ................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 3

ARGUMENT ................................................................. 5

**I.  The plain text of the Second Amendment does not cover the Ammunition Laws.** .......................................................... 5

    *A.*  Heller, McDonald*, and* Bruen *all emphasized that the Second Amendment extends only to law-abiding, responsible citizens.* ........... 6

    *B.*  *The Ammunition Laws do not implicate law-abiding persons' Second Amendment right to purchase ammunition.* ........................... 7

    *C.*  *The district court erred in its secondary justification for its decision—that the Ammunition Laws violate the Second Amendment because they "may be" abusive as applied.* .................... 11

**II.  If the Court proceeds to *Bruen*'s historical analysis, it must take the nuanced approach because a dramatic technological change— ghost guns—presents an unprecedented societal concern.** .................... 18

    *A.*  *Dramatic technological change has made untraceable, homemade firearms widely accessible for criminal activity and mass violence.* ..................................................................... 20

    *B.*  *The unprecedented societal concern posed by ghost guns requires a nuanced historical analysis under* Bruen. ......................... 25

CONCLUSION ............................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baird v. Bonta,*
No. 2:19-CV-00617-KJM-AC, 2023 WL 9050959 (E.D. Cal. Dec. 29, 2023) .................................................................................10

*Bauer v. Becerra,*
858 F.3d 1216 (9th Cir. 2017) .........................................................16

*Cantwell v. Connecticut,*
310 U.S. 296 (1940).........................................................................9

*City of Syracuse, et al. v. Bur. of Alcohol, Tobacco, Firearms & Explosives,*
20-cv-6885 (S.D.N.Y. Dec. 9, 2020)..............................................20

*District of Columbia v. Heller,*
554 U.S. 570 (2008).........................................................2, 4, 5, 8, 9, 10

*Garland v. Blackhawk Mfg. Group,*
23-A-302 (October 16, 2023) ..........................................................25

*Jackson v. City & Cnty. of San Francisco,*
746 F.3d 953 (9th Cir. 2014) ...........................................................17

*McDonald v. City of Chicago,*
561 U.S. 742 (2010).........................................................................2, 5

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022)....................2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 16, 17, 24, 25, 28

*Nat'l Archives & Records Admin. v. Favish,*
541 U.S. 157 (2004).........................................................................12

*Ocean State Tactical, LLC v. Rhode Island,*
95 F.4th 38 (1st Cir. 2024)...............................................................28

*Rhode v. Bonta* (*Rhode II*),
    No. 18-CV-802-BEN (JLB), 2024 WL 374901 (S.D. Cal. Jan. 30,
    2024) ............................................................. 6, 7, 12, 13, 14, 15, 16, 17, 24, 25

*Shuttlesworth v. Birmingham*,
    394 U.S. 147 (1969) .................................................................................... 9

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) (en banc) ............................................ 16

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) ............................................................ 28

*United States v. Chemical Foundation, Inc.*,
    272 U.S. 1 (1926) .................................................................................... 12

*United States v. Perez-Garcia*,
    96 F.4th 1166 (9th Cir. 2024) ........................................................ 5, 6

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) (en banc) .................................. 15, 16, 17

**Statutes and Regulations**

18 U.S.C. § 923 ...................................................................................... 19

Cal. Penal Code § 11106 ........................................................................ 8

Cal. Penal Code § 30312 .................................................................... 2, 7

Cal. Penal Code § 30314 .................................................................... 2, 7

Cal. Penal Code § 30352 ................................................................ 2, 7, 8

Cal. Penal Code § 30370 ................................................................ 2, 7, 8

Cal. Code Regs., tit. 11, § 4282 ........................................................... 8

**Constitutional Provisions**

U.S. Const. amend. II ............................................................................. 4

iv

## INTEREST OF *AMICI CURIAE*[1]

The Brady Center to Prevent Gun Violence ("Brady") is the nation's longest-standing nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, direct legal advocacy, and political action on behalf of victims and communities affected by gun violence. Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a nonprofit law and policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded more than 30 years ago following a gun massacre at a San Francisco law firm. It was later renamed Giffords Law Center in 2017 after joining forces with the gun safety organization led by former Congresswoman Gabrielle Giffords. In support of their missions, *Amici Curiae* file this brief in support of Appellant the Attorney General of the State of California, and reversal.

Brady and Giffords Law Center have a substantial interest in ensuring that the Second Amendment is interpreted and applied in a way that preserves the authority of democratically elected officials to address the nation's gun-violence

---

[1] All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than *Amici* or their counsel contributed money that was intended to fund preparing or submitting this brief.

1

epidemic. Brady and Giffords Law Center have contributed technical expertise and informed analysis in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Several courts have also cited research and information from their *amicus curiae* briefs in Second Amendment rulings.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As articulated in *Heller* and *Bruen*, the Second Amendment right "'is not unlimited'" and inures solely to the benefit of "ordinary, law-abiding, adult[s]." *Bruen*, 597 U.S. at 21, 31 (quoting *Heller*, 554 U.S. at 626); *see also Heller*, 554 U.S. at 635 (describing the right as belonging to "law-abiding, responsible citizens"). Accordingly, states may enact commonsense firearm-related laws—including ones that regulate *non-law-abiding* persons—without violating the protections afforded by the Second Amendment. Adhering to these principles, California Penal Code Sections 30312(a), 30312(b), 30314(a), 30370, 30352(a)–(d) (the "Ammunition Laws") prevent persons who could not lawfully purchase a firearm ("prohibited persons") from purchasing ammunition by requiring in-person transactions and background checks. Because background-check and in-person-purchase requirements do not infringe on the right to lawful self-defense, the Ammunition Laws present no Second Amendment issue. This is reason alone for this Court to reverse.

But even if the Court proceeds to the *Bruen* inquiry regarding the history and tradition of firearms regulations, that inquiry must consider the unprecedented societal concern posed by ghost guns. *See Bruen*, 597 U.S. at 27. A phenomenon of dramatic technological change, ghost guns are far cheaper, faster, and easier to make than any other kind of firearm; in fact, they can be made or assembled at

3

home, presenting unique challenges to keeping these guns out of the hands of persons prohibited from firearm ownership. The Ammunition Laws provide a crucial response to the problem of ghost guns by preventing prohibited persons from purchasing ammunition and, thus, from using these weapons. Given this modern problem, the Court should heed *Bruen*'s reminder that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated," by pursuing a "more nuanced" approach to its historical analysis, *id.* at 27–28, that does not conflate these untraceable and deadly weapons with the pre-industrial era muskets of the eighteenth century—as the district court did. Accordingly, the district court's decision should be reversed.

## ARGUMENT

**I.    The plain text of the Second Amendment does not cover the Ammunition Laws.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *Heller*, the Supreme Court pronounced that the Amendment guarantees the right to possess and carry arms for defense of self and home.  554 U.S. at 626.  That right, however, "is not unlimited," *id.*, and the Court instructed that we must begin with the Amendment's "plain text," *Bruen*, 597 U.S. at 32.  The Ammunition Laws fall outside its ambit.

In *Bruen*, the Supreme Court announced a new text-and-tradition test for courts examining firearm regulations.  Under *Bruen*, plaintiffs must first establish that the laws they challenge implicate conduct covered by the plain text of the Second Amendment.  597 U.S. at 24.  If, and only if, the challengers successfully meet their threshold burden must the government demonstrate that its regulations are consistent with the Nation's historical tradition of firearm regulation.  *Id.*  If the plaintiffs fail to meet their burden, the court need not go any further, and the regulations do not violate the Second Amendment.  This is so here, and the district court's contrary conclusion was error.

    *A.*    Heller*,* McDonald*, and* Bruen *all emphasized that the Second Amendment extends only to law-abiding, responsible citizens.*

In *Heller*, the Supreme Court stressed that the Second Amendment right to bear arms belongs to "*law-abiding, responsible* citizens." 554 U.S. at 635 (emphasis added); *see also id.* at 644 (Stevens, J., dissenting) ("[T]he Court limits the protected class to 'law-abiding, responsible citizens.'"). And the Court identified a non-exhaustive list of longstanding and "presumptively lawful regulatory measures," including regulations that entirely prohibit the possession of firearms by those with prior felony convictions or mental illnesses or impose conditions and qualifications on the sale of firearms. *Id.* at 626–27 & n.26. In *McDonald*, the Court "repeat[ed its] assurances" that it was not "cast[ing] doubt on such longstanding regulatory measures." 561 U.S. at 786.

*Bruen* further confirmed that the Second Amendment provides for the "right of an *ordinary, law-abiding* citizen to possess a handgun in the home" and the "similar right" of an "*ordinary, law-abiding* citizen[] . . . to carry [a] handgun[] publicly for self-defense." 597 U.S. at 8–11 (emphases added). Indeed, the *Bruen* majority opinion and concurrences "used the term 'law-abiding, responsible citizens' and its variants more than" twenty times when describing the Second Amendment's scope. *United States v. Perez-Garcia*, 96 F.4th 1166, 1179 & n.9–10 (9th Cir. 2024) (collecting each mention on the term in *Bruen*). And, as especially relevant here, the Court held that states may enact regulations that "are designed to

6

ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" such as those that "require applicants to undergo a background check or pass a firearms safety course." *Bruen*, 597 U.S. at 38 n.9.

> B.  *The Ammunition Laws do not implicate law-abiding persons' Second Amendment right to purchase ammunition.*

Under *Bruen*'s recitation, "[t]he threshold question in a Second Amendment claim is whether the Amendment presumptively protects the individual's conduct." *Perez-Garcia*, 96 F.4th at 1178. This question itself has two subparts: (1) "whether the petitioners [a]re among 'the people' within the plain meaning of the Second Amendment," and (2) "whether the plain text of the Amendment encompasses the individuals' 'proposed course of conduct.'" *Id.* (quoting *Bruen*, 597 U.S. at 31–32). *Amici* focus on the second sub-question here.

The district court erred by construing the Second Amendment as conferring a freestanding and far-reaching right to purchase ammunition, *Rhode v. Bonta* (*Rhode II*), No. 18-CV-802-BEN (JLB), 2024 WL 374901, at *5 (S.D. Cal. Jan. 30, 2024), without regard to whether the purchaser is law-abiding, or otherwise a member of a prohibited class that is not entitled to possess or operate a firearm. Under the district court's overbroad interpretation, *any* conduct related to the purchase of ammunition is covered by the Second Amendment, and *any* law that regulates the purchase of ammunition necessarily implicates Second Amendment protections. This Court should correct the district court's misreading.

The purpose of the Ammunition Laws is to ensure that those seeking to purchase ammunition "are, in fact, 'law-abiding, responsible citizens,'" who possess Second Amendment rights to bear arms. *Bruen,* 597 U.S. at 38 n.9. The Ammunition Laws therefore require that would-be ammunition purchasers establish that they are *not prohibited* from exercising that right.[2] The plaintiffs' proposed course of conduct, for purposes of *Bruen*'s threshold question, is to purchase ammunition without first submitting to and passing a background check. The Second Amendment's plain text protects no such thing.

The Ammunition Laws require ammunition purchasers to establish that they are not prohibited by law from possessing firearms by undergoing one of two available background checks, and doing so in person, with proof of lawful residency, and subject to vendor recordkeeping. Cal. Penal Code §§ 30312(a), 30312(b), 30314(a), 30370, 30352(a)–(d). The background-check process is straightforward. To start a check, the purchaser must present a Real ID or a California state identification and proof of lawful residency. Cal. Penal Code

---

[2] The district court analogizes the Ammunition Laws' burden on an ammunition purchaser to requiring a "credit check every time [a car owner] needs to refill his car with gas or recharge his battery at a charging station." *Rhode II*, 2024 WL 374901, at *2. This analogy misses the mark because—among other reasons—creditworthiness is not a prerequisite to operating a motor vehicle, as law-abidingness is to the Second Amendment right to bear arms. The Ammunition Laws are thus better analogized to the requirement that one show identification for age verification at a bar or liquor store—even a bar or liquor store the purchaser patronized the day before.

§ 30352(a)(2).  To streamline the background-check process, the State relies on its

Automated Firearms System ("AFS"), which tracks sales, transfers, and ownership

of firearms.  Cal. Penal Code §§ 11106, 30370(a)(1), (e); Cal. Code Regs., tit. 11,

§ 4282.  A non-prohibited person with an AFS record may opt for the $1 "Standard

Check," which completes in a matter of minutes, and may then proceed to purchase

ammunition.  If a non-prohibited person's Standard Check is rejected, that person

may utilize the $19 "Basic Check," which takes one to a few days to complete.[3]

The person may then proceed to purchase as much ammunition as desired.

These laws do not implicate the Second Amendment because they do not

prevent any "law-abiding, responsible" person from "keep[ing]" or "bear[ing]

arms" for self-defense.  *Heller*, 554 U.S. at 635.  Rather, because they provide

enumerated standards and no subjective discretion in their application, the

Ammunition Laws are akin to the "shall-issue" permitting regimes endorsed by the

Supreme Court in *Bruen*.  Because such regimes grant licenses based on "a general

desire for self-defense" without a showing of cause, the Court reasoned that,

notwithstanding that they require the acquisition of a license, "shall-issue" regimes

"do not necessarily prevent 'law-abiding, responsible citizens' from exercising

---

[3] There are additional options as well.  If a non-prohibited person whose Standard
Check is rejected has an AFS record, that person may update that record online and
re-submit a Standard Check.  If the non-prohibited person does not have an AFS
record, that person may create one by purchasing a new firearm or submitting for
Department approval an ownership report of a firearm the person already owns—
after which a Standard Check may be re-submitted.

their Second Amendment right[s]," and so are generally permissible. *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). The law invalidated in *Bruen*, by contrast, involved a "may-issue" licensing regime that required applicants to "show an atypical need for armed self-defense," and subjected the application to a licensing official's "'appraisal of facts, . . . exercise of judgment, and . . . formation of an opinion.'" *Id.* at 38 n.9 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)).

Like the shall-issue regimes endorsed by the Supreme Court, the Ammunition Laws operate on "narrow, objective, and definite standards." *Id.* (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)). Specifically, the requirements for background checks, proof of lawful residency, and face-to-face transactions involve no judgment calls or weighing of evidence. Indeed, *Bruen* specifically identified a background check for firearm possession and public carry as falling into this category of lawful regulations. *Id.*; *see also id.* at 80 (Kavanaugh, J., concurring) (noting constitutional permissibility of shall-issue regimes that may require "fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements").

The Ammunition Laws are designed not to burden the rights of law-abiding persons, but to ensure that ammunition is not sold to individuals who do not

possess, or have forfeited, their Second Amendment rights. *See, e.g.*, *Baird v. Bonta*, No. 2:19-CV-00617-KJM-AC, 2023 WL 9050959, at *1 (E.D. Cal. Dec. 29, 2023) ("the Second Amendment must allow states to distinguish "ordinary, law-abiding citizens" from others somehow, including by requiring a license."). Because these laws are therefore "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *Id.* at *22 (quoting *Heller*, 554 U.S. at 635), "nothing in [*Bruen*] should be interpreted to suggest the[ir] unconstitutionality." *Bruen*, 597 U.S. at 38 n.9.

Properly framed, the plain text of the Second Amendment does not protect a right to purchase ammunition without a background check, *i.e.*, without demonstrating that the purchaser is among the class of purchasers whose conduct has not disqualified them from Second Amendment protection. Accordingly, the Court should reverse.

> C. *The district court erred in its secondary justification for its decision— that the Ammunition Laws violate the Second Amendment because they "may be" abusive as applied.*

The Supreme Court in *Bruen* endorsed objective licensing regimes, like the Ammunition Laws. At the same time, the Court did not rule out constitutional challenges to licensing schemes that the government "put[s] toward abusive ends," 597 U.S. at 38 n.9, such as where lengthy wait times or exorbitant fees are used to infringe upon individuals' right to lawful self-defense. In such cases, a challenger

who established such intentional misfeasance or malfeasance on the part of the state could overcome the presumption of constitutionality afforded to such license laws.

The district court purported to rely on the abusive-ends exception it read into a *Bruen* footnote to provide a secondary basis for its decision. Although the Supreme Court in *Bruen* did not delineate if or how this "abusive-ends exception" should be applied by the lower courts, the district court's method cannot be correct.

First, the Supreme Court's description—that the non-discretionary scheme at issue "be put toward abusive ends"—makes clear that the exception would place the burden on the challenger to show that the state has engaged in intentional misfeasance or malfeasance through the enforcement of the regulations, a showing the plaintiffs did not even attempt to make. The phase "put toward" means "[t]o do or expend something in an attempt to achieve some goal or outcome."[4] And the relevant definitions of "end" are "an outcome worked toward," "purpose," and "the object by virtue of or for the sake of which an event takes place."[5] These definitions accord with the longstanding presumption of regularity afforded to the government, whereby "in the absence of clear evidence to the contrary, courts

---

[4] PUT TOWARD, *The American Heritage Dictionary of Phrasal Verbs* (2005), https://perma.cc/4K7Q-JE3C (captured May 6, 2024).

[5] END, *Merriam-Webster.com Dictionary*, https://perma.cc/QHY6-YRYW (captured May 6, 2024) (definition four).

presume that they have properly discharged their official duties." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)).  Thus, for a regulatory regime to be "put toward [an] abusive end[]," *Bruen*, 597 U.S. at 38 n.9, the entity administering it must purposefully abuse an otherwise benign regime.  Had the Supreme Court envisioned the exception to cover unintended conduct, it would have used language concerning outcomes, rather than causes, that signified as much—for example, by pointing out regimes *resulting* in "exorbitant fees" or "lengthy wait times."  It did not.

The plaintiffs presented no evidence of intentional abuse by the State, and the district court made no such finding either.  Rather, the district court acknowledged that where purchasers had background checks erroneously rejected, that occurred largely "because the state had no record of gun ownership or because of personal identifier mismatches."  *Rhode II*, 2024 WL 374901, at *6 & n.15 (citing "address mismatches," "no apparent AFS record," and "name mismatches" as accounting for 85% of rejections).  That is not a finding of malintent.

Second, the district court's decision was standardless.  The court simply concluded that "[i]f any background check system satisfies *Bruen*'s footnote nine description of a scheme put to abusive ends, as opposed to the system originally

13

approved by the voters,"[6] the Ammunition Laws "may be it." *Rhode II*, 2024 WL 374901, at *8. The district court neither provided nor discernably implemented a test for what may or may not meet the abusive-ends exception. It merely opined that the Standard Check's rejection rates were "too high," *id.* at *7, without any analysis of whether those rates alone constitute or betray "abusive ends." The court did not explain what "too high" meant; how it came to that conclusion; or whether a tolerable rejection rate exists, and if it does, how low it would need to be to pass muster under the district court's interpretation of the exception. The court also did not consider the other methods through which non-prohibited purchasers could still buy ammunition if their Standard Checks were rejected, such as by undergoing the Basic Check or updating firearms records in the AFS and re-running the Standard Check.[7]

---

[6] An independent fault in the district court's analysis is its consistent focus on comparing the laws at issue with Proposition 63, a ballot measure approved by California voters at the 2016 general election. *Rhode II*, 2024 WL 374901, at *1–2. Proposition 63 would have created a different background-check and ammunition-purchase-permitting scheme, if not for the California Legislature's prospective amendment of the measure in enacting the Ammunition Laws. *Id.* The district court's preference for a law that was not enacted is of no relevance to the legal issues here.

[7] In addition, the district court compared the number of people who underwent ammunition background checks in the first seven months of the Ammunition Laws' enactment with the number of people who were rejected as prohibited persons, whose firearms, magazine, or ammunition were seized, or who were arrested or convicted. The district court implied, but did not explicitly find (much less provide a rationale), that the number of rejections and other actions did not justify the number of people undergoing the background check. Moreover, the district court did not consider whether the Ammunition Laws effectively blocked prohibited purchasers from attempting to purchase ammunition in the first place.

Finally, the undisputed evidence presented to the district court rebuts the notion that the Ammunition Laws are so faulty in practice as to render them unconstitutional. The district court found that, in 2019, "during the first seven months of [the Ammunition Laws'] operation, 101,047 law-abiding gun owners who established their citizenship and underwent background checks were nevertheless rejected. The 2019 rejection rate was 16%." *Id.* at *6. The district court acknowledged that the rejection rate was declining: in January 2023, "the background check rejection rate [wa]s lower at 11%." *Id.* at *7; *see* Fifth Supplemental Declaration of Morales, Dkt. 92-11 ¶ 14. Of the 11% whose Standard Check was rejected, just over a third of them "had still not successfully purchased ammunition six months later." *Rhode II*, 2024 WL 374901, at *7. So, even assuming that these individuals' background checks were all improperly rejected, they would amount to an overall erroneous-rejection rate of about 4%.

As the district court recognized, "[o]ne would expect problems and errors in a new system" like the one created by the Ammunition Laws. *Id.* Indeed, we have come to expect such issues in longstanding government systems as well.[8] Moreover, an error rate of 4% and an initial rejection rate of 11% is not so out of

---

[8] *See* SNAP Payment Error Rates (2022), U.S. DEP'T OF AGRIC., https://perma.cc/J7M6-47R2 (captured May 6, 2024) (finding that the payment-error rate for California's Supplemental Nutrition Assistance Program was 11.10% in 2022).

the realm of expectations that it amounts to *abuse*, rendering the background-check system as a whole unconstitutional.

The court nevertheless concluded that the rejection rate was "too high" based on a Fifth Circuit case involving the Voting Rights Act. *See Rhode II*, 2024 WL 374901, at *8 & n.25 (quoting *Veasey v. Abbott*, 830 F.3d 216, 250 (5th Cir. 2016) (en banc), *cert. denied*, 580 U.S. 1104 (2017)). This Voting Rights Act case is plainly irrelevant here, and the district court's reasoning-by-analogy is inapt.

In *Veasey*, the en banc Fifth Circuit held that a Texas voter-identification statute was unlawful because it disparately impacted minorities, who disproportionately lacked the new form of identification necessary to vote. 830 F.3d at 272. The district court compared the 4.5% of registered voters in Texas who lacked such identification and the underlying documents necessary to procure it, to the 11% of ammunition purchasers whose Standard Check was rejected the first time. *Rhode II*, 2024 WL 374901, at *8. In addition, in a parenthetical in a footnote, the district court quoted the *Veasey* court's determination that the Texas voter-identification law was burdensome because it was costly and required some plaintiffs to travel long distances. *Id.* at *8 n.25.

The analogy to *Veasey* fails for several reasons. First, unlike in *Veasey*, the plaintiffs here made no showing that California's application of the Ammunition Laws had any discriminatory effect. Second, in making its analogy, the district

16

court again ignored that there are methods other than the Standard Check for a Californian to prove lawful eligibility to purchase ammunition, such as the Basic Check. When such methods are considered, or when the persons initially rejected re-submit to the Standard Check, the overall rejection rate falls to below what was found to violate the Voting Rights Act in *Veasey*. *See Rhode II*, 2024 WL 374901, at *7. Third, the costs for a background check, ranging from $1 to $19, *id.* at *3, are far from "exorbitant," *Bruen*, 597 U.S. at 38 n.9, and are much lower than the costs required for some Texans to comply with the law at issue in *Veasey*, which included in some instances that they obtain their out-of-state birth certificates for $81 before applying for voter identification, *Veasey*, 830 F.3d at 255. *Cf. Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) ($19 fee for firearm-purchase recordkeeping had no "impact on the plaintiffs' actual ability to obtain and possess a firearm").

Finally, unlike the arduous journey some Texas plaintiffs made to apply for voter identification, *see id.* (describing 60-mile roundtrips), the district court here did not make any findings that there were long-distance-travel requirements that deterred prospective ammunition purchasers in California. To paraphrase this Court's decision in *Teixeira*, "conspicuously missing from this lawsuit is any honest-to-God resident . . . complaining that he or she cannot lawfully buy [ammunition] nearby" because of the Ammunition Laws. *Teixeira v. Cnty. of*

17

*Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) (en banc).  Insofar as there is some

minor travel-based burden, this Court has consistently held that "the Second

Amendment does not elevate convenience and preference over all other

considerations." *Id.* (citing *Jackson v. City & Cnty. of San Francisco*, 746 F.3d

953, 968 (9th Cir. 2014), *abrogated on other grounds by Bruen*, 597 U.S. at 19).

Accordingly, *Veasey* provides no barrier to reversal here.

## II.    If the Court proceeds to *Bruen*'s historical analysis, it must take the nuanced approach because a dramatic technological change—ghost guns—presents an unprecedented societal concern.

Because the Ammunition Laws do not burden "a law-abiding citizen's right

to armed self-defense," *Bruen*, 597 U.S. at 29, the Court need not reach the second

step under *Bruen* and evaluate whether the law is "consistent with this Nation's

historical tradition of firearm regulation." *Id.* at 17.  But if the Court reaches the

second step, it should take a "more nuanced approach" to the historical analysis

because the laws address an unprecedented societal concern posed by a dramatic

technological change—ghost guns. *Id.* at 27–28.

In conducting its historical analysis, the district court erred by conflating

ghost guns with arms manufactured by artisan gunsmiths at the Founding.  *See*

*Rhode II*, 2024 WL 374901, at *11.  The district court's comparison was based on a

flawed understanding of arms manufacturing in the eighteenth and early nineteenth

centuries.  Today's ghost guns are far deadlier, cheaper, and easier to make than

18

eighteenth-century guns. And as historians like Brian DeLay have shown, gunsmiths making supposedly "homemade" firearms at the Founding were industrialists who relied almost entirely on government contracts to support their work.[9] These gunsmiths are far more analogous to the large firearms manufacturers of today than to individuals making ghost guns from kits ordered online without ever leaving home. This "Ikea-style" production has made it harder to limit gun possession to law-abiding persons and thereby has contributed to substantial untraceable gun violence across the country. These modern challenges demand a modern solution.

The California Ammunition Laws are a crucial tool in reducing the danger of criminally used ghost guns. These laws cut off the supply of ammunition to persons who, despite being prohibited from possessing firearms, are nonetheless able to acquire and use cheap and untraceable ghost guns. To whatever extent California's solution is novel, it is amply justified by the novelty of the problem and not inconsistent with the Nation's historical tradition of firearm regulation.[10]

---

[9] *See generally* Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Calif. L. Rev. _, 79–80 (*forthcoming* 2025).

[10] *Amici* submit this brief in part to elaborate on why the proliferation of ghost guns requires that any historical analysis of the Ammunition Laws follow *Bruen*'s "more nuanced approach" and be given wider constitutional berth. *Amici* incorporate Appellant's analogical analysis of Ammunition Laws within the historical tradition of firearm regulation. *See* Blue Br. at 27–38.

A.   *Dramatic technological change has made untraceable, homemade firearms widely accessible for criminal activity and mass violence.*

1.   Ghost guns are now much easier to obtain and assemble.

Ghost guns are firearms that are "manufactured or assembled without a traceable serial number by unlicensed individuals."[11]  The term "ghost guns," popularized in 2013 with the advent of the first widely available 3D-printed gun, specifically refers to guns that can be assembled at home by the average person with a "gun kit" or manufactured with a 3D printer.[12]

Rapidly advancing technology has enabled the average person to circumvent federal regulations requiring gun serial numbers,[13] and to create a fully functional,

---

[11] Office of Gun Violence Prevention, *Data Report: The Impact of Gun Violence in California* 7, n.7, California Dep't of Justice (Aug. 2023) (hereinafter "California DOJ Report"), https://perma.cc/6X3X-DZP9 (captured May 6, 2024).

[12] *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce* 37, Bureau of Alcohol, Tobacco, and Firearms (May 5, 2022) (hereinafter "ATF Report"), https://perma.cc/5D5W-WJ6P (captured May 6, 2024).

[13] Since 1958, federal regulations have required firearm manufacturers and importers to engrave serial numbers on guns, including their frames and receivers. DeLay, *supra* note 9, at 55 & n.236–37; *see also* 18 U.S.C. § 923(i). Manufacturers initially used serial numbers to track a gun's history, but they have since also become essential to law enforcement.  Investigators use serial numbers from guns recovered at crime scenes to determine the owners or sellers of guns used in a crime, check whether a firearm is stolen, and collect other information relevant to an investigation.  Without a serial number, law enforcement cannot trace the source of a gun, making it difficult to identify the perpetrator of a crime or potential gun traffickers, and ultimately to prevent further gun violence.

unmarked gun in an hour or less.[14]  Ghost guns are commonly assembled using

"buy-build-shoot" kits that are 80% complete and contain all the parts and often

the equipment necessary to assemble the gun at home.[15]  Although gun kits have

been sold since the late 1990s, the market took off in around 2009, when firearm

sellers in California began selling unfinished receivers for AR-15 and AK-47 guns

to circumvent the State's assault weapons laws.[16]  The internet has also facilitated

access to gun kits, which are widely available online.

Because ghost-gun kits contain standardized parts made by major firearm

manufacturers, kit guns function on par with their fully assembled counterparts

sold on the market.[17]  And given the kits' accessibility, anyone—including those

convicted of felonies, domestic abusers, and gun traffickers—can purchase, build,

and transport them, even into states with more stringent gun-violence-prevention

---

[14] DeLay, *supra* note 9, at 59.  In connection with earlier ghost-gun litigation, one individual submitted a declaration explaining he had "never attempted to build a firearm using an unfinished frame or receiver," that he watched "instructional videos on YouTube for thirty minutes," then built "a complete pistol from [a] handgun kit in 86 minutes."  Decl. of Justin McFarlan, *City of Syracuse, et al. v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, 20-cv-6885, Dkt. 64-34, ¶¶ 8, 10, 11 (S.D.N.Y. Dec. 9, 2020); *see also* Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic of Violence*, N.Y. TIMES (Nov. 14, 2021), https://perma.cc/22TK-VWL5 (captured May 6, 2024) ("[A]n experienced amateur can make the minor modifications needed to turn [ghost-gun kit] into a working firearm in less than an hour.").

[15] Anni Karni & Chris Cameron, *'Ghost Guns': What Are They and Why There's a Fight Over Them*, N.Y. TIMES (Aug. 8, 2023), https://perma.cc/SS98-W3Q5 (captured May 6, 2024).

[16] Karni & Cameron, *supra* note 15.

[17] *Buying vs. Building an AR-15: Pros and Cons*, Gun Builders Depot (last visited May 6, 2024), https://perma.cc/TRF3-HTP8 (captured May 6, 2024).

laws, all without a background check.[18]  These days, even a beginner with little or no experience with guns can complete a popular AR-15 kit and end up with a serviceable weapon in an hour or less.[19]  These kits often cost hundreds of dollars less than the average AR-15.[20]

More recently, it has become possible to wholly manufacture a gun using a 3D printer.  In 2013, the company Defense Distributed first made downloadable the computer-aided-design ("CAD") files necessary to instruct a 3D printer on how to "print" an actual gun.[21]  The initial product was rudimentary, requiring additional metal parts and only capable of firing a single shot at a time.

But in the last decade, 3D-printed gun assembly technology has advanced substantially and continues to improve as high-strength polymers that can better withstand heat and force make these weapons lighter, cheaper, and more durable.[22]  For example, the FGC-9—a semi-automatic rifle that capably shoots 9mm

---

[18] *See, e.g.*, California DOJ Report, *supra* note 11, at 17.

[19] *See, e.g.*, *How To Build An AR-15 | A Step-By-Step Instruction Guide*, KAK Industry (Dec. 2, 2022), https://blog.kakindustry.com/how-to-build-an-ar-15/ (last visited May 6, 2024).

[20] *How Much Does An AR-15 Cost?*, Anthony Arms (Jan. 12, 2024), https://perma.cc/6WNW-E8RG (captured May 6, 2024); Karni & Cameron *supra* note 15.

[21] Andy Greenberg, *How 3-D Printed Guns Evolved into Serious Weapons in Just One Year*, Wired (May 15, 2014), https://perma.cc/D6RH-RT97 (captured May 6, 2024).

[22] Ari Schneider, *3D-Printed Guns are Getting More Capable and Accessible*, Slate, https://perma.cc/8M5W-BMR7 (captured May 6, 2024); ATF Report *supra* note 12, at 34.

ammunition and is durable enough to withstand thousands of rounds—was introduced in 2021.[23]  An FGC-9 can be made in as little as five hours[24] and almost entirely with a 3D printer, CAD files available online, and a few inconspicuous parts commonly available at hardware stores.[25]  The FGC-9's supplies cost $200, less than half the price of the popular mid-tier semi-automatic rifles it replicates.[26]

        2.      Ghost guns are increasingly used to commit violent crime and mass shootings.

Ghost guns are now readily accessible to non-law-abiding persons who are barred by law from possessing firearms and, given the effectiveness and untraceability of these guns, they have become a criminal weapon of choice.  There is "an emerging reliance by criminal organizations" on ghost guns, which are a "digital-age upgrade" from stolen guns with filed-off serial numbers.[27]  The rise of ghost guns has both increased violent crime and made it harder to trace perpetrators and prevent future crime.

---

[23] *Id.*

[24] FGC 9 STL Files, 3D Gun Builder, https://perma.cc/SEB2-AQA2 (captured May 6, 2024).

[25] *Id.*; *see* Andrew W. Eichner, *Crime in the Age of Printable Guns: Methodologies and Obstacles to Prosecuting Federal Offenses Involving 3D-Printed Firearms*, 45 Vt. L. Rev. 189, 215 (2020) ("With a drill and basic skills, virtually anyone can build a gun today in the comfort of their own home legally." (quoting Brandi Hitt, *'Ghost Guns' Investigation: Law Enforcement Seeing Unserialized Firearms on Daily Basis in SoCal*, ABC 7 (Jan. 30, 2020), https://perma.cc/U77Q-6QGK (captured May 6, 2024))).

[26] Schneider, *supra* note 22.

[27] Thrush, *supra* note 14.

A recent report from the U.S. Department of Justice shows that ghost gun use in crime has risen 1,000% nationwide since 2016.[28]  This trend holds true in California.  In 2016, law enforcement reported to the California Department of Justice that it recovered just 167 ghost guns.  By 2022, that number had risen to 12,894—a 7,000% increase.  And in an 18-month period from 2020 to 2021, ghost guns accounted for 25–50% of firearms recovered at crime scenes.[29]

Although California and a handful of other states have promulgated regulations to curb ghost gun proliferation, gun trafficking from states with looser controls remains a grave problem.  For example, California law enforcement requested the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") to trace 54,338 guns recovered in 2021, but 42% were untraceable, many of them ghost guns.  And half of those that could be traced were traced to out-of-state vendors.[30]

The proliferation of ghost guns has helped fuel increasing gun violence across the country.  Ghost guns have been used to commit numerous crimes, including school shootings, homicides, domestic violence, robberies, and murders of law-enforcement officers.[31]  They have also been used in three separate mass

---

[28] Cara Tabachnick, *Ghost gun use in U.S. crimes has risen more than 1,000% since 2017, federal report says*, CBS (Feb. 2, 2023), https://perma.cc/4V9S-CD4M (captured May 6, 2024).

[29] Karni & Cameron, *supra* note 15.

[30] California DOJ Report, *supra* note 11, at 17.

[31] *What Are Ghost Guns?*, Brady Center, https://perma.cc/3RRS-EMTH (captured May 6, 2024).

shootings in California since 2013—Saugus (2019), Tehama County (2017), and Santa Monica (2013)—resulting in 12 deaths and dozens of injuries.[32]

    B.    *The unprecedented societal concern posed by ghost guns requires a nuanced historical analysis under* Bruen.

Step two of the *Bruen* framework requires a State to demonstrate that the challenged law is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24–25. But *Bruen* recognized that novel challenges may necessitate novel regulations. *Id.* at 28 ("[T]he Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."). Consequently, courts undertaking the historical analysis should take "a more nuanced approach" in "cases implicating unprecedented societal concerns or dramatic technological changes." *Id.* at 27.

The district court gave short shrift to the State's demonstration that ghost guns pose a unique and dangerous societal concern, disposing of this immense public safety problem in just three sentences, without engaging with the arguments raised. *Rhode v. Bonta*, 2024 WL 374901, at *11 (Jan. 30, 2024). In so doing, the district court conflated the ghost guns of today with unmarked guns that existed in the eighteenth century. *Id.* ("Guns made without serial numbers, or 'ghost guns' as the government refers to them, have been in existence throughout the eighteenth

---

[32] Brady Center, *supra* note 31.

and nineteenth centuries."). Relying on the sole similarity that some guns in both eras were unmarked, and ignoring important differences in make and accessibility, the district court found that ghost guns are a "general societal problem that has persisted since the 18th century." *Id.* Then, finding no historically analogous ammunition regulations addressing unserialized guns, the district court held that the Ammunition Laws were inconsistent with the Second Amendment. *Id.* (quoting *Bruen*, 597 U.S. at 26).

Contrary to the district court's hastily drawn conclusion, modern ghost guns differ significantly from Founding-era firearms, and can be made and wielded by people who are legally barred from gun ownership. They therefore present unique societal problems. *See supra* Section II.A.[33] First, guns in general are exponentially more effective—and thus dangerous—than those of the eighteenth century. At the Founding, guns were hard to maneuver and load, and often inaccurate. The musket, a popular gun of the day, was five feet long and weighed 11 pounds, had a range of 125 yards, shot at 413 feet per second, and had 40% accuracy.[34] By contrast, an AR-15, commonly made as a ghost gun, is roughly half

---

[33] The Supreme Court has implicitly recognized that ghost guns are a major problem. In 2023, it vacated a Northern District of Texas order enjoining enforcement of a federal regulation on the sale of ghost gun kits. *Garland v. Blackhawk Mfg. Group*, 23-A-302 (October 16, 2023).

[34] *See* John W. Wright, *The Rifle in the American Revolution*, 29 AM. HIST. REV. 293, 294 (1924).

the length and weight, has double the accuracy, and shoots bullets that travel at seven times the speed.[35]  And whereas a musket could fire between three and five times per minute, accounting for a twelve second reload time for a single bullet, an AR-15 can fire a bullet every second without pause and be reloaded in two seconds.[36]

Second, ghost guns are easier and faster to produce due to technological advances, including the internet.  In the eighteenth century, "[f]irearms were the most technologically complex objects most people ever encountered."[37]  Gun-making was a small-scale, specialized trade in which each firearm was crafted by hand through a month-long process of forging, assembling, grinding, and filing each component.[38]  Muskets, for example, were composed of a wooden stock, a lock mechanism made of iron and steel, an iron barrel, and other brass parts.

---

[35] *See* Armed Servs. Tech. Info. Agency, *Report on a Test of Rifle, Caliber .223, AR- 15*, at 1 (Nov. 1960).

[36] *Id.*; *see also* Charles C. Carlton, *This Seat of Mars: War and the British Isles 1585–1746*, at 171–73 (2011) ("A well-trained infantryman could fire five shots per minute."); Christopher Ingram, *What 'Arms' Looked Like When the 2nd Amendment Was Written*, WASH. POST (June 13, 2016), https://perma.cc/MCW3-JZ2X (captured May 29, 2024) ("a skilled" musket or flintlock pistol shooter could fire "three or possible four rounds" per minute); *see* T.Rex Arms, *2 Second Rifle Speed Reload Standard*, at 0:01–0:03, YouTube (Jan. 10, 2017), https://perma.cc/2CTE-6L5N (captured May 20, 2024).

[37] DeLay, *supra* note 9, at 60–61.

[38] James B. Jacobs & Alex Haberman, *3D-Printed Firearms, Do-It-Yourself Guns, & the Second Amendment*, 80 L. & CONTEMP. PROBS. 129, 137 (2017); Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 92 BUS. HIS. REV. 57, 63 (2018).

While carpenters could make stocks and blacksmiths could make brass components, locks and barrels were extremely complex to make and required high-quality material.[39]  The process was time-consuming and expensive, and consumer demand was relatively low.[40]  The main driver of gun development was not private but military need.[41]  Gun culture was thus utilitarian, not consumerist.[42]

Put simply, there was no tradition of self-made firearms at the Founding akin to homemade ghost guns today.[43]  Most gunsmiths, who were skilled professionals, simply repaired firearms; only a small proportion of even these skilled professionals assembled or made new guns.[44]  The difficulty of making guns for the military, much less for personal use, is underscored by the fact that Americans relied heavily on European guns and gun components during the Revolution and pre-Revolution battles.[45]  Even though the federal government tried to encourage domestic production, Americans simply lacked the resources and specialization of labor that gave Europe a competitive edge.[46]

---

[39] DeLay, *supra* note 9, at 61.

[40] Regele, *supra* note 38, at 63.

[41] *See* DeLay, *supra* note 9, at 74–79.

[42] *Id.* at 13.

[43] *Id.* at 71–72.

[44] *Id.* at 67–71.

[45] *Id.* at 74, 78.

[46] DeLay, *supra* note 9, at 72–78.

By contrast, a relative amateur today can assemble or manufacture a functional semi-automatic pistol or rifle at home in an hour or less using unregulated ghost gun parts or kits or a 3D printer. This problem—or anything akin to it—did not exist when now-antiquated guns were used to wage our Revolution. Ghost guns thus present an exceptional societal concern that merits effective regulations, even if those regulations lack a "historical twin." *Bruen*, 597 U.S. at 30. The Ammunition Laws provide such a solution.

Even crediting the district court's superficial likening of ghost guns to "[g]uns made without serial numbers" in the eighteenth and nineteenth centuries, since *Bruen*, this Court and many others have held that new societal concerns can develop even for issues that existed at the Founding when those issues, or their role in society, changes. In *United States v. Alaniz*, this Court considered the constitutionality of a sentencing enhancement for possession of a dangerous weapon at the time of a felony drug offense. The Court held that, although smuggling existed at the Founding, illegal drug trafficking presented "unprecedented contemporary concerns regarding drug abuse." *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023). Accordingly, the Court did not limit its search for historical analogues to those involving drug offenses. *Id.* at 1130; *accord Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 43–44 (1st Cir. 2024) (although some multi-shot weapons existed at the Founding, the present-day

29

use of firearms firing more than 10 rounds in mass shootings poses an unprecedented societal concern). The Court should do the same here.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Appellant's brief, the district court's judgment should be reversed, and this Court should remand for entry of judgment in favor of the Attorney General.

Respectfully submitted,

*/s/ Michael K. Plimack*

| | |
|---|---|
| Douglas N. Letter | Michael K. Plimack |
| Shira Lauren Feldman | Nathan E. Shafroth |
| BRADY CENTER TO PREVENT GUN VIOLENCE | COVINGTON & BURLING LLP |
| 840 First Street, N.E., Suite 400 | 415 Mission Street, Suite 5400 |
| Washington, DC 20002 | San Francisco, CA 94105-2533 |
| (202) 370-8100 | mplimack@cov.com |
| | (415) 591-6000 |

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN
VIOLENCE
840 First Street, N.E., Suite 400
Washington, DC 20002
(202) 370-8100

Michael K. Plimack
Nathan E. Shafroth
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
mplimack@cov.com
(415) 591-6000

Esther Sanchez-Gomez
William T. Clark
GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE
268 Bush Street #555
San Francisco, CA 94104

Hassan Ahmad
Tori N. Keller
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, DC 20001

May 31, 2024

*Counsel for* Amici Curiae

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form08instructions.pdf](http://www.ca9.uscourts.gov/forms/form08instructions.pdf)

**9th Cir. Case Number(s)** No. 24-542

I am the attorney or self-represented party.

**This brief contains 6,988 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Michael K. Plimack*      **Date** May 31, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*