No. 24-542

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

KIM RHODE, ET AL.,

*Plaintiffs-Appellees,*

v.

ROB BONTA, in his official capacity as Attorney General
of the State of California,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Southern District of California
No. 3:18-cv-00802-BEN-JLB
Hon. Roger T. Benitez

_____

**BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE
IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

_____

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, D.C. 20044
(202) 517-6620
fjamison@everytown.org

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163

May 31, 2024

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT ...................................................................................2

    I.    Plaintiffs Have Not Met Their Burden to Establish that the Second
        Amendment's Plain Text Covers Their Conduct .......................................2

    II.   The Court Should Consider Evidence From the Reconstruction Era and
        Later .......................................................................................6

        a.    The Proper Focus for *Bruen*'s Historical Analysis Is 1868 Rather Than
           1791 .............................................................................7

        b.    The District Court Was Wrong to Discount Historical Evidence
           Postdating 1868 ...............................................................17

CONCLUSION.................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. Chiumento*,
  89 F. 4th 271 (2d Cir. 2023), *petition for cert. filed*, No. 23-910
  (U.S. Feb. 20, 2024) ....................................................................... *passim*

*Baird v. Bonta*,
  81 F.4th 1036 (9th Cir. 2023) ............................................................11

*Bevis v. City of Naperville*,
  85 F.4th 1175 (7th Cir. 2023), *petitions for cert. filed*, Nos. 23-877, 23-878,
  23-879, 23-880 (U.S. Feb. 12, 2024) .............................................4, 6

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..................................................................... *passim*

*Doe v. Bonta*,
  --- F.4th ----, No. 23-55133, 2024 WL 2037144 (9th Cir. May 8, 2024) .............4

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ..............................................................9

*Gould v. Morgan*,
  907 F.3d 659 (1st Cir. 2018) ..............................................................9

*Kipke v. Moore*,
  No. 1:23-cv-01293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) .......................11

*Lara v. Comm'r Pa. State Police*,
  91 F.4th 122 (3d Cir. 2024) ..............................................................12

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ........................................................................8

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) .......................................................................21

*McRorey v. Garland*,
  99 F.4th 831 (5th Cir. 2024) .......................................................2, 4, 5

*Md. Shall Issue, Inc. v. Moore*,
  86 F.4th 1038 (4th Cir. 2023), *vacated on grant of reh'g en banc*, 2024 WL 124290
  (4th Cir. Jan. 11, 2024) ....................................................................6

*Md. Shall Issue, Inc. v. Montgomery County*,
   680 F. Supp. 3d 567 (D. Md. 2023), *appeal docketed*, No. 23-1719
   (4th Cir. July 10, 2023) .........................................................................11

*N.Y. State Firearms Ass'n v. James*,
   No. 6:23-cv-06524, 2024 WL 1932050 (W.D.N.Y. May 2, 2024),
   *appeal docketed*, No. 24-1290 (2d Cir. May 14, 2024) ............................22

*Nat'l Rifle Ass'n v. Bondi*,
   61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346
   (11th Cir. 2023) .....................................................................................10

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022)................................................................................ *passim*

*Rupp v. Bonta*,
   No. 8:17-cv-00746, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024),
   *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024) ....................10, 12

*Teixeira v. County of Alameda*,
   873 F.3d 670 (9th Cir. 2017) (en banc)..................................................5

*United States v. Alaniz*,
   69 F.4th 1124 (9th Cir. 2023) ...............................................................11

*United States v. Greeno*,
   679 F.3d 510 (6th Cir. 2012) ..................................................................9

*United States v. Libertad*,
   No. 1:22-cr-00644, 2023 WL 4378863 (S.D.N.Y. July 7, 2023) ...........6

*United States v. Meyer*,
   No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023).........15

*United States v. Perez-Garcia*,
   96 F.4th 1166 (9th Cir. 2024) ............................................................4, 17

*We the Patriots, Inc. v. Lujan Grisham*,
   No. 1:23-cv-00773, 2023 WL 6622042 (D.N.M. Oct. 11, 2023),
   *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023) .......................11

## STATUTES AND RULES

Cal. Penal Code § 30312(b) ........................................................................5

Cal. Penal Code § 30352(c) ........................................................................5

Cal. Penal Code § 30370 .............................................................................5

## OTHER AUTHORITIES

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ...............15, 16

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (July 20, 2021)............................................17

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018)................................................17

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022)....13

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ...................................13, 14

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (now published at 97 Ind. L.J. 1439), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ...............15, 16

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022)........................................................14

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ........................................13

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ........................................14

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ................................13

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021)........................................13

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

California's ammunition background check requirements are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), for the reasons stated in the State's opening brief, Dkt. 13.1 ("State Br.").[2] Everytown submits this amicus brief to expand on

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

[2] This amicus brief addresses only aspects of Plaintiffs-Appellants' Second Amendment claim. The Court should reverse the district court's judgment and

two methodological points. *First*, on the initial, textual inquiry of *Bruen*'s framework, Plaintiffs have the burden to establish that the law's requirements infringe their right to keep and bear arms, and they have not met that burden. Rather, as the Fifth Circuit recently explained, such "ancillary firearm regulations" do not fall within the scope of the Second Amendment's plain text at all, but instead are presumptively lawful "conditions and qualifications on the commercial sale of arms." *See McRorey v. Garland*, 99 F.4th 831, 836-39 (5th Cir. 2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008)). *Second*, if this Court were to reach the historical inquiry of the *Bruen* framework—which asks whether a law is "consistent with the Nation's historical tradition of firearm regulation," 597 U.S. at 24—it should center its analysis on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. Moreover, 1868 is neither a starting line nor a cutoff; under *Bruen* and *Heller*, both earlier and later history are also relevant.

## ARGUMENT

## I.    Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an

---

remand for entry of judgment in favor of the State for all the reasons the State set out.

individual's conduct." *Bruen*, 597 U.S. at 17. If so, the court then asks whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* If not, the inquiry ends. *See generally id.* at 31-38 (separating application of test into Part III.A (text) and Part III.B (history)).

The burden to satisfy the initial, textual inquiry is on the plaintiff challenging a law. *See* State Br. 18-19. *Bruen* makes this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises after ("when" or "because") the textual inquiry is satisfied. *See Bruen*, 597 U.S. at 24, 44 n.11. The burden shifts to the government only after this threshold analysis. If the burden were on the government throughout—in what would be an unusual departure from ordinary principles of constitutional litigation—the Court would have said so. Instead, *Bruen* discusses the government's burden only at the historical step. *See, e.g.*, *id.* at 33-34 ("[T]he burden falls on [the government] to show that [the challenged restriction] is consistent with this Nation's historical tradition of firearm regulation."). Multiple courts—including the Second and Seventh Circuits—have thus correctly read *Bruen* to place the burden on the plaintiff to establish that the Second Amendment's plain text covers their conduct. *See, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 383 (2d Cir. 2023) (explaining that plaintiffs were "required to show" that proposed conduct "was within the plain text of the Second Amendment"), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024); *Bevis v. City of Naperville*, 85

3

F.4th 1175, 1194 (7th Cir. 2023) (observing that that "plaintiffs ... have the burden" on *Bruen*'s textual inquiry), *petitions for cert. filed*, Nos. 23-877, 23-878, 23-879, 23-880 (U.S. Feb. 12, 2024).[3]

As the State has explained, Plaintiffs have not met their textual burden. *See* State Br. 18-27. They have not shown—and cannot show—that the Second Amendment protects a right to purchase ammunition without a background check. *See id.*; *see also, e.g., Doe v. Bonta*, --- F.4th ----, No. 23-55133, 2024 WL 2037144, at *5 (9th Cir. May 8, 2024) (stating that "critical inquiry" at text step is "what conduct of the plaintiffs is relevant," and that "*Bruen* itself suggests that the relevant conduct of the plaintiffs is 'the proposed course of conduct,' *i.e., the conduct the regulation prevents plaintiffs from engaging in*" (emphasis added) (quoting *Bruen*, 579 U.S. at 32)). The Fifth Circuit's recent decision in *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024), is particularly instructive. There, the court found that "ancillary firearm regulations such as background checks preceding sale" do not fall within the scope of the Second Amendment's plain text, but instead are presumptively lawful "conditions and qualifications on the commercial sale of arms." *Id.* at 836-39 (quoting *Heller*, 554 U.S. at 626-27 & n.26). *McRorey* affirmed the denial of a motion

---

[3] This Court has not yet decided which party bears the burden on *Bruen*'s textual inquiry. *See United States v. Perez-Garcia*, 96 F.4th 1166, 1178 n.8 (9th Cir. 2024) (stating that it "need not decide that issue here" because its conclusion on the textual inquiry would be the same "regardless of which party in this case carried the burden on this issue").

for a preliminary injunction against the federal law that requires enhanced background checks, including up to a 10-business-day wait, before federally-licensed dealers may transfer firearms to individuals under age 21. *See id.*

The Fifth Circuit correctly observed in *McRorey* that the Second Amendment's "plain text covers plaintiffs' right 'to keep and bear arms,'" and "on its face 'keep and bear' does not include purchase—let alone without background check." *Id.* at 838. To be sure, "regulations on purchase so burdensome that they act as *de facto* prohibitions on acquisition" would almost certainly be captured by the Second Amendment's text and be "subject to *Bruen*'s historical framework." *Id.* at 838 n.18, 840; *see also, e.g.*, *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (noting that the Second Amendment protects "ancillary rights *necessary to the realization of the core right to possess a firearm for self-defense*" (emphasis added)). But that is not this case, because the burdens here—a background check and a face-to-face transaction—are minimal. *See* Cal. Penal Code § 30312(b) (providing for face-to-face transactions); *id.* §§ 30352(c), 30370 (providing for background checks); s*ee also* State Br. 5-10 (describing statutory requirements). Plaintiffs have offered no evidence that these modest requirements infringe the right to keep and bear arms. *See* State Br. 25-26; *see also McRorey*, 99 F.4th at 840 (holding that a point-of-sale background check, including a 10-business-day waiting period, does not constitute "a *de facto* prohibition on possession" of a firearm, and

thus does not fall within the scope of the Second Amendment's text); *see also, e.g.*, *Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1056 (4th Cir. 2023) (Keenan, J., dissenting) (finding that the Supreme Court "has provided clear guidance that an 'infringement' of an individual's Second Amendment rights would require a greater impediment than a simple processing delay, firearms training, or the imposition of an administrative fee"), *vacated on grant of reh'g en banc*, 2024 WL 124290 (4th Cir. Jan. 11, 2024); *United States v. Libertad*, No. 1:22-cr-00644, 2023 WL 4378863, at *3 (S.D.N.Y. July 7, 2023) (noting that "any number of regulations may incidentally, minimally, or not substantially burden the exercise of a right without being considered to actually 'infringe' it").

In sum, Plaintiffs have not carried their textual burden, and this Court may affirm on that basis alone. *See Bevis*, 85 F.4th at 1192 (explaining that if challenged regulation does not implicate Second Amendment's text, Constitution "has nothing to say" and state is "free to [regulate], or not to [regulate], depending on the outcome of the democratic process").

## II. The Court Should Consider Evidence From the Reconstruction Era and Later

If the Court proceeds to *Bruen*'s second step and inquires whether California's ammunition background check requirements are "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, it may confront the question of whether the most relevant time period for that inquiry

6

centers on the Reconstruction era, and the ratification of the Fourteenth Amendment in 1868, or the founding era, and the ratification of the Second Amendment in 1791, a question *Bruen* explicitly left open. *Id.* at 37-38. The State has demonstrated that its law is entirely consistent with the American tradition of firearms regulation regardless of which period this Court considers. *See* State Br. 15-16, 29-33. But if the Court finds it necessary to decide the question, it should conclude that the most relevant time period centers around 1868. And, contrary to the district court's approach below, *see* 1-ER-19-20, 26, it should further conclude that the historical inquiry extends thereafter, to encompass consistent later restrictions.

### a.  The Proper Focus for *Bruen*'s Historical Analysis Is 1868 Rather Than 1791

Historical tradition—from the founding era and earlier, to the 19th century, through Reconstruction, and beyond—is consistent in demonstrating the constitutionality of background checks. *See* State Br. 5-6, 29-33. Where, as here, the inquiry into the public understanding in 1791 and 1868 yield the same result, the court need not resolve the issue of the correct time period. *See Bruen*, 597 U.S. at 37-38 (recognizing "an ongoing scholarly debate" on the time-period question but ultimately not addressing it because, in *Bruen*, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same"). Nevertheless, if this Court reaches the question, it should hold that the

inquiry centers on 1868.

To begin with, in a case challenging the constitutionality of a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; after all, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 597 U.S. at 37. Thus, because the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35; emphasis added in *Bruen*).

Insisting that the 1791 understanding should apply against the states also does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). As the Second

8

Circuit explained, "[i]t would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 89 F.4th at 305. That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *accord United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified).").[4]

Multiple courts of appeals have reached similar conclusions in the wake of *Bruen*. The Second Circuit recently held that, because the case before it challenged "a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis." *Antonyuk*, 89 F.4th at 304; *see also id.* at

---

[4] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework used by lower federal courts and their step-one analyses remain, as a general matter, good law. *Bruen* removed the second step (means-end scrutiny) of the pre-*Bruen* framework from the analysis, but explained that "[s]tep one of [the prior framework] is broadly consistent with *Heller*." 597 U.S. at 19.

9

318 n.27 ("[E]vidence from Reconstruction regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is at least as relevant as evidence from the Founding Era regarding the Second Amendment itself."). A panel of the Eleventh Circuit similarly held that, in cases involving state laws, where the understanding of the right to keep and bear arms differs between the founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023). Although that panel opinion has now been vacated for rehearing en banc, its analysis of the relevant time period remains consistent with originalist principles. *See Antonyuk*, 89 F.4th at 305 (following *Bondi*). As the panel explained:

> This is necessarily so if we are to be faithful to the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the Second Amendment) and a later one (here, the Fourteenth Amendment and the understanding of the right to keep and bear arms that it incorporates), "the later-enacted [provision] controls to the extent it conflicts with the earlier-enacted [provision]." … The opposite rule would be illogical.

*Bondi*, 61 F.4th at 1323-24 (alterations in original) (citations omitted). Other courts have agreed. *See, e.g.*, *Rupp v. Bonta*, No. 8:17-cv-00746, 2024 WL 1142061, at *9, 31-32 (C.D. Cal. Mar. 15, 2024) (concluding that "ratification of the Fourteenth

Amendment is the operative period from which to discern the public understanding of the Second Amendment"), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024); *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 582 (D. Md. 2023) (concluding that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Kipke v. Moore*, No. 1:23-cv-01293, 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) (agreeing with *Maryland Shall Issue*); *We the Patriots, Inc. v. Lujan Grisham*, No. 1:23-cv-00773, 2023 WL 6622042, at *8 (D.N.M. Oct. 11, 2023) (agreeing with *Bondi* and *Maryland Shall Issue* that "that historical sources from … 1868 are more probative of the scope of the Second Amendment's right to bear arms than those from the Founding Era"), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023). And these decisions are consistent this Court's post-*Bruen* jurisprudence, which has relied on Reconstruction-era evidence to uphold modern-day restrictions. *See United States v. Alaniz*, 69 F.4th 1124, 1129 & n.2 (9th Cir. 2023) (relying on consistent historical evidence through "the Second Founding" to uphold a sentencing enhancement tied to firearm possession, and thus finding that it "need not reach the question of the proper era from which to draw the historical analogues"); *see also Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (stating that, under the historical

inquiry, courts should look for analogues "when the Second *or Fourteenth Amendment* was ratified" (emphasis added)).[5]

The conclusion that the 1868 understanding of the Second Amendment right should apply in a case against a state is far from a radical one. Indeed, it was the position former Solicitor General Paul Clement took as counsel for the NRA's New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

---

[5] The Court should not follow the Third Circuit's focus on 1791 in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024). Instead of engaging with originalist principles, the Third Circuit based its conclusion on the "general assumption" in several Supreme Court cases cited by *Bruen*. *See id.* at 133-33 (citing *Bruen*, 597 U.S. at 37). But those cases did not address the significance of the Fourteenth Amendment's ratification for the question of which time period is most relevant to the historical inquiry and cannot have resolved the question that *Bruen* expressly left open. *See Bruen*, 597 U.S. at 37-38. At the very least, because it relied on an assumption and cannot be squared with originalist principles, *Lara* is not persuasive. *See Rupp*, 2024 WL 1142061, at *32 (declining to follow *Lara* because, "[r]ather than elevate an assumption to a holding, the Court thinks it best to address the issue from first principles and … the Court is persuaded that Reconstruction-era practice provides the most probative evidence of the Second Amendment's meaning").

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

It is also the position of leading originalist scholars. *See, e.g.*, Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("1868 is … the proper temporal location for applying a whole host of rights to the states, including the right that had earlier been codified as the Second Amendment …. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right" that 1868 meaning controls); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"). Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill [of Rights]

in 1789 is to be preferred to its meaning in 1868.").[6] In sum, originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

A question raised by that conclusion (though one not directly presented in this case) is what the temporal focus should be in cases challenging *federal* laws. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* seemed to reject the possibility of different standards for the state and federal governments. 597 U.S. at 37 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as

---

[6] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the federal government. Professors Blackman and Shapiro, for example, maintained (pre-*Bruen*) that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, *supra*, at 51. As discussed below, *Bruen* appears to require originalists to choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 14-17.

against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted only that prior decisions had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. If the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id*. at 37-38. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g.*, *United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice

Thomas, writing for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[7] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 597 U.S. at 38. On this view, too, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive places restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 597 U.S. at 30 (emphasis

---

[7] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

16

added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period.[8]

Here, the district court placed "emphasis … on the earlier time period" without meaningfully grappling with this debate. *See* 1-ER-19; *see also id.* (deeming sources postdating 1791 "less helpful"). Should the Court reach the question, it should find that 1868 is the proper focus for *Bruen*'s historical analysis.

### b. The District Court Was Wrong to Discount Historical Evidence Postdating 1868

In addition to concluding that 1868, rather than 1791, should be the focus of the historical analysis, this Court should also recognize that 1868 is neither a starting line nor a cutoff, and that consistent later history is also highly relevant. *Heller* and *Bruen* both considered history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 597 U.S. at 34-35, 44-50, making the district court's seeming rejection of sources pre-dating the Constitution, *see* 1-ER-19, puzzling. *See also Perez-Garcia*, 96 F.4th at 1191 (listing "English history" among relevant sources).

---

[8] Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

And, even more notable to this case, under *Heller* and *Bruen*, the district court was wrong to arbitrarily cut off the historical record at 1868 (or 1888).[9]

*Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 597 U.S. at 20 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison). Thus, regardless of which period (founding or Reconstruction) this Court determines to be the most relevant, it should look to "practice" thereafter to "settle" the meaning of the right

---

[9] The district court initially directed the State to produce a list of relevant historical laws from "the time of the Second Amendment to twenty years after the Fourteenth Amendment"—specifically, 18<u>88</u>. 1-ER-20. But it limited its focus to "50 historical laws dating from 1789 to 18<u>68</u>." *Id.* at 24 (emphasis added). For the reasons explained in this Section, either cutoff is arbitrary and inconsistent with *Bruen*.

18

and demonstrate that California's ammunition background check requirements are

constitutional. *See* State Br. 37.

The district court nevertheless discounted the State's post-1868 history. *See*

1-ER-19-20, 26. It did so in part because, in its view, under *Bruen*, "[l]ate

nineteenth century evidence is not particularly instructive." *Id.* at 19 (citing *Bruen*,

597 U.S. at 36).[10]  But that is not correct, as a close reading of *Bruen* shows. There,

the Court found what it described as "overwhelming evidence of an otherwise

---

[10] As the State explained in its stay motion, considering later historical
evidence is especially warranted here given the "dramatic technological changes"
and "unprecedented societal concerns" present in this case. *See* Dkt. 4.1 at 17.
More specifically, background checks of the type at issue in this case were not
technically possible in earlier eras. *See id.* (noting that "[b]ackground checks (in the
modern sense) became feasible only after the development of a reliable and fast
internet, computer databases, and other technological changes"); *see also* 2-ER-103-
108 (Declaration of Prof. Robert Spitzer) (explaining the technological changes
through the late-19th and 20th centuries that allowed for modern background
check laws); *Antonyuk*, 89 F.4th at 322-24 (noting that the "explosive growth of
cities" and concomitant emergence of organized police forces in the decades after
the Civil War was accompanied by increased administrative capacity that made
new forms of regulation possible, so that restrictions that were once enforced only
ex post by justices of the peace could now operate ex ante through licensing).
Additionally, the need to require background checks for ammunition has greatly
increased with the recent rise of 3D-printed firearms and self-assembled "ghost
guns," which enable purchasers to more easily evade background check
requirements for firearm sales. *See* Dkt. 4.1 at 17 (explaining that the challenged
law "also address[es] the modern proliferation of 'ghost guns'"); 2-ER-469
(California Department of Justice report noting that the number of ghost guns
recovered by law enforcement in California increased from 707 in 2018 to 12,894
in 2022). These dramatic changes in circumstances call for "a more nuanced
approach" to the historical analysis, *see Bruen*, 597 U.S. at 27, including
consideration of more recent historical practice.

enduring American tradition permitting public carry." *Bruen*, 597 U.S. at 67. That "overwhelming evidence," in the Court's view, was directly contrary to the challenged New York law, which "operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id*. at 60; *see also id*. at 71 (similar). For example, the Court reviewed cases from the early- and mid-19th century and concluded that "these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues." *Id.* at 55. And it read surety statutes from the mid-19th century as establishing that "everyone started out with robust carrying rights." *Id.* at 57 (cleaned up).

Together, the cases, statutes, and other evidence the Court canvassed constituted "overwhelming evidence" that law-abiding citizens with ordinary self-defense needs had the right to carry handguns outside the home for that purpose, *see id.* at 67—which New York's law did not permit. And it was in this context that the Court approached the 19th-century laws that operated similarly to New York's (an 1871 Texas law that limited public carry to those with special need for self-defense) or were even stricter (laws, primarily from territories, that completely prohibited carrying handguns in towns, cities, and villages). *See id*. at 64-68. Because these laws contradicted the challengers' "overwhelming" affirmative evidence that individuals with ordinary self-defense needs had a right to carry in

public, they could not carry New York's burden to establish consistency with historical tradition. And that is the context in which the Court announced that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 66.

Such contradictions are entirely absent here. There is no evidence that there was ever a constitutional right to purchase ammunition without a background check, or that the public understanding of the right underwent some startling transformation between 1791 and 1868 (or later). *See* State Br. 29-33, 37; *cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) ("Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness."); *Antonyuk*, 89 F.4th at 304 (finding it "implausible" that "public understanding would promptly dissipate whenever [one] era gave way to another"). Without such contradictory evidence, *Bruen* places no limitation on the "insight into the meaning of the Second Amendment" that late-19th-century evidence (or even early 20th-century evidence[11]) can provide.

Here, laws from 1868 and later, including carry-licensing laws from the late 19th century, are consistent with earlier historical principles—and make clear the

---

[11] *Bruen*'s reason for dismissing New York's early-20th-century evidence was the same as for its late-19th-century evidence: it "does not provide insight into the meaning of the Second Amendment *when it contradicts earlier evidence*." 597 U.S. at 66

constitutionality of California's law. *See* State Br. 31-32; *see also N.Y. State Firearms Ass'n v. James*, No. 6:23-cv-06524, 2024 WL 1932050, at *6 (W.D.N.Y. May 2, 2024) (holding that New York's similar "ammunition background check requirement is consistent with 'the well-recognized historical tradition of preventing dangerous individuals from possessing weapons'" (quoting *Antonyuk*, 89 F.4th at 307)), *appeal docketed*, No. 24-1290 (2d Cir. May 14, 2024).

*   *   *

In sum, if this Court reaches this question, it should focus any historical inquiry on the period around 1868, and it should further consider the "regular course of practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like California's ammunition background check requirements.

---

n.28 (emphasis added). Here, the analogous 20th-century laws that the State and its experts have pointed to do not contradict any earlier evidence. *See, e.g.*, 1-ER-118-119 (20th-century licensing laws); *see also* State Br. 5-6 (modern firearm and ammunition background check laws).

## CONCLUSION

This Court should reverse the district court's judgment and remand for entry of judgment in favor of the State.

Respectfully submitted,

Dated: May 31, 2024

/s/ Freya Jamison
Freya Jamison

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, D.C. 20044
(202) 517-6620
fjamison@everytown.org

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163

*Counsel for amicus curiae*
*Everytown for Gun Safety*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number:** 24-542

I am the attorney or self-represented party.

**This brief contains <u>5,783</u> words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Freya R. Jamison        **Date** 05/31/2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**        *Rev. 12/01/22*