No. 24-542

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

KIM RHODE; GARY BRENNAN; CORY HENRY; EDWARD JOHNSON; SCOTT LINDEMUTH; RICHARD RICKS; DENISE WELVANG; ABLE'S SPORTING, INC., a Texas corporation; AMDEP HOLDINGS, LLC, a Florida limited liability company doing business as Ammunition Depot; R&S FIREARMS, INC., an Arizona corporation doing business as Sam's Shooters Emporium; CALIFORNIA RIFLE & PISTOL ASSOCIATION, a California corporation,
*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California,
*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA, CASE NO.3:18-CV-00802-BEN-JLB, THE HONORABLE JUDGE ROGER T. BENITEZ

---

### BRIEF OF NATIONAL ASSOCIATION FOR GUN RIGHTS AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 WADSWORTH BOULEVARD
WHEAT RIDGE, COLORADO 80033
(303) 205-7870
E-mail: barry@arringtonpc.com
*Attorney for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

National Association for Gun Rights has no parent corporations. It has no stock. Therefore, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF CONTENTS ...........................................................ii

TABLE OF AUTHORITIES ......................................................iii

INTEREST OF AMICUS .........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................2

ARGUMENT .....................................................................5

I. The Right to Keep and Bear Arms is Not a Second-Class Right .......................................................5

II. The Right to Purchase Ammunition is an Integral Part of the Fundamental Right to Keep and Bear Arms ...........................................................9

III. Voting Rights Are Fundamental .........................................10

IV. Historically, Second Amendment Rights Have Been Denied in the Same Way as Voting Rights .........................10

Poll Taxes ...............................................................11

Testing Requirements................................................13

V. The District Court's Reliance on Voting Rights Precedent Was Particularly Apt .......................................15

VI. The Court Should Treat These Plaintiffs with the Same Dignity as it Would Treat Voting Rights Plaintiffs ...............................................................18

CONCLUSION ...................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Breedlove v. Suttles,*
    302 U.S. 277 (1937) ...................................................................... 12

*Butler v. Thompson,*
    341 U.S. 937 (1951) ...................................................................... 12

*D.C. v. Heller,*
    554 U.S. 570 (2008) ................................................................... 6, 7

*Duncan v. Bonta,*
    19 F.4th 1087 (9th Cir. 2021) ........................................................ 6

*Gonzalez v. Arizona,*
    485 F.3d 1041 (9th Cir. 2007) ..................................................... 11

*Harper v. Virginia State Bd. of Elections,*
    383 U.S. 663 (1966) ............................................................ *passim*

*Idaho Coal. United for Bears v. Cenarrusa,*
    342 F.3d 1073 (9th Cir. 2003) ............................................. 8, 9, 10

*Jackson v. City & Cnty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ......................................................... 9

*McDonald v. Chicago,*
    561 U.S. 742 (2010) ........................................................ 2, 5, 6, 7

*Murphy v. Guerrero,*
    2016 WL 5508998, (D. N. Mar. I. Sept. 28, 2016) ................... 12, 13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) ................................................................. *passim*

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ................................................................ 8, 10

*Rhode v. Bonta,*
    __ F.Supp.3d ___, 2024 WL374901 (S.D. Cal. 2024) ........... 9, 16, 17

iii

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) .......................................................... 13, 14, 17

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ...................................................... 9

*United States v. Atkins*,
    323 F.2d 733 (5th Cir. 1963) ................................................... 13

*United States v. Rahimi*,
    144 S. Ct. 1889 (2024) ............................................................ 5, 6

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016), *cert. denied*, 580 U.S. 1104
    (2017) .......................................................................... 4, 15, 16, 17

## Statutes & Other Authorities:

U.S. Const. Amend. II ............................................................ *passim*

U.S. Const. Amend. XIV ................................................................7

U.S. Const. Amend. XV ............................................................ 4, 17

1 St. George Tucker, *Blackstone's Commentaries: With Notes of
    Reference to the Constitution and Laws of the Federal Government
    of the United States; and of the Commonwealth of Virginia* app.
    n.D, at 300 (Phil., William Young Birch &
    Abraham Small 1803) .................................................................. 10

J. Baxter Stegall, *The Curse of Ham: Disarmament Through
    Discrimination - the Necessity of Applying Strict Scrutiny
    to Second Amendment Issues in Order to Prevent Racial
    Discrimination by States and Localities Through Gun
    Control Laws*, 11 Liberty U.L. Rev. 271 (2016) ............................ 11

Mark W. Smith, *NYSRPA v. Bruen: A Supreme Court Victory for
    the Right to Keep and Bear Arms-and A Strong Rebuke to
    "Inferior Courts,"* 2022 Harv. J.L. & Pub. Pol'y Per Curiam
    24 (2022) ....................................................................................... 7, 8

SB 14............................................................................................. 16, 17

iv

## INTEREST OF AMICUS

The right to keep and bear arms is a fundamental right that existed prior to the Constitution. The right is not in any sense granted by the Constitution. Nor does it depend on the Constitution for its existence. Rather, the Second Amendment declares that the pre-existing "right of the people to keep and bear Arms shall not be infringed." The National Association for Gun Rights ("NAGR")[1] is a nonprofit membership and donor-supported organization with hundreds of thousands of members nationwide. The sole reason for NAGR's existence is to defend American citizens' right to keep and bear arms. In pursuit of this goal, NAGR has filed numerous lawsuits seeking to uphold Americans' Second Amendment rights. NAGR has a strong interest in this case because the guidance the Court will provide in its resolution of this matter will have a major impact on NAGR's ongoing litigation efforts in support of Americans' fundamental right to keep and bear arms.

---

[1] No party's counsel authored this brief in whole or in part and other than NAGR no person contributed money to fund its preparation or submission. All parties consent to the submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In *McDonald v. Chicago*, 561 U.S. 742 (2010), and again in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Court cautioned the lower federal courts against treating the fundamental right to keep and bear arms as a "second-class right." Indeed, *Bruen* can perhaps best be seen as a corrective to the circuit court's failure to heed this caution after *McDonald*.

The contrast between the circuit court's shabby treatment of the right to keep and bear arms and other fundamental rights is perhaps no more obvious than when one compares Second Amendment cases to voting rights cases. In *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966), the Court held that burdens on the right to vote must be "carefully and meticulously scrutinized." And that is exactly what the circuit courts have done since 1966. Not so when it comes to the Second Amendment. As the government's 50-0 post-*McDonald* win streak in this circuit attests, the circuit courts have done exactly the opposite of "carefully and meticulously scrutiniz[ing]" burdens on the right to keep and bear arms. Gun owners are not asking for special treatment. They ask only that the courts treat their fundamental right to keep and bear

2

arms with the same dignity and respect as other rights, such as the right to vote.

The right to acquire ammunition is integral to the right to use a firearm protected by the Second Amendment. After all, without bullets, the right to bear a firearm would be meaningless. Voting rights are also fundamental in a free and democratic society. The right to vote and the right to bear arms are similar in another respect. Historically, the governments that denied marginalized groups the right to vote also denied those groups' right to bear arms for self-defense, often using the same tactics.

Indeed, the similarities between historical disenfranchisement laws and historical disarmament laws is striking. In both cases, unscrupulous government officials have imposed burdens such as excessive taxes and unreasonable licensing schemes to deny both rights. For example, poll taxes and prohibitive taxes on firearms or ammunition have this in common: They both restrict the exercise of a fundamental right on the basis of wealth and the ability to pay. In both cases, this is repugnant to the Constitution. Similarly, unreasonable licensing burdens are just as unconstitutional in the context of Second Amendment

arms rights as they are in the context of Fifteenth Amendment voting rights.

Because of the parallels between the development of voting rights law and Second Amendment law, the district court's reliance on the Fifth Circuit's voting rights decision in *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016), *cert. denied*, 580 U.S. 1104 (2017), was particularly apt. In *Veasey*, the court struck down a Texas law that effectively disenfranchised 4.5 percent of registered voters in the state and imposed burdens on voters similar to the burdens imposed by the California statute challenged in this case. The district court reasoned that if it was unlawful for Texas to impose an identification requirement that effectively disenfranchised 4.5% of the registered voters in the state, surely it is wrong for California to impose an identification requirement that blocks an untold number of gun owners from undergoing an ammunition background check and then rejects 11% of those who are checked. This conclusion was undoubtedly correct, and for that reason NAGR urges the Court to affirm the district court's decision.

4

# ARGUMENT

## I. The Right to Keep and Bear Arms is Not a Second-Class Right

In *McDonald*, the Court held that the right to keep and bear arms is among the "fundamental rights necessary to our system of ordered liberty." *Id.*, 561 U.S. at 778. See also *United States v. Rahimi*, 144 S. Ct. 1889, 1891 (2024). Unfortunately, in the years that followed *McDonald*, the lower courts largely failed in their duty to protect American citizens' fundamental Second Amendment rights. Justice Kavanaugh described the lower courts' failure as follows:

> Just consider how lower courts approached the Second Amendment before our decision in *Bruen*. They reviewed firearm regulations under a two-step test that quickly devolved into an interest-balancing inquiry, where courts would weigh a law's burden on the right against the benefits the law offered. Some judges expressed concern that the prevailing two-step test had become just window dressing for judicial policymaking. To them, the inquiry worked as a black box regime that gave a judge broad license to support policies he favored and discard those he disliked. How did the government fare under that regime? *In one circuit, it had an undefeated, 50–0 record.* In *Bruen*, we rejected that approach for one guided by constitutional text and history.

*Rahimi*, 144 S. Ct. at 1909 (Kavanaugh, J., concurring) (internal citations and quotation marks omitted, emphasis added, cleaned up).[2]

After years of observing the lower courts' failures in the Second Amendment context, the Court announced a course correction in *Bruen*. The Court wrote that if the last decade of Second Amendment litigation had taught it anything, it is that the lower courts too often deferred to legislatures under the "banner of 'intermediate scrutiny.'" 597 U.S. at 26. Hence, *Bruen* repudiated the intermediate scrutiny analysis that had been developed by the circuit courts in the wake of *McDonald* in favor of the text and history analysis established in *D.C. v. Heller*, 554 U.S. 570 (2008). *Bruen*, 597 U.S. at 17.

The law challenged in *Bruen* was a New York statute that granted licensing officials discretion to deny licenses to carry firearms in public based on a perceived lack of need or suitability. The Court held this discretionary-issue law unconstitutional. In doing so, it emphatically called on the lower courts to stop treating the constitutional right to keep and bear arms as a "second class right" subject to an entirely different

_____

[2] The Court should note particularly Justice Kavanaugh's criticism of its Second Amendment jurisprudence. *Id.*, quoting *Duncan v. Bonta*, 19 F.4th 1087, 1167, n.8 (9th Cir. 2021) (VanDyke, J., dissenting).

body of rules than the other Bill of Rights guarantees. 597 U.S. at 70, citing *McDonald*, 561 U.S. at 780.

*Bruen* did nothing novel when it invalidated New York's law giving government officials unfettered discretion to prevent citizens from exercising their constitutional rights. See Mark W. Smith, *NYSRPA v. Bruen: A Supreme Court Victory for the Right to Keep and Bear Arms-and A Strong Rebuke to "Inferior Courts"*, 2022 Harv. J.L. & Pub. Pol'y Per Curiam 24, 6 (2022). Rather, the Court held that it was reiterating its prior precedent, especially *Heller. Bruen*, 597 U.S. at 24. *McDonald* had specifically stated that the fundamental right to keep and bear arms should be treated the same as other fundamental rights recognized under the Fourteenth Amendment. The Court wrote that any argument that the right should be circumscribed compared to other rights is "inconsistent with the long-established standard we apply in incorporation cases." 561 U.S. at 781. *Bruen* needed to reiterate *McDonald's* admonition because, as discussed above, in the dozen years after *McDonald*, that admonition had gone largely unheeded by the circuit courts.

The contrast between the circuit courts' shabby treatment of the right to keep and bear arms compared to other constitutional guarantees is perhaps no more obvious than when one compares Second Amendment cases to voting rights cases. See Smith, *supra*, at 6, citing *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) ($1.50 poll tax unconstitutional) and *Reynolds v. Sims*, 377 U.S. 533 (1964) (vote diluting discrimination unconstitutional). Burdens on the right to vote must be "carefully and meticulously scrutinized." *Harper, supra*, 383 U.S. at 667. Hence, "the Court has been aggressive in finding voting rights abridgments unconstitutional." *Smith*, at 6. And the circuit courts, including this one, have adhered to this doctrine scrupulously.[3]

If nothing else, *Bruen* stands for the proposition that the lower courts must subject burdens on the right to keep and bear arms to at least the same level of scrutiny to which they subject burdens on the right to vote. *Smith*, *supra*, at 6. Impediments on the right such as fees, taxes, labor, and delay must be subjected to searching constitutional scrutiny, and any attempt to use these procedural maneuvers to burden the

---

[3] See, e.g., *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073 (9th Cir. 2003).

8

fundamental right to keep and bear arms must be struck down. *Id*. Gun owners are not asking for special treatment; they ask only that their Second Amendment rights be treated with the same dignity and respect as the courts have treated other constitutional guarantees such as the right to vote. *Id*.

## II.   The Right to Purchase Ammunition is an Integral Part of the Fundamental Right to Keep and Bear Arms

The district court correctly held (and the State concedes) that the right to acquire the ammunition necessary to use a firearm is covered by the Second Amendment. *Rhode v. Bonta*, __ F.Supp.3d ___, 2024 WL 374901, at *4 (S.D. Cal. 2024). While the Second Amendment does not explicitly protect ammunition, without bullets, the right to bear arms would be meaningless. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). Therefore, the right to possess firearms implies a corresponding right to obtain the bullets necessary to use them. *Id*. See also *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (same). Thus, the statutes challenged in this case burden the fundamental right to keep and bear arms.

### III. Voting Rights Are Fundamental

The next step in the analysis is straightforward. Voting rights are undoubtedly fundamental in a free and democratic society, because the right to exercise the franchise in a free and unimpaired manner helps preserve other basic civil and political rights. *Harper,* 383 U.S. at 667, citing *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). See also *Idaho Coalition*, *supra*, 342 F.3d at 1076.

Like the right to vote, the right to keep and bear arms serves to preserve other basic freedoms. Doubtless, this is why prominent early nineteenth-century constitutional authority St. George Tucker referred to the right as the "true palladium of liberty." 1 St. George Tucker, *Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States; and of the Commonwealth of Virginia* app. n.D, at 300 (Phil., William Young Birch & Abraham Small 1803).

### IV. Historically, Second Amendment Rights Have Been Denied in the Same Way as Voting Rights

The right to keep and bear arms is similar to the right to vote in another respect – the burdens governments have imposed on Second Amendment rights are similar to the dirty tricks governments used to

disenfranchise disfavored groups in the darker eras of our history. See generally J. Baxter Stegall, *The Curse of Ham: Disarmament Through Discrimination - the Necessity of Applying Strict Scrutiny to Second Amendment Issues in Order to Prevent Racial Discrimination by States and Localities Through Gun Control Laws*, 11 Liberty U.L. Rev. 271 (2016) (hereinafter "Stegall").

There are strong parallels between the poll taxes and other burdens on the right to vote and unreasonable licensing laws (such as the one struck down in *Bruen*), permitting schemes, fees, and taxes designed to suppress the exercise of Second Amendment rights. Stegall, at 319. Indeed, the similarities between historical disenfranchisement laws and historical disarmament laws is striking, as such laws often walked hand in hand and employed similar techniques. *Id*. at 320.

*Poll Taxes*

Of all of the nefarious schemes governments implemented to prevent disfavored groups from voting, the poll tax was perhaps the most insidious. No one ever doubted that poll taxes were specifically intended to suppress the votes of poor people, especially poor racial minorities. *Gonzalez v. Arizona*, 485 F.3d 1041, 1049 (9th Cir. 2007). Sadly, however,

in the 99 years from the end of the Civil War in 1865 until the ratification of the Twenty-fourth Amendment in 1964, our Nation continued to countenance discriminatory poll tax laws. But the Twenty-fourth Amendment outlawed poll taxes only in federal elections. In *Breedlove v. Suttles*, 302 U.S. 277 (1937), and again in *Butler v. Thompson*, 341 U.S. 937 (1951), the Court upheld the constitutionality of poll taxes in state elections. It was not until *Harper* was decided in 1966 – fully 101 years after the end of the Civil War – that the blight of poll taxes was once and for all eradicated in the entire nation.

In *Harper*, the Court noted that it had long been mindful that where fundamental rights are concerned, restrictions must be "closely scrutinized and carefully confined." *Id*., 316 U.S. at 541. And the right to vote is "too precious, too fundamental" to be restricted on the basis of wealth and the ability to pay. *Id*. The same is true with the right to keep and bear arms. That is why the United States District Court for the Northern Mariana Islands had little difficulty striking down the $1,000 tax the Territory imposed on the sale of handguns. See *Murphy v. Guerrero*, 2016 WL 5508998, (D. N. Mar. I. Sept. 28, 2016). It was obvious to everyone involved that the real purpose of the tax was not to raise

revenue but to suppress the exercise of a fundamental right. The court noted that "the Commonwealth's law would come close to destroying the right to keep and bear a handgun for self-defense – particularly for the most vulnerable members of society." *Id*., at *25. Echoing *Harper*, the court continued: "The government need not arm the poor, but it cannot impose uncommon burdens on their ability to exercise their fundamental constitutional rights."

*Testing Requirements*

After Reconstruction, several states adopted laws that persisted into the 1960s that required citizens to pass various tests as a condition to registering to vote. *South Carolina v. Katzenbach*, 383 U.S. 301, 310-11 (1966). While on their face the laws were racially neutral, their obvious intent was to disenfranchise disfavored minorities and poor whites. *Id*. The laws required citizens to prove among other things that they were literate and had "good morals." *Id*. at 312-13. The Supreme Court was particularly offended by the "good morals" requirement because the standard was "so vague and subjective that it [] constituted an open invitation to abuse at the hands of voting officials." *Id*. at 313, citing *United States v. Atkins*, 323 F.2d 733, 743 (5th Cir. 1963).

Suspension of such tests[4] was the first of the remedies imposed by the
Voting Rights Act of 1965. *Katzenbach*, 383 U.S. at 315. In *Katzenbach*,
the Court upheld the constitutionality of the Act against a challenge
brought by South Carolina. *Id*. at 337.

The New York law challenged in *Bruen* gave licensing officials
similar "unchanneled discretion" to determine if New York citizens would
be permitted to exercise their fundamental right to keep and bear arms.
597 U.S. at 79 (Kavanaugh, J., concurring). The court held that such
discretionary "may issue" licensing laws are facially unconstitutional.
597 U.S. at 70. In the voting rights context, *Katzenbach* was offended by
a "vague and subjective" moral character standard that amounted to "an
open invitation to abuse at the hands of voting officials." For practically
identical reasons, in the Second Amendment context, *Bruen* was offended

---

[4] The Act banned any test that required an applicant to (1) demonstrate
the ability to read, write, understand, or interpret any matter,
(2) demonstrate any educational achievement or his knowledge of any
particular subject, (3) *possess good moral character*, or (4) prove his
qualifications by the voucher of registered voters or members of any other
class. *Id*. at 317-18 (emphasis added). Since the Voting Rights Act has
banned such tests for nearly 60 years, there has never been a case in
which it was necessary for a court to hold them unconstitutional per se.
But there can be no doubt that if such a case were to arise, no court would
countenance giving a government official any discretion (far less
unfettered discretion) to determine whether a citizen could vote.

14

by the vague and subjective proper cause standard that for decades had been abused by New York officials to deny law-abiding citizens their right to carry firearms for self-defense.

## V. The District Court's Reliance on Voting Rights Precedent Was Particularly Apt

As we have seen, the history of the Nation shows a remarkable convergence between the motivations for and the methods used by laws that disenfranchise citizens and laws that disarm them. There have always been powerful interests with no regard for the fundamental rights of ordinary law-abiding citizens. Thankfully, we have made much progress. Poll taxes are a thing of the past, as are discriminatory taxes on guns that operate effectively to disarm citizens of limited means. Government officials may no longer arrogate unto themselves the discretion to determine whether a person may vote. Nor do they have unfettered discretion to determine who may carry arms for the purpose of self-defense.

Because of the parallels between the development of voting rights law and Second Amendment jurisprudence, the district court's reliance on *Veasey v. Abbott*, 830 F.3d 216, 250 (5th Cir. 2016), *cert. denied*, 580

15

U.S. 1104 (2017), was particularly apt. See *Rhode v. Bonta*, 2024 WL 374901, at *8 and n. 25 (S.D. Cal. 2024).

*Veasey* involved a challenge to a Texas voter identification law (SB 14). In determining whether SB 14 had a disparate impact on minority voters, the Texas district court found that 4.5% of registered voters in Texas lacked the types of identification mandated by the statute and these voters were disproportionately minorities. 830 F.3d at 250. The district court also explored the types of burdens the minority voters encountered in complying with the SB 14 identification requirements. These included (1) the difficulty of obtaining an EIC[5] and voting with the proper ID; (2) the cost of underlying documents necessary to obtain an EIC or other SB 14 identification; (3) difficulties with delayed, nonexistent, out-of-state, or amended birth certificates due to nontraditional births and errors on birth certificates; (4) long distances and other travel issues that made getting to a registrar and Department of Public Safety office difficult; (5) an overly strict disability exemption; and (6) a burdensome alternative for voting absentee. 830 F.3d at 254.

---

[5] "EIC" stands for Election Identification Certificate. Texas offered free EICs to voters who did not have other forms of identification such as a driver's license. 830 F.3d at 256.

Based on this evidence the Fifth Circuit upheld the Texas district court's finding that SB 14 imposed significant and disparate burdens on the right to vote. 830 F.3d at 256.

The district court in this case drew some obvious parallels between the Fifth Circuit's reasoning in *Veasey*[6] and the circumstances of this case. The district court concluded that if it was unlawful for Texas to impose an identification requirement that effectively disenfranchised 4.5% of the registered voters in the state, surely it is wrong for California to impose an "identification requirement that blocks an untold number of gun owners from undergoing an ammunition background check and then rejects 11% of those who are checked." *Rhode*, 2024 WL 374901 at *8. Moreover, the kinds of burdens on voting rights identified by the *Veasey* plaintiffs are the same kinds of burdens that Plaintiffs face in this case in order to be eligible for the ammunition background check. *Id*. at *8, n.25.

In drawing these parallels, the district court harkened to *Bruen's* admonition: "The constitutional right to bear arms in public for self-

---

[6] While *Veasey* was technically a Voting Rights Act case, that Act flows directly from the Fifteenth Amendment. *Katzenbach*, 383 U.S. at 328.

defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at *8, quoting *Bruen*, 597 U.S. at 70 (cleaned up). This was entirely appropriate.

## VI. The Court Should Treat These Plaintiffs with the Same Dignity as it Would Treat Voting Rights Plaintiffs

In conclusion, NAGR urges the Court to ask itself the following questions:

1. Would it allow California to place a financial burden on the right to vote that restricts the exercise of the franchise on the basis of wealth?

2. Would it allow California to impose a "good morals" requirement on voter registration that is so vague and subjective that it constitutes an open invitation to abuse at the hands of voting officials?

3. Would it allow California to impose an identification requirement that effectively disenfranchises 4.5% of the registered voters in the State?

Presumably, the answer to each of these questions is "no." Similarly, therefore, the Court should not allow California to impose an "identification requirement that blocks an untold number of gun owners from undergoing an ammunition background check and then rejects 11% of those who are checked."

## CONCLUSION

NAGR respectfully requests the Court to affirm the district court's ruling.

Respectfully submitted,

/s/ Barry K. Arrington

_____

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 WADSWORTH BOULEVARD
WHEAT RIDGE, COLORADO 80033
(303) 205-7870
E-mail: barry@arringtonpc.com
*Attorney for Amicus Curiae*

July 30, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number 24-542**

I am the attorney or self-represented party.

**This brief contains 3,667 words,** including zero words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ **X** ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.

20

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Barry K. Arrington*          **Date** July 30, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

21