No. 24-542

◆ ━ ◆

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

◆ ━ ◆

KIM RHODE; GARY BRENNAN; CORY HENRY; EDWARD JOHNSON; SCOTT LINDEMUTH; RICHARD RICKS; DENISE WELVANG; ABLE'S SPORTING, INC., A Texas Corporation; AMDEP HOLDINGS, LLC, a Florida limited liability company D/B/A Ammunition Depot; R&S FIREARMS, INC., an Arizona corporation D/B/A Sam's Shooters Emporium; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,
*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California,
*Defendant-Appellant*.

◆ ━ ◆

On Appeal from the
United States District Court for the Southern District of California
No. 3:18-cv-00802-BEN-JLB

◆ ━ ◆

## *AMICUS CURIAE* BRIEF OF THE BUCKEYE
## INSTITUTE IN SUPPORT OF PLAINTIFFS-APPELLEES

◆ ━ ◆

David C. Tryon
*Counsel of Record*
Alex M. Certo
The Buckeye Institute
88 East Broad Street
Suite 1300
Columbus, OH 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org

*Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 29 and 26.1, The Buckeye Institute has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

INTEREST OF *AMICUS CURIAE* .......................................................... 1

SUMMARY OF ARGUMENT .................................................................. 2

ARGUMENT ........................................................................................... 3

    I.    The judiciary is and should be vigilant in protecting enumerated constitutional rights .......................................................................... 3

        A. The First Amendment's Ancillary Protections ........................... 5

        B. The Fourth Amendment's Ancillary Protections ....................... 8

        C. The Sixth and Seventh Amendments' Ancillary Rights .......... 10

        D. Voting Rights' Ancillary Protections ........................................ 11

        E. The Second Amendment's Ancillary Protections .................... 13

    II.    Lawful firearms ownership is beneficial to society ...................... 15

        A. Lawful defensive uses of firearms eclipse criminal uses ........ 16

        B. Lawful gun owners should be encouraged to learn proper usage ........... 23

CONCLUSION ...................................................................................... 28

CERTIFICATE OF COMPLIANCE ..................................................... 29

CERTIFICATE OF SERVICE ............................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Americans for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ...............................................................7

*Andrews v. State,*
  50 Tenn. 165 (1871) ........................................................14, 15

*Batson v. Kentucky*,
  476 U.S. 79 (1986) ..............................................................11

*Buckley v. Valeo*,
  424 U.S. 1 (1976) .................................................................6

*Camara v. Mun. Ct. of City & Cnty. of San Francisco*,
  387 U.S. 523 (1967) ..............................................................9

*Carey v. Population Servs., Int'l,*
  431 U.S. 678 (1977) .............................................................14

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) ..............................................................6

*Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n*,
  518 U.S. 604 (1996) ..............................................................6

*Dimick v. Schiedt*,
  293 U.S. 474 (1935) .............................................................10

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .............................................13, 14, 15, 16

*Elrod v. Burns*,
  427 U.S. 347 (1976) ..............................................................7

*Ezell v. Chicago*,
  651 F.3d 684 (7th Cir. 2011)....................................................14

*Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*,
  479 U.S. 238 (1986) ..............................................................6

*Florida v. Jardines*,
  569 U.S. 1 (2013) .............................................................8, 9

*Frank v. State of Md.*,
359 U.S. 360 (1959) ...................................................................... 9

*Gideon v. Wainwrigh*t,
372 U.S. 335 (1963) .................................................................... 10

*Gouled v. United States*,
255 U.S. 298 (1921) .................................................................... 10

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989) ...................................................................... 11

*Healy v. James*,
408 U.S. 169 (1972) ...................................................................... 7

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
961 F.Supp.2d 928 (N.D. Ill. 2014) .......................................... 14

*Illinois State Bd. of Elections v. Socialist Workers Party*,
440 U.S. 173 (1979) .................................................................... 12

*Jackson v. City and County of San Francisco*,
746 F.3d 953 (9th Cir. 2014) ...................................................... 14

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018) ...................................................................... 7

*Johnson v. Zerbst*,
304 U.S. 458 (1938) .................................................................... 10

*Katz v. United States*,
389 U.S. 347 (1967) ...................................................................... 8

*Ker v. State of Cal.*,
374 U.S. 23 (1963) ...................................................................... 10

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
567 U.S. 298 (2012) ...................................................................... 7

*Lane v. Wilson*,
307 U.S. 268 (1939) .................................................................... 12

*Luis v. United States*,
578 U.S. 5 (2016) ................................................................. 5, 14

*McConnell v. Federal Election Comm'n,*
 540 U.S. 93 (2003) ............................................................................6

*Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue,*
 460 U.S. 575 (1983) ..........................................................................6

*Muscarello v. United States,*
 524 U.S. 125 (1998) ........................................................................13

*NAACP v. Alabama ex rel. Patterson,*
 357 U.S. 449 (1958) ..........................................................................8

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
 597 U.S. 1 (2022) ............................................................................13

*Norman v. Reed,*
 502 U.S. 279 (1992) ........................................................................12

*Nueslein v. District of Columbia,*
 73 App.D.C. 85, 115 F.2d 690 (1940) ..............................................9

*Oliver v. United States,*
 466 U.S. 170 (1984) ......................................................................8, 9

*Radich v. Guerrero,*
 No. 1:14–CV–00020, 2016 WL 1212437 (D. N. Mar. I. Mar. 28, 2016) ...........15

*Reynolds v. Sims,*
 377 U.S. 533 (1964) ....................................................................11, 12

*Roberts v. United States Jaycees,*
 468 U.S. 609 (1984) ..........................................................................7

*Sec. & Exch. Comm'n v. Jarkesy,*
 144 S. Ct. 2117 (2024) ................................................................10, 11

*See v. City of Seattle,*
 387 U.S. 541 (1967) ..........................................................................9

*Soldal v. Cook County,*
 506 U.S. 56 (1992) ............................................................................8

*South v. Peters,*
 339 U.S. 276 (1950) ........................................................................12

v

*Teixeira v. Cnty. of Alameda,*
    822 F.3d 1047 (9th Cir. 2016) ......................................................................... 13, 15

*Teixeira v. Cnty. of Alameda,*
    873 F.3d 670 (9th Cir. 2017) .................................................................................. 14

*Tull v. United States,*
    481 U.S. 412 (1987) ................................................................................................ 11

*Ullmann v. United States,*
    350 U.S. 422 (1956) .................................................................................................. 3

*United States v. Jones,*
    565 U.S. 400 (2012) .................................................................................................. 8

*United States v. Miller,*
    307 U.S. 174 (1939) ................................................................................................ 14

*Valley Forge Christian College v. Americans United for Separation of Church*
    *& State, Inc.,* 454 U.S. 464 (1982) .......................................................................... 4

**Statutes**

Cal. Penal Code § 26815 ................................................................................................ 23

Cal. Penal Code § 27540(e) ........................................................................................... 23

Cal. Penal Code § 31615 ................................................................................................ 23

Cal. Penal Code §§ 26840 ............................................................................................. 23

**Other Authorities**

1 H. Osgood, *The American Colonies in the 17th Century* (1904) ......................... 14

2023 CA S.B. 53 ............................................................................................................... 23

3 W. Blackstone, *Commentaries on the Laws of England* (8th ed. 1778) ............... 10

Aaron Castrejon, *Homeowner Fires Gun, Scares off Alleged Squatters in
    Arcadia*, SGV Citywatch (June 13, 2024) ............................................................. 17

Alvaro Castillo-Carniglia et al., *California's Comprehensive Background
    Check And Misdemeanor Violence Prohibition Policies And Firearm
    Mortality*, 30 Annals of Epidemiology 50 (2019) .............................................. 26

Anthony Robledo, *Video shows man trying to rob California store with fake gun, then clerk pulls out real one*, USA Today (Aug. 19, 2023) ........................21

Brandon Downs, *Man acted in self-defense in deadly shooting at Carmichael apartment, deputies say*, CBS News (May 26, 2024) ......................19

Claire Cardona, *'Our Home Was Invaded by Evil': 3 Dead, Including Gunman, in North Texas Church Shooting*, NBCDFW 5 (Dec. 30, 2019) ..........22

Fernando Haro Garcia, *Liquor store worker fires his own gun after being shot during robbery in Long Beach*, Long Beach Post News (Dec. 20, 2023)................................................................................................................22

*Firearm Ownership in California*, University of California Firearm Violence Research Center (2018) ............................................................................................25

Gigi Graciette, *LA homeowner shoots intruder; suspect has extensive criminal record authorities say,* Fox 11 L.A. (July 9, 2024) ...............................18

Hollie McKay, *Where do criminals really get their guns?*, Fox 10 Phoenix (Feb. 19, 2024) ....................................................................................................26

Jas Kang, *California woman shoots, kills man who came to her home armed with knives*, KTLA 5 (May 19, 2024) ....................................................................18

Jazlyn Gomez & Lucas Gonzalez, *Mass shooting at Greenwood Park Mall leaves multiple dead, injured*, WRTV Indianapolis (July 17, 2022)....................23

Magnus Lofstrom & Brandon Martin, *Retail Theft and Robbery Rates Have Risen across California*, Public Policy Institute of California (Sept. 7, 2023)................................................................................................................20

*Manhattan Beach jewelry store employee shoots at smash-and-grab thieves*, Fox 11 LA, (Oct. 9, 2023) ...................................................................................22

Nicholas J. Johnson, *Firearms Policy and the Black Community: An Assessment of the Modern Orthodoxy*, 45 Conn. L. Rev. 1491 (2013)..........16, 17

*NSSF Releases Most Recent Firearm Production Figures*, National Shooting Sports Foundation (Nov. 16, 2020) ....................................................................27

Rob McMillan, *Customer shoots, critically wounds suspect during attempted robbery at message business in Riverside*, ABC 7 (Sept. 21, 2023)....................21

T. Cooley, *General Principles of Constitutional Law* (2d ed. 1891) ......................14

3 Thomas Jefferson, *Writings* (H.A. Washington ed., 1853) ..................................15

U.S. Bureau of Justice Statistics, NCJ 251776, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016* (2019) ............................3

*Why own a gun? Protection is now top reason*, Pew Research Center (Mar. 12, 2013)............................................................................................................19

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (2022) ................................................19, 20

**Constitutions**

U.S. Const. amend. I............................................................................................4

U.S. Const. amend. II ..........................................................................................4

U.S. Const. amend. IV.........................................................................................8

U.S. Const. amend. VI.........................................................................................4

U.S. Const. amend. VII........................................................................................4

U.S. Const. amend. XIX.......................................................................................4

U.S. Const. amend. XV........................................................................................4

U.S. Const. amend. XXIV....................................................................................4

## INTEREST OF AMICUS CURIAE[1]

The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—to formulate and promote free-market policy in the states. The Buckeye Institute accomplishes its mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policies, and marketing those policy solutions for implementation in Ohio and replication across the country. The Buckeye Institute works to restrain governmental overreach at all levels of government. In fulfillment of that purpose, The Buckeye Institute files lawsuits and submits amicus briefs. As it pertains to this case, The Buckeye Institute has been active in advocating for the constitutional right to keep and bear arms. *See, e.g., New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022); *Herrera v. Raoul*, No. 23-878 (Cert. Pet. filed Feb. 12, 2024); *Antonyuk v. James*, No. 23-910 (Cert. Pet. filed Feb. 20, 2024); *Doe v. Columbus*, Delaware C.P. No. 23-cv-H-02-0089 (Ohio).The Buckeye Institute is a nonpartisan, nonprofit, tax-exempt organization, as defined by I.R.C. section 501(c)(3).

---

[1] Pursuant to Rules 29, The Buckeye Institute states that all parties have given consent to file this amicus brief. Further, no counsel for any party has authored this brief in whole or in part and no person other than the amicus has made any monetary contribution to this brief's preparation or submission.

## SUMMARY OF THE ARGUMENT

No constitutional right is less fundamental than another. Courts have jealously guarded the enumerated rights guaranteed in the Bill of Rights and subsequent constitutional amendments. This case is about the enumerated rights contained in the Second Amendment. And just as other enumerated rights have ancillary protections that enable the exercise of such enumerated right, so is the case with the Second Amendment. The Second Amendment not only guarantees the right "to keep and bear arms," but it also guarantees the ability to acquire and use them. And use requires ammunition—ammunition for self-defense and ammunition to practice and become proficient using firearms.

There are criminals in our society who misuse firearms. Society seeks to reduce criminal usage of firearms. However, many of the attempted solutions focus on the firearms rather than the criminals. California's ammunition purchasing restrictions suffer from that same flawed logic. The advocates of firearms and ammunition restrictions look only at the criminal misuse of firearms to justify their policy solutions. But the positive uses of firearms must also be part of the equation. Only a very small percentage of firearm owners misuse firearms. And of the billions of rounds of ammunition in circulation, only an infinitesimal percentage will ever be used in the commission of crime. And certainly, criminals can and will easily circumvent the restrictions imposed on ammunition purchases. Indeed, criminals

who use firearms in the commission of crime almost universally obtain those firearms illegally. U.S. Bureau of Justice Statistics, NCJ 251776, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016* Table 5 (2019). Consequently, California's ammunition restriction is a burden on lawful firearms owners rather than an effective tool to stop criminal misuse of firearms.

These observations are important when considering the imposition of government restrictions on the rights of law-abiding gun owners. While the Supreme Court has rejected balancing tests in favor of a history and tradition analysis, background information on the extensive positive uses of firearms is helpful to understand the fabric of the right "to keep and bear arms." But in the end, as Appellees explain, the government has not satisfied its burden to provide valid and relevant historical examples of restrictions on ammunition purchases.

## ARGUMENT

## I. The judiciary is and should be vigilant in protecting enumerated constitutional rights.

Interference with any constitutional right is always suspect. "To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution." *Ullmann v. United States*, 350 U.S. 422, 428–29 (1956). No constitutional right is "less 'fundamental' than" others, and "we know of no principled basis on which to create a hierarchy of constitutional values . . . ." *Valley Forge Christian College v.*

3

*Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 484 (1982). This case is about the rights guaranteed by the Second Amendment. These rights are entitled to the same protection as other enumerated rights in the Constitution, such as the right to free speech, the right to be secure in one's house, the right to a jury trial, and the right to vote. To afford the Second Amendment equal status among the other enumerated rights requires honoring the ancillary rights that attach to its exercise, just as courts have done with the First, Fourth, Sixth, Seventh, and other Amendments.

Starting with the First Amendment, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The operative language of the Second Amendment is "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Fourth Amendment protects the right to be secure in one's house. The Seventh Amendment "preserves" "the right of trial by jury . . . ." U.S. Const. amend. VII. See also U.S. Const. amend. VI (guaranteeing an "impartial jury" in criminal cases). And "[t]he right of citizens of the United States to vote shall not be denied or abridged . . . ." U.S. Const. amend. XV. *See also* U.S. Const. amends. XIX, XXIV.

These enumerated rights all protect and preserve Americans' liberties from abridgment, infringement, violation, or denial by the government. And they are all fundamental rights, explicitly protected by amendments to the Constitution. While

the law surrounding each of these rights has evolved separately, there is a common thread throughout the Supreme Court's holdings: These rights must be respected, and the government needs to be very careful when it treads on these rights. "Constitutional rights thus implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 27 (2016) (Thomas, J., concurring in the judgment). And each of these rights is entitled to as much respect as the others.

### A. The First Amendment's Ancillary Protections

The First Amendment's guarantee of freedom of speech is a cherished freedom. But free speech does not happen in a vacuum. While the command "Congress shall make no law . . . abridging the freedom of speech," is very succinct, the exercise of that right requires a medium and money. Courts have thus protected the use of both when ancillary to the exercise of this freedom.

For example, while the government may tax newspapers in the same way it taxes other retail products, the Supreme Court has forbidden singling newspapers out for special taxation. Understanding that protecting the First Amendment required the protection of the ancillary right to access the materials used in its exercise, the Supreme Court struck down a special tax on ink and paper

> that applie[d] only to certain publications protected by the First Amendment. Although the State argues now that the tax on paper and ink is part of the general scheme of taxation, the use tax provision . . .

> is facially discriminatory, singling out publications for treatment that is, to our knowledge, unique in Minnesota tax.

*Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 581 (1983). The Court also noted the history and tradition of the First Amendment in its analysis: "There is substantial evidence that differential taxation of the press would have troubled the Framers of the First Amendment." *Id.* at 583.

The Court has also held that spending money for or against a candidate or cause is speech, and restricting the use of funds for speech is thus unconstitutional. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 52–54 (1976) (invalidating government-imposed restrictions on campaign expenditures); *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 256–265 (1986) (invalidating restraints on independent expenditures applied to express advocacy groups); *Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n*, 518 U.S. 604, 608 (1996) (opinion of Breyer, J.) (invalidating limits on uncoordinated political party expenditures). The First Amendment's "right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise." *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part, concurring in judgment in part, and dissenting in part), *overruled in part by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); see also *Citizens United*, 558 U.S. at 339 ("prohibition on corporate independent expenditures is thus a ban on speech").

6

Similarly, "[c]ompelling a person to *subsidize* the speech of other private speakers raises [ ] First Amendment concerns." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 893 (2018) (citing *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012)). Thus, the Court has held that a "'significant impingement on First Amendment rights' occurs when public employees are required to provide financial support for a union that 'takes many positions during collective bargaining that have powerful political and civic consequences.'" *Id.* (quoting *Knox*, 567 U.S. at 310–311).

Further, the Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). "Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quoting *Roberts*, 468 U.S. at 622). Further,

> the freedom of association may be violated where a group is required to take in members it does not want, *see Roberts*, 468 U.S. at 623, where individuals are punished for their political affiliation, *see Elrod v. Burns*, 427 U.S. 347, 355 (1976) (plurality opinion), or where members of an organization are denied benefits based on the organization's message, *see Healy v. James*, 408 U.S. 169, 181–182 (1972).

*Id.* (internal citations cleaned up). And, "[i]t is hardly a novel perception that

7

compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

## B. The Fourth Amendment's Ancillary Protections

As with its First Amendment jurisprudence, the Supreme Court has not hesitated to protect those ancillary rights necessary to make good the promise that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The Fourth Amendment "indicates with some precision the places and things encompassed by its protections." *Oliver v. United States*, 466 U.S. 170, 176 (1984). "The Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quoting *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)) (internal quotation marks omitted). But, through *Katz v. United States*, 389 U.S. 347 (1967), the Court held that "property rights 'are not the sole measure of Fourth Amendment violations . . . .'" *Jardines*, 569 U.S. at 5 (quoting *Soldal v. Cook County*, 506 U.S. 56, 64 (1992)).

While the Fourth Amendment only lists "houses," the Court has "regard[ed]

the area 'immediately surrounding and associated with the home'—what [its] cases

call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'" *Id.*

at 6 (quoting *Oliver*, 466 U.S. at 180). This is because

> the right would be of little practical value if the State's agents could
> stand in a home's porch or side garden and trawl for evidence with
> impunity; the right to retreat would be significantly diminished if the
> police could enter a man's property to observe his repose from just
> outside the front window.

*Id.*

Further, the Fourth Amendment's security extends outside the home and even

to one's business.

> The businessman, like the occupant of a residence, has a constitutional
> right to go about his business free from unreasonable official entries
> upon his private commercial property. The businessman, too, has that
> right placed in jeopardy if the decision to enter and inspect for violation
> of regulatory laws can be made and enforced by the inspector in the
> field without official authority evidenced by warrant.

*See v. City of Seattle*, 387 U.S. 541, 543 (1967).

> For as Chief Justice Vinson wrote in *Nueslein v. District of Columbia*,
> 73 App.D.C. 85, 87, 115 F.2d 690, 692, while the Fourth Amendment
> "was written against the background of the general warrants in England
> and the writs of assistance in the American colonies," it "gives a
> protection wider than these abuses." It was designed to protect the
> citizen against uncontrolled invasion of his privacy.

*Frank v. State of Md.*, 359 U.S. 360, 381–382 (1959) (Douglas, J., dissenting)

(internal citation omitted), *overruled by Camara v. Mun. Ct. of City & Cnty. of San*

*Francisco*, 387 U.S. 523 (1967).

Implicit in the Fourth Amendment's protection from unreasonable

searches and seizures is its recognition of individual freedom. That safeguard has been declared to be "as of the very essence of constitutional liberty" the guaranty of which "is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen."

*Ker v. State of Cal.*, 374 U.S. 23, 32 (1963) (quoting *Gouled v. United States*, 255 U.S. 298, 304 (1921)).

## C. The Sixth and Seventh Amendments' Ancillary Rights

The Supreme Court has similarly rejected the government's efforts to evade the Sixth and Seventh Amendment's jury protections. The right to trial by jury is "of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right" has always been, and "should be[,] scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935). "Commentators recognized the right as 'the glory of the English law,' and it was prized by the American colonists." *Sec. & Exch. Comm'n v. Jarkesy*, 144 S. Ct. 2117, 2128 (2024) (quoting 3 W. Blackstone, *Commentaries on the Laws of England* 379 (8th ed. 1778)).

In the Sixth Amendment criminal context, the Supreme Court has vigorously upheld the rights of criminal defendants. The right to counsel afforded by the Sixth Amendment means that upon request the court must provide counsel to a defendant subject to possible deprivation of life or liberty. *See Gideon v. Wainwrigh*t, 372 U.S. 335, 343 (1963) (citing *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938)). Furthermore,

the Supreme Court has held that when a jury has been selected through racially discriminatory practices, there is harm not only to the defendant in that case but to "the entire community." *Batson v. Kentucky*, 476 U.S. 79, 87 (1986).

In the Seventh Amendment civil context, Congress cannot "conjure away the Seventh Amendment by mandating that traditional legal claims be . . . taken to an administrative tribunal." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 52 (1989). The Supreme Court has reaffirmed the right of civil defendants to have their case heard before a jury before a civil penalty can be imposed. *Jarkesy*, 144 S. Ct. at 2139. The protections of the Seventh Amendment apply when the penalties are meant to "punish or deter the wrongdoer" rather than a fine that is meant to "'restore the status quo.'" *Id.* at 2129 (quoting *Tull v. United States*, 481 U.S. 412, 422 (1987)). This protection afforded to a civil defendant is not just the guarantee of a jury but additionally, a neutral adjudicator, a benefit that can only be found within an Article III court.

### D. Voting Rights' Ancillary Protections

"Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "And for reasons too self-evident to warrant amplification here, [the Court has] often reiterated that voting is of the most fundamental significance under our constitutional structure." *Illinois State Bd. of Elections v.*

11

*Socialist Workers Party*, 440 U.S. 173, 184 (1979). The Fifteenth, Nineteenth, and Twenty-fourth Amendments were all affirmative changes to the United States' common law heritage. *See Reynolds*, 377 U.S. at 555 n. 28. And, the Court has found voting rights are also protected by the First and Fourteenth Amendments. *E.g.*, *Norman v. Reed*, 502 U.S. 279, 288 (1992) (noting that "the constitutional right of citizens to create and develop new political parties . . . derives from the First and Fourteenth Amendments"). Once recognized, those rights have been and continue to be aggressively protected.

Though their terms are simple, the Fifteenth, Nineteenth, and Twenty-fourth Amendments' reach is broad. For example, "[t]he [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by [one] race although the abstract right to vote may remain unrestricted as to race." *Lane v. Wilson*, 307 U.S. 268, 275 (1939).

> There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted. . . . It also includes the right to have the vote counted at full value without dilution or discount. . . . That federally protected right suffers substantial dilution . . . [where a] favored group has full voting strength . . .[and] [t]he groups not in favor have their votes discounted.

*South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting); *accord Reynolds*, 377 U.S. at 554–555.

12

### E. The Second Amendment's Ancillary Protections

The foregoing shows that courts are serious about protecting enumerated constitutional rights—including the means necessary to effectuate those rights. Courts must give the same respect to the rights protected by the Second Amendment.

The Second Amendment protects a fundamental right—the right "to keep and bear arms." U.S. Const. amend. II. This right has been controversial for decades, but it is now settled law that the right to self-defense is not merely a "subsidiary interest," but rather a "central component." *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008). The Second Amendment's right to bear arms is meant to confer a right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person. *Id.* at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). And it is not in any way a "second-class right" and deserves the same degree of respect as all other fundamental rights protected in the Constitution. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022).

> If "the right of the people to keep and bear arms" is to have any force, the people must have a right to acquire the very firearms they are entitled to keep and to bear. Indeed, where a right depends on subsidiary activity, it would make little sense if the right did not extend, at least partly, to such activity as well. The Supreme Court recognized this principle in very different contexts . . . .

*Teixeira v. Cnty. of Alameda*, 822 F.3d 1047, 1055 (9th Cir. 2016), *on reh'g en banc*,

873 F.3d 670 (9th Cir. 2017) (citing *Carey v. Population Servs., Int'l*, 431 U.S. 678, 689 (1977) ("Limiting the distribution of nonprescription contraceptives to licensed pharmacists clearly imposes a significant burden on the right of the individuals to use contraceptives.")). It is not much of a leap that the Second Amendment also protects rights ancillary to the right to keep and bear arms—such as acquiring firearms and the ammunition for them. For "[c]ommerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense . . . ." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc).

Just as free speech needs paper and ink to communicate, and money to distribute that communication, firearms need ammunition to be of any use.

> The right to keep and bear arms . . . "implies a corresponding right to obtain the bullets necessary to use them," *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (C.A.9 2014), and "to acquire and maintain proficiency in their use," *Ezell v. Chicago*, 651 F.3d 684, 704 (C.A.7 2011). See *District of Columbia v. Heller*, 554 U.S. 570, 617–618 (2008) (citing T. Cooley, *General Principles of Constitutional Law* 271 (2d ed. 1891) (discussing the implicit right to train with weapons)); *United States v. Miller*, 307 U.S. 174, 180 (1939) (citing 1 H. Osgood, *The American Colonies in the 17th Century* 499 (1904) (discussing the implicit right to possess ammunition)); *Andrews v. State,* 50 Tenn. 165, 178 (1871) (discussing both rights). Without protection for these closely related rights, the Second Amendment would be toothless."

*Luis*, 578 U.S. at 26–27 (Thomas, J., concurring in the judgment) (internal citations cleaned up); *accord Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928, 930 (N.D. Ill. 2014) ("right must also include the right to acquire a firearm"); *Radich v. Guerrero*, No. 1:14–CV–00020, 2016 WL 1212437, at *7 (D.

N. Mar. I. Mar. 28, 2016) ("If the Second Amendment individual right to keep and bear a handgun for self-defense is to have any meaning, it must protect an eligible individual's right to purchase a handgun, as well as the complimentary right to sell handguns."). When ratifying the Second Amendment,

> [t]he historical record indicates that Americans continued to believe that [the English] right [to keep and bear arms] included the freedom to purchase and to sell weapons. In 1793, Thomas Jefferson noted that "[o]ur citizens have always been free to *make, vend, and export arms. It is the constant occupation and livelihood of some of them.*" Thomas Jefferson, 3 Writings 558 (H.A. Washington ed., 1853). . . . At the time the Fourteenth Amendment was ratified, . . . at least some American jurists simply assumed that the "right to keep arms, necessarily involve[d] the right to purchase them." *Andrews v. State*, 50 Tenn. 165, 178 (1871).

*Teixeira*, 822 F.3d at 1055, *on reh'g en banc*, 873 F.3d 670 (emphasis added).

Thus, the Second Amendment's protections extend far beyond just possession of a firearm.

## II.  Lawful firearms ownership is beneficial to society.

While the background and context of the other rights discussed above are relatively well known, that is not necessarily the case for matters relating to firearms. Firearms legislation is usually focused on the prevention of firearms misuse. This is a laudable goal. Indeed, the Supreme Court specifically recognized "the problem of handgun violence in this country." *Heller,* 554 U.S. at 636. But *Heller* explained that this concern does not trump "the inherent right of self-defense [that] has been central

15

to the Second Amendment right." *Id.* at 628. Despite this core value, it is uncommon for legislation to recognize, facilitate, or encourage the positive uses of firearms.

Nevertheless, it is useful for courts to understand these positive uses in evaluating prohibitory or restrictive firearms regulations and their effect on the constitutional rights to keep and bear arms. Such understanding can also facilitate a greater understanding of the importance of the constitutional right to keep and bear arms, and that it is not a second-rate right—it is entitled to the same respect courts offer to all other enumerated constitutional rights.

## A. Lawful defensive uses of firearms eclipse criminal uses.

The right to self-defense is well grounded historically and confirmed by the Supreme Court. Indeed, "[o]ne of the factors motivating the protections under the Freedman's Acts and the Fourteenth Amendment was the deprivation of Black civil rights, including the right of Blacks to arm themselves for personal protection." Nicholas J. Johnson, *Firearms Policy and the Black Community: An Assessment of the Modern Orthodoxy*, 45 Conn. L. Rev. 1491, 1500 (2013). Of course, this right is available to all, and it is a good thing that it is. Unfortunately, our society includes violent individuals intent on harming others. Americans have utilized the right to lawfully defend themselves with firearms many times.

> There have been 14 major surveys of defensive gun use ("DGU"). The estimates range from highs above 2 million [per year] to lows in excess of 100,000 [per year]. The compromise estimate is around 700,000 DGU's per year. . . . A significant aspect of these DGU's is that in the

vast majority of them, no shots are fired.

*Id.* at 1591–593.

Indeed, every year Californians are forced to exercise this right of defensive action due to the violent aggression of another. Some recent examples exemplify this positive firearms usage.

- In June 2024, a homeowner in Arcadia called the police stating that he had seen four unknown individuals inside his home from the street. The trespassers came out of the home and were confronted by the homeowner. There was a brief altercation, and in fear for his life, the homeowner drew his firearm and fired it in the air in an attempt to frighten the trespassers. The trespassers then fled and were later apprehended by law enforcement. Aaron Castrejon, *Homeowner Fires Gun, Scares off Alleged Squatters in Arcadia*, SGV Citywatch (June 13, 2024).[2]

- In July 2024, a 56-year-old man in Los Angeles whose home was broken into in broad daylight in July of 2024. The burglars had been lurking in the neighborhood, looking for unoccupied homes to break into. After seeing the homeowner's wife leave for work, two individuals broke into the home and were confronted by the homeowner. He was assaulted, pepper sprayed,

[2] https://www.sgvcitywatch.com/arcadia/homeowner-fires-gun-scares-off-alleged-squatters-in-arcadia

and was only able to stop the attack by non-fatally shooting one of his assailants. Gigi Graciette, *LA homeowner shoots intruder; suspect has extensive criminal record authorities say,* Fox 11 L.A. (July 9, 2024).[3]

- In May of 2024, a Los Angeles County woman shot and killed a man who she had a restraining order against after he "arrived at the home armed with knives and attempted to stab" her and another occupant of her home. The woman had gone out into her driveway and saw the man approaching her. After seeing the knives, the woman then shot the man and then called the police. Jas Kang, *California woman shoots, kills man who came to her home armed with knives*, KTLA 5 (May 19, 2024).[4]

- Also in May 2024, a Sacramento County man shot and killed a man who broke into his apartment late at night. The intruder was the ex-boyfriend of the man's current girlfriend. After banging on the door for 20 minutes, the ex-boyfriend forced his way inside after the man's girlfriend opened the door. The intruder then assaulted the man, choking him. The man broke free, retrieved his firearm, and shot and killed the ex-boyfriend. Brandon

---

[3] https://www.foxla.com/news/intruder-shot-la-homeowner-probation.
[4] https://ktla.com/news/local-news/woman-shoots-kills-man-who-came-to-her-southern-california-home-armed-with-knives/.

Downs, *Man acted in self-defense in deadly shooting at Carmichael apartment, deputies say*, CBS News (May 26, 2024).[5]

These examples are not novel occurrences. Nearly half of all American gun owners state that their primary reason for owning a gun is for protection. *Why own a gun? Protection is now top reason*, Pew Research Center (Mar. 12, 2013).[6] Surprisingly—maybe even shockingly—almost one-third of American gun owners report having used a gun for self-defense. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 9 (2022).[7] Considering that roughly 81.4 million Americans own a firearm, this means that approximately 25.3 million lawful gun owners have at some point used a firearm for self-defense. *Id.* The examples above are "worse-case scenarios" since, in the vast majority of defensive incidents, no shots are even fired. In over 80% of incidents in which a gun was employed for self-defense, the threat was alleviated by either displaying the firearm (50.9%) or by the gun owner merely telling their assailant that they had a gun (31%). *Id.* at 13.

Considering the magnitude of these numbers, one might envision an alarming picture of America like the wild west of Hollywood imagination—where guns are

---

[5] https://www.cbsnews.com/sacramento/news/man-shot-killed-overnight-in-a-carmichael-apartment-deputies-say/.

[6] https://www.pewresearch.org/politics/2013/03/12/why-own-a-gun-protection-is-now-top-reason/.

[7] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494.

19

drawn in public places on a near-constant basis. However, that is not reality. Of the millions of instances of defensive gun use, over 75% percent occurred in the gun owner's home or on their property. *Id.* at 14. This number exceeds 80% when other non-public areas are included. *Id.* As the Supreme Court stated in *Heller*, this is precisely the right that the Second Amendment is meant to protect—the lawful use of a firearm for self-protection and to protect one's children, spouses, and other loved ones.

Though the majority of DGUs occur on private property, the importance of analogous uses in public places should not be overlooked. Considering California's recent rise in commercial robbery and burglary, the right to defend oneself has never been more important for retail store owners, employees, and patrons. Magnus Lofstrom & Brandon Martin, *Retail Theft and Robbery Rates Have Risen across California*, Public Policy Institute of California (Sept. 7, 2023).[8] In the last year alone, there have been at least four *reported* instances of defensive gun use during the commission of retail robbery in California. Each instance resulted in the cessation of the threat and, more importantly, allowed for the employees and other patrons to leave the scene uninjured.

- In August 2023, a convenience store clerk in Orange County was

---

[8] https://www.ppic.org/blog/retail-theft-and-robbery-rates-have-risen-across-california/.

threatened by a man claiming to have a gun. Upon realizing that the gun the would-be robber held appeared fake, the clerk drew his own firearm, causing the robber to flee. No one was harmed during the incident. Anthony Robledo, *Video shows man trying to rob California store with fake gun, then clerk pulls out real one*, USA Today (Aug. 19, 2023).[9]

- In September 2023, two men broke into a massage parlor in Riverside in an attempted robbery. One robber had a firearm. A patron of the establishment drew his own firearm and fired at the robbers, hitting one of them, and causing them both to flee. The robber who had been hit was apprehended by police. No employees or other patrons were harmed during the incident. Rob McMillan, *Customer shoots, critically wounds suspect during attempted robbery at massage business in Riverside*, ABC 7 (Sept. 21, 2023).[10]

- In October 2023, five robbers wearing hoodies and armed with hammers invaded a jewelry store in Manhattan Beach. They then proceeded to smash the display cases and steal jewelry. An employee of the store had a firearm and fired at the robbers, causing them to flee to vehicles waiting for them outside. No one was harmed during the incident. *Manhattan Beach jewelry*

---

[9] https://www.usatoday.com/story/news/nation/2023/08/19/fake-gun-robbery-video-california-liquor-store/70625118007/.

[10] https://abc7.com/riverside-robbery-suspect-employee-shooting/13808627/.

*store employee shoots at smash-and-grab thieves*, Fox 11 LA, (Oct. 9, 2023).[11]

- In December 2023, a man entered a convenience store in Long Beach and demanded money from the clerk. The robber then pulled out a gun and shot the clerk in the upper body multiple times. While on the ground, the clerk pulled out his own firearm and returned fire at his assailant, causing him to flee. The clerk was taken to the hospital with non-life-threatening injuries. Fernando Haro Garcia, *Liquor store worker fires his own gun after being shot during robbery in Long Beach*, Long Beach Post News (Dec. 20, 2023).[12]

On the national level, there have been multiple active shooter situations in which a private citizen has dispatched the shooter with a firearm before law enforcement had an opportunity to respond. *See* Claire Cardona, *'Our Home Was Invaded by Evil': 3 Dead, Including Gunman, in North Texas Church Shooting*, NBCDFW 5 (Dec. 30, 2019)[13]; *See also* Jazlyn Gomez & Lucas Gonzalez, *Mass*

---

[11] https://www.foxla.com/news/manhattan-beach-jewelry-store-employee-shoots-at-smash-and-grab-thieves.

[12] https://lbpost.com/news/crime/nq-market-liquor-store-shooting-robbery.

[13] *https*://www.nbcdfw.com/news/local/one-dead-two-wounded-after-shooting-reported-at-white-settlement-church/2283225/.

*shooting at Greenwood Park Mall leaves multiple dead, injured*, WRTV Indianapolis (July 17, 2022)[14].

**B. Lawful gun owners should be encouraged to learn proper usage.**

Defending oneself with a gun requires ammunition. Effective defensive use of firearms requires familiarity with firearms, and more particularly, with the firearm the person uses for self-defense or other positive use. That, in turn, requires practice. And practice requires more ammunition. California's statute restricts these positive uses. And it is not just the specific law challenged here, but the whole patchwork of California firearms restrictions. California already requires that all firearm sales and transfers must be done through a licensed firearms dealer. Cal. Penal Code §§ 26840, 27540(e), 31615. Additionally, California law imposes a mandatory ten-day waiting period on firearm transactions. Cal. Penal Code § 26815. In June of 2024, the California Senate passed Senate Bill 53, which would require gun owners to store their weapons in a Department of Justice-approved storage locker in their own homes, essentially crippling the ability of Californians to defend their homes in an emergency situation. 2023 CA S.B. 53. These numerous restrictions subvert the Second Amendment and undermine Californians' ability to protect themselves and others.

---

[14] https://www.wrtv.com/news/local-news/crime/police-shooting-reported-at-greenwood-park-mall.

Now, California has imposed obstacles to the exercise of this valuable enumerated right in ways that it would never consider imposing on the other rights discussed above. Imagine a background check before speaking, serving on a jury, or voting. Or a prohibition on the importation of ink, writing paper, books, or even computers from other states. Nor would California dare require someone to register with the government before acquiring any of these things. Appellant will argue that this situation is different. Of course, that is always the argument when the government wants to evade the Constitution. They claim they restrict ammunition acquisition for safety purposes. But Appellant has neither satisfied *Bruen's* historical analog requirements nor shown that these restrictions will make the state any safer. Indeed, the idea that criminals intent on using firearms in crime will not purchase ammunition in other states or from other illegal sources strains credulity. Instead, this law only burdens those who would not misuse firearms to begin with. Certainly, the number of firearm owners misusing firearms is tiny compared to the criminal usage of firearms.

"An estimated 4.2 million California adults (14% of adults in the state) personally own a gun, and an additional 3.1 million (11%) live in a home with someone else who does." *Firearm Ownership in California*, University of California

Firearm Violence Research Center (2018).[15] Certainly only a small percentage of gun owners are using guns in crimes.[16] And the percentage of the 20,000,000 firearms that they own, *id*., and are used in crime is much smaller.

Even amicus Everytown For Gun Safety, which purports to be a "data-driven" organization that champions "evidence-based policies" has not provided any data or evidence that California's ammunition restriction will prevent any crime. That is because there is no such evidence.

Violence by criminals using guns is a sad reality. Unfortunately, there is no simple solution. California's statute is essentially a universal background check—but for ammunition. Since such universal background checks have not worked for guns in California, no one should expect them to work for ammunition.

> "In 1991, California implemented a law that mandated a background check for all firearm purchases with limited exceptions (comprehensive background check or CBC policy) and prohibited firearm purchase and possession for persons convicted within the past 10 years of certain violent crimes classified as misdemeanors (MVP policy). . . . CBC and MVP policies were not associated with changes in firearm suicide or homicide."

---

[15]

https://health.ucdavis.edu/vprp/FVRC/Fact_Sheets/CSaWSBrief_InjPrev_Kravitz-Wirtz.pdf.
[16] Amicus did not find any reliable statistics of how many owners of lawfully acquired firearms ever used their firearms in a criminal manner.

Alvaro Castillo-Carniglia et al., *California's Comprehensive Background Check And Misdemeanor Violence Prohibition Policies And Firearm Mortality*, 30 Annals of Epidemiology 50 (2019).

Indeed, "[t]he majority of firearms used in criminal activity are obtained illegally . . . ." Hollie McKay, *Where do criminals really get their guns?*, Fox 10 Phoenix (Feb. 19, 2024)[17] (quoting David Chianese, "a correspondent at Law Enforcement Today, published author and former NYPD detective"). "Stricter or additional gun laws do not reduce gun violence." *Id.* And a 2019 survey conducted by the Department of Justice confirmed this, finding that some 43 percent of imprisoned criminals using firearms acquired them on the black market, 6 percent acquired them via theft, 11 percent had someone else buy a gun for them (i.e., an illegal purchase known as a "straw purchase"), and 15 percent got guns from a friend or relative. *Id.* About 12 percent of weapons found on a crime scene had been brought there by someone else. *Id.* In contrast, only about 10 percent of criminals who used guns got them via a retail purchase—including 0.8 percent at a gun show. *Id.*

Ammunition is obviously easier to obtain on the "black market" than firearms. There are many billions of rounds of ammunition available throughout the country and undoubtedly hundreds of millions within California. In 2018 alone, the firearms

---

[17] https://www.fox10phoenix.com/news/where-do-criminals-really-get-their-guns

industry manufactured 8.7 billion rounds of ammunition for the U.S. market. *NSSF Releases Most Recent Firearm Production Figures*, National Shooting Sports Foundation (Nov. 16, 2020).[18] It begs credulity to suggest that this law will be any more than a minor inconvenience to those already predisposed to criminal conduct. By contrast, the imposition of these barriers upon the millions of law-abiding gun owners is considerable. Further, compared to the billions of rounds of ammunition produced every year, only an infinitesimal number of those rounds will ever be used in crime. The law-abiding owners' rights should not be undermined by an ineffective—and unconstitutional law.

As governments continue to seek solutions to criminals committing violent acts, they need to always be vigilant of the Second Amendment rights of law-abiding gun owners. California's efforts here are neither effective nor respectful of those law-abiding gun owners. Of course, the Supreme Court rejected balancing tests in favor of a history and tradition test. But, the background and full social context of firearms ownership and legal usage are important for a full understanding of this constitutional right. In any event, California has not met its burden of showing that there are historical analogs to California's repressive ammunition regulation, as both the district court ruled and the Appellees well explain.

---

[18] https://www.nssf.org/articles/nssf-releases-most-recent-firearm-production-figures/.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's decision.

Respectfully submitted,

*/s/ David C. Tryon*
David C. Tryon
  *Counsel of Record*
Alex M. Certo
The Buckeye Institute
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
Email: D.Tryon@BuckeyeInstitute.org

July 31, 2024

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the word limit of Fed. R. App. P. 29(a)(2) and L.R. 32-1(a) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,490 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Times New Roman.

/s/ *David C. Tryon*
David C. Tryon
*Attorney of record for*
*The Buckeye Institute*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing amicus brief was served on all counsel of record via the Court's electronic filing system this 31st day of July 2024.

Respectfully submitted,

/s/ *David C. Tryon*

David C. Tryon
*Attorney of record for*
*The Buckeye Institute*