**Docket No. 24-542**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

———————◆———————

KIM RHODE; GARY BRENNAN; CORY HENRY; EDWARD JOHNSON; SCOTT LINDEMUTH; RICHARD RICKS; DENISE WELVANG; ABLE'S SPORTING, INC., a Texas corporation; AMDEP HOLDINGS, LLC, a Florida limited liability company doing business as Ammunition Depot; R&S FIREARMS, INC., an Arizona corporation doing business as Sam's Shooters Emporium; CALIFORNIA RIFLE & PISTOL ASSOCIATION, a California corporation,

*Plaintiffs-Appellees,*

v.

ROB BONTA, in his official capacity as Attorney General of the State of California,

*Defendant-Appellant.*

———————————————————

*Appeal from a Decision of the United States District Court for the Southern District of California, No. 3:18-cv-00802-BEN-JLB · Honorable Roger T. Benitez*

## *AMICI CURIAE* BRIEF OF AMERICAN FIREARMS ASSOCIATION, ET AL. IN SUPPORT OF APPELLEES

STEPHEN R. KLEIN
BARR & KLEIN PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com

*Attorney for Amici Curiae American Firearms Association,
New York State Firearms Association, Georgia Gun Owners,
Illinois Firearms Association, Iowa Gun Owners, Missouri Firearms Coalition,
Minnesota Gun Rights, Ohio Gun Owners, Washington Gun Rights and Wyoming Gun Owners*

 COUNSEL PRESS INC. · (213) 680-2300

PRINTED ON RECYCLED PAPER 

## Corporate Disclosure Statements

*Amici Curiae* American Firearms Association, New York State Firearms Association, Georgia Gun Owners, Illinois Firearms Association, Iowa Gun Owners, Missouri Firearms Coalition, Minnesota Gun Rights, Ohio Gun Owners, Washington Gun Rights and Wyoming Gun Owners submit their corporate disclosure statements under Federal Rule of Appellate Procedure 26.1

*Amici* are each non-profit 501(c)(4) organizations, have no corporate parent and are not owned in whole or in part by any publicly held corporation, respectively.

# Table of Contents

Corporate Disclosure Statements ............................................................... i

Table of Contents ...................................................................................... ii

Table of Authorities ................................................................................. iii

Interests of *Amici Curiae* ........................................................................1

Summary of the Argument ........................................................................2

Argument ...................................................................................................3

      I.     Ammunition Background Checks Violate the Second
            Amendment ..........................................................................3

           A.     Understanding *Bruen*'s "Historical Analogue" Test .................4

           B.     First Amendment Analogues Inform Second
               Amendment Concerns ...............................................7

           C.     There is No Historical Analogue for Ammunition
               Background Checks ..................................................10

Conclusion ..............................................................................................18

# Table of Authorities

## Cases

*ACLU of Illinois v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012) ................................................................7

*Baird v. Bonta*,
  81 F.4th 1036 (9th Cir. 2023) ..............................................................10

*Buck v. Bell*,
  274 U.S. 200 (1927) .......................................................................6, 12

*Buehrle v. City of Key West*,
  813 F.3d 973 (11th Cir. 2015) ..............................................................7

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) .............................................................................7

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..................................................................... 3, 4, 7

*Duncan v. Becerra*,
  366 F.Supp.3d 1131 (S.D. Cal. 2019) ................................................10

*Duncan v. Bonta*,
  142 S. Ct. 2895 (2022) ........................................................................10

*Duncan v. Bonta*,
  19 F.4th 1087 (9th Cir. 2021) ..............................................................10

*Fed. Election Comm'n v. Cruz*,
  596 U.S. 289 (2022) ........................................................................9, 14

*Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*,
  551 U.S. 449 (2007) ........................................................................9, 17

*Huddleston v. U.S.*,
  415 U.S. 814 (1974) ............................................................................13

*Jackson v. City & Cnty. of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ..............................................................10

*Jones v. Bonta*,
    34 F.4th 704 (9th Cir. 2022) ................................................................3

*Lamont v. Postmaster Gen. of the U.S.*,
    381 U.S. 301 (1965) ...........................................................................8

*McCutcheon v. Fed. Election Comm'n*,
    572 U.S. 185 (2014) .............................................................. 9, 13, 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1, 29 (2022) ............................................................... passim

*N.Y. Times Co. v. U.S.*,
    403 U.S. 713 (1971) .........................................................................15

*Near v. Minnesota*,
    283 U.S. 697 (1931) .........................................................................15

*Riley v. Nat'l Fed'n of the Blind*,
    487 U.S. 781 (1988) ...........................................................................8

*U.S. v. Matteo*,
    718 F.2d 340 (2d Cir. 1983) ...........................................................13

*U.S. v. Rahimi*,
    144 S. Ct. 1889 (2024) ............................................................. 14, 15

*Vill. of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980) ...........................................................................8

**Statutes**

18 U.S.C. § 922 ........................................................................................13

2016 California Proposition 63 ................................................................15

Cal. Penal Code § 28220 .........................................................................13

**Other Authorities**

114 Cong. Rec. 13647 (1968) .................................................................13

4 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789
    (Washington Chauncey Ford ed., 1906) ..........................................14

iv

*Ammunition*, MERRIAM-WEBSTER,
   https://www.merriam-webster.com/dictionary/ammunition ...............................11

*Analogy and Analogical Reasoning*, STANFORD ENCYCLOPEDIA OF
   PHILOSOPHY, June 25, 2013, https://plato.stanford.edu/entries/
   reasoning-analogy/ ..................................................................................................16

Cass Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741
   (1993) ........................................................................................................ 5, 6, 12

DODGEBALL: A TRUE UNDERDOG STORY (Twentieth Century Fox 2004) .............11

Frederick Schauer & Barbara A. Spellman, *Analogy, Expertise, and
   Experience*, 84 U. CHI. L. REV. 249 (2017) .......................................................5, 17

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*,
   62 TENN. L. REV. 461 (1995) ..................................................................................7

## Constitutional Provisions

U.S. CONST. amend. I ....................................................................... passim

U.S. CONST. amend. II....................................................................... passim

## Interests of *Amici Curiae*[1]

The American Firearms Association is a nonprofit organized under section 501(c)(4) of the Internal Revenue Code that supports Second Amendment rights at the national level and in states nationwide. The American Firearms Association therefore opposes the California's imposition of draconian and ahistorical background checks upon the mere purchase of ammunition, which infringe upon the bearing of commonly owned firearms that are protected by the Second Amendment.

The New York State Firearms Association, Georgia Gun Owners, Illinois Firearms Association, Iowa Gun Owners, Missouri Firearms Coalition, Minnesota Gun Rights, Ohio Gun Owners, Washington Gun Rights and Wyoming Gun Owners are all nonprofits organized under section 501(c)(4) of the Internal Revenue Code that oppose ammunition background checks in their respective states. The New York State Firearms Association is a party to a challenge to New York's ammunition background checks. *See N.Y. State Firearms Ass'n v. James*, No. 23-CV-6524-FPG, 2024 WL 1932050 (W.D.N.Y. May 2, 2024) (appeal filed).

---

[1] All parties have consented to this filing. No party's counsel authored this brief in whole or in part, and no person or entity other than *Amici*, their counsel, or their members made a monetary contribution intended to fund the preparation or submission of this brief.

## Summary of the Argument

The Court should affirm the ruling of the court below that California's ammunition background checks are unconstitutional under the Second Amendment. U.S. CONST. amend. II. The court below correctly ruled that ammunition background checks implicate the Second Amendment and that the state had not affirmatively proved that such regulations are analogous to historic regulation. Under *New York State Rifle and Pistol Association v. Bruen*, to determine if a law is analogous the Court is required to compare it to how the historic precedent regulated the right to bear arms and why it did so. 597 U.S. 1, 29 (2022). When considering this, the Court should draw from First Amendment precedent to recognize that laws justified by prophylaxis-upon-prophylaxis are just as suspect under Second Amendment analysis. *See* U.S. CONST. amend. I. There is no comparable burden upon gun rights or comparable justification in the historic record that permits requiring ammunition background checks on top of firearm background checks, firearm licensure, firearm registration and myriad other prophylactic rules already enacted in California law. Having offered nothing but the broadest generalizations in support of its analysis, the state has failed to carry its burden under *Bruen* and the Court should affirm that ammunition background checks are unconstitutional.

## Argument

Until recently, at no point in history have law-abiding Californians—or law-abiding citizens anywhere across the country—endured background checks and fees for every single purchase of ammunition. 1 Excerpts of Record ("ER") 13 ("When *Heller* was decided, no state in the nation had ever required a background check for ammunition."); *see generally District of Columbia v. Heller*, 554 U.S. 570 (2008); *see also* Appellees' Br. 8-17 (detailing different types of ammunition background checks, each with associated fees). Such recurring background checks are unconstitutional under the Second Amendment. U.S. CONST. amend. II. This Court should affirm the ruling of the court below.

## I.    Ammunition Background Checks Violate the Second Amendment

The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The right to keep and bear firearms "implies a corresponding right" to obtain ammunition for them. *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022) (vacated on other grounds); 1-ER-10. Per *New York State Rifle and Pistol Association v. Bruen*, the "Constitution presumptively protects that conduct." 597 U.S. 1, 24 (2022). This Court's task, then, is to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26. This requires an

examination of the law's justification explained during the relevant period. *Id.* at 41–42.

California's ammunition background check system elevates the state's assumption that every citizen is presumptively an unfit, dangerous citizen over the constitutional guarantee of the Second Amendment. *See* Appellants' Br. 1 (California "established a background check regime for ammunition transactions that is *identical in all material respects* to the requirements that apply to firearms transactions in the State." (emphasis added)). Under such an approach, any legislative body would have freewheeling discretion over how to determine just whom unfit or dangerous people may be. But this is the inverse of the Second Amendment's guarantee. "A constitutional guarantee subject to future judges' [or legislative] assessments of its usefulness is no constitutional guarantee at all." *Heller*, 554 U.S. at 634. That is, any means-end interest balancing about the scope of the Second Amendment was conducted by the people at the ratification of the Bill of Rights. This Court's role is limited here—to examine whether the state has carried its burden in evincing historical support for its challenged laws. It has not.

## A. Understanding *Bruen*'s "Historical Analogue" Test

*Bruen* requires that a court addressing a challenge under the Second Amendment ask if the conduct is truly covered by its scope. 597 U.S. at 17. If so, as here, the burden then shifts to government to "prove that its firearms regulation is

part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. When the government is able to prove a "well-established and representative historical analogue" a court may conclude that the activity "falls outside of the Second Amendment." *Id.* at 30, 17 (internal quotations and citations omitted).

Due care must be given to the relevancy and rigor of the historical analogues employed by government to support its firearms restriction. *Id.* at 29–30. This requires measuring whether the historical analogues cited by the state are "relevantly similar." *Id.* at 29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)); *see also* Frederick Schauer & Barbara A. Spellman, *Analogy, Expertise, and Experience*, 84 U. CHI. L. REV. 249, 254 (2017) ("A green hat is similar to a green truck in its greenness, for example, but dissimilar in a host of other ways."). *Bruen* instructs that the "relevantly similar" analysis should be grounded in two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 29. When deciding "how" a law burden's Second Amendment rights, courts analyze whether the proposed analogue imposes a "comparable burden." *Id.* As to deciding "why" under *Bruen*, courts ask whether the "burden is comparably justified." *Id.*

While a perfect historical twin is not required, historical analogues must be well-established and representative, lest they "endors[e] outliers" and muddy the

5

constitutional comparisons. *Id.* at 30. The Supreme Court relied on Professor Sunstein's work, *On Analogical Reasoning*, to help shape *Bruen*'s test. *Id.* at 29. Professor Sunstein observes how easy it is to engage in spurious classification or other forms of bad formalism in analogic reasoning. 106 HARV. L. REV. at 756–57. Such an example can be found in Justice Holmes's infamous opinion in *Buck v. Bell* in favor of compulsory sterilization. 274 U.S. 200, 207 (1927). Problematically:

> Holmes suggested that if people can be conscripted during wartime, or can be forced to obtain vaccinations, it follows that the state can require sterilization of the "feeble-minded." But this is a casual and unpersuasive claim. Many principles may cover the first two cases without also covering the third. Holmes does not explore the many possibly relevant similarities and differences among these cases.

Sunstein, 106 HARV. L. REV. at 757. A typical error in analogical reasoning is to resort to inappropriately high levels of generality without conducting a rigorous—that is, rigid—examination of: (a) differences between cited examples or (b) low to intermediate level principles that may describe differences between example sets. *Id.*; *see* Appellants' Br. 38 (acknowledging "the rigidity of the . . . analysis" of the court below). It is of the utmost importance to employ the appropriate analogical test given *Bruen*'s call for courts to assess historical laws in Second Amendment jurisprudence.

### B.    First Amendment Analogues Inform Second Amendment Concerns

It is appropriate to draw upon First Amendment analogues when reviewing Second Amendment claims. *See* U.S. CONST. amend. I. In *Heller*, for example, the Supreme Court repeatedly compared the right to keep and bear arms with the freedom of speech in the First Amendment. 554 U.S. at 582, 595, 606, 634–35; *see also* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480–81 (1995) ("franchise and the right to arms were 'intimately linked' in the minds of the Framers and of prior and subsequent republican thinkers."). First Amendment jurisprudence offers a well-developed body of caselaw analyzing antecedent burdens imposed against free speech rights that should be considered in Second Amendment claims such as those here. Because it is tempting to believe that a supposedly simple, repetitive background checks inflict little to no burden, an analysis of corresponding First Amendment caselaw is helpful. *See also Bruen*, 597 U.S. at 24.

The Supreme Court has consistently protected all elements of creation of the "speech process." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). Were it so that the First Amendment did not protect the antecedent acts giving rise to the free flow of ideas, government would be free to "proceed upstream and dam the source" of speech. *Buehrle v. City of Key West*, 813 F.3d 973, 977 (11th Cir. 2015); *see also ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012)

(failure to protect antecedent speech acts would make resulting publication utterly ineffective). This same concern holds true for antecedent acts giving rise to effective self-defense.

Even incidental, antecedent burdens on speech trigger serious constitutional review. In *Lamont v. Postmaster General of the United States*, the Postal Service halted any mail deemed to be "communist political propaganda" until a postal recipient affirmed that he wanted it delivered. 381 U.S. 301 (1965). From the government's perspective, little burden was placed on speech rights—after all, all a recipient had to do was affirm he wanted certain mailings approved. But even this incidental imposition on speech rights was ruled unconstitutional given that it required an "official act" for a constitutional right to be realized. *Id.* at 305.

Charitable solicitation cases like *Riley v. National Federation of the Blind*, which invalidated reasonable fee rule imposed on charities, also stand for the proposition that even seemingly minor antecedent burdens matter. 487 U.S. 781, 791 (1988). *Village of Schaumburg v. Citizens for a Better Environment* holds similarly. 444 U.S. 620 (1980). There, the Supreme Court invalidated a local ordinance prohibiting door-to-door solicitations from charities not using at least seventy-five percent of their funds for "charitable purposes." *Id.* at 624, 639. Such antecedent rules burdened just how charities would later exercise their free speech rights, violating the First Amendment.

Relevant to the second *Bruen* factor that asks "why" a burden is needed, First Amendment jurisprudence instructs that courts should be careful in accepting precautionary or too-far-removed prophylactic government interests. *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 479 (2007). In *Wisconsin Right to Life*, the Federal Election Commission expanded the reach of its regulations to capture more speech because it was concerned that protected speech might "circumvent" other rules guarding against less-protected speech. *Id.* But the Supreme Court cautioned that government rules based on a "prophylaxis-upon-prophylaxis" interest is not consistent with strict scrutiny. *Id.* Similarly, the Supreme Court struck down aggregate contribution limits in *McCutcheon v. Federal Election Commission*. 572 U.S. 185, 221 (2014). There, the Court ruled that base contribution limits were themselves prophylactic measures against corruption and an aggregate limitation was simply another government attempt to rely on a "prophylaxis-upon-prophylaxis" interest. *Id.* In such an instance, courts should be "particularly diligent" in scrutinizing the law. *Id.*; *see also Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 291 (2022) ("Such a prophylaxis-upon-prophylaxis approach . . . is a significant indicator that the regulation may not be necessary for the interest it seeks to protect.").

This well-settled approach to prophylactic interests in First Amendment jurisprudence has also seen some application in Second Amendment cases. In

9

*Duncan v. Becerra*, a district court invalidated California's statute prohibiting firearm magazines beyond a certain capacity based, in part, on the government's reliance on prophylactic interests. 366 F.Supp.3d 1131, 1159, 1173, 1180 (S.D. Cal. 2019). An *en banc* panel of this Court reversed that opinion, *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), only to have the judgment vacated and case remanded by the Supreme Court. *Duncan v. Bonta*, 142 S. Ct. 2895 (2022) (memorandum opinion). Important to that case is the realization here—that the state's approach treating each law-abiding citizen as a dangerous or suspect individual "turns the Second Amendment on its head." *Duncan*, 366 F.Supp.3d at 1173 (internal quotations and citations omitted).

### C. There is No Historical Analogue for Ammunition Background Checks

Firearms are useless without ammunition. This, to this Court's credit, provides the basis for protecting the right to keep and bear ammunition just like the right to keep and bear the "arms" that use it under the Second Amendment. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (abrogation on other grounds recognized in *Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023)). This constitutional protection notwithstanding, there are stark differences between firearms and ammunition, all of which foreclose casually analogizing historic laws that govern firearms acquisition by law-abiding citizens with wholly modern laws that govern each and every ammunition purchase by law-abiding citizens.

Ammunition is, by design, disposable. Most modern cartridges contain a primer, propelling charge, and projectile. *See Ammunition*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/ammunition [https://perma.cc/MDE7-X6CC]. Enterprising gun owners can often recover and reuse empty cartridges by replacing the primer, propelling charge and projectile. Most gun owners, however, purchase new ammunition made by a manufacturer, and they do so having already proven they are not part of the narrow class of individuals who have lost their Second Amendment rights, such as felons.

The state here argues that because historic laws permitted disarmament of certain individuals and, at points, required loyalty oaths to keep and bear arms, the state may run a background check with every purchase of ammunition. Appellants' Br. 29-32. That is, even after one has proven under modern law that he is eligible to purchase a firearm with a background check or even acquires license to carry a firearm (after, among other things, passing another background check), he must take something akin to a "loyalty oath" before every purchase of ammunition for the firearm.[2] *Id.* at 30. This is not a comparable burden.

---

[2] Rip Torn, playing Patches O'Houlihan in the film *Dodgeball*, uttered the absurd, perhaps immortal line "If you can dodge a wrench, you can dodge a ball." The state might believe this is true enough. *See* DODGEBALL: A TRUE UNDERDOG STORY (Twentieth Century Fox 2004). In fairness, the problem here is not analogous to wrenches versus dodgeballs, but hundreds of dodgeballs versus a single dodgeball.

The state's reasoning is analogically inappropriate because, as discussed by Professor Sunstein, the analogy lifts itself to a high level of generality without examining differences between firearm and ammunition background checks or even firearms and ammunition in the first instance. Sunstein, 106 HARV. L. REV. at 757. Even if the background check process is "identical in all material respects," as the state claims, it is imposed upon every purchase made for ammunition for firearms that have already been cleared—it is endlessly repetitive, making it distinct for purposes of the "how" of *Bruen*. Appellants' Br. 1, 28-38; *Bruen*, 597 U.S. at 29–30. And this undermines the "why" of historic precedent completely: law-abiding individuals are examined again and again in the name of filtering out dangerous individuals when they have already established their constitutional credentials. *See Bruen*, 597 U.S. at 29–30. Like Justice Holmes's opinion in *Buck*, the state relies on inappropriately high levels of generalization in examining historical analogues. The state's reliance on "regulations [that] imposed other conditions on the commercial market for firearms and ammunition more generally" tips their hand completely, indicating that it believes an historic regulation is analogous merely because it regulated arms in some way. Appellants' Br. 32. Because of this failure, this Court should reject the state's arguments and affirm the lower court.

California maintains a sprawling, prophylactic system of firearms registration and regulation addressing public safety concerns. Federal law requires a National

Instant Criminal Background Check System ("NICS") check by a licensed firearms dealer prior to any transfer, sale, exchange, or disposal of a firearm. 18 U.S.C. § 922(t). The California Department of Justice acts as the middleman between California dealers and the federal government for NICS. Cal. Penal Code § 28220. Both California and federal law ensure that firearms background checks are grounded in the purpose of preventing dangerous individuals from possessing weapons. Like individual campaign contribution limits in *McCutcheon*, a firearms background check is *itself* prophylactic in hoping to prevent against future harm. 572 U.S. at 221; *U.S. v. Matteo*, 718 F.2d 340, 341 (2d Cir. 1983) (describing firearms background checks as prophylactic in nature). Legislative history acknowledges that Congress passed the Gun Control Act of 1968 to advance this prophylactic interest. *Huddleston v. U.S.*, 415 U.S. 814, 829 (1974) (citing 114 Cong. Rec. 13647, 21784 (1968)). At this first level of prophylactic concern, courts have generally upheld governmental power to conduct background checks for firearms purchases.

An analytical—and thus Constitutional—problem occurs when government moves to impose not a first-level restriction on Second Amendment rights, such as a firearms background check, but secondary, ongoing background checks for ammunition. Here, for instance, the government has not presented a single law that required a loyalty oath to bear firearms and yet another one to bear ammunition: they were, in fact, one in the same oath. *See* Appellants' Br. 29-32. If government has

13

first moved to advance a prophylactic interest in upholding public safety, then continuing, duplicative restrictions against Second Amendment rights necessitate "particular[] diligen[ce]" in examining the validity of that secondary restriction. *McCutcheon*, 572 U.S. at 221. That is, California's reliance on a prophylaxis-upon-prophylaxis interest in public safety by regurgitating and repeating its already preventative background check system should meet with heightened suspicion here. *See* Appellants' Br. 29-33 (discussing strictly single-approval laws). As is recognized in the First Amendment context, this prophylaxis-upon-prophylaxis is a "significant indicator that the regulation may not be necessary for the interest it seeks to protect." *Cruz*, 596 U.S. at 291. In light of *Bruen*'s call for special attention to employing appropriate historical analogues, California's ammunition background check regime is unconstitutional.

Just as the burden of repetition exceeds historic comparison, the justifications are tenuous as well. The state relies primarily on Revolutionary War era loyalty oaths, such as the recommendation by the Continental Congress that individuals be disarmed unless they swore such an oath. Appellants' Br. 29 (quoting 4 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789 at 205 (Washington Chauncey Ford ed., 1906)). But the use of loyalty oaths in the colonies has limited application. Disarmament may occur when a person, if armed, would pose a genuine threat of immediate danger to others. *See U.S. v. Rahimi*, 144 S. Ct. 1889, 1901 (2024) (people

presenting a "special danger of misuse" may have firearms rights restricted). Oaths and wide-ranging checks are unusual, not ordinary, historic examples.[3] To the extent that colonial laws reflect a broader historical analogue, it is for the unsurprising proposition that in war time or times of domestic unrest civil liberties may be diminished. This, again, parallels First Amendment jurisprudence. *See, e.g.*, *N.Y. Times Co. v. U.S.*, 403 U.S. 713, 726 (1971) (Brennan, J., concurring) (First Amendment liberties remain protected during war time except for the most guarded governmental information, such as troop locations); *Near v. Minnesota*, 283 U.S. 697, 716 (1931). Suffice it to say, California is not in a time of war or domestic unrest.

The examples cited are not an appropriate basis upon which to analyze the constitutional propriety of California's never-ending background checks for ammunition purchases. In short, like *Buck*, the state uses poorly-correlated laws to support a principle of high generality—that government may impose restrictions based on "'dangerous individuals.'" Appellants' Br. 6 (quoting 2016 California Proposition 63 § 2(7)). California's ammunition background check system elevates

---

[3] And this is the constitutional rub. *Rahimi* affirms that, in exceptional circumstances with due process rights observed, dangerous people may be disarmed or subject to additional vetting. 144 S. Ct. at 1901. But it does not stand in support of California's upside-down approach to the Second Amendment—that everyone, everywhere, in every instance is likely dangerous and must undergo secondary background checks each time they purchase ammunition.

a policy assumption that every citizen is likely an unfit, dangerous citizen over the constitutional guarantee of the Second Amendment. The state must do better than this to meet its burden in upholding California's ahistorical approach to ammunition regulation under *Bruen*. *See generally* Appellants' Br. 28-38.

As *Bruen* instructs, and as related First Amendment caselaw affirms, attention to the interest advanced here—*Bruen*'s "why" inquiry—and corresponding fit should be considered. But California fails to address other reasons why these laws may have existed for particular classes and may not be readily applicable here. That is, low and intermediate principles (more simply: apparent differences and rules of analogical reasoning) readily distinguish them from California's unprecedented ammunition background checks.[4]

There are also important concerns about *Bruen*'s "how" because the cited examples are particularly focused on narrow groups during exigent times. They do

---

[4] Among many textbook-style guidelines for evaluating the strength of analogical reasoning comparisons, several prove helpful here: (1) analogies involving more similarities between two comparative domains are stronger; (2) analogies involving more differences between the two offer weaker proof; (3) analogies involving causal relations are more plausible than those not involving them; (4) the relevance of the similarities or differences should have a weighted effect in the analysis; and (5) analogies offering multiple analogical examples of similarity supporting the same conclusion are stronger. *See Analogy and Analogical Reasoning*, STANFORD ENCYCLOPEDIA OF PHILOSOPHY, June 25, 2013, https://plato.stanford.edu/entries/reasoning-analogy/ [https://perma.cc/AYV7-QK4N].

not apply broadly to every law-abiding purchaser of ammunition. And existing law already provides for, among other things, firearm background checks by state and federal law to achieve a prophylactic safety interest. A critical analysis of the "how" thus demonstrates that historical laws targeted particular groups of people in extraordinary circumstances. Yet, California law already has, among myriad other regulations, a firearm background check in place, making its application to ammunition purchases unnecessarily duplicative—an impermissible prophylaxis-upon-prophylaxis approach. *See Wisconsin Right to Life, Inc.*, 551 U.S. at 47. And California's approach is anything but exceptional or targeted. It applies to every law-abiding citizen and requires them to undergo background checks with each ammunition purchase only to be granted through an official act of the state. Apples and oranges, as it were. *See* Appellees' Br. 16-25.

"A green hat is similar to a green truck in its greenness, for example, but dissimilar in a host of other ways." Schauer & Spellman, 84 U. CHI. L. REV. at 254. The state's offering of historical laws prohibited certain dangerous people from obtaining arms at some hasty level of generalization, just as a green truck and a green hat are superficially similar. But that is not enough for the state to carry its burden under *Bruen*. Because the historical examples laws are one-time burdens, focus on extraordinary circumstances and apply to limited classes of people, they are inappropriate support for California's always-applicable, never-ending ammunition

background checks. The lower court properly applied *Bruen*'s historical analogue test, and the state has not, supporting affirmance by this Court.

## Conclusion

The Second Amendment is not a problem to be solved. California may disarm felons and other dangerous persons and keep them disarmed with historically analogous laws such as background checks for firearms purchases or, as the court below noted, as part of a shall-issue permitting regime. 1-ER-23; *see also Bruen*, 597 U.S. at 38 n.9. But the state may not implement part of that very same process, faults and all, to basic exercises of Second Amendment rights by law-abiding citizens such as ammunition purchases. This Court should affirm the opinion of the court below.

Dated: July 31, 2024                    Respectfully submitted,

                                        */s/ Stephen Klein*
                                        Stephen R. Klein
                                        BARR & KLEIN PLLC
                                        1629 K St NW Ste. 300
                                        Washington, DC 20006
                                        Tel/Fax: 202-804-6676
                                        steve@barrklein.com
                                        *Counsel for* Amici Curiae

## Certificate of Compliance

This document complies with the type-volume limitation set forth in Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because it contains 4,062 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point font.

*/s/ Stephen Klein*
Stephen R. Klein

**Certificate of Service**

I certify that on July 31, 2024, I electronically filed the foregoing Brief of Amici Curiae in Support of Plaintiffs-Appellees with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Stephen Klein*
Stephen R. Klein