No. 24-542

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

KIM RHODE, ET AL.,

*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellant.*

_____

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:18-cv-00802-BEN-JLB
The Honorable Roger T. Benitez, Judge

_____

## APPELLANT'S REPLY BRIEF

_____

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
JOHN D. ECHEVERRIA
*Supervising Deputy Attorneys General*
CHRISTINA R.B. LÓPEZ
MEGHAN H. STRONG
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

September 13, 2024

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................1

Argument....................................................................................................3

I.    California's ammunition background check requirements comport
with the Second Amendment ..........................................................3

    A.    Plaintiffs have not established that the Second Amendment's
text protects a right to purchase ammunition without a
background check ...................................................................3

    B.    The ammunition background check requirements are
presumptively lawful ...........................................................6

    C.    The ammunition background check requirements are not
abusive....................................................................................8

    D.    The ammunition background check requirements are consistent
with the principles underpinning the Nation's historical
tradition of regulation .......................................................14

II.    Sections 30312 and 30314 do not violate the dormant Commerce
Clause.............................................................................................18

III.    Federal law does not preempt Section 30314 .............................25

Conclusion................................................................................................27

Certificate of compliance .......................................................................28

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Arnold's Wines, Inc. v. Boyle*
  571 F.3d 185 (2d Cir. 2009) ................................................................. 21

*B&L Prods., Inc. v. Newsom*
  104 F.4th 108 (9th Cir. 2024) ....................................................... 3, 4, 7

*Black Star Farms LLC v. Oliver*
  600 F.3d 1225 (9th Cir. 2010) .............................................................. 21

*Brown & Williamson Tobacco Corp. v. Pataki*
  320 F.3d 200 (2d Cir. 2003) ........................................................... 19, 22

*C.A. Carbone, Inc. v. Town of Clarkstown*
  511 U.S. 383 (1994) .............................................................................. 22

*Dean Milk Co. v. City of Madison, Wisconsin*
  340 U.S. 349 (1951) .............................................................................. 21

*District of Columbia v. Heller*
  554 U.S. 570 (2008) ...................................................................... *passim*

*Exxon Corp. v. Governor of Md.*
  437 U.S. 117 (1978) ................................................................... 19, 20, 23

*Fresno Rifle & Pistol Club, Inc. v. Van de Kamp*
  746 F. Supp. 1415 (E.D. Cal. 1990) ................................................ 25, 26

*Granholm v. Heald*
  544 U.S. 460 (2005) ......................................................................... 20, 21

*Iowa Pork Producers v. Bonta*
  2024 WL 3158532 (9th Cir. June 25, 2024) ........................................ 23

*Jackson v. City & Cnty. of San Francisco*
  746 F.3d 953 (9th Cir. 2014) ................................................................. 3

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Maine v. Taylor*
477 U.S. 131 (1986)........................................................25

*Maryland Shall Issue, Inc. v. Moore*
___ F.4th ____, 2024 WL 3908548
(4th Cir. Aug. 23, 2024)..............................................4, 6

*McDonald v. City of Chicago*
561 U.S. 742 (2010)........................................................14

*McRorey v. Garland*
99 F.4th 831 (5th Cir. 2024)....................................*passim*

*Moody v. NetChoice*
144 S. Ct. 2383 (2024)......................................................9

*Nat'l Ass'n of Optometrists & Opticians v. Harris*
682 F.3d 1144 (9th Cir. 2012)......................................22

*Nat'l Pork Producers Council v. Ross*
6 F.4th 1021 (9th Cir. 2021)........................................23

*New York State Rifle & Pistol Ass'n v. Bruen*
597 U.S. 1 (2022)....................................................*passim*

*Oakland Tactical Supply, LLC v. Howell Township, Michigan*
103 F.4th 1186 (6th Cir. 2024)......................................4

*Ortega v. Lujan Grisham*
___ F. Supp. 3d____ , 2024 WL 3495314
(D.N.M. July 22, 2024)................................................11

*Pharm. Research & Mfrs. of Am. v. Cnty. of Alameda*
768 F.3d 1037 (9th Cir. 2014)......................................24

*Pike v. Bruce Church, Inc.*
397 U.S. 137 (1970)........................................................22

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Rocky Mountain Gun Owners v. Polis*
  701 F. Supp. 3d 1121 (D. Colo. 2023) ..............................................11

*Teixeira v. Cnty. of Alameda*
  873 F.3d 670 (9th Cir. 2017) .......................................................3, 4

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*
  588 U.S. 504 (2019)....................................................................21

*Tolchin v. N.J. Supreme Court*
  111 F.3d 1099 (3d Cir. 1997).......................................................20

*UFO Chuting of Hawaii, Inc. v. Smith*
  508 F.3d 1189 (9th Cir. 2007).....................................................24

*United States v. Manney*
  ___ F.4th ____, 2024 WL 3853846
  (9th Cir. Aug. 19, 2024).............................................................3, 5

*United States v. Perez-Garcia*
  96 F.4th 1166 (9th Cir. 2024)..............................................6, 16, 17

*United States v. Rahimi*
  144 S. Ct. 1889 (2024).........................................................*passim*

*United States v. Salerno*
  481 U.S. 739 (1987)......................................................................2

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham*
  2024 WL 3466482 (D. Vt. July 18, 2024).....................................11

*Wolford v. Lopez*,
  ___ F.4th ____, 2024 WL 4098462
  (9th Cir. Sept. 6, 2024)...............................................................16

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

**STATUTES**

18 U.S.C.
  § 922(a)(3) ...................................................................................26
  § 922(a)(6) ...................................................................................13
  § 922(d)(5)(A) ..............................................................................12
  § 922(g)(5)(A) ..............................................................................12
  § 926A .................................................................................25, 26

49 U.S.C. § 30301 ...........................................................................12

Ala. Code
  § 13A-11-75(c) .............................................................................11

Cal. Penal Code
  § 30312(a)-(b) ..............................................................................19
  § 30314(a) .............................................................................19, 25
  § 30352(c) ....................................................................................11
  § 30370 ........................................................................................11

Cal. Veh. Code
  § 12801.9 ......................................................................................12

Ohio Rev. Stat.
  § 2923.125(D)(1) ..........................................................................11

Wash. Rev. Code
  § 9.41.070(1) ................................................................................11

**REGULATIONS**

Cal. Code Regs., Title 11
  § 4045.1(b) ...................................................................................12
  §§ 4282-4286 ...............................................................................11

27 C.F.R.
  § 478.11 ........................................................................................13
  § 478.124 ......................................................................................13

## TABLE OF AUTHORITIES
### (continued)

**Page**

§ 478.124(c)(1) ...................................................................13
§ 478.124(c)(3)(i) ...............................................................13
§ 478.124(c)(3)(iii) .............................................................13

**OTHER AUTHORITIES**

132 Cong. Rec. H4102-03, 1986 WL 792564 ......................................27

132 Cong. Rec. S5358-04, 1986 WL 774609 .......................................27

California Bureau of Firearms, Frequently Asked Questions:
   Ammunition Purchases, https://tinyurl.com/bdcu7yh6 .....................................11

California Regulatory Notice Register (Aug. 23, 2024), Notice of
   Proposed Rulemaking: Ammunition Purchase Fee,
   https://tinyurl.com/yys5xc6e .................................................................9

## INTRODUCTION

Plaintiffs' understanding of the Second Amendment is at odds with precedent. In their view, the Second Amendment demands a historical justification for any regulation that concerns the purchase of ammunition by law-abiding citizens. AB 27-28. And because the challenged background checks differ in some ways from prophylactic measures used in the past, they are unconstitutional. AB 31-39. Both arguments are based on a misreading of *Bruen*. The Second Amendment's text does not guarantee a right to purchase firearms or ammunition instantaneously. Even if this Court were to assume that the Second Amendment presumptively protects such a right, history confirms that there is nothing "particularly novel" about adopting screening mechanisms that "keep[] operable firearms out of the hands of those who are ineligible 'to possess and carry' them." AB 31. Plaintiffs' view that the challenged background checks are nevertheless unconstitutional because they require purchasers to confirm their eligibility each time they seek to purchase ammunition would call all point-of-sale background checks into question—including the firearms background checks that federal law has required for decades.

Plaintiffs devote much of their briefing to *Bruen*'s cautionary note that an otherwise constitutional regime might raise concerns if "put toward abusive ends." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022). But

1

plaintiffs have not come anywhere close to making that showing. While they contend that California's ammunition background check requirements are "byzantine," "needlessly error-prone," and require "herculean" efforts, AB 5, 27, 41—they do not and cannot dispute that the overwhelming majority of ammunition background checks are processed and approved in under one minute. 3-ER-411. That is fatal to plaintiffs' facial challenge on that ground, which requires proof that "no set of circumstances exists" under which the challenged ammunition background check requirements would be valid, and is therefore "the most difficult challenge to mount successfully." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Plaintiffs' dormant Commerce Clause and federal preemption claims also fail. The face-to-face transaction requirement does not discriminate against out-of-state interests, and plaintiffs' claim that it imposes substantial burdens on interstate commerce rests on allegations similar to those this Court has previously rejected. And the federal safe harbor for the interstate transportation of firearms does not preempt California's background check requirement for ammunition imported by California residents into the State.

# ARGUMENT

## I. CALIFORNIA'S AMMUNITION BACKGROUND CHECK REQUIREMENTS COMPORT WITH THE SECOND AMENDMENT

### A. Plaintiffs Have Not Established That the Second Amendment's Text Protects a Right to Purchase Ammunition Without a Background Check

Under *Bruen*, "litigant[s] invoking the Second Amendment must first establish that the 'Second Amendment's plain text covers'" their proposed conduct. *B&L Prods.*, *Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024) (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022)). Plaintiffs assert that this threshold inquiry is "simple," because they are part of "the people" that the Second Amendment protects, AB 27, and their proposed conduct involves "acquiring ammunition," AB 28. To be sure, the Second Amendment protects "ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc). That ancillary protection includes a right "to obtain the bullets necessary to use" protected firearms. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); OB 18-20. But that does not mean that "every requirement making it slightly more difficult to possess [ammunition] demands a full historical inquiry into its origin." *United States v. Manney*, ___ F.4th ____, 2024 WL 3853846, at *3 (9th Cir. Aug. 19, 2024).

This Court recently explained that when a regulation concerns implied ancillary rights, the relevant question is whether the regulation "'meaningfully constrain[s]' the right to keep and bear arms for the purpose of self-defense." *B&L Prods.*, 104 F.4th at 119 (quoting *Teixeira*, 873 F.3d at 680). If the challenged regulation does not actually restrict "conduct necessary to effectuate" the right to keep and bear arms, it "need not satisfy *Bruen*'s second step, even though it regulates conduct connected to firearms" in some way. *Oakland Tactical Supply, LLC v. Howell Township, Michigan*, 103 F.4th 1186, 1196 (6th Cir. 2024).[1] Because the provisions at issue allow firearm owners to purchase as much ammunition as they want, so long as they submit to a background check (which can usually be completed quickly) they do not meaningfully constrain the right to keep and bear arms.

Plaintiffs cannot avoid their burden by defining their proposed conduct at a level that is "not attuned to the actual activity" regulated by the challenged statutes. *B&L Prods.*, 104 F.4th at 117 n.17. They cite *Bruen* and *Rahimi* as support for

---

[1] *See also McRorey v. Garland*, 99 F.4th 831, 838 n.18 (5th Cir. 2024) (firearms background check requirements were not "so burdensome that they act as *de facto* prohibitions on acquisition" and therefore were not subject to "*Bruen*'s rigorous historical requirement"); *Maryland Shall Issue, Inc. v. Moore*, ___ F.4th ____, 2024 WL 3908548, at *9 (4th Cir. Aug. 23, 2024) (considering whether shall-issue licensing law "infringe[d]" or "effectively denie[d]" the right to keep and bear arms).

their view that they may define the regulated conduct at the highest level of generality.  AB 29.  But both of those cases concerned "prohibitions, or near prohibitions, on the ability to possess firearms," which "directly implicated the right to bear and carry arms for self-defense."  *Manney*, 2024 WL 3853846, at *3; *see McRorey*, 99 F.4th at 838-839.  Indeed, in *Rahimi* "no one question[ed]" that the challenged law concerned "individual conduct covered by the text of the Second Amendment."  *United States v. Rahimi*, 144 S. Ct. 1889, 1907 (2024) (Gorsuch, J., concurring).  It does not follow from either precedent that an individual can always invoke the Second Amendment's presumptive protection by describing the relevant conduct at a general level.  By plaintiffs' account, any generally applicable law that affected an individual's ability to acquire an arm in any way (such as a zoning law or sales tax) would require a historical analysis.

Plaintiffs' own allegations establish that they seek to do something more specific than "acquiring ammunition":  They wish to do so without completing background checks, and without complying with the restrictions on direct-to-home ammunition shipments that are designed to prevent evasion of the background check requirements.  *See* 4-ER-649-656.  But apart from arguing that the text of the Second Amendment covers a general right to "acquir[e] ammunition," they do not attempt to show that the text of the Second Amendment protects *that* conduct. AB 28-29.

### B.   The Ammunition Background Check Requirements Are Presumptively Lawful

Plaintiffs also set aside relevant principles established in *Bruen* and *Heller*, which confirm that the challenged ammunition background checks are presumptively lawful.  *Bruen* acknowledged the facial constitutionality of "shall-issue" licensing regimes that require "applicants to undergo a background check or pass a firearms safety course," among other requirements.  597 U.S. at 38 n.9; *see also Maryland Shall Issue*, 2024 WL 3908548, at *6.  And *Heller* deemed "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms" to be "presumptively lawful regulatory measures."  554 U.S. at 626-627 & n.26; *see* OB 20-24.

Plaintiffs contend that the Supreme Court did not mean what it said when it singled out certain regulatory measures as presumptively lawful.  AB 29-31.  They rely on *Rahimi*'s statement that the government bears the burden of justifying all laws regulating "arms-bearing conduct."  *Rahimi*, 144 S. Ct. at 1897; *United States v. Perez-Garcia*, 96 F.4th 1166, 1175 (9th Cir. 2024) ("*any* regulation infringing on Second Amendment rights" must be consistent with historical tradition).  But treating certain restrictions as presumptively lawful is consistent with that approach.  *Heller* identified certain restrictions that do not regulate arms-bearing conduct protected by the Second Amendment, or otherwise implicate

6

presumptively protected conduct, and therefore do not require a historical analysis. *B&L Prods.*, 104 F.4th at 119; *see McRorey*, 99 F.4th at 836-837. And neither *Bruen* nor *Rahimi* purported to overrule that aspect of *Heller*. *See, e.g.*, *Bruen*, 597 U.S. at 17, 24, 26 ("keeping with *Heller*," "reiterat[ing]" *Heller*'s "approach," "apply[ing] *Heller*'s "test"). Indeed, *Rahimi* reiterated "that many . . . prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Rahimi*, 144 S. Ct. at 1902.[2]

Plaintiffs appear to accept that *Bruen* endorsed shall-issue licensing regimes (including those that require the applicant to pass a background check) as presumptively lawful. AB 39-40. But they contend that *Bruen*'s approval was limited to licensing regimes and does not extend to background check requirements that require purchasers to establish that they are not prohibited from possessing firearms and ammunition before each transaction. *See id*. That argument fails to engage with *Bruen*'s reasoning, which does not depend on any feature particular to

---

[2] Plaintiffs alternatively claim that the challenged ammunition background check requirements cannot be considered presumptively lawful, because they were enacted in 2016. AB 30-31. That cannot be the standard, or else any modern law could never be presumptively lawful, even if it were identical to historical precursors. The relevant question is not when the challenged regulations were enacted, but whether they are part of the same class of laws that *Heller* recognized do not implicate the Second Amendment. *See B&L Prods.*, 104 F.4th at 111-112, 119 (restrictions on the commercial sale of firearms enacted in 2019 and 2021 were presumptively lawful).

a license.  *Bruen* explained that "shall-issue" regimes are constitutional because they do not "necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry," but "ensure only that those [who carry] are, in fact, law-abiding, responsible citizens" in the first instance.  597 U.S. at 38 n.9 (internal quotation marks omitted).  Nothing in that analysis suggests that there is a constitutional line between licensing requirements and background check requirements, when both are directed at the same goal: preventing prohibited persons from acquiring firearms and ammunition.  *McRorey*, 99 F.4th at 836 (understanding *Bruen* and *Heller* to "make clear that background checks preceding firearm sales are presumptively constitutional").

### C.   The Ammunition Background Check Requirements Are Not Abusive

*Bruen* provided a guardrail for determining when a "shall-issue" requirement might raise constitutional concerns, cautioning that the Court did not "rule out" constitutional challenges to shall-issue regimes where "exorbitant fees" or "lengthy wait times" deny law-abiding citizens their right to keep and bear arms.  597 U.S. at 38 n.9.  Plaintiffs assert that the challenged background check requirements are the "poster child" for such a regime.  AB 40.  That is incorrect.  A Basic Check

costs $19, and a Standard Check costs $1.  OB 26.[3]  Both background checks allow

purchasers to obtain as much ammunition as they desire in a single transaction,

once approved.  The most recent record data, which plaintiffs do not dispute,

establishes that over 99 percent of all ammunition background checks were

completed in less than one minute, and nearly 90 percent were approved in less

than one minute.  3-ER-411.  That alone disproves the plaintiffs' assertion that the

"system is inherently flawed" and that they are therefore entitled to the broad facial

relief awarded by the district court.  AB 43; *see Moody v. NetChoice*, 144 S. Ct.

2383, 2397 (2024) (noting that facial challenges are "hard to win" by design,

because they otherwise "threaten . . . [to] prevent[] duly enacted laws from being

implemented in constitutional ways").

Plaintiffs nonetheless contend the ammunition background regime is "riddled

with arbitrary obstacles" that prevent many purchasers from acquiring ammunition.

AB 35.  It is not apparent whether plaintiffs themselves have actually experienced

the issues of which they complain.  *See*, *e.g.*, 4-ER-641 (for Plaintiff Welvang, "the

time from when the vendor submitted the eligibility check through when the dealer

---

[3] The California Department of Justice recently proposed to raise the fee for the
Standard Check from $1 to $5 to defray operating costs for the ammunition
background check system.  *See* California Regulatory Notice Register (Aug. 23,
2024), Notice of Proposed Rulemaking: Ammunition Purchase Fee,
https://tinyurl.com/yys5xc6e.

hit the 'Deliver' button . . . took just over a minute" on one occasion, and "less than a minute" on another).  In any event, their complaints are overstated.

1.  Plaintiffs first rely on the 11 percent rate of Standard Check rejections, which occurred in most instances because the purchaser's identifying information (name, address, date of birth, or ID number) did not match an AFS entry.  AB 40; OB 26-27.  Those mismatches are not "trivial," AB 9, nor do they reflect an "unwilling[ness]" on the part of the State "to even try to conduct the background check."  AB 41.  They preclude the State from using the streamlined process to confirm that the purchaser may lawfully possess ammunition, which is dependent "on the purchaser already having undergone a firearms background check and being subject to inclusion in the [Armed Prohibited Persons System]."  4-ER-570. Firearm owners can resume using expedited Standard Checks by updating their information online, so that the computer system can match the entries near-instantaneously before their next purchase.[4]  And in the interim, they may continue

---

[4] Plaintiffs assert that it "can be a herculean task" to update AFS records, because customers must report their personal information as it was when it was reported to the Department.  AB 42; *see* AB 42-43.  But any person who does not recall what information may have been used can obtain all of their firearms records by submitting a form to the Department.  3-ER-633-634.  The customer can then use that information to update their AFS records online—and can continue to purchase ammunition in the interim by requesting a Basic Check.

10

to purchase ammunition by requesting a Basic Check, which can typically be completed within five or six days. *See* OB 27.[5]

To be sure, the record reflects that some purchasers appear not to have made use of this option, for unclear reasons. *See* AB 44; OB 27. But that fact does not alone prove that California residents "have been arbitrarily denied their Second Amendment rights." AB 2. On their face, the challenged statutes and implementing regulations provide purchasers with a number of different methods for satisfying the background check requirement. *See, e.g.*, Cal. Penal Code §§ 30352(c), 30370; Cal. Code Regs., tit. 11, §§ 4282-4286. The State has also endeavored to provide further information to firearm owners and licensed vendors about how they may resolve any issues related to the ammunition background check requirements, including through periodic vendor trainings and bulletins, hotlines, and online FAQs. *See, e.g.*, California Bureau of Firearms, Frequently

---

[5] That time period is shorter than many of the permissible processing periods under the shall-issue licensing schemes endorsed in *Bruen*. *See Bruen*, 597 U.S. at 13 n.1; Ala. Code § 13A-11-75(c) (30-day period); Ohio Rev. Stat. § 2923.125(D)(1) (45-day period); Wash. Rev. Code § 9.41.070(1) (30 or 60-day period). And it is similar in duration to the firearms waiting period requirements that federal courts have upheld after *Bruen*. *See Ortega v. Lujan Grisham*, ___ F. Supp. 3d____, 2024 WL 3495314, at *29 (D.N.M. July 22, 2024) (holding that plaintiffs were unlikely to succeed on Second Amendment challenge to seven-day waiting period for firearms purchases); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 2024 WL 3466482, at *23 (D. Vt. July 18, 2024) (72-hour waiting period), *appeal filed* No. 24-2026 (2d. Cir. July 29, 2024); *Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1126, 1146 (D. Colo. 2023) (three-day waiting period).

11

Asked Questions: Ammunition Purchases, https://tinyurl.com/bdcu7yh6.  And while a person who believes that a specific denial violates the Second Amendment may raise their particular claims through an as-applied challenge, plaintiffs have not identified any such individual who would be entitled to even that relief.

2.  Plaintiffs also fault the State for declining to accept identification cards marked "Federal Limits Apply" when conducting ammunition background checks. AB 6-7, 44-45.  But there is a reason for the restriction:  Federal law prohibits individuals who do not have lawful status in the United States from possessing firearms or ammunition.  18 U.S.C. § 922(d)(5)(A), (g)(5)(A).  Identification cards that comply with the federal REAL ID Act of 2005 can be used for background checks, because those cards require the holder to submit proof of lawful presence. *See* 49 U.S.C. § 30301 note (Sec. 202. Minimum requirements and issuance standards for Federal recognition).  A "Federal Limits Apply" ID does not require proof of lawful presence, and thus cannot be used for that requirement.  Cal. Veh. Code § 12801.9.  Purchasers who do not have federally-compliant identification can still obtain a background check, but must provide supporting documents establishing lawful presence, such as a passport, visa, or birth certificate.  Cal. Code Regs., tit. 11, § 4045.1(b).

The State's requirement does not differ in any meaningful way from those that apply to firearms background checks.  Plaintiffs' claim that "the federal

government . . . accepts FLA IDs as sufficient to undergo a background check to purchase *a firearm*" is misleading. AB 7; *see* 2-SER 387-391 (citing 27 C.F.R. § 478.124). The relevant regulation does not endorse use of a "Federal Limits Apply" ID to confirm lawful presence. It only authorizes licensed vendors to use a government-issued identification card to "verify the identity of the transferee." 27 C.F.R. § 478.124(c)(3)(i); *see id.* § 478.11. The regulation separately requires transferees to certify upon criminal penalty that they are citizens or are lawfully present, and requires certain noncitizens to supply additional documentation. *See* 27 C.F.R. § 478.124(c)(1), (c)(3)(iii); 18 U.S.C. § 922(a)(6).

Plaintiffs have not shown that purchasers with "Federal Limits Apply" IDs have been systematically prevented from acquiring ammunition because of the supporting documentation requirement.[6] None of the plaintiffs claims to hold a "Federal Limits Apply" ID themselves. 2-ER-51-73; 4-ER-649-656. In their brief, plaintiffs cite only a declaration from a nonparty ammunition vendor, who reported turning away 12 customers with "Federal Limits Apply" IDs who did not have supplemental documentation on hand. *See* AB 8; 2-SER-348-349. The declaration was executed on July 10, 2019—ten days after the ammunition background check

---

[6] Plaintiffs are incorrect that the "Federal Limits Apply" ID is the State's "standard-issue" ID. AB 8; *see also* AB 7 ("California issues FLA IDs by default.") The State leaves it to the applicant to decide which form of identification is best for them. *See* Dist. Ct. Dkt. 33-1 at 355-357.

13

requirements first took effect. 2-SER-352. It is understandable that some customers may not have been aware of the need to present additional documentation at that time. But since then, millions of ammunition background checks have been approved, authorizing ammunition transactions across the State.

### D. The Ammunition Background Check Requirements Are Consistent with the Principles Underpinning the Nation's Historical Tradition of Regulation

With respect to *Bruen*'s historical inquiry, plaintiffs' primary argument is that the challenged ammunition background check requirements are unconstitutional because they are modern. Plaintiffs reason that while "[a]mmunition sales predate the founding," and firearms background checks emerged "early in the 20th century," California became the first State to require point-of-sale background checks for ammunition transactions in 2016. AB 31. But *Bruen* requires more than looking to the date the challenged law was enacted. The Supreme Court has explained that the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897. And the Court assured that "state and local experimentation with reasonable firearms regulations" would "continue" following the incorporation of the Second Amendment against the States. *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality op.); *see Bruen*, 597 U.S. at 30.

14

Those cautionary notes are particularly important where a regulation implicates technological change. *See Bruen*, 597 U.S. at 27. It is evident why the precise types of point-of-sale background checks that are required nationally for firearms sales today emerged only recently. Background checks, in their modern form, depend on centralized databases capable of consolidating information about prohibited persons, which can be updated by multiple users and queried by vendors statewide in real time. *See* 2-ER-104; Ohio Br. 7 ("there was no Founding-era Internet" capable of maintaining a point-of-sale background check system").

Plaintiffs nevertheless attack the background check requirements on the basis that they do not "look . . . like" historical laws. AB 34. But as *Rahimi* explained, the relevant question is whether the challenged regulation is "consistent with the principles that underpin our regulatory tradition." 144 S. Ct. at 1898. The ammunition background check requirements are consistent with historical tradition: From before the founding to present, governments have required law-abiding citizens to satisfy screening mechanisms intended to prevent prohibited persons from accessing firearms or ammunition. *See* OB 31-32. That tradition includes loyalty oath requirements, concealed carry licensing schemes, and surety laws. It also includes point-of-sale background checks for firearms and ammunition sales, even if they depend on more modern techniques.

15

Plaintiffs address the historical evidence by taking a "divide-and-conquer" approach" that "miss[es] the forest for the trees." *Perez-Garcia*, 96 F.4th at 1191. For instance, plaintiffs distinguish founding-era loyalty oath requirements on the ground that they did not apply exclusively to firearms, but were "*general* requirement[s]" that applied to "all manner of privileges." AB 34. But plaintiffs do not explain why a historical analogue that restricted rights more broadly cannot serve as a relevant historical precursor for a less burdensome law. And plaintiffs concede that the justification for background checks—"keeping operable firearms out of the hands of those who are ineligible to 'possess and carry' them"—is not "particularly novel." AB 41.

Similar to the challenged background checks, loyalty oath requirements allowed the government to distinguish between those citizens whose firearm possession was lawful and those that could be properly disarmed. *See Bruen*, 597 U.S. at 28-29. And they did so by placing an incidental regulatory burden on law-abiding citizens, to permit the government to make such distinctions. *See* OB 29-30. They are therefore proper analogues to the challenged ammunition background checks, even if this Court were to apply a "stricter 'distinctly similar' test." *See Wolford v. Lopez*, ___ F.4th ____, 2024 WL 4098462, at *11 (9th Cir. Sept. 6, 2024).

Plaintiffs also dismiss founding-era surety laws, and 19th century licensing regimes for the public carry of firearms. *See* AB 35-36. Plaintiffs contend that surety laws are inapposite because they were targeted at individuals suspected at future misbehavior, and that licensing schemes are distinct because they only require the purchaser to demonstrate their eligibility to obtain a license (and again whenever the license must be renewed), while ammunition background checks apply each time at the point of sale. *See id.* But *Bruen* does not ask courts to "isolate each historical precursor and ask if it differs from the challenged regulation in some way." *Perez-Garcia*, 96 F.4th at 1191. Surety requirements served as a "mechanism for preventing violence before it occurred," by requiring individuals to provide assurances to confirm their eligibility to keep and bear arms. *Rahimi*, 144 S. Ct. at 1900. And there is no reasonable argument that the burdens of a modern point-of-sale background check are incomparable to those imposed by 19th century licensing regimes—particularly when, in most instances, complying with a modern background check only requires the purchaser to pay a small fee, provide appropriate identification to the vendor, and await approval.[7]

---

[7] *Cf.* 2-ER-112 (1871 Missouri ordinance that required applicants to secure "written permission from the Mayor" to carry a concealed firearm); 2-ER-116-117 (1893 Florida law that required applicant to submit identifying information and "give a bond running to the Governor . . . in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun" to carry a repeating rifle).

17

Finally, plaintiffs contend that *Rahimi* supports their understanding of the historical analysis.  AB 35-37.  But *Rahimi*'s own reliance on surety laws is instructive: it found those laws adequate to support a temporary *prohibition* on firearms and ammunition ownership—even though that mechanism is "by no means identical" to a surety requirement.  144 S. Ct. at 1901; *see id.* at 1939-1941 (Thomas, J., dissenting).  Similarly, while none of the historical analogues are identical to a modern ammunition background check requirement, they "do[] not need to be."  *Id.* at 1901.  What matters is that the ammunition background check requirements fit within the tradition those analogues represent: that States may require individuals to satisfy screening determinations before they may possess dangerous weapons.

## II.   Sections 30312 and 30314 Do Not Violate the Dormant Commerce Clause

Plaintiffs' brief confirms that their dormant Commerce Clause claim should be rejected.  They have not shown that the requirement that ammunition transfers occur through in-state and face-to-face transactions discriminates against interstate commerce, and their *Pike* claim is all but foreclosed by circuit precedent.

1. Plaintiffs assert that the State has "conced[ed]" that the in-state, face-to-face transaction requirement "discriminat[es]" against "'out-of-state vendors'" because they "cannot 'sell ammunition' directly to Californians" without "'a physical presence and license in California.'"  AB 46.  That is untrue.  The State

18

has never suggested that the challenged statutes discriminate against out-of-state interests. *All* ammunition transactions by *all* vendors are subject to the same requirements. All vendors (whether in-state or out-of-state) must ship ammunition to a licensed vendor within the State if they prefer to sell to customers over the Internet, or without a physical store. Cal. Penal Code §§ 30312(a)-(b), 30314(a); OB 39-41. And all vendors (whether in-state or out-of-state) must obtain a license for a brick-and-mortar store to provide ammunition directly to a customer. While vendors must have a physical location in the State to obtain a license, that requirement does not grant "in-state sellers a monopoly on sales of ammunition to state residents." AB 46. A Dick's Sporting Goods that is incorporated in Delaware and has its principal place of business in Pennsylvania may obtain a license for any brick-and-mortar location in California, just as any other vendor may. That requirement may persuade certain vendors to open physical stores within the State, but that "does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 125 (1978). The dormant Commerce Clause does not protect "the particular structure or methods of operation in a retail market" or "particular interstate firms." *Id.* at 127.

The Second Circuit's analysis of a similar in-state and face-to-face transaction requirement is instructive. In *Brown & Williamson Tobacco Corp. v. Pataki*, 320

19

F.3d 200, 203 (2d Cir. 2003), the court rejected a dormant Commerce Clause

challenge to a New York law that required cigarette sales to be made in face-to-

face, in-state transactions to facilitate verification of the purchaser's age and the

collection of state taxes. *Id.* at 212, 214. The court determined that the challenged

law was not discriminatory, because it imposed "a requirement that applies to all

direct shippers of cigarettes wherever they may be located" that "neither impede[d]

nor obstruct[ed] the flow of cigarettes in interstate commerce." *Id.* at 213-214.

The court acknowledged that certain retailers might find it "unworkable" to

establish brick-and-mortar outlets, but "[t]he fact that the burden of a state

regulation falls on some interstate companies does not, by itself, establish a claim

of discrimination." *Id.* at 212 (quoting *Exxon*, 437 U.S. at 126); *see also Tolchin v.*

*N.J. Supreme Court*, 111 F.3d 1099, 1107-1108 (3d Cir. 1997) (requirement that

attorneys maintain a bona fide office in New Jersey to practice in that State was not

discriminatory).

　　None of the cases cited by plaintiffs is to the contrary. Plaintiffs contend that

*Granholm v. Heald*, 544 U.S. 460, 470 (2005) establishes that in-state, face-to-face

transaction requirements are discriminatory. *See* AB 49. That is incorrect.

*Granholm* considered state laws that allowed in-state wineries to ship directly to

consumers, while effectively banning out-of-state wineries from doing the same.

544 U.S. at 469. As to the New York laws, the issue was not that "every winery

20

that wanted to ship directly to New Yorkers needed a physical presence in New York." AB 48. It was that New York had created a two-track system in which wineries that produced wine from New York grapes could ship directly from their wineries and bypass the three-tiered distribution requirements that would otherwise apply to those sales, while other wineries could not. *Granholm*, 544 U.S. at 470; *see id.* at 473 (noting that the requirements were part of a national "patchwork" designed to "protect local wineries" as part of an "on-going, low-level trade war"). *Granholm* accepted as "unquestionably legitimate" the alcohol distribution model prevalent in most states, which channels all liquor through licensed in-state retailers and wholesalers, but "treat[s] liquor produced out of state the same as its domestic equivalent." *Id.* at 489; *see Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1234 (9th Cir. 2010) (endorsing direct shipment limitations that apply evenhandedly); *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 190-192 (2d Cir. 2009).[8]

Plaintiffs also invoke *Dean Milk Co. v. City of Madison, Wisconsin*, 340 U.S. 349 (1951), which they read for the sweeping proposition that laws requiring in-state or in-person conduct trigger heightened dormant Commerce Clause scrutiny.

---

[8] Plaintiffs claim that cases addressing liquor distribution are inapposite, because the Twenty-first Amendment provides an independent constitutional justification for such laws. But the Court has "repeatedly rejected" the view that the Amendment may justify protectionist laws. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 531 (2019).

*See* AB 47. In *Dean Milk*, the Court addressed a law that barred any milk from being sold unless it had been pasteurized within five miles from the central square of Madison, Wisconsin. 340 U.S. at 355. While the law was neutral on its face, the Court held that it discriminated in "practical effect" because it "protect[ed] a major local industry against competition from [outside] the State." *Id.* at 354; *see also C.A. Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994) (invalidating law requiring waste to be transferred at a single processing facility). There was no evident justification for the measure: Madison's own health commissioner testified that the city could safeguard the quality of locally sold milk without requiring every seller to establish a processing plant within a five-mile radius of the city. 340 U.S. at 355-356. Plaintiffs have not shown any comparable form of protectionism here. The challenged requirements do not prohibit vendors from stocking their stores with ammunition manufactured elsewhere, or otherwise isolate the State from competition, and therefore do not violate the dormant Commerce Clause. *See Brown & Williamson Tobacco Co.*, 320 F.3d at 210-211.

2. Before a court may proceed to the balancing inquiry established in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), a plaintiff must establish that the challenged statutes impose a substantial burden on interstate commerce, suggesting a discriminatory purpose not evident in their terms. *Nat'l Ass'n of Optometrists &*

22

*Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012); *see* OB 43-44. Plaintiffs have not satisfied that threshold inquiry.

If the allegations in *National Pork* did not establish a substantial burden, the allegations here cannot, either. *See Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1033 (9th Cir. 2021); *Iowa Pork Producers v. Bonta*, 2024 WL 3158532 (9th Cir. June 25, 2024) (acknowledging that this Court's decision in *National Pork* "remains controlling in this circuit"). The "crux" of the plaintiffs' claims in *National Pork* was that producers would need to "expend millions" and restructure their operations to comply with the challenged law. 6 F.4th at 1033; *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 404 (2023) (Kavanaugh J., concurring in part) (stating that the law at issue would cost producers "hundreds of millions (if not billions) of dollars"). The Court found those allegations insufficient because "laws that increase compliance costs, without more, do not constitute a significant burden on interstate commerce," even if they inflict "heavy burdens on some out-of-state sellers." *Nat'l Pork*, 6 F.4th at 1032; *see also Exxon*, 437 U.S. at 127-129. The crux of plaintiffs' claim here is similar: Plaintiffs allege that out-of-state ammunition vendors will be "subject to additional expenses and loss of business," and may need to restructure their retail operations, including by working with in-state vendors to process their transactions if they lack brick-and-mortar locations in the State. AB 51. Because those compliance costs cannot

23

establish a substantial burden, plaintiffs' *Pike* claim fails for the same reasons as the claim in *National Pork*. *See* OB 43-44.

Even if this Court were to engage in *Pike* balancing, the challenged provisions should be upheld. A law's burdens on interstate commerce are clearly excessive under *Pike* only if they "so outweigh the putative benefits as to make the statute unreasonable or irrational." *UFO Chuting of Hawaii, Inc. v. Smith*, 508 F.3d 1189, 1196 (9th Cir. 2007). There is nothing unreasonable or irrational about requiring ammunition transfers to take place in face-to-face transactions at a licensed vendor's in-state location. That requirement ensures that the ammunition background check is conducted by a vendor who is able to visually confirm the purchaser's identity before transferring ammunition, and that purchasers cannot evade the background check requirement by ordering ammunition in mass quantities online, or by purchasing it from out of state. *See* OB 46. It also allows the State to ensure compliance with the background check requirements. Plaintiffs offer no alternative at all for achieving those legitimate public-safety objectives. Indeed, because those government interests would satisfy the "more demanding scrutiny" reserved for discriminatory measures, *see Maine v. Taylor*, 477 U.S. 131, 138 (1986), it follows that California's face-to-face requirement satisfies the deferential *Pike* standard. *See also Pharm. Research & Mfrs. of Am. v. Cnty. of Alameda*, 768 F.3d 1037, 1045 (9th Cir. 2014) ("[R]egulations that touch upon

safety are those that the [Supreme] Court has been most reluctant to invalidate"
and receive a "strong presumption of validity" (ellipsis and citation omitted)).

## III. FEDERAL LAW DOES NOT PREEMPT SECTION 30314

Even assuming the Federal Firearm Owners Protection Act confers an
entitlement to transport ammunition, *but see* OB 48, it would not conflict with
Section 30314.  Plaintiffs agree that Section 926A is "not implicated at all" when
"the individual could not 'lawfully possess and carry such firearm'" (or
ammunition) in the destination state.  AB 56.  That concession is fatal to their
preemption claim.  Ammunition that is transported across state lines without first
being transferred to a licensed vendor for processing and a background check
cannot be lawfully possessed within the State.  Cal. Penal Code § 30314(a).  That
provision does not "regulat[e] the interstate transportation of ammunition
generally," AB 56, it sets a condition for the lawful possession of ammunition in
California, by residents of the State.  *See Fresno Rifle & Pistol Club, Inc. v. Van de
Kamp*, 746 F. Supp. 1415, 1427 (E.D. Cal. 1990) (California law prohibiting
transportation of assault weapons into the State "clearly . . . can be reconciled"
with § 926A), *aff'd on other grounds*, 965 F.2d 723 (9th Cir. 1992).[9]  Indeed,

---

[9] Plaintiffs assert that *Fresno* is "doubly inapposite" because it "predates *Heller*"
and "rests on the notion that there is no individual right to possess even a firearm."
AB 56 n.9.  While *Fresno*'s Second Amendment analysis has been abrogated, its
rejection of plaintiffs' federal preemption claim remains persuasive.  *See Fresno*,
746 F. Supp. at 1427.

25

because of federal requirements, California residents generally cannot travel home with a firearm purchased from an out-of-state vendor, either.  *See* 18 U.S.C. § 922(a)(3).

Plaintiffs rely on the non-obstante clause at the beginning of Section 926A, which provides that the section applies "[n]otwithstanding any other provision of any law or any rule or regulation of a State."  AB 54-55.  But the clause cannot rewrite Section 926A's requirement that the individual must be able to "lawfully possess and carry" the transported firearm or ammunition in the destination state. 18 U.S.C. § 926A.  And because that requirement is not satisfied unless Section 30314's requirements have been met, there is no conflict between state and federal law.

Finally, plaintiffs briefly argue that Section 30314 "poses an obstacle to the objectives" of Section 926A.  AB 55 n.8.  Nothing about the above, however, prevents Section 926A from providing "law-abiding Americans" the ability "to exercise their right to interstate travel with personally owned firearms."  *Id.*  It only means that travelers cannot disregard the laws that apply when they arrive in California, which is consistent with Section 926A's terms.  The same legislative materials plaintiffs cite as evidence of Section 926A's objectives confirm what its text says:  that Section 926A does not "modify the State or local laws at the place of origin or the jurisdiction where the trip ends in any way."  132 Cong. Rec.

H4102-03, 1986 WL 792564 (statement of Rep. McCollum); *see also* 132 Cong. Rec. S5358-04, 1986 WL 774609 (statement of Sen. McClure).

## CONCLUSION

The judgment of the district court should be reversed, and this Court should remand for entry of judgment in favor of the Attorney General.

Dated:  September 13, 2024                Respectfully submitted,


                                    */s/ Mica L. Moore*
                                    _____

                                    ROB BONTA
                                    *Attorney General of California*
                                    MICHAEL J. MONGAN
                                    *Solicitor General*
                                    HELEN H. HONG
                                    *Principal Deputy Solicitor General*
                                    THOMAS S. PATTERSON
                                    *Senior Assistant Attorney General*
                                    MICA L. MOORE
                                    *Deputy Solicitor General*
                                    R. MATTHEW WISE
                                    JOHN D. ECHEVERRIA
                                    *Supervising Deputy Attorneys General*
                                    CHRISTINA R.B. LÓPEZ
                                    MEGHAN H. STRONG
                                     *Deputy Attorneys General*
                                    *Attorneys for Defendant and Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** <u>No. 24-542</u>

I am the attorney or self-represented party.

**This brief contains <u>5,486 words</u>,** including _____ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** <u>*/s/ Mica L. Moore*</u>             **Date:** <u>September 13, 2024</u>