**ROB BONTA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

300 SOUTH SPRING STREET, SUITE 1702
LOS ANGELES, CA 90013-1230

Public: (213) 269-6000
Telephone: (213) 269-6138
E-Mail: Mica.Moore@doj.ca.gov

March 5, 2025

VIA ACMS

Molly Dwyer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

RE:     *Rhode v. Bonta*, No. 24-542
        Citation of Supplemental Authority

Dear Ms. Dwyer:

Appellant writes to notify the Court of the decision in *Day v. Henry*, No. 23-16148 (9th Cir. Mar. 4, 2025). The Court rejected a dormant Commerce Clause challenge to Arizona's "ban on direct shipping from retailers without in-state premises." Slip op. 7. It held that plaintiffs failed to meet their burden of establishing discrimination, because "Arizona's laws apply even-handedly to all wine retailers, no matter whether that retailer is headquartered, incorporated or otherwise based in another state." *Id.* at 16; *see* OB 38-41. It rejected the argument that *Granholm v. Heald*, 544 U.S. 460 (2005), "prohibit[s] Arizona from implementing a physical premise requirement as a matter of law." Slip op. 16; *see* AB 47-48. Judge Forrest concurred in part and dissented in part. Slip op. 22-29.

Sincerely,

*/s/ Mica L. Moore*

MICA L. MOORE
Deputy Solicitor General

For     ROB BONTA
        Attorney General

Attachment.

cc: All Counsel of Record (via ACMS)

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| REED DAY; ALBERT JACOBS, | No. 23-16148 |
| *Plaintiffs - Appellants*, | D.C. No. 2:21-cv-01332-GMS |
| v. | |
| BEN HENRY, in his official capacity as Director of the Arizona Department of Liquor Licenses and Control; et al., | OPINION |
| *Defendants - Appellees*, | |
| and | |
| WINE AND SPIRITS WHOLESALERS ASSOCIATION OF ARIZONA, | |
| *Intervenor - Defendant - Appellee*. | |

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, District Judge, Presiding

Argued and Submitted October 22, 2024
Phoenix, Arizona

2    DAY V. HENRY

Filed March 4, 2025

Before:  MILAN D. SMITH, JR., BRIDGET S. BADE, and
         DANIELLE J. FORREST, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Partial Concurrence and Partial Dissent by Judge Danielle
J. Forrest.

## SUMMARY[*]

### Commerce Clause

The panel affirmed the district court's summary
judgment for state officials and an intervenor-defendant in a
42 U.S.C. § 1983 action brought by Arizona residents
alleging that Arizona's statutory scheme preventing retailers
without in-state premises from shipping wine directly to
Arizona consumers violates the Commerce Clause.

The panel first held that plaintiffs met the requirements
for Article III standing. The redressability requirement of
standing had been met because the district court was capable
of granting at least some relief, regardless of whether that
relief—or any other possible relief—might ultimately prove
appropriate on the merits.

The panel held that plaintiffs failed to meet their burden
of showing that Arizona's physical presence requirement

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

was discriminatory. Arizona's requirement that a retailer establish a physical premise in Arizona that is managed by an Arizona resident to obtain a retail license to ship wine directly to consumers applies even-handedly to all wine retailers, no matter whether that retailer is headquartered, incorporated, or otherwise based in another state. Moreover, Arizona's physical premise requirement was not so "onerous" as to be expressly discriminatory. Out-of-state businesses can (and do) obtain retail licenses in Arizona. The fact that out-of-state businesses possess Arizona retail licenses and have obtained direct shipping privileges supports the conclusion that Arizona's laws do not have a discriminatory effect in practice.

Concurring in part and dissenting in part, Judge Forrest agreed that plaintiffs have standing to challenge Arizona's restrictions. She dissented because she believes Arizona's law is discriminatory. At bottom, Arizona allows only those retailers willing to set up shop in-state to ship wine to Arizonans. That type of economic isolationism is facially discriminatory, in part because it tends to discourage domestic corporations from plying their trades in interstate commerce. Judge Forrest would remand for the district court to conduct the required evidentiary inquiry into whether Arizona's discriminatory regulations may be justified on legitimate, non-protectionist grounds.

## COUNSEL

James A. Tanford (argued), Robert D. Epstein, and James E. Porter II, Epstein Seif Porter & Beutel LLP, Indianapolis, Indiana; Christopher J. Zachar, Zachar Law Firm PC, Phoenix, Arizona; for Plaintiffs-Appellants.

Luci D. Davis (argued) and Nathan T. Arrowsmith, Attorneys; Dena R. Benjamin and Linda Bergevin, Assistant Attorneys General; Kristen K. Mayes, Arizona Attorney General; Arizona Attorney General's Office, Phoenix, Arizona; for Defendants-Appellees.

Hannah H. Porter (argued) and Kevin E. O'Malley, Gallagher & Kennedy PA, Phoenix, Arizona, for Intervenor-Defendant-Appellee.

Frederick R. Yarger and William Sowers Jr., Wheeler Trigg O'Donnell LLP, Denver, Colorado; Jacob Hegeman, Wine & Spirits Wholesalers of America Inc., Washington, D.C.; for Amici Curiae Wine & Spirits Wholesalers of America Inc. and American Beverage Licensees.

John C. Neiman Jr. and Mollie G. Hughes, Maynard Nexsen PC, Birmingham, Alabama, for Amicus Curiae National Beer Wholesalers Association.

DAY V. HENRY 5

## OPINION

M. SMITH, Circuit Judge:

Plaintiff-Appellants Reed Day and Albert Jacobs are Arizona residents who desire to ship wine directly to themselves from retailers who do not maintain in-state premises in Arizona. Arizona's statutory scheme, however, prevents such shipments. As a result, Plaintiffs brought a civil rights action against various Arizona state officials pursuant to 42 U.S.C. § 1983, challenging the statutory scheme, which they claim violates the Commerce Clause. Plaintiffs now appeal the district court's order granting summary judgment to the state officials and an intervenor-defendant. For the reasons explained below, we affirm.

## BACKGROUND

Like many states, Arizona utilizes a "three-tier" system to regulate the sale and distribution of alcohol. This system allocates the sale and distribution of alcohol among producers, wholesalers, and retailers. Licensed wholesalers must buy from producers (sometimes called suppliers) and then sell to licensed retailers, who then sell to consumers. The three-tier framework arose because of "tied-house" saloons in the pre-Prohibition era, in which alcohol producers set up saloonkeepers who promised to sell only their products and to meet minimum sales goals. *Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 867 (6th Cir. 2020). The tied-house system led to excessive alcohol consumption, and after the Eighteenth Amendment was repealed, states used the significant authority given to them by § 2 of the Twenty-first Amendment to create strict boundaries between producers and consumers of alcohol. *Id.* at 867–68.

6          DAY V. HENRY

Arizona's current statutory scheme subjects all three tiers of alcohol sales and distribution to a series of complex—and overlapping—statutes and regulations. For example, all liquor shipped into Arizona must be invoiced to the wholesaler by the supplier and must be held by the wholesaler for at least twenty-four hours. Ariz. Rev. Stat. § 4-243.01(B). Meanwhile, retailers may only buy from wholesalers, registered retail agents, or a handful of other clearly defined sources. *Id.* § 4-243.01(A)(3). Retailers must hold their license through an Arizona resident (or qualifying corporation) and must have a physical premise managed by an Arizona resident. *Id.* § 4-202(A), (C). Only licensed retailers may take orders off-site (e.g., by phone or internet) and ship directly to consumers within the state. *Id.* § 4-203(J). Knowingly shipping wine directly to a purchaser in Arizona without the proper retail license is a class 2 misdemeanor. *Id.* § 4-203.04(H)(1).

As a result of these—and other—provisions, retailers who do not maintain premises in Arizona cannot ship directly to consumers within the state, but licensed retailers with in-state premises may do so. A limited exception exists for out-of-state wineries, which may receive a license to ship small quantities of their product directly to consumers. *Id.* § 4-203.04(F). The "physical premise" or "presence" requirement, as this restriction is sometimes called, has been the subject of increasing litigation in recent years, with plaintiffs across a variety of states challenging similar requirements as a violation of the dormant Commerce Clause that cannot be otherwise justified by § 2 of the Twenty-first Amendment.

## PROCEDURAL BACKGROUND

Plaintiffs are Arizona residents and self-described "avid wine drinker[s]" who want to have wine shipped directly to them from retailers who do not have in-state premises. Following in the footsteps of petitioners in other states, Plaintiffs sued Defendants—the Director of the Arizona Department of Liquor Licenses and Control, the Chair of the Arizona State Liquor Board, and the Attorney General of Arizona—in their official capacities pursuant to 42 U.S.C. § 1983. Plaintiffs sought a declaratory judgment that the ban on direct shipping from retailers without in-state premises is unconstitutional and an injunction barring Defendants from enforcing the laws that prohibit retailers without in-state premises from shipping wine to Arizona consumers. The Wine and Spirits Wholesalers Association of Arizona later joined as Intervenor-Defendant.

On August 12, 2022, Plaintiffs and Defendants filed cross-motions for summary judgment. Plaintiffs argued that because no license exists that would give a retailer without in-state premises shipping privileges, Arizona's laws discriminate against out-of-state interests in violation of the Commerce Clause. Plaintiffs then argued that these discriminatory laws could not be otherwise upheld as serving the state's legitimate interests in public health and safety because Arizona did not prove that it could not serve those interests through nondiscriminatory alternatives. In contrast, Defendants argued that the relevant laws are not discriminatory because they treat in-state and out-of-state prospective licensees the same and that, regardless, the interests served by the regulatory scheme are "more than sufficient" to sustain the laws. Intervenor-Defendant filed its own motion for summary judgment on September 9, 2022, echoing Defendants' arguments and explaining the

importance of Arizona's presence requirement to the functioning of the state's three-tier scheme.

On August 9, 2023, the district court granted Defendants' and Intervenor-Defendant's motions for summary judgment and denied Plaintiffs' motion. *Day v. Henry*, 686 F. Supp. 3d 887 (D. Ariz. 2023). The district court reasoned that it was unlikely that Plaintiffs had standing and that, even if they did, their claims still failed on the merits. *Id.* at 892, 894. The district court agreed with Defendants and Intervenor-Defendant that the physical premise requirement is not discriminatory and that, regardless, this requirement is essential to Arizona's three-tier system and is supported by legitimate nonprotectionist state interests. *Id* at 897–98. On August 28, 2023, Plaintiffs timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the standing issue de novo. *Hall v. Norton*, 266 F.3d 969, 975 (9th Cir. 2001). We also review de novo the district court's summary judgment order. *2-Bar Ranch Ltd. P'ship v. United States Forest Serv.*, 996 F.3d 984, 990 (9th Cir. 2021).

## ANALYSIS

### I. Plaintiffs have met the requirements for Article III standing.

As a threshold matter, Plaintiffs have met the requirements for Article III standing. These requirements are threefold: a plaintiff must have (1) suffered an injury-in-fact that is (2) traceable to the defendant's challenged conduct, and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). If "a favorable judicial decision would not require the defendant to redress the plaintiff's claimed injury, the plaintiff cannot demonstrate redressability unless she adduces facts to show that the defendant or a third party are nonetheless likely to provide redress as a result of the decision." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (citations omitted). Plaintiffs must also show that the relief they seek is "within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020).

The district court found that it was "doubtful" that Plaintiffs could show standing because of two distinct problems with the element of redressability. *Day*, 686 F. Supp. 3d at 892. First, because it was "unclear which provisions Plaintiffs actually challenge," it was likely unchallenged provisions would still block their desired relief. *Id.* A plaintiff cannot meet redressability if he or she only challenges part of a regulatory scheme and other uncontested laws would still prevent relief. *See Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941, 955 (9th Cir. 2006). Second, the district court found that it was not clear "that the [c]ourt could, or in any event, would grant the relief that Plaintiffs request," which included enjoining unidentified statutes, rewriting the regulations, or commanding the legislature to redo the licensing scheme. *Day*, 686 F. Supp. 3d at 892, 894. The district court rejected the idea of "leveling down," in which it could cure the constitutional issue by enjoining retailers with in-state premises from shipping to Arizona consumers (as opposed to "leveling up" by extending shipping rights to all retailers), because doing so would "not . . . provide these Plaintiffs with the relief that they request." *Id.* at 893.

We disagree with the district court and find that Plaintiffs have met the requirements for standing. Standing is a threshold consideration that must be determined before considering the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Notably, a plaintiff satisfies redressability "when he shows that a favorable decision will relieve a discrete injury to himself," not that "a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Moreover, a district court is not limited to a plaintiff's proposal and instead "may enter any injunction it deems appropriate, so long as the injunction is 'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Kirola v. City and Cnty. of San Francisco*, 860 F.3d 1164, 1176 (9th Cir. 2017) (quoting *United States v. AMC Ent., Inc.*, 549 F.3d 760, 775 (9th Cir. 2008)).

As a preliminary matter, Plaintiffs did challenge the relevant laws, routinely listing in their complaint and briefing the specific statutes they were challenging. Therefore, Plaintiffs' claims do not possess the fatal flaw of failing to identify independent provisions that would still block relief should the court enjoin only the challenged statutes. *See Nuclear Info. & Res. Serv.*, 457 F.3d at 955. Instead, what Plaintiffs inconsistently identified was their requested *relief*: They routinely changed which particular statutes they wanted enjoined and later agreed with the district court that they wanted the court to direct the legislature to "fix" the unconstitutional laws generally. But, as noted above, the district court was not limited to Plaintiffs' suggestions and had the authority to create its own remedy. *See Sharp v. Weston*, 233 F.3d 1166, 1173 (9th Cir. 2000) ("Once a constitutional violation has been found, a district court has broad powers to fashion a remedy.").

Redressability is meant only to be "a constitutional minimum, depending on the relief that federal courts are *capable* of granting." *Kirola*, 860 F.3d at 1176.

Here, the district court was capable of granting at least some relief. For example, the district court could have enjoined the enforcement of the statutory scheme as applied to all liquor retailers and wholesalers inside *and* outside of Arizona. This solution would negate the Commerce Clause issue by eliminating enforcement of the allegedly discriminatory laws altogether.[1] Although such an injunction might be broad, it is not the kind of relief that is outside the power of Article III courts under *Juliana*. *See Johnson v. City of Grants Pass*, 72 F.4th 868, 882 (9th Cir. 2023) (explaining that enjoining the enforcement of a few municipal ordinances "cannot credibly be compared to an injunction seeking to require the federal government to 'phase out fossil fuel emissions and draw down excess atmospheric CO2'") (quoting *Juliana*, 947 F.3d at 1164–65), *rev'd on other grounds*, *City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520 (2024). Therefore, because the district court was capable of granting at least some relief, and regardless of whether that relief—or any other possible relief—might ultimately prove appropriate on the merits, the redressability requirement of standing has been met. *See Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 63 (9th Cir.

---

[1] Intervenor-Defendant protests that such a "leveling up" would contravene the Arizona Legislature's intent to "retain the current three-tier" system. 2006 Ariz. Sess. Laws 1098. Any such restraint would be a merits determination about the appropriate remedy, not an Article III constraint on the district court's power. To hold otherwise would allow states to litigation-proof any regulatory scheme by including "level-down" provisions to defeat standing.

12          DAY V. HENRY

2024) (stating that "redressability should not be conflated with the merits").

## II. Arizona's physical presence requirement is not discriminatory.

Plaintiffs' suit focuses on the tension between two constitutional provisions: § 2 of the Twenty-first Amendment and the Commerce Clause. In 1920, the Eighteenth Amendment became effective, ushering in Prohibition by banning the manufacture, sale, or transportation of liquor. U.S. Const. amend. XVIII § 1. Thirteen years later, the country changed course and ratified the Twenty-first Amendment, repealing the Eighteenth Amendment. U.S. Const. amend. XXI § 1. But the Twenty-first Amendment "did not return the Constitution to its pre-1919 form." *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 853 (7th Cir. 2000). Rather, while § 1 repealed the Eighteenth Amendment, § 2 added new language clarifying that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI § 2. This addition was modeled on pre-Prohibition legislation that was intended to "give each State a measure of regulatory authority over the importation of alcohol." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 525, 528 (2019). The wording used in this legislation—and later in § 2—was framed "not as a measure conferring power on the States but as one prohibiting conduct that violated state law." *Id.* at 526.

Over time, the broad language of § 2 has come into conflict with other parts of the Constitution, most notably the Commerce Clause, which reserves for Congress the power

"[t]o regulate Commerce . . . among the several States."
U.S. Const. art. 1, § 8, cl. 3. The "negative" reading of this
clause—known as the "dormant Commerce Clause"—
prevents states from adopting protectionist measures that
unduly restrict interstate commerce. *See Nat'l Pork
Producers Council v. Ross*, 598 U.S. 356, 368–69 (2023).
Although the Supreme Court initially treated § 2 as
functionally overriding other constitutional provisions,
including the Commerce Clause, it eventually walked back
that interpretation. *Tenn. Wine*, 588 U.S. at 529–30. Instead,
the Supreme Court now finds that state laws that violate
other parts of the Constitution are not necessarily saved by
the Twenty-first Amendment. *See Granholm v. Heald*, 544
U.S. 460, 486–87 (2005). Regarding the Commerce Clause
in particular, the Court has found that § 2 does not abrogate
Congress's Commerce Clause powers and that state
regulation of alcohol is limited by the Clause's
nondiscrimination principle. *Id.* at 487.

In *Tennessee Wine*, the Supreme Court set out a two-part
test to manage the ongoing tension between § 2 and the
Commerce Clause. *See B-21 Wines, Inc. v. Bauer*, 36 F.4th
214, 222 (4th Cir. 2022). First, when a plaintiff challenges
the constitutionality of state liquor regulations pursuant to
the Commerce Clause, the court must address whether the
challenged statutory scheme is discriminatory. *Tenn. Wine*,
588 U.S. at 539. If the laws are not discriminatory, then the
scheme is constitutional, and the court need not proceed to
the second step. However, if the laws *are* discriminatory,
the court then asks "whether the challenged requirement can
be justified as a public health or safety measure or on some
other legitimate nonprotectionist ground." *Id*. If so, the
scheme is constitutional despite its discriminatory nature.

14          DAY V. HENRY

There are three ways that a statutory scheme can discriminate against out-of-state interests: facially, purposefully, or in practical effect. *See Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009). The first step in analyzing any law under the dormant Commerce Clause is "to determine whether it 'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.'" *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). Discrimination means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* This differential treatment must be "as between persons or entities who are similarly situated." *See Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010). The party challenging the scheme bears the burden of showing discrimination. *Id.*

Plaintiffs urge us to find at the first step of the *Tennessee Wine* test that Arizona's laws improperly discriminate against interstate commerce. First, Plaintiffs argue that *Granholm* and *Tennessee Wine*, in which the Supreme Court found various state wine laws to be discriminatory, necessarily compel a similar outcome here. Second, Plaintiffs point to data, noting that e-commerce constitutes twenty percent of all retail sales generally and arguing that Arizona "gives its own wine retailers exclusive access" to that market, which is the kind of "economic protectionism" the Commerce Clause prohibits. Plaintiffs also cite data showing that Arizona wine stores carry approximately fifteen percent of the wines available nationally and that foreign, old, and rare wines are readily available in other states but not in Arizona, and use this data to argue that

DAY V. HENRY 15

depriving a citizen of the right "to have access to the markets of other States on equal terms" is also a violation of the Commerce Clause under *Granholm*.

In response, Defendants argue that Arizona's laws are not discriminatory because retailers from any state are free to obtain licenses. They argue that although obtaining a license requires an in-state storefront, an Arizona resident to manage the store, and that the license be held through a resident, the fact that the company need not be a resident, owned by a resident, formed under Arizona law, or be present a minimum amount of time—plus the fact that Arizona companies and non-Arizona companies have the same privileges once licensed—means the Commerce Clause is not implicated. Defendants also note that Total Wine, a company headquartered in Maryland, is an Arizona-licensed retailer that maintains in-state stores and buys products from Arizona-licensed wholesalers, and therefore can directly ship to Arizona consumers. Defendants argue that unlike a durational residency requirement, a physical premise requirement is not a "per se burden" on out-of-state companies because the storefront requirement relies on a company's resources and business model, not its citizenship or residency.

The district court agreed with Defendants, finding that there was no discrimination because Arizona's presence requirement "applies evenhandedly to in-state and out-of-state retailers." *Day*, 686 F. Supp. 3d at 896. The district court noted that the presence requirement does not outright prevent an out-of-state retailer from obtaining a license, pointing out that several large companies such as Walmart, Sam's Club, and Total Wine had acquired licenses and opened retail premises in Arizona even though they are headquartered elsewhere. *Id.* Unlike in *Tennessee Wine*, in

16          DAY V. HENRY

which a strict two-year durational residency requirement "plainly favored in-state residents," the district court found that here, "no such prerequisite favoring in-state residents exists." *Id.* at 897. Instead, if an out-of-state company wants to sell wine to consumers in Arizona, it needs to comply with the same requirements as in-state companies; Arizona companies are just as burdened by the physical premise requirement as out-of-state companies. *Id.*

We conclude that Plaintiffs have not met their burden of showing that the liquor laws at issue here are discriminatory. Arizona's laws apply even-handedly to all wine retailers, no matter whether that retailer is headquartered, incorporated, or otherwise based in another state. While Plaintiffs claim that Arizona "directly discriminates" against out-of-state retailers because it "issues licenses to in-state retailers that permit them to sell wine online and ship it to consumers" in Arizona but "will not issue similar licenses or give similar shipping privileges to out-of-state retailers," this argument distorts the issue. Arizona gives *licensed* retailers the privilege of directly shipping to customers. The requirement that a retailer establish a physical premise in Arizona that is managed by an Arizona resident to obtain a license applies to all retailers, not just those based in another state. There is no clear-cut "in-state" and "out-of-state" divide in the manner that Plaintiffs characterize the issue.

Furthermore, neither *Granholm* nor *Tennessee Wine* prohibit Arizona from implementing a physical premise requirement as a matter of law. Plaintiffs rely heavily on language from *Granholm* that an "in-state presence requirement runs contrary to our admonition that States cannot require an out-of-state firm to become a resident in order to compete on equal terms." *Granholm*, 544 U.S. at 475 (internal quotation marks and citation omitted). But

*Granholm* made those comments in the context of reviewing a New York statutory scheme that created a discriminatory *exception* to the three-tier scheme. *See id.* As the Second Circuit explained in a substantially similar case to this one, "*Granholm* validates evenhanded state policies regulating the importation and distribution of alcoholic beverages under the Twenty-first Amendment. It is only where states create discriminatory exceptions to the three-tier system . . . that their laws are subject to invalidation based on the Commerce Clause." *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 190 (2d Cir. 2009). Like the Second Circuit, we decline to construe the language of *Granholm* to reach the circumstances of this case.

Plaintiffs also rely on *Tennessee Wine*, but that case similarly does not mandate a finding of discrimination here. In *Tennessee Wine*, the Supreme Court struck down Tennessee's durational residency requirement, which was so "onerous" as to be expressly discriminatory. 588 U.S. at 511. Under Tennessee law, individuals had to be Tennessee residents for two years before they could obtain a liquor retail license, and the "extraordinarily restrictive" rules for corporations meant a corporation could not obtain a retail license unless all its officers, directors, and capital stock owners satisfied the individual residency requirement. *Id.* Here, there is no durational residency requirement: Arizona requires that a physical premise be managed, and the retail license held, by an Arizona resident but there is no durational aspect, and the residency requirement does not apply to the owners or operators of the business. Moreover, Arizona's premise requirement is not so "onerous" as to be expressly discriminatory. As the district court noted, out-of-state businesses can (and do) obtain retail licenses in Arizona. *Day*, 686 F. Supp. 3d at 896. For example, Total Wine,

18          DAY V. HENRY

which is owned by residents of Maryland, was one of the
parties involved in *Tennessee Wine* because of difficulties it
had obtaining a retail license in Tennessee. 588 U.S. at 512.
In contrast, Total Wine already owns and operates stores in
Arizona. *Day*, 686 F. Supp. 3d at 896.

Indeed, the fact that out-of-state businesses possess
Arizona retail licenses and have obtained direct shipping
privileges supports the conclusion that Arizona's laws do not
have a discriminatory effect in practice. As Defendants
observe, setting up a physical storefront in Arizona is not a
"per se burden on out-of-state companies and per se benefit
to in-state companies" because a retailer's ability to comply
with the physical premise requirement is based in large part
on a company's resources and business model, not its
citizenship or residency. A major national retailer like Total
Wine undoubtedly devotes a much smaller portion of its
resources to setting up a physical storefront in Arizona than
a smaller business incorporated in Arizona with less access
to capital. And although Plaintiffs argue that the issue is not
"whether an out-of-state firm could move to Arizona and
open a liquor store" but whether "Arizona can *require* them"
to do so, they are mistaken. First, Plaintiffs again misstate
the statutory requirements: firms do not have to "move" to
Arizona to get licensed, they merely have to open a physical
store. Second, as the Supreme Court recently emphasized,
"[c]ompanies that choose to sell products in various States
must normally comply with the laws of those various
States." *Nat'l Pork Producers Council*, 598 U.S. at 364.

The burden is on the Plaintiffs to show that, even though
some businesses have obtained Arizona retail licenses,
Arizona's laws are nonetheless still discriminatory in
practice. *See Black Star Farms LLC*, 600 F.3d at 1230. They
have not met this burden. Rather, Plaintiffs make the

conclusory allegation that "[i]t would be economically prohibitive for a retailer to set up separate operations in multiple states . . . and impossible for it to comply with multiple state laws, each requiring it to buy its wine only from wholesalers in that state."  However, in neither the briefs nor the record do they address that out-of-state businesses have successfully obtained Arizona retail licenses.  The record merely indicates that, at best, some other out-of-state retailers (such as K&L Wine Merchants) have chosen not to obtain Arizona retail licenses.  That some retailers have chosen not to establish physical premises in Arizona, however, is insufficient to demonstrate that the scheme as a whole has a discriminatory effect.

Otherwise, the record includes some evidence demonstrating that there might be an issue of fact as to (1) whether Arizona's laws are necessary to protect public health and safety, and (2) the effect of the physical premise requirement on consumer choice.  But the issue of public health and safety is not relevant to whether Arizona's laws are discriminatory, i.e., the first part of the *Tennessee Wine* test.[2]  And the fact that Arizona's laws limit the availability

---

[2] Circuits have come to conflicting conclusions as to whether, at the second part of the *Tennessee Wine* test, a presence requirement must be supported by evidence that it advances the goals of the Twenty-first Amendment or, instead, is justified as a necessary part of the "unquestionably legitimate" three-tier system. *Compare Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1183–84 (8th Cir. 2021) (stating that "we should be no more invasive of the 'unquestionably legitimate' three-tiered scheme than the Supreme Court has mandated"); *B-21 Wines, Inc.*, 36 F.4th at 229 (holding that North Carolina's physical premise requirement was "justified on the legitimate nonprotectionist ground of preserving North Carolina's three-tier system"); *and Arnold's Wines, Inc.*, 571 F.3d at 190 (stating that the challenge to New York's physical premise requirement was "a frontal attack on the

20          DAY V. HENRY

of certain wines within the state because those wines are
currently only offered elsewhere is not sufficient on its own,
absent any specific prohibitions on the importation of certain
wines, to establish a dormant Commerce Clause violation.
*See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682
F.3d 1144, 1145, 1155 (9th Cir. 2012) (holding, in a dormant
Commerce Clause challenge to California laws preventing
opticians from offering prescription eyewear at the same
location in which examinations are conducted, that there was
no significant burden on interstate commerce in part because
the plaintiffs had "not produced evidence that the challenged
laws interfere with the flow of eyewear into California; any
optician, optometrist, or ophthalmologist remains free to
import eyewear originating anywhere into California and
sell it there").

Plaintiffs want to obtain wine, over the phone or via the
internet, from a retailer in any state and have it delivered
directly to their home. That is an understandable desire. But
"the dormant Commerce Clause does not . . . guarantee
Plaintiffs their preferred method of operation." *Id.* at 1151.
Instead, at summary judgment, the question we must
examine is "whether the *record* adduced by [Plaintiffs] was
sufficient to support a verdict in [their] favor to the effect

---

constitutionality of the three-tier system itself" in contravention of
*Granholm*); *with Anvar v. Dwyer*, 82 F.4th 1, 11 (1st Cir. 2023) (holding
that Rhode Island's physical premise requirement "must be supported by
'concrete evidence' demonstrating that its predominant effect advances
the goals of the Twenty-first Amendment"); *and Block v. Canepa*, 74
F.4th 400, 414 (6th Cir. 2023) (holding that the district court "should
have considered" how the plaintiffs' evidence that Ohio's physical
premise requirement promotes protectionism compares to the
defendants' evidence that the restriction promotes public health).
Because we find that Arizona's laws are not discriminatory, we need not
address the issue. *See Tenn. Wine*, 588 U.S. at 539.

that this facially neutral and even-handed scheme does have such a prohibited discriminatory effect." *Black Star Farms LLC*, 600 F.3d at 1231. Plaintiffs have not met their burden of either demonstrating that Arizona's laws are not neutral or that they substantially burden interstate commerce in practice. Therefore, Plaintiffs have not sufficiently demonstrated that Arizona's alcohol laws violate the dormant Commerce Clause.

Finally, as several other courts have observed, if the kind of laws at issue here were found to be discriminatory, then *all* laws relying on the authority of § 2 would likely be discriminatory. *See, e.g.*, *Bridenbaugh*, 227 F.3d at 853 (stating that "[e]*very* use of § 2 could be called 'discriminatory' in the sense that plaintiffs use that term, because every statute limiting importation leaves intrastate commerce unaffected"); *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1184 (8th Cir. 2021) (noting that Missouri imposed the same physical premise requirements on in-state and out-of-state retailers and so "[v]iewed from this perspective, laws establishing a three-tiered distribution system may be economically and socially anachronistic, but they do not discriminate against out-of-state retailers and wholesalers"). The effect of the presence requirement is simply to "mandate[] that both in-state and out-of-state liquor pass through the same three-tier system before ultimate delivery to the consumer." *Arnold's Wines, Inc.*, 571 F.3d at 191. To find this kind of basic importation restriction discriminatory would therefore render § 2 "a dead letter." *Bridenbaugh*, 227 F.3d at 853. The Supreme Court has not yet struck such a blow to § 2, and neither do we.

22          DAY V. HENRY

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

---

FORREST, Circuit Judge, concurring in part and dissenting in part.

I agree that Plaintiffs have standing to challenge Arizona's restrictions that allow only in-state retailers to ship wine to Arizona consumers, and therefore I join Section I of the majority's analysis. But because Arizona's law is discriminatory, I respectfully dissent from the majority's merits analysis under *Tennessee Wine & Spirits Retailers Association v. Thomas*, 588 U.S. 504 (2019), in Section II. I would remand for the district court to conduct the required evidentiary inquiry into whether Arizona's discriminatory regulations may be justified on legitimate, non-protectionist grounds.

### *Tennessee Wine* **Analysis**

As the majority explains, the Supreme Court has developed a two-step framework to reconcile the apparent tension between § 2 of the Twenty-first Amendment and the dormant Commerce Clause. *See* Maj. Op. 12–13. We apply normal Commerce Clause principles at the first step, finding suspect any state regulation that discriminates against interstate commerce. *See Tennessee Wine*, 588 U.S. at 533, 539. A finding of discrimination is typically fatal. *Id.* at 539. But the Twenty-first Amendment gives states some leeway when regulating alcohol. *Id.* If the state provides concrete evidence that its discriminatory regime advances public health, safety, or another legitimate non-protectionist

interest that could not be served by nondiscriminatory measures, it may continue to enforce its discriminatory regulations. *Id.* at 539–40.

## I. Step One: Discrimination

The majority holds that Plaintiffs' challenge fails at *Tennessee Wine*'s first step because Arizona's shipping restriction does not discriminate against interstate commerce. The thinking is that the restriction distinguishes only between licensed and unlicensed retailers, not between residents and nonresidents. There is no guarantee that an in-state retailer will have a brick-and-mortar presence and an Arizona manager, and thus be eligible for a license. And out-of-state retailers can obtain the proper license. All they have to do is open a storefront in Arizona and hire an Arizonan to manage the store and hold the license. With respect, that view of interstate commercial discrimination defies both precedent and common sense.

If I said I would only hire clerks who had studied in my alma mater's law library, I could not maintain that I have no hiring preference for University of Idaho students. Sure, a Harvard student could fly to Spokane, drive to Moscow, read a few cases in the library, and then apply. Likewise, there is no guarantee that any given University of Idaho student has studied in the law library. But that is not the point. I have plainly adopted a preference for University of Idaho students and discriminated against all others.

The Supreme Court has never allowed such easy workarounds to the Commerce Clause's antidiscrimination command. Take *Dean Milk Co. v. City of Madison*, 340 U.S. 349 (1951). Madison allowed the sale of pasteurized milk only if it was bottled within five miles of city limits, and all other milk only if it was sourced from within twenty-five

24          DAY V. HENRY

miles. *Id.* at 350–51. An Illinois distributor had no difficulty convincing the Court that the ordinance "plainly discriminate[d] against interstate commerce." *Id.* at 354. And that is because the state had "erect[ed] an economic barrier" foreclosing "competition from without the State." *Id.* There is no indication that the Court would have reached a different decision had it considered that the Illinois corporation could have purchased a Madison dairy and hired some industrious Madisonian milkers to gain access to that market.

More to the point, the Supreme Court has rejected precisely the argument that the majority accepts here. In *Granholm v. Heald*, the Court reviewed a licensing scheme that allowed out-of-state wineries to ship wine directly to consumers only if they opened an in-state branch office and warehouse. 544 U.S. 460, 474–75 (2005). The Court concluded that the "in-state presence requirement runs contrary to our admonition that States cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Id.* at 475 (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963)).

The majority draws too fine a line by looking only to a retailer's state of incorporation. *Granholm* did not define residency based on legal formalities. Rather, it found that New York would require an out-of-state firm to "become a resident" if the firm were forced to establish an in-state presence to obtain equal access to the New York market. *Id.* At bottom, Arizona allows only those retailers willing to set up shop in-state to ship wine to Arizonans. That type of "economic isolationism" is "facially discriminatory, in part because it tend[s] 'to discourage domestic corporations from plying their trades in interstate commerce.'" *Camps Newfound/Owatonna Inc. v. Town of Harrison*, 520 U.S.

564, 579 (1997) (quoting *Fulton Corp. v. Faulkner*, 516 U.S. 323, 333 (1996)). The majority's definition of neutral regulations—looking only to where a retailer "is headquartered, incorporated, or otherwise based," Maj. Op. 16—would allow precisely the "economic Balkanization" that the dormant Commerce Clause seeks to avoid. *See Granholm*, 544 U.S. at 472 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979)).

The majority's attempt to distinguish *Granholm* is unavailing, at least at this stage in the analysis. It holds that *Granholm* applies only to exceptions to a state's three-tier scheme, and by implication, that Plaintiffs' challenge is to an integral part of Arizona's three-tier scheme. *See* Maj. Op. 16–17. A law's relationship to the three-tier system, though, is at most relevant at the second step of the *Tennessee Wine* analysis. *See* 588 U.S. at 535. It has no bearing on whether a law is discriminatory. *See id.*; *Granholm*, 544 U.S. at 476; *see also B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 222–23, 227–28 (4th Cir. 2022) (considering the law's centrality to the three-tier system at step two after finding it discriminatory at step one).

As to the majority's discussion of *Tennessee Wine*, it is true that Tennessee implemented a more egregious two-year waiting period before new state residents could obtain a retail license, 588 U.S. at 504. But nowhere did the Supreme Court purport to establish that scheme as the floor of unconstitutionality. A regulatory regime like Arizona's may be slightly less problematic but discriminatory all the same.

26            DAY V. HENRY

Ultimately, we are faced with much the same licensing scheme and arguments that the Fourth Circuit confronted in *B21 Wines*. That court acknowledged

> that out-of-state wine retailers can obtain a permit to ship their product to North Carolina residents, provided, inter alia, that those retailers are managed or owned by a North Carolina resident, have in-state premises, and buy their product from an in-state wholesaler. But that prospect does not eliminate the statutorily mandated differential treatment.

*Id.* at 223 n. 5 (citing *Granholm*, 544 U.S. at 474–75). Whatever complexities and disagreements there may have been at step two of the *Tennessee Wine* framework, *compare id.* at 227–29, *with id.* at 232–38 (Wilkinson, J., dissenting), the Fourth Circuit had no difficulty finding North Carolina's scheme discriminatory at step one. Neither should we.

### II. Step Two: Legitimate Regulatory Basis

Because Arizona's licensing scheme is discriminatory, it would be invalid if applied to any product other than alcohol. *See Granholm*, 544 U.S. at 476; *Tennessee Wine*, 588 U.S. at 539. But § 2 of the Twenty-first Amendment may yet come to Arizona's rescue. Beyond repealing Prohibition, that Amendment preserved states' authority to regulate alcohol by prohibiting "[t]he transportation or importation into any State . . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof." U.S. Const. amend. XXI § 2. Thus, notwithstanding the dormant Commerce Clause, a discriminatory regulation on alcohol is permissible if it is "justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Tennessee*

*Wine*, 588 U.S. at 539. However, "[w]here the predominant effect of a law is protectionism, not the protection of public health or safety, it is not shielded by § 2." *Id.* at 539–40. Not only must the ends be legitimate, but a State cannot employ discriminatory means unless "nondiscriminatory alternatives would be insufficient to further [its] interests." *Id.* at 540. Arizona must bring "concrete evidence" to the means-ends inquiry at *Tennessee Wine*'s second step; "mere speculation" and "unsupported assertions" will not do. *Id.* at 539–40 (quoting *Granholm*, 544 U.S. at 490, 492).

Some circuits hold that regulations essential to a state's three-tier system, including physical presence requirements, are per se legitimate. *See B-21 Wines*, 36 F.4th at 227–29; *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1180–84 (8th Cir. 2021); *see also* Maj. Op. 19–20 n.2 (collecting cases in the circuit split). Arizona would have us join them. I would not.

Courts that have adopted the per se validity rule for essential components of three-tier systems have grabbed at language in *Granholm* and *Tennessee Wine* calling that system "unquestionably legitimate." *See, e.g.*, *B-21*, 36 F.4th at 227 (quoting *Granholm*, 544 U.S. at 489) (citing *Tennessee Wine*, 588 U.S. at 534). But if *Tennessee Wine* meant to create a carveout to its usual rule that states must produce concrete evidence that discriminatory regulations serve legitimate interests, it picked an exceedingly odd way to do so.

*Tennessee Wine* chastised the plaintiffs for "read[ing] far too much into *Granholm*'s discussion of the three-tiered model," particularly in a case that did not concern "an essential feature of a three-tiered scheme." 588 U.S. at 535. Fresh off the Court's warning against overreading its

28            DAY V. HENRY

discussions of the three-tier model, other circuits have read *Tennessee Wine*'s discussion of this model to covertly create a new step two in the analysis by negative inference. *See B-21 Wines*, 36 F.4th at 234 (Wilkinson, J., dissenting). First, we decide if the law is discriminatory. Then we would decide if it is essential to the three-tier system. Only if we answer "yes" to the former and "no" to the latter would we reach the second (now third) part of the *Tennessee Wine* inquiry and examine whether concrete evidence shows that the regulation advances legitimate health or safety interests. *See, e.g.*, *Sarasota Wine*, 987 F.3d at 1183–84 (skipping "evidentiary weighing" for physical premise requirements that are essential to the three-tier system).

Rather than read that middle question into the Supreme Court's test, I would conduct the typical step-two analysis. Given the Supreme Court's flattering descriptions of the three-tier scheme, *e.g. Tennessee Wine*, 588 U.S. at 534–35, a regulation's central place in such a scheme may be powerful evidence of its legitimacy. But the three-tier system is ultimately a means to promote the public welfare, not an end in itself. The inquiry remains whether, based on "concrete evidence" rather than "speculation," a regulation promotes public health, safety, or another non-protectionist goal in a way that a nondiscriminatory regulation could not. *Id.* at 539–40; *accord Anvar v. Dwyer*, 82 F.4th 1, 9–11 (1st Cir. 2023); *Block v. Canepa*, 74 F.4th 400, 412–14 (6th Cir. 2023).

Here, the district court bypassed the requisite evidentiary weighing and relied on the regulations' perceived centrality to Arizona's three-tier system. Accordingly, I would remand for the district court to determine whether concrete evidence supports Arizona's contentions that limiting direct shipment privileges to retailers with in-state storefronts and Arizona

managers advances the state's legitimate health and safety goals, and that nondiscriminatory regulations would be an inadequate substitute. *See Anvar*, 82 F.4th at 11 (remanding for the district court to conduct the appropriate evidentiary analysis); *Block*, 74 F.4th at 414 (same).

For these reasons, I respectfully dissent from Section II of the majority's analysis.