Clement & Murphy
PLLC

June 23, 2025

**VIA ACMS**

Molly Dwyer
Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

   Re:  *Rhode v. Bonta*, No. 24-542

Dear Ms. Dwyer:

   Pursuant to Federal Rule of Appellate Procedure 28(j), Appellees bring the Court's attention to *Nguyen v. Bonta*, No. 24-2036 (9th Cir. June 20, 2025) ("Op."). *Nguyen* underscores that California's novel ammunition-background-check regime is unconstitutional.

   Appellant has argued that the California laws challenged in this case do not regulate conduct covered by the Second Amendment's text at all. *Nguyen* (further) confirms that Appellant is wrong. *See* Op.8-13; *see also* Dkt.74.1 (Appellees' 28(j) letter discussing *Yukutake v. Lopez*). *Nguyen* explicitly held that "the Second Amendment's plain text … protects the ability to acquire multiple arms." Op.11. *Nguyen* further held that laws that "meaningfully constrain[] the right to purchase and possess []arms" restrict conduct covered by the plain text, Op.13, and the record here proves beyond doubt that the challenged laws do at least that much (if not far more), *see, e.g.*, ER68 ¶9; ER71-73 ¶¶5-14; ER75-77 ¶¶3-11; ER97; 2-SER-348-50. "[T]hus," they are "presumptively unconstitutional." Op.13.

   *Nguyen* also confirms that California cannot carry its historical-tradition burden to overcome that presumption. California has argued that its laws are relevantly similar to historical firearm restrictions that "were targeted at individuals suspected [of] future misbehavior." Reply.Br.17. But as *Nguyen* explained, "historical regulations [that] prohibited only a specific group considered to be dangerous from acquiring or possessing []arms" are not relevantly similar to modern laws that "impede[] nearly all individuals from acquiring … []arms." Op.22. And, here, the evidence is pellucid that California's novel ammunition-background-check laws do exactly that. Furthermore, *Nguyen* held that historical "laws requiring dealers to register and track sales" are not "relevantly similar" to modern laws that, like those at issue here, "impose [a] burden on an individual's ability to acquire … arms." Op.21. *Nguyen* is thus further proof that when—as here—a modern law has a vastly different "how" and/or "why" than purported historical analogues, the modern law is inconsistent with historical tradition.

Molly Dwyer
June 23, 2025
Page 2 of 2

      Ultimately, while much of the opinion in *Nguyen* is narrowly (and appropriately) focused on the one-gun-a-month law there at issue, *Nguyen*'s analysis makes a critical point crystal clear: "[T]he Second Amendment is more robust than California accepts." Op.12.


               Respectfully submitted,

               <u>s/Matthew D. Rowen</u>
               Matthew D. Rowen

               *Counsel for Appellees*

Cc:  All Counsel of Record

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHELLE NGUYEN; DOMINIC BOGUSKI; JAY MEDINA; FRANK COLLETTI; JOHN PHILLIPS; PWGG, LP; DARIN PRINCE; NORTH COUNTY SHOOTING CENTER, INC.; FIREARMS POLICY COALITION, INC.; SAN DIEGO COUNTY GUN OWNERS POLITICAL ACTION COMMITTEE; SECOND AMENDMENT FOUNDATION, | No. 24-2036 <br><br> D.C. No. 3:20-cv-02470-WQH-MMP <br><br><br> OPINION |
| *Plaintiffs - Appellees*, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of the State of California; ALLISON MENDOZA, in her capacity as the Director of the Department of Justice Bureau of Firearms, <br><br> *Defendants - Appellants*. | |

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted August 14, 2024
Submission Vacated February 21, 2025
Resubmitted June 20, 2025
Pasadena, California

Filed June 20, 2025

Before: John B. Owens, Bridget S. Bade, and Danielle J.
Forrest, Circuit Judges.

Opinion by Judge Forrest;
Concurrence by Judge Owens

## SUMMARY[*]

### Second Amendment

Affirming the district court's summary judgment in favor of plaintiffs, the panel held that California's "one-gun-a-month" law, which prohibits most people from buying more than one firearm in a 30-day period, facially violates the Second Amendment.

Applying *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the panel first asked whether the Second Amendment's plain text covers the regulated conduct. If so, the Constitution presumptively protects that conduct. That presumption can be overcome only if

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

historical precedent from before, during, and even after the founding evinces a comparable tradition of regulation.

The panel held that California's law is facially unconstitutional because the plain text of the Second Amendment protects the possession of multiple firearms and protects against meaningful constraints on the acquisition of firearms through purchase.

Next, the panel held that California's law is not supported by this nation's tradition of firearms regulation. *Bruen* requires a "historical analogue," not a "historical twin," for a modern firearm regulation to pass muster. Here, the historical record does not even establish a historical cousin for California's one-gun-a-month law.

Concurring, Judge Owens wrote separately to note that the panel's opinion only concerns California's "one-gun-a-month" law. It does not address other means of restricting bulk and straw purchasing of firearms, which this nation's tradition of firearm regulation may support.

---

## COUNSEL

Raymond M. DiGuiseppe (argued), The DiGuiseppe Law Firm PC, Southport, North Carolina, for Plaintiffs-Appellees.

Jerry T. Yen (argued), Christina R.B. Lopez, Deputy Attorneys General; Anthony R. Hakl, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General, Sacramento, California; for Defendants-Appellants.

C.D. Michel and Anna M. Barvir, Michel & Associates PC, Long Beach, California, for Amici Curiae California Rifle & Pistol Association, Second Amendment Law Center, and Operation Blazing Sword-Pink Pistols.

Joseph G.S. Greenlee and Erin M. Erhardt, National Rifle Association of America, Institute for Legislative Action, Fairfax, Virginia, for Amicus Curiae National Rifle Association of America.

Erin E. Murphy, Paul D. Clement, Matthew D. Rowen, and Nicholas M. Gallagher, Clement & Murphy PLLC, Alexandria, Virginia; Lawrence G. Keane and Shelby B. Smith, National Shooting Sports Foundation Inc., Washington, D.C.; for Amicus Curiae National Shooting Sports Foundation Inc..

Jeremiah L. Morgan and William J. Olson, William J. Olson PC, Vienna, Virginia; John I. Harris III, Schulman LeRoy & Bennett PC, Nashville, Tennessee; for Amici Curiae Gun Owners of California Inc., Gun Owners of America, Inc., Gun Owners Foundation, Heller Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, Virginia Citizens Defense League, Virginia Citizens Defense Foundation, America's Future Inc., U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund.

## OPINION

FORREST, Circuit Judge:

California has a "one-gun-a-month" law that prohibits most people from buying more than one firearm in a 30-day period. The district court held that this law violates the Second Amendment. We affirm. California's law is facially unconstitutional because possession of multiple firearms and the ability to acquire firearms through purchase without meaningful constraints are protected by the Second Amendment and California's law is not supported by our nation's tradition of firearms regulation. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022).

## BACKGROUND

The California Legislature enacted the one-gun-a-month law in 1999. Originally, it was focused on concealable handguns: "No person shall make an application to purchase more than one pistol, revolver, or other firearm capable of being concealed upon the person within any 30-day period." 1999 Cal. Stat. 1759, 1767. Correspondingly, firearm dealers were prohibited from delivering such weapons "whenever the dealer is notified by the Department of Justice that within the preceding 30-day period the purchaser has made another application to purchase a pistol, revolver, or other firearm capable of being concealed upon the person." *Id.* at 1769. California's purpose in enacting these restrictions was "to stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun"—a process known as a "straw transaction." Hearing on Assemb. B. 202, Assemb. Comm. on Pub. Safety, 1999−2000 Leg., Reg. Sess. (Cal. March 16, 1999). It concluded that restricting

how often an individual could buy a concealable firearm would "curtail the illegal gun market, disarm criminals, and save lives." *Id.*

Over time, the one-gun-a-month restriction was extended to more firearms. 2019 Cal. Stat. 6166. And by 2024, it applied to *all* firearms. 2022 Cal. Stat. 3358, 3370. California Penal Code § 27535(a) currently states that individuals may not apply "to purchase more than one firearm within any 30-day period," and § 27540(f) prohibits a firearms dealer from delivering any firearm if the dealer is notified that "the purchaser has made another application to purchase a handgun, semiautomatic centerfire rifle, completed frame or receiver, or firearm precursor part" within the preceding 30-day period. Some individuals and entities are exempt from this restriction, including law enforcement, correctional facilities, and licensed private-security companies; visual entertainment companies "whose production by its nature involves the use of a firearm"; licensed collectors; and individuals seeking to replace a lost or stolen firearm. Cal. Penal Code § 27535(b).

Plaintiffs-Appellees are individuals who desire to purchase more than one firearm a month, three organizations whose members want to do the same, and two firearm retailers and their respective owners who want to engage in these transactions. They sued claiming that California's one-gun-a-month law facially violates the Second Amendment. Applying *Bruen*, the district court granted summary judgment for Plaintiffs and enjoined California from enforcing its law. California timely appealed, and a motions panel stayed the district court's injunction pending appeal. We reversed the stay after oral argument.

## DISCUSSION

We review the constitutionality of a statute de novo. *Mai v. United States*, 952 F.3d 1106, 1112 (9th Cir. 2020). We also review the legal conclusions supporting permanent injunctions granted at summary judgment de novo. *City & County of San Francisco v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022). Because Plaintiffs assert a facial challenge, "we consider only the text of the [statute]." *Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172, 1176 (9th Cir. 2020). Plaintiffs must establish "that no set of circumstances exist under which the [law] would be valid." *Moody v. NetChoice LLC*, 603 U.S. 707, 723 (2024) (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also United States v. Rahimi*, 602 U.S. 680, 693 (2024).

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This provision, coupled with the Fourteenth Amendment, "protect[s] an individual right to keep and bear arms for self-defense." *Bruen*, 597 U.S. at 17; *see also District of Columbia v. Heller*, 554 U.S. 570, 628–30 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 767–68, 791 (2010). The analysis of a Second Amendment challenge is rooted in the constitutional text and in our nation's history and tradition of firearm regulation. *Bruen*, 597 U.S. at 24. We first ask whether "the Second Amendment's plain text" covers the regulated conduct at issue. *Id.* If it does, "the Constitution presumptively protects that conduct." *Id.* That presumption can be overcome only if "'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 27 (quoting *Heller*, 554 U.S. at 631).

## I.   The Second Amendment

### A.

To begin our analysis in this pre-enforcement context, we first identify "the conduct the regulation prevents plaintiffs from engaging in." *Doe v. Bonta*, 101 F.4th 633, 639 (9th Cir. 2024). The district court identified the regulated conduct as buying more than one firearm from a licensed dealer in a 30-day period. The parties do not dispute this framing. We likewise agree that this is "what the plaintiffs want[] to do and what the challenged law prevent[s] them from doing." *Id*.

### B.

Next, we consider whether the plain text of the Second Amendment protects the regulated conduct just identified. *Bruen*, 597 U.S. at 24. It is well established that the Second Amendment's guarantee of "the right of the people to keep and bear Arms," U.S. Const. amend. II, protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635; *see also McDonald*, 561 U.S. at 780. This "core Second Amendment right . . . 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), *abrogated on other grounds by Bruen*, 597 U.S. 1). Thus, we have "consistently held that the Second Amendment . . . 'protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense.'" *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024) (quoting *Teixeira*, 873 F.3d at 677), *cert. denied* --- S. Ct. ---, 2025 WL 1211774 (2025). While we have not defined "the precise scope" of protected ancillary rights, we have held "that the plain text

of the Second Amendment only prohibits *meaningful constraints* on the right to acquire firearms." *Id.* (quoting *Teixeira*, 873 F.3d at 678) (emphasis added).

To demonstrate this principle, we discuss two of our prior cases. *Teixeira* concerned a zoning ordinance that made it "virtually impossible to open a [new] gun store in unincorporated [areas of] Alameda County." 873 F.3d at 676. We nonetheless concluded that the ordinance was permissible because "there were ten gun stores in Alameda County" and buyers could purchase firearms at a sporting goods store located "approximately 600 feet away from the proposed site of [the plaintiff's] planned store." *Id.* at 679. We stated that "the Second Amendment does not elevate convenience and preference over all other considerations." *Id.* at 680. Similarly, *B&L Productions* concerned a California law banning firearm sales on state property. 104 F.4th at 111. We explained that while "a ban on all sales of a certain type of gun or ammunition in a region generally implicates the Second Amendment, . . . a minor constraint on the precise locations within a geographic area where one can acquire firearms does not." *Id.* at 119. And we upheld the challenged law because "[m]erely eliminating one environment where individuals may purchase guns does not constitute a meaningful constraint on Second Amendment rights when they can acquire the same firearms down the street." *Id.*

The laws we considered in *Teixeira* and *B&L Productions* are plainly distinguishable from the one-gun-a-month law here. Limiting where firearms may be sold, when there are other reasonably available options, is a significantly lesser interference with an individual's ability

to acquire (and therefore possess) firearms than banning the purchase of more than one firearm in a 30-day period.[1]

California nonetheless argues that its law is constitutional because (1) the Second Amendment does not guarantee a right to possess multiple firearms and (2) even if it did, restricting the frequency of purchase does not prevent someone from acquiring multiple firearms. Both arguments fail.

### 1.

California suggests that the Second Amendment only guarantees a right to possess *a single* firearm, and that Plaintiffs' rights have not been infringed because they already possess at least one firearm. California is wrong. The Second Amendment protects the right of the people to "keep and bear *Arms*," plural. U.S. Const. amend. II (emphasis added). This "guarantee[s] the individual right to possess and carry *weapons*." *Heller*, 554 U.S. at 592 (emphasis added). And not only is "Arms" stated in the plural, but this term refers to more than just guns. It includes other weapons and instruments used for defense. *See id.* at 581. California's interpretation would mean that the Second Amendment only protects possession of a single weapon *of any kind*. There is no basis for interpreting the constitutional text in that way.

For these reasons, we easily conclude that the plain text of the Second Amendment protects the right to possess multiple firearms, and we are not alone. The D.C. Circuit has held that limiting the number of firearms an individual can purchase or register within a 30-day period interferes with

---

[1] Effective January 1 of this year, even private firearm sales are subject to the one-gun-a-month restriction (with limited exceptions). Cal. Penal Code § 27535 (2025); *see also* 2023 Cal. Stat. 4449, 4450.

"an individual's undoubted constitutional right to keep arms (plural) in his or her home." *Heller v. District of Columbia* (*Heller III*), 801 F.3d 264, 280 (D.C. Cir. 2015).

## 2.

California next argues that the conduct it regulates does not fall within the protection of the Second Amendment because restricting citizens from purchasing only one firearm in a 30-day period does not prohibit them from possessing multiple firearms. California primarily relies on *McRorey v. Garland*, where the Fifth Circuit upheld a federal law allowing gun dealers to delay a sale for up to ten days to complete a background check. 99 F.4th 831, 839–40 (5th Cir. 2024). *McRorey* reasoned from *Bruen*'s statement that background checks—not put to abusive means—are presumptively valid, *id.* at 837, and concluded that a ten-day delay to conduct a Congressionally-mandated background check "does not qualify" as abusive, *id.* at 840. The *McRorey* court also concluded that while the Second Amendment prohibits regulations that act as *de facto* bans, thus extending some "protection to acquisition," *id.* at 838 n.18, "on its face" it does not protect the right to "purchase" arms, *id.* at 838.

California's reliance on *McRorey* is unavailing. First, we have held that the Second Amendment does protect against meaningful constraints on the acquisition of firearms through purchase. *See B&L Prods.*, 104 F.4th at 118. And if the Second Amendment's plain text protects the ability to possess multiple arms, which we conclude that it does, then it also protects the ability to acquire multiple arms. *See id.* ("The right to keep arms, necessarily involves the right to purchase them, . . . and to purchase and provide ammunition

suitable for such arms . . . ." (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871))).

Second, we have also held that the Second Amendment prohibits not just bans but any "meaningful constraints on the right to acquire firearms." *Id.* The delay in the federal statute analyzed by *McRorey* served a presumptively valid purpose. But with California's one-gun-a-month law, delay *itself* is the purpose. By categorically prohibiting citizens from purchasing more than one firearm of any kind in a 30-day period, California is infringing on citizens' exercise of their Second Amendment rights. *See Infringement*, Black's Law Dictionary (12th ed. 2024) ("An encroachment or trespass on (a right, privilege, etc.).").

We are not aware of any circumstance where government may temporally meter the exercise of constitutional rights in this manner. And we doubt anyone would think government could limit citizens' free-speech right to one protest a month, their free-exercise right to one worship service per month, or their right to be free from unreasonable searches and seizures to apply only to one search or arrest per month. We could go on. If the frequency with which constitutional rights can be exercised could be regulated in this manner without infringement, what would limit government from deciding that a right need only be available every six months or once a year or at any other interval it chooses? California had no answer to this concern at oral argument.

The point is that the Second Amendment is more robust than California accepts. *See Bruen*, 597 U.S. at 70 ("The constitutional right to bear arms . . . is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" (quoting *McDonald*, 561

U.S. at 780)). Its monthly metering of firearm purchases meaningfully constrains the right to purchase and possess firearms and is thus presumptively unconstitutional. U.S. Const. amend. II; *B&L Prods.*, 104 F.4th at 118–20.

## II. History and Tradition

To overcome the presumption of invalidity, California must demonstrate that its law is supported by our "historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. This inquiry requires "reasoning by analogy." *Id.* at 28. We consider "whether the [challenged] law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692 (alteration in original) (quoting *Bruen*, 597 U.S. at 29). We are looking for a "historical *analogue*" to the challenged regulation, not a "historical *twin*." *Bruen*, 597 U.S. at 30. "*Why* and *how* the regulation burdens the [Second Amendment] right are central to this inquiry." *Rahimi*, 602 U.S. at 692 (emphases added)*.* If historical laws[2] "regulated firearm use to address particular problems, that [is] a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id*. But if a modern law "regulates arms-bearing for a permissible reason," it nonetheless violates the Second Amendment "if it does so to an extent beyond what was done at the founding." *Id.*

---

[2]Although California "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second [Amendment]," *Bruen*, 597 U.S. at 37, we need not wade into the debate about whether 18th or 19th century historical analogues govern, *id.* at 38. California's regulation is unconstitutional based on the understandings of both eras.

California argues that the history of firearms regulation supports its one-gun-a-month law for two reasons. First, it contends that we must take a "nuanced approach" in analyzing history because the one-gun-a-month law targets novel, unprecedented concerns. Second, it contends that the one-gun-a-month law is consistent with the strong tradition of restricting dangerous individuals from acquiring firearms. We address each contention in turn.

## A. Nuanced Approach

California's "nuanced approach" argument comes from *Bruen*. The Supreme Court acknowledged that the historical analogues presented in that case and *Heller* were "relatively simple to draw" but that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27. It is unclear whether this passage created a different standard from the otherwise applicable "relevantly similar" standard, or whether it was a recognition that analogical reasoning may be more challenging in some cases where modern regulation addresses issues that could not have been contemplated historically. *See Rahimi*, 602 U.S. at 692 (defining *Bruen*'s historical-analogue standard as "relevantly similar" without referencing a "nuanced approach"). But we need not wrestle with this question here because a nuanced approach, whatever it means, is not called for in this case.

California argues that "governments during the founding and Reconstruction simply did not have to confront the social problems created by the immediate commercial availability of firearms for large purchases." It also asserts that "large-scale firearms trafficking and straw purchasing" were not problems during these eras because "firearms were

made by hand, in a time consuming and laborious process."
Although there were "manufacturing advances" by the time
the Fourteenth Amendment was passed, "existing
distribution networks still did not allow for the kinds of bulk
firearms purchases that are possible today."

It cannot reasonably be disputed that firearm
manufacturing and availability are different today than they
were in our early history. But arms trafficking is not a new
problem. Early colonial and American laws prohibited
certain categories of individuals deemed dangerous from
possessing arms. For example, in 1619, colonial Virginia
made it illegal to "sell or give any Indians any piece, shot, or
powder, or any other arms offensive or defensive, upon pain
of being held a traitor to the colony and of being hanged as
soon as the fact is proved, without all redemption." 1
*Journals of the House of Burgesses of Virginia* (H.R.
McIlwaine & John P. Kennedy, eds., 1905), *reprinted in
Colonial Origins of the American Constitution: A
Documentary History* 283, 287 (Donald S. Lutz ed., 1998).
Despite this prohibition, however, the Virginia colony
recognized in the 1670s that "though good lawes have been
made for prohibiting the tradeing with Indians for armes and
ammunition, yet great quantities have beene yearely vended
amongst them." 2 *The Statutes at Large: Being a Collection
of All the Laws of Virginia from the First Session of the
Legislature, in the Year 1619*, at 336 (William Waller
Hening ed., 1823).

Similarly, in the 1640s, the Massachusetts colony
recognized that despite prohibitions "against selling guns
and powder to the Indians, they are yet supplied by indirect
meanes." 2 *Records of the Governor and Company of the
Massachusetts Bay in New England (1642–1649)*, at 16
(Nathaniel B. Shurtleff, ed., 1853). Other colonies also

adopted firearm restrictions that were of limited effect "because of the difficulty of monitoring arms trading in early America, [and] because such trading was highly profitable." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 58 (2017).

Concerns of illegal firearms sales prevailed beyond the 1600s and 1700s and into the Civil War era. *See* William S. Dutton, *Du Pont: One Hundred and Forty Years* 92 (1949) (noting that when southern states sought to arm themselves through northern manufacturers, the Du Pont Company instructed its agents "to sell not a pound of powder to buyers who might ship it surreptitiously into seceding States"). California's expert stated that during the nineteenth century, "black markets in stolen goods" were a problem and "Americans were concerned about firearms being sold into the wrong hands." Additionally, we are unpersuaded by California's argument that the mass availability of firearms is a new development. In another case, California argued that "[t]he market revolution of the Jacksonian period (1828–1854) led to radical advancements in firearms technology and [the] wide availability of cheaper, deadlier, concealable firearms." *See* Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 15, *Chavez v. Bonta*, No. 3:19-cv-01226 (S.D. Cal. Mar. 15, 2024), ECF No. 132-1. Because the industrialized production of guns can be traced back to the mid-nineteenth century, it is not a "dramatic technological change[]" requiring a nuanced approach. *Bruen*, 597 U.S. at 27.

In sum, the modern problems that California identifies as justification for its one-gun-a-month law are perhaps different in degree from past problems, but they are not different in kind. Therefore, a nuanced approach is not

warranted. *Compare Worth v. Jacobson*, 108 F.4th 677, 696–97 (8th Cir. 2024), *cert. denied* --- S. Ct. ---, 2025 WL 1151242 (2025) (rejecting Minnesota's argument that a nuanced approach applies where the nineteenth century "market revolution" made handguns more accessible), *with Antonyuk v. James*, 120 F.4th 941, 1026 (2d Cir. 2024) (applying a nuanced approach to a regulation prohibiting firearms in zoos because zoos did not exist at the founding).

## B. Historical Regulations

California asserts that there are historical analogues that imposed "relevantly similar" burdens as its one-gun-a-month law for "relevantly similar" reasons. In assessing historical evidence, "we do not isolate each historical precursor and ask if it differs from the challenged regulation in some way." *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024). We "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit" by looking at the *why* and *how* of the historical regulations. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). Here, we first describe the historical record presented and then analyze whether it supports California's one-gun-a-month law.

### 1.

We have analyzed some of the relevant historical evidence in prior cases. In *Teixeira*, we recognized that "[i]n response to the threat posed by Indian tribes, the colonies of Massachusetts, Connecticut, Maryland, and Virginia all passed laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms

or ammunition to Indians."[3] 873 F.3d at 685. California highlights a 1646 law in the Connecticut colony that "banned the sale of firearms by its residents outside the colony." *Id.* (citing 1 *The Public Records of the Colony of Connecticut* 138–39, 145–46 (J. Hammond Trumbull ed., 1850)). But this law was more akin to a licensing regime than an outright ban because residents could obtain a license to sell arms outside the "confederate jurisdictions," which included Massachusetts, Connecticut, New Plymouth, and New Haven. *See* Trumbull, *supra*, at 145 & n.*; 2 John Winthrop, *The History of New England from 1630 to 1649*, at 101 (James Savage ed., 1826) (describing the formation of this colonial confederation).

Virginia also had a law stating that "any person found within an Indian town or more than three miles from an English plantation with arms or ammunition above and beyond what he would need for personal use would be guilty of the crime of selling arms to Indians, even if he was not actually bartering, selling, or otherwise engaging with the Indians." *Teixeira*, 873 F.3d at 685 (citing 2 Hening, *supra*, at 336–37). But this apparently was narrowed or nullified around 1676, by which point there was legislation stating that "any of his majesties loyall subjects inhabiting this colony" had liberty to sell arms, and "Indians of the Easterne shore have like and equall liberty of trade or otherwayes with

---

[3] Plaintiffs fault California for relying on "bigoted or racist" laws that would be considered illegal in modern times. While many of the historical laws identified may be unconstitutional today, they nonetheless are instructive on the historical understanding of gun rights and regulation, and we have previously relied on them. *See Teixeira*, 873 F.3d at 685. *But see Rahimi*, 602 U.S. at 775–76 (Thomas, J., dissenting) (referring to these laws as "cautionary tales").

any other our ffriends and neighbouring Indians."**4** 2 Hening, *supra*, at 403; *see also id.* at 411–12 (further expanding the arms trade with Native Americans).

While some colonies passed blanket restrictions on trading arms with Indian tribes in the seventeenth century, many narrowed these restrictions in the early eighteenth century to prohibit only private individuals from engaging in such trade. For example, a 1763 Pennsylvania law "banned unlicensed private citizens from exchanging guns, gunpowder, shot, bullets, lead, or other warlike stores to Native peoples." And other colonial laws only banned citizens from selling Indians certain classes of firearms.

California identifies licensing regimes implemented during the Reconstruction era and late nineteenth century as evidence of states restricting who could carry firearms.**5** And it points to other late nineteenth century laws prohibiting intoxicated individuals from acquiring firearms "because of the concern for impulsive firearm violence." *See* An Act to

---

[4] California also points to a 1652 New York law that outlawed "Illegal Trade in Powder, Lead, and Guns by 'Private Persons.'" *See* Ordinance of the Director and Council of New Netherland against Illegal Trade in Powder, Lead, and Guns in New Netherland by Private Persons (1652), *reprinted in Laws & Ordinances of New Netherland (1638–1674)*, at 128 (E.B. O'Callaghan ed., 1867). Because the exact text of this law is unavailable, we are unable to determine if this is a sufficient historical analogue. *See id.* (noting that the ordinance "is not among the Records, and seems, indeed, not to have been very strictly enforced").

[5] *See, e.g.*, *Ordinances of Jersey City Passed by the Board of Alderman Since May 1, 1871*, at 86–87 (1874); *Ordinances of the Mayor, Alderman and Commonalty of the City of New York* 214−16 (Elliott F. Shepard & Ebenezer B. Shafer eds., 1881); *Charter & Ordinances of the City of Sacramento* 173 (R.M. Clarken ed., 1896); Scandia, Kan., Ordinance No. 79 (1894), *reprinted in* 23 Scandia J. 1, Jan. 5, 1894, at 8.

Prevent the Carrying of Concealed Weapons and for Other Purposes, 1878 Miss. Laws 175, § 2 ("It shall not be lawful for any person to sell to any . . . person intoxicated, knowing him to be . . . in a state of intoxication, any [deadly weapon]"); 2 General Statutes of the State of Kansas 353 (W.C. Webb ed., 1897) ("[A]ny person under the influence of intoxicating drink . . . found . . . carrying on his person a pistol, bowie-knife, dirk, or other deadly weapon" is subject to a misdemeanor charge).

There are also examples of states requiring dealers to register and track firearm sales, which California relies on as evidence that there is a historical tradition of legislatures "controlling and tracing the sale of firearms." In 1881, Illinois required every dealer to keep a register of all sales of deadly weapons—which included "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person." Act of April 16, 1881, § 1–2, 1881 Ill. Laws 73. In 1892, Congress passed a law requiring weapons dealers in the District of Columbia to maintain a "written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons." Act of July 13, 1892, Pub. L. No. 52-159, § 5, 27 Stat. 116, 117.

California notes examples of categorical bans of certain types of weapons to establish a history of legislatures banning firearms to "prevent them from ending up in criminal hands." In 1837, Georgia passed a statute banning the sale of certain types of knives, "pistols, dirks, sword canes, spears, [etc.]." 1837 Ga. Laws 90, 90–91. The following year, Tennessee passed a similar statute banning knives like the Bowie knife and certain pocket pistols. 1838 Tenn. 200, 200–01. But there is no example of a categorical ban on *all* types of firearms. For example, as California's

expert observed, Tennessee permitted the sale of "army/navy pistols" and Georgia permitted the sale of "horseman's pistols."

Finally, California relies on various licensing and taxing regulations to demonstrate a history of limiting the immediate availability and use of weapons and ammunition for private, everyday purposes. *See e.g.*, 1838 Fla. Terr. Laws 36, 36 (requiring venders of "dirks, pocket pistols, sword canes, or bowie knives" to pay a tax before selling these items); 1893 S.C. Acts 426, 426–27 (granting counties ability to issue licenses to venders to sell pistols). In the Connecticut colony, external exports of gunpowder required special licenses. 15 *Public Records of the Colony of Connecticut* 191 (Charles J. Hoadly ed., 1890). And California suggests that, like its one-gun-a-month law, some states taxed the purchaser as opposed to the vendor based on the quantity of arms owned. *See* 1866 Ga. Law 27, 27–28 (authorizing a special tax on every dog or firearm owned above three on plantations in three counties); 1867 Miss. Laws 327, 327–38 (placing a tax on firearms possessed within one county); 7 Ala. Code § 434(10) (1867) (taxing privately owned pistols). These laws did not limit the number of firearms a law-abiding citizen could acquire.

## 2.

Turning to whether California's one-gun-a-month law is "relevantly similar" to the historical landscape just described, we easily conclude that it is not. Many of California's proposed historical analogues impose no burden on an individual's ability to acquire, keep, or bear arms. For example, the laws requiring dealers to register and track sales do not burden the purchaser. *See Doe*, 101 F.4th at 639. It is also unclear what burden several of the identified tax

regulations imposed on purchasers because they targeted only sellers. While California's law also regulates sellers, there is no question that its focus is preventing purchasers from buying multiple firearms at one time.

Additionally, many of California's analogues imposed more limited burdens than the one-gun-a-month law. On the one hand, some of the historical regulations prohibited only a specific group considered to be dangerous from acquiring or possessing firearms—laws targeting Indians, foreigners, and the intoxicated. On the other hand, many analogues restricted only a subset of arms. But California's law applies to all firearms and nearly all individuals. California acknowledges, as it must, that not all Californians are dangerous, but it contends that laws preventing dangerous individuals from acquiring firearms nonetheless imposed a similar burden on firearm sellers by limiting the available buyers. This argument ignores that California's law primarily impedes nearly all individuals from acquiring multiple firearms. *Cf. Teixeira*, 873 F.3d at 684 (holding that there is no "freestanding right" to sell a firearm if "divorced from the citizenry's ability to obtain and use guns").

As to the licensing regimes identified, we are unpersuaded that they support California's categorical 30-day ban on purchasing more than one firearm. Requiring a law-abiding citizen to apply or qualify for a license as a barrier to entry is a different (and lesser) burden than prohibiting an individual from engaging in the regulated conduct all together for a 30-day period. Because the one-gun-a-month law establishes no exemption or pathway by which a law-abiding citizen can purchase more than one firearm within a 30-day period, we reject California's attempt to draw a comparison to the licensing analogues.

We agree with the district court that the historical law presenting the closest analogue with relevant similarities is a law from the Virginia colony that prohibited the "carrying of more than one gun and ten charges of powder when traveling near any Native town or more than three miles away from an English plantation." *Nguyen v. Bonta*, 720 F. Supp. 3d 921, 938 (S.D. Cal. 2024); *see also Teixeira*, 873 F.3d at 685. As the district court aptly noted, "[t]his law imposes both a quantity limitation (carrying more than one gun and ten charges of powder) as well as a temporal limitation (when traveling near any Native town or three miles away from an English plantation)." *Nguyen*, 720 F. Supp. 3d at 938. But there remain important differences. This law did not burden a citizen's ability to acquire multiple firearms within a specific period. It burdened only how many firearms a person could carry in a defined location. This limitation has different implications for the right protected by the Second Amendment—preservation of citizens' ability to defend themselves—than California's one-gun-a-month law. Thus, we conclude it is not similar enough to support California's law. But even if we were to conclude this analogue is "relevantly similar," one tree does not make a forest. *Perez-Garcia*, 96 F.4th at 1191 (emphasizing the court's responsibility to "examine the historical evidence as a whole").

It is also worth noting that the Virginia colony enacted this law 100 years before the founding, and the restriction seemingly only lasted a few years given that unlimited arms trading for Virginians and certain natives increased in 1676. *See* 2 Hening, *supra*, at 403, 411–12. By the founding era, the historical record suggests that it was common for Americans to "carry two, four, or even six single shot pistols on their belt" and that "pistols were often sold . . . in pairs."

NGUYEN V. BONTA

Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 Willamette L. Rev. 699, 719 (2008).

Because the historical record makes clear that California's one-gun-a-month law is not relevantly similar to our tradition in *how* it regulates firearms, we need not go any further. *Rahimi*, 602 U.S. at 692.

\* \* \* \* \*

The Second Amendment expressly protects the right to possess multiple arms. It also protects against meaningful constraints on the right to acquire arms because otherwise the right to "keep and bear" would be hollow. And while *Bruen* does not require a "historical twin" for a modern firearm regulation to pass muster, 597 U.S. at 30, here the historical record does not even establish a historical cousin for California's one-gun-a-month law.

**AFFIRMED.**

---

OWENS, Circuit Judge, concurring:

I concur fully in the majority opinion. I write separately to note that our opinion only concerns California's "one-gun-a-month" law. It does not address other means of restricting bulk and straw purchasing of firearms, which our nation's tradition of firearm regulation may support.