**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

KIM RHODE; GARY BRENNAN;
CORY HENRY; EDWARD
JOHNSON; SCOTT LINDEMUTH;
RICHARD RICKS; DENISE
WELVANG; ABLE'S SPORTING,
INC., a Texas corporation; AMDEP
HOLDINGS, LLC, a Florida limited
liability company doing business as
Ammunition Depot; R&S
FIREARMS, INC., an Arizona
corporation doing business as Sam's
Shooters Emporium; CALIFORNIA
RIFLE & PISTOL ASSOCIATION,
a California corporation,

*Plaintiffs - Appellees*,

v.

ROB BONTA, in his official capacity
as Attorney General of the State of
California,

*Defendant - Appellant*.

No. 24-542

D.C. No.
3:18-cv-00802-
BEN-JLB

OPINION

---

2            RHODE v. BONTA

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted December 4, 2024
Pasadena, California

Filed July 24, 2025

Before: Jay S. Bybee, Sandra S. Ikuta, and Bridget S. Bade,
Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Judge Bybee

## SUMMARY[*]

### Second Amendment

Affirming the district court's grant of a permanent injunction, the panel held that California's ammunition background check regime, which requires firearm owners to complete background checks before each ammunition purchase, facially violates the Second Amendment.

The panel applied the two-step framework set forth in *New York State Rifle and Pistol Association v. Bruen*, 597

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

U.S. 1 (2022), in assessing plaintiffs' Second Amendment challenge.

Applying the first step, the panel held that California's ammunition background check regime implicates the plain text of the Second Amendment because the regime meaningfully constrains the right to keep operable arms.

Applying the second step, the panel held that the government failed to carry its burden of showing that California's ammunition background check regime "is consistent with the Nation's historical tradition of firearm regulation." The historical analogues proffered by California were not within the relevant time frame, nor were they relevantly similar to California's ammunition background check regime.

Accordingly, the panel held that California's ammunition background check regime did not survive scrutiny under the two-step *Bruen* analysis.

The panel next considered *Bruen's* footnote stating that "nothing in [the Supreme Court's] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." The panel explained that the Supreme Court indicated that shall-issue regimes may be constitutional, but did not hold that they were per se consistent with the Second Amendment. Moreover, *Bruen* shed no light on the constitutionality of an ammunition background check regime, which is meaningfully distinguishable from a shall-issue licensing regime.

Finally, the panel considered the implications of the nature of plaintiffs' facial challenge to California's ammunition background check regime. The panel held that

*Bruen*'s two-step framework applies regardless of whether a plaintiff brings a facial or as-applied challenge to a law alleged to violate the Second Amendment.

Because California's ammunition background check regime violates the Second Amendment, the panel held that the district court did not abuse its discretion in granting a permanent injunction.

Dissenting, Judge Bybee would reverse the judgment of the district court and hold that California's ammunition background check scheme is facially constitutional. Under the first step of the *Bruen* framework, California's imposition of a *de minimis* delay and small fee for purchasing ammunition cannot possibly "meaningfully constrain" the right to keep and bear arms, and therefore it is unnecessary to proceed to *Bruen*'s second step. In addition, the Supreme Court has repeatedly recognized that objective, "shall-issue" licensing regimes—like California's—are presumptively lawful, and plaintiffs have failed to rebut that presumption.

Judge Bybee also analyzed the Commerce Clause and preemption arguments that the majority did not reach, and would hold that (1) California's face-to-face requirement to consummate ammunition transactions does not violate the Commerce Clause; and (2) federal law does not preempt California's prohibition on bringing out-of-state ammunition into the state.

## COUNSEL

Matthew D. Rowen (argued), Erin E. Murphy, and Paul D. Clement, Clement & Murphy PLLC, Alexandria, Virginia; C.D. Michel and Sean A. Brady, Michel & Associates PC, Long Beach, California; for Plaintiffs-Appellees.

Mica L. Moore (argued), Deputy Solicitor General; Noreen P. Skelly, Attorney; Anthony P. O'Brien, Deputy Attorney General; Office of the California Attorney General, Sacramento, California; Christina R.B. Lopez, Deputy Attorney General; John D. Echeverria and R. Matthew Wise, Supervising Deputy Attorneys General; Thomas S. Patterson, Senior Assistant Attorney General; Helen H. Hong, Principal Deputy Solicitor General; Michael J. Mongan, Solicitor General; Rob Bonta, California Attorney General; Office of the California Attorney General, Los Angeles, California; Sebastian Brady; Meghan H. Strong, Deputy Attorney General; California Department of Justice, San Francisco, California; for Defendant-Appellant.

Michael K. Plimack and Nathan E. Shafroth, Covington & Burling LLP, San Francisco, California; Hassan Ahmad and Tori N. Keller, Covington & Burling LLP, Washington, D.C.; Douglas N. Letter and Shira L. Feldman, Brady Center to Prevent Gun Violence, Washington, D.C.; Esther Sanchez-Gomez and William T. Clark, Giffords Law Center to Prevent Gun Violence, San Francisco, California; for Amici Curiae Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence.

Freya Jamison, Everytown Law, Washington, D.C.; Janet Carter and William J. Taylor Jr., Everytown Law, New York, New York; for Amicus Curiae Everytown for Gun Safety.

Barry K. Arrington, Arrington Law Firm, Wheat Ridge, Colorado, for Amicus Curiae National Association for Gun Rights.

David C. Tryon and Alex M. Certo, The Buckeye Institute, Columbus, Ohio, for Amicus Curiae The Buckeye Institute.

Stephen R. Klein, Barr & Klein PLLC, Washington, D.C., for Amici Curiae American Firearms Association, et al..

Mathura Sridharan and Nicholas A. Cordova, Deputy Solicitors General; T. Elliot Gaiser, Ohio Solicitor General; Dave Yost, Ohio Attorney General; Office of the Ohio Attorney General, Columbus, Ohio; Sean M. Corkery, Assistant Attorney General; Alan M. Hurst, Idaho Solicitor General; Raul R. Labrador, Idaho Attorney General; Idaho Office of the Attorney General, Boise, Idaho; Steve Marshall, Alabama Attorney General, Office of the Alabama Attorney General, Montgomery, Alabama; Treg R. Taylor, Alaska Attorney General, Office of the Alaska Attorney General, Anchorage, Alaska; Tim Griffin, Arkansas Attorney General Office of the Arkansas Attorney General, Little Rock, Arkansas; Ashley Moody, Florida Attorney General, Office of the Florida Attorney General, Tallahassee, Florida; Christopher M. Carr, Georgia Attorney General, Office of the Georgia Attorney General, Atlanta, Georgia; Theodore E. Rokita, Indiana Attorney General, Office of the Indiana Attorney General, Indianapolis, Indiana; Brenna Bird, Iowa Attorney General, Office of the Iowa Attorney General, Des Moines, Iowa; Kris Kobach, Kansas Attorney General, Office of the Kansas Attorney General, Topeka, Kansas; Elizabeth B. Murrill, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi

Attorney General, Jackson, Mississippi; Andrew Bailey, Missouri Attorney General, Office of the Missouri Attorney General, Kansas City, Missouri; Austin Knudsen, Montana Attorney General, Office of the Montana Attorney General, Helena, Montana; Michael T. Hilgers, Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; John M. Formella, New Hampshire Attorney General, Office of the New Hampshire Attorney General, Concord, New Hampshire; Drew H. Wrigley, North Dakota Attorney General, Office of the North Dakota Attorney General, Bismarck, North Dakota; Alan Wilson, South Carolina Attorney General, Office of the South Carolina Attorney General, Columbia, South Carolina; Marty Jackley, South Dakota Attorney General, Office of the South Dakota Attorney General, Pierre, South Dakota; Jonathan Skrmetti, Tennessee Attorney General and Reporter, Office of the Tennessee Attorney General, Nashville, Tennessee; Ken Paxton, Texas Attorney General, Office of the Texas Attorney General, Austin, Texas; Sean D. Reyes, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; Patrick Morrisey, West Virginia Attorney General, Office of the West Virginia Attorney General, Charleston, West Virginia; Bridget Hill, Wyoming Attorney General, Office of the Wyoming Attorney General, Cheyenne, Wyoming; for Amici Curiae Ohio, Idaho, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming.

Jeremiah L. Morgan, William J. Olsen, and Robert J. Olson, William J. Olson PC, Vienna, Virginia; Joseph W. Miller, Law Office of Joseph Miller LLC, Fairbanks, Alaska; John

8        RHODE V. BONTA

I. Harris III, Schulman Leroy & Bennett PC, Nashville, Tennessee; for Amici Curiae Gun Owners of California, Gun Owners of America, Inc., Gun Owners Foundation, Heller Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, America's Future, U.S. Constitutional Rights Legal Defense Fund, Conservative Legal Defense and Education Fund, and Restoring Liberty Action Committee.

## OPINION

IKUTA, Circuit Judge:

This appeal raises the question whether California's first-of-its-kind ammunition background check regime, which requires firearm owners to complete background checks before each ammunition purchase, violates the Second Amendment. We hold that California's ammunition background check regime is unconstitutional, and we affirm the district court's grant of a permanent injunction.

I

A

In 2016, California voters approved Proposition 63, which created a background check regime for ammunition sales. This regime went into effect July 1, 2019.

California requires residents to purchase ammunition through licensed ammunition vendors in face-to-face

transactions. *See* Cal. Penal Code § 30312(a)–(b).[1] The sale of ammunition must be approved by the California Department of Justice (referred to here as the "department") "at the time of purchase or transfer, prior to the purchaser or

---

[1] Section 30312, reads, in pertinent part:

> (a)(1) Commencing January 1, 2018, the sale of ammunition by any party shall be conducted by or processed through a licensed ammunition vendor.
>
> (2) When neither party to an ammunition sale is a licensed ammunition vendor, the seller shall deliver the ammunition to a vendor to process the transaction. The ammunition vendor shall promptly and properly deliver the ammunition to the purchaser, if the sale is not prohibited, as if the ammunition were the vendor's own merchandise. If the ammunition vendor cannot legally deliver the ammunition to the purchaser, the vendor shall forthwith return the ammunition to the seller. The ammunition vendor may charge the purchaser an administrative fee to process the transaction, in an amount to be set by the Department of Justice, in addition to any applicable fees that may be charged pursuant to the provisions of this title.
>
> (b) Commencing January 1, 2018, the sale, delivery, or transfer of ownership of ammunition by any party may only occur in a face-to-face transaction with the seller, deliverer, or transferor, provided, however, that ammunition may be purchased or acquired over the Internet or through other means of remote ordering if a licensed ammunition vendor initially receives the ammunition and processes the transaction in compliance with this section and Article 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4 of this part.

Cal. Penal Code § 30312(a)–(b).

| 10 | RHODE V. BONTA |

transferee taking possession of the ammunition." *Id.* § 30370(a).

The statutes and regulations provide a detailed description of the four ways that a person can obtain authorization to purchase ammunition. First, a "Basic Ammunition Eligibility Check" authorizes a single transaction for any quantity of ammunition. *See* Cal. Code Regs. tit. 11, § 4283; Cal. Penal Code § 30370(a)(3).[2] By statute, the department "shall develop a procedure in which a person who is not prohibited from purchasing or

---

[2] Section 30370(a), in full, provides:

> Commencing July 1, 2019, the department shall electronically approve the purchase or transfer of ammunition through a vendor, as defined in Section 16151, except as otherwise specified. This approval shall occur at the time of purchase or transfer, prior to the purchaser or transferee taking possession of the ammunition. Pursuant to the authorization specified in paragraph (1) of subdivision (c) of Section 30352, the following persons are authorized to purchase ammunition:

> (1) A purchaser or transferee whose information matches an entry in the Automated Firearms System (AFS) and who is eligible to possess ammunition as specified in subdivision (b).

> (2) A purchaser or transferee who has a current certificate of eligibility issued by the department pursuant to Section 26710.

> (3) A purchaser or transferee who is not prohibited from purchasing or possessing ammunition in a single ammunition transaction or purchase made pursuant to the procedure developed pursuant to subdivision (c).

Cal. Penal Code § 30370(a).

possessing ammunition may be approved for a single ammunition transaction or purchase." Cal. Penal Code § 30370(c). The department has imposed a fee of $19. Cal. Code Regs. tit. 11, § 4283(b). To run such a basic check, a vendor swipes the prospective purchaser's driver's license or other government ID through a magnetic reader. *Id.* § 4283(c); Cal. Penal Code § 28180(a). The system then automatically checks the purchaser's identifying information in four state databases (Automated Criminal History Record System, Mental Health Firearms Prohibition System, California Restraining and Protective Order System, and Wanted Persons System). If the person's name is not listed in any of the four databases, the basic check is completed automatically. If the person's name is listed in any of the four databases, a department analyst manually reviews that database to confirm that the prospective purchaser is correctly listed in the database. If the automatic or manual check shows that the person is eligible to purchase ammunition, the person is approved for a one-time purchase or transfer of ammunition. Cal. Code Regs. tit. 11, § 4283(d)(1). Otherwise, the person is not eligible to purchase ammunition. Basic checks take an average of five to six days to process. Approval for a basic check expires 30 days after it is issued. *Id.*

The second type of background check is known as a Standard Ammunition Eligibility Check and costs $1. *Id.* § 4282(b); Cal. Penal Code § 30370(b), (e). A person whose information matches an entry in the Automated Firearms System (AFS) and is not listed in the Prohibited Armed Persons File, *see* Cal. Penal Code § 30000(a), Cal. Code Regs. tit. 11, § 4281(m), is authorized to purchase ammunition pursuant to the standard check. Cal. Code Regs. tit. 11, § 4282(a); Cal. Penal Code § 30370(a)(1). The AFS

12                          RHODE v. BONTA

is a repository of firearm records maintained by the
department, Cal. Code Regs. tit. 11, § 4281(d); Cal. Penal
Code § 11106, which includes the Dealers' Record of Sale
(DROS) of firearms, Cal. Penal Code § 11106(b)(2)(A). A
person is charged a DROS fee of $31.19 for each firearm
transaction.  Cal. Code Regs. tit. 11, § 4001(a).  Under the
department's policy, Standard Ammunition Eligibility
Check approval is valid for 18 hours.[3]  If a person is rejected
from a Standard Ammunition Eligibility Check due to the
lack of a current, matching AFS entry, the person may be
able to obtain ammunition by paying the $19 fee for a Basic
Ammunition Eligibility Check.  *See* Cal. Penal Code
§ 30370(c).

Third, a person may obtain authorization to purchase
ammunition by having a current certificate of eligibility
issued by the department.   Cal.   Penal   Code
§§ 30370(a)(2), 26710.[4]  To obtain a certificate of eligibility,

---

[3] California has not identified any regulation that gives the department
the authority to limit the validity of a Standard Ammunition Eligibility
Check approval for 18 hours.

[4] In full, section 26710 provides:

> (a) A person may request a certificate of eligibility
> from the Department of Justice.

> (b) The Department of Justice shall examine its
> records and records available to the department in the
> National Instant Criminal Background Check System
> in order to determine if the applicant is prohibited by
> state or federal law from possessing, receiving,
> owning, or purchasing a firearm.

> (c) The department shall issue a certificate to an
> applicant if the department's records indicate that the

a person must pay a $22 application fee, Cal. Code Regs. tit. 11, § 4038(b)(1), and undergo an application process that involves fingerprinting, *id.* § 4032.5, and a criminal background check, Cal. Penal Code § 26710(b). A certificate of eligibility must be renewed annually. Cal. Code Regs. tit. 11, § 4038(a). Each renewal costs $22. *Id.* § 4038(b)(2). Certificate of eligibility holders must pay a $1 verification fee at the time of each ammunition purchase. Cal Penal Code § 30370(e); Cal. Code Regs. tit. 11, § 4285(b). Under the department's policy, following each verification, a certificate of eligibility holder is approved to buy ammunition for 18 hours.[5]

Finally, a person who was approved by the department to buy a firearm may purchase ammunition in the same transaction as the firearm purchase if the ammunition vendor is a licensed firearms dealer, and certain other requirements are met. Cal. Penal Code § 30352(c)(2). The buyer must pay the $31.19 fee for the firearms eligibility check. Cal. Code Regs. tit. 11, §§ 4001(a), 4284(b). California subjects firearms transactions to a 10-day waiting period. Cal. Penal

---

applicant is not a person who is prohibited by state or federal law from possessing firearms.

(d) The department shall adopt regulations to administer the certificate of eligibility program and shall recover the full costs of administering the program by imposing fees assessed to applicants who apply for those certificates.

Cal. Penal Code § 26710.

[5] California has not identified any regulation that authorizes it to limit the ability of a Certificate of Eligibility holder to buy ammunition for 18 hours after each verification.

14          RHODE V. BONTA

Code § 26815(a).**6**   Ammunition purchased as part of a
firearms transaction is subject to the 10-day waiting period
as well, unless the buyer undergoes another type of
background check and pays a separate fee. Cal. Code Regs.
tit. 11, § 4284(c).

California residents cannot bypass face-to-face
transactions with licensed vendors by purchasing
ammunition in another state and bringing it into California.
*See* Cal. Penal Code § 30314(a).**7**   Therefore, while
California residents may buy ammunition remotely, such as
over the internet, *id.* § 30312(b), they may not access the
ammunition without a face-to-face transaction in California.
If residents purchase ammunition outside of California, they
must have the ammunition "delivered to a licensed
ammunition vendor for delivery . . . pursuant to the
procedures set forth in Section 30312." *Id*. § 30314(a).**8**

---

**6** There are exceptions to this 10-day waiting period for sales, deliveries,
or transfers to law enforcement officers for use on duty, Cal. Penal Code
§ 26950, loans of unloaded firearms for use as a prop in an entertainment
production or event, *id.* § 27000, and sales, deliveries, and transfers
between or to licensed firearm importers and manufacturers, *id.* § 27100.

**7** In full, section 30314(a) provides:

> Commencing January 1, 2018, a resident of this state
> shall not bring or transport into this state any
> ammunition that he or she purchased or otherwise
> obtained from outside of this state unless he or she first
> has that ammunition delivered to a licensed
> ammunition vendor for delivery to that resident
> pursuant to the procedures set forth in Section 30312.

Cal. Penal Code § 30314(a).

**8** California has made certain exceptions to the requirement that residents
have ammunition purchased or obtained outside the state delivered to a

If neither party to an ammunition sale is a licensed vendor, the seller must deliver the ammunition to a licensed vendor for processing. *Id.* § 30312(a)(2). When ammunition has been delivered to a California licensed vendor on behalf of a California purchaser, the vendor must take several steps before delivering the ammunition to the purchaser. First, the vendor who receives the ammunition must verify with the department that the buyer is authorized to purchase ammunition. *Id.* § 30352(d).**9** If the department's records do not list the buyer as an authorized ammunition purchaser, the vendor must deny the sale or transfer of the ammunition. *Id.* In other words, a vendor

---

licensed vendor for processing. Cal. Penal Code § 30314(b). Persons who do not have to comply with this requirement include: ammunition vendors; sworn peace officers or federal law enforcement officers; licensed importers or manufacturers of firearms or ammunition; persons on a list of exempted federal firearms licensees; persons listed as collectors of firearms; and persons who acquired the ammunition from a spouse, registered domestic partner, or another immediate family member. *Id.*

9 Section 30352(d) provides:

> Commencing July 1, 2019, the ammunition vendor shall verify with the department, in a manner prescribed by the department, that the person is authorized to purchase ammunition. If the person is not listed as an authorized ammunition purchaser, the vendor shall deny the sale or transfer.

Cal. Penal Code § 30352(d). This subdivision does not apply to sales or transfers of ammunition to individuals listed in section 30352(e), which includes certain ammunition vendors, exempted federal firearms licensees, a person who works at a specified target facility, a gunsmith, a wholesaler, and specified manufacturer or importer of firearms or ammunition, a specified authorized law enforcement representative, or a specified peace officer. *See id.* § 30352(e). None of these exceptions is relevant here.

16          RHODE V. BONTA

may not deliver ammunition to a buyer unless the buyer is
"authorized to purchase ammunition." *Id.* § 30352(c).[10]

    If the buyer is so authorized, the licensed vendor can
charge the buyer a processing fee. *Id.* § 30312(a)(2). The
department has the authority to set the amount of these fees.
*Id.* If the purchaser is present for immediate delivery of the
ammunition, the processing fee cannot exceed $5. Cal. Code
Regs. tit. 11, § 4263(a)(1).[11]  But if the purchaser is not

---

[10] Section 30352(c), in full, provides:

> (c) Commencing on July 1, 2019, only those persons
> listed in this subdivision, or those persons or entities
> listed in subdivision (e) [described supra, in footnote
> 9], shall be authorized to purchase ammunition. Prior
> to delivering any ammunition, an ammunition vendor
> shall require bona fide evidence of identity to verify
> that the person who is receiving delivery of the
> ammunition is a person or entity listed in subdivision
> (e) or one of the following:
>
> (1) A person authorized to purchase ammunition
> pursuant to Section 30370.
>
> (2) A person who was approved by the department to
> receive a firearm from the ammunition vendor,
> pursuant to Section 28220, if that vendor is a licensed
> firearms dealer, and the ammunition is delivered to the
> person in the same transaction as the firearm.

Cal. Penal Code § 30352(c)(1)–(2).

[11] In full, section 4263 provides:

> (a) In addition to any applicable Department of Justice
> fee, an ammunition vendor may charge the purchaser
> a fee(s) for processing the sale of ammunition between
> two private parties as follows:

RHODE V. BONTA 17

present for immediate delivery, the vendor can charge an additional fee for storage of the ammunition. *Id.* § 4263(a)(2). The purchaser must agree to the storage fee before the vendor receives the ammunition, but the department places no limit on the amount of money that vendors can charge for storage. *Id.* Licensed California vendors may also decline to process third parties' ammunition transactions.

The department must approve a sale or transfer of ammunition "at the time of purchase or transfer, prior to the purchaser or transferee taking possession of the ammunition." Cal. Penal Code. § 30370(a). Contrary to the dissent, obtaining such approval is not limited to a $1 fee, and is not free from delay. *Cf.* Dissent at 55. A Standard Ammunition Eligibility Check costs $1, but only if the person previously paid a DROS fee of $31.19 per firearm. Cal. Penal Code § 30370(a), (e); Cal. Code Regs. tit. 11, §§ 4001(a), 4282. Similarly, a certificate of eligibility holder must pay a $1 verification fee at the time of each ammunition purchase, Cal. Penal Code § 30370(a), (e), but the holder must pay $22 on an annual basis to be a certificate holder, Cal. Code Regs. tit. 11, § 4038. Other than the 10-day waiting period for purchasing ammunition as part of a

---

(1) If the purchaser will be present for immediate delivery of the ammunition, the fee shall not exceed five dollars ($5).

(2) If the purchaser will not be present for immediate delivery of the ammunition, the vendor may charge an additional storage fee as agreed upon with the purchaser prior to the vendor receiving the ammunition.

Cal. Code Regs. tit. 11, § 4263.

18          RHODE V. BONTA

firearms transaction, Cal. Penal Code § 26815(a), there is no
language in the applicable rules regarding the allowable
delay time in approving or denying a background check.
Section 30370(a) requires that approval occur before a
person can take possession of the ammunition, but it does
not require that approval be given within a certain time
period.

Because this appeal involves a facial challenge to
California's ammunition background check regime, *United
States v. Rahimi* directs us to consider whether the law on its
face fits within the plain text of the Second Amendment and
this Nation's historical tradition. 602 U.S. 680, 700
(2024).[12]

B

We now turn to the facts of this case. In 2018, lead
plaintiff Kim Rhode, who has won Olympic medals for trap
and skeet shooting, filed this pre-enforcement action along
with six other California residents, three out-of-state
ammunition vendors, and the California Rifle & Pistol
Association, Inc. The plaintiffs (referred to collectively as
"Rhode") challenged California's ammunition background
check regime on several grounds, three of which are relevant
to this appeal. Rhode argues that California's ammunition
background check regime infringes upon California
residents' Second Amendment right to keep and bear arms,
violates the dormant Commerce Clause by barring
unlicensed, out-of-state ammunition vendors from selling

---

[12] California defends its ammunition background check regime as an
integrated whole, rather than rule by rule. Therefore, we consider the
ammunition background check regime as a whole.

ammunition directly to Californians, and is expressly preempted by 18 U.S.C. § 926A.[13]

The district court issued a preliminary injunction barring California from "enforcing the ammunition sales background check provisions found in California Penal Code §§ 30370(a) through (d) and 30352, and the ammunition anti-importation provisions found in §§ 30312(a) and (b), 30314(a)." *Rhode v. Becerra*, 445 F. Supp. 3d 902, 957 (S.D. Cal. 2020). After the Supreme Court issued its decision in *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022), we vacated the preliminary injunction and remanded to the district court for further proceedings consistent with *Bruen*. *Rhode v. Bonta*, No. 20-55437, 2022 WL 17099119, at \*1 (9th Cir. Nov. 17, 2022). On remand, the district court consolidated the hearing on the motion for a preliminary injunction with a

---

[13] 18 U.S.C. § 926A provides:

> Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: *Provided*, That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console.

trial on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, and each party submitted evidence. *See* Fed. R. Civ. P. 65(a)(2).

Following the hearing, the district court permanently enjoined California from enforcing the ammunition sales background check provisions found in sections 30352 and 30370(a) through (e) and from enforcing the ammunition anti-importation provisions found in sections 30312 (a) and (b) and 30314(a). The district court also enjoined California from criminally enforcing sections 30312(d), 30314(c), and 30365(a). It concluded that California's ammunition background check regime violated the Second Amendment and that the anti-importation provisions violated the dormant Commerce Clause. It also concluded that section 30314(a) was preempted by § 926A to the extent that it criminalized a California resident's transportation of ammunition into California from other states.

California appealed. It moved to stay the district court's permanent injunction and judgment. A motions panel of this court granted that motion.

We have jurisdiction to review a final judgment under 28 U.S.C. § 1291. We review for abuse of discretion the district court's decision to grant or deny a permanent injunction. *Metlakatla Indian Cmty. v. Dunleavy*, 58 F.4th 1034, 1042 (9th Cir. 2023). We review de novo the legal conclusions underlying the district court's decision. *Id.* Where, as here, the district court has consolidated proceedings under Rule 65(a)(2), we review its factual findings for clear error. *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024, 1031 (9th Cir. 2013). Because Rhode brings a facial challenge, "we consider only the text of the [challenged rules]." *Nguyen v. Bonta*, 149 F.4th 1237,

RHODE V. BONTA                      21

1240 (9th Cir. 2025) (quoting *Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172, 1176 (9th Cir. 2020)).

II

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.**[14]**

*New York State Rifle and Pistol Association v. Bruen* guides our analysis. 597 U.S. 1 (2022). *Bruen* provides a two-part framework for assessing Second Amendment challenges. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. The government must then show that the challenged rule "is consistent with this Nation's historical tradition of firearm regulation." *Id.*

A

The Supreme Court has interpreted the text of the Second Amendment to refer to "bearable arms." *See District of Columbia v. Heller*, 554 U.S. 570, 581–84 (2008); *Bruen*, 597 U.S. at 28. Bearable arms are "[w]eapons of offence" or "any thing that a man wears for his defence, or takes into his hands," that is carried "for the purpose of offensive or defensive action." *Heller*, 554 U.S. at 581, 584 (internal quotation marks and citations omitted). The term "arms" encompasses commonplace weapons, as well as military weapons. *See id.* at 581. The Second Amendment reaches

---

[14] The Fourteenth Amendment incorporates the Second Amendment right against the states. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

"instruments that constitute bearable arms," regardless whether those instruments existed at the founding. *Rahimi*, 602 U.S. at 691 (quoting *Heller*, 554 U.S. at 582).

The Supreme Court has indicated that the Second Amendment protects "operable" arms. *See Heller*, 554 U.S. at 630, 635 (holding that a requirement that firearms be "kept inoperable" is unconstitutional). Because arms are inoperable without ammunition, the right to keep and bear arms necessarily encompasses the right to have ammunition. *Cf. Bruen*, 597 U.S. at 32–33 (explaining that "the *central component*" of the Second Amendment right is the right to use an arm for self-defense (quoting *Heller*, 554 U.S. at 599)). A firearm is not available "for the purpose of offensive or defensive action," *Heller*, 554 U.S. at 584 (internal quotation marks omitted), if it is unloaded. In other words, the right to keep and bear arms incorporates the right to operate them, which requires ammunition. *See Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (opining that "without bullets, the right to bear arms would be meaningless"), *abrogated on other grounds by Bruen*, 597 U.S. 1. Thus, we have recognized that laws regulating ammunition fall under the ambit of the Second Amendment. *See id.* (concluding that "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them" (internal quotation marks and citation omitted)); *see also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (concluding that the Second Amendment right to keep and bear arms encompasses a "corollary" right to possess the components "necessary to render [one's] firearms operable"), *abrogated on other grounds by Bruen*, 597 U.S. 1; *Duncan v. Bonta*, 133 F.4th 852, 866 (9th Cir. 2025). Therefore, at the first step of *Bruen*, the text of the Second Amendment applies to

the right to keep and bear operable arms, which includes the right to have ammunition.

We have also recognized that the right to keep and bear arms "wouldn't mean much without the ability to acquire arms." *See Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (internal quotation marks and citations omitted). Therefore, "laws imposing conditions and qualifications on the commercial sale of arms" implicate the plain text of the Second Amendment if they "'meaningfully constrain[]' the right to keep and bear arms." *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118–19 (9th Cir. 2024) (first quoting *Heller*, 554 U.S. 626–27, 627 n.26; and then quoting *Teixeira*, 873 F.3d at 680). To be sure, "the Second Amendment does not elevate convenience and preference over all other considerations." *Teixeira*, 873 F.3d at 680. "[A] minor constraint on the precise locations within a geographic area where one can acquire firearms does not" meaningfully constrain the right to keep and bear arms. *B&L Prods.*, 104 F.4th at 119. By contrast, the "monthly metering of firearm purchases meaningfully constrains the right to purchase and possess firearms and is thus presumptively unconstitutional." *Nguyen*, 140 F.4th at 1243.

## B

At the second step of the *Bruen* framework, a court must consider whether the challenged rule is "consistent with this Nation's historical tradition." 597 U.S. at 17. The determination whether a law comports with historical tradition "will often involve reasoning by analogy." *Id.* at 28.

When reviewing historical analogues, courts should give particular weight to laws in effect closer in time to the adoption of the Second Amendment (1791) and the

24                        RHODE v. BONTA

Fourteenth Amendment (1868). *See id.* at 34. Courts may consider later laws, which can "liquidate and settle the meaning of disputed or indeterminate terms & phrases in the Constitution." *Id.* at 35–36 (internal quotation marks and citations omitted). However, courts should be careful not to give too much weight to post-enactment laws. *See id.* at 36. "[T]o the extent later history contradicts what the text says, the text controls." *Id.*

When determining whether a historical regulation is a proper analogue for a modern regulation, courts must consider whether the historical and modern regulations are "relevantly similar." *Id.* at 28–29 (citation omitted). This analogical reasoning process is "neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. The law is not "trapped in amber," and the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691–92. For the challenged rule to pass constitutional muster, it must be a "well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30 (emphasis in original).

Two factors are central to the determination whether a rule is relevantly similar: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29; *see also Rahimi*, 602 U.S. at 692. In assessing the "why," we look at why the historical analogue regulated firearms and whether it was enacted to address a certain problem. *See Rahimi*, 602 U.S. at 692. If a historical law addressed a certain problem, modern laws that impose similar restraints to address a similar problem are likely constitutional. *Id.* In assessing the "how," we consider the nature of the challenged law's restriction of the Second Amendment right. *See id.* Even if a firearm regulation has

a permissible purpose (the "why" of the regulation), it is unconstitutional if it restricts the Second Amendment right "to an extent beyond what was done" at the founding or at Reconstruction (the "how" of the regulation). *Id.*

### III

We now consider the constitutionality of California's ammunition background check regime, applying *Bruen*'s two-step framework.

### A

We begin with whether the plain text of the Second Amendment applies to Rhode's proposed course of conduct: acquiring ammunition.[15] California does not dispute that the ammunition background check regime impacts "the people" that the Second Amendment protects, as the rules apply to all residents of California. Furthermore, because ammunition is necessary to the operation of a firearm, California does not dispute that the right to keep ammunition is entitled to protection under the Second Amendment.

---

[15] For purposes of the first step of the *Bruen* analysis, the relevant conduct is "the conduct the regulation prevents [the individual] from engaging in." *United States v. Manney*, 114 F.4th 1048, 1052 (9th Cir. 2024) (quoting *Doe v. Bonta*, 101 F.4th 633, 639 (9th Cir. 2024)), cert. denied, No. 24-6197, 2025 WL 299574 (U.S. Jan. 27, 2025). California attempts to characterize the proposed course of conduct as "purchas[ing] ammunition without complying with any background check requirements." But defining the proposed course of conduct by reference to the challenged regulatory requirements is inconsistent with *Bruen*, in which the Supreme Court defined the proposed course of conduct as "carrying handguns publicly for self-defense," not as carrying handguns publicly without meeting the requirements of the challenged regulation. 597 U.S. at 32; *cf. B&L Prods.*, 104 F.4th at 117 n.17 (defining the proposed course of conduct with reference to the "actual activity" that the challenged statutes regulated).

Laws that impose "conditions and qualifications on the commercial sale of arms" are presumptively unconstitutional if they "meaningfully constrain" the right to keep and bear arms. *B&L Prods.*, 104 F.4th at 118–19. Because Rhode asserts a facial challenge, in considering whether California's ammunition background check regime meaningfully constrains the right to keep and bear arms, we look only at the text of the challenged rules. *Nguyen*, 140 F.4th at 1240. As discussed above, a person who wants to keep an operable firearm must necessarily acquire ammunition. *See Jackson*, 746 F.3d at 967. Because the right to keep and bear arms includes the right to keep operable arms, rules on ammunition acquisition implicate the plain text of the Second Amendment if they meaningfully constrain the right to keep operable arms. *Nguyen*, 140 F.4th at 1241.

We conclude that California's ammunition background check meaningfully constrains the right to keep operable arms. California's ammunition background check regime regulates all ammunition acquisitions by California residents; the regime applies not only to every transaction in California but also to ammunition purchases by California residents outside the state. Cal. Penal Code §§ 30312, 30314, 30370. It requires California residents to pay for and complete an in-person background check before each ammunition acquisition. *Id.* § 30312. Though not all the rules comprising California's ammunition background check regime impose delays on their face,[16] they do not

---

[16] *Cf.* Cal. Penal Code § 26815(a) (subjecting firearms purchases to a 10-day waiting period); Cal. Code Regs. Tit. 11, § 4284 (subjecting ammunition purchased as part of a firearms transaction to the same delay, unless the purchaser completes another form of background check).

require California to approve checks within a certain time frame.[17]  Requirements prior to various types of background checks, such as fingerprinting, *see* Cal. Code Regs. tit. 11, § 4032.5, inherently cause some amount of delay.  After approval, moreover, a California resident may be required to purchase ammunition during a specified period of time— e.g., 18 hours—after passing a background check.  The regime applies to all types of ammunition, *see* Cal. Penal Code §§ 30312, 30314, and California residents cannot avoid the background check requirements by taking advantage of internet or out-of-state sales, *id.* § 30314.  Rather, out-of-state purchases are subject to additional delays and fees.  *See id.*[18]  Given the fees and delays associated with California's ammunition background check regime, and the wide range of transactions to which it applies, we conclude that, in all applications, the regime

---

[17] Contrary to the dissent, Dissent at 66, section 30370(a) does not require the department to approve an ammunition purchase within a specified time frame.  Rather, it provides that a purchaser cannot take possession of ammunition until the department has approved the sale. *See* Cal. Penal Code § 30370(a) (requiring a purchaser to obtain the department's approval of a sale of ammunition "at the time of purchase or transfer, prior to the purchaser or transferee taking possession of the ammunition.").  California has not interpreted the phrase "time of purchase" as imposing any time constraints on the department.

[18] Twenty-four states filed an amicus brief arguing that California's requirements are meaningful constraints, because they prohibit direct-delivery internet sales, and impose "inconvenience and expense on Californians who wish to access the unmatched selection that the multi-billion dollar internet ammunition market offers."  Brief for Ohio, Idaho, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming as Amici Curiae at 5, *Rhode v. Bonta*, No. 24-542 (July 31, 2024).

28                    RHODE V. BONTA

meaningfully constrains California residents' right to keep
and bear arms.  Thus, it is not a "presumptively lawful
regulatory measure[]." *See Heller*, 554 U.S. at 626–27, 627
n.26; *see also B&L Prods.*, 104 F.4th at 119.**[19]**

    Three of our prior cases, *B&L Productions*, *Teixeira*, and
*Nguyen*, are helpful comparators.**[20]**  In *Teixeira*, we held that

---

[19] The dissent's argument that California's ammunition background
check regime does not meaningfully constrain the right to obtain
firearms because it imposes a $1 fee and one-minute delay in 99% of
cases, Dissent at 66–67 & n.7, is wrong.  First, we consider only the text
of the challenged rules in assessing a facial challenge, *Nguyen*, 140 F.4th
at 1240, and the text does not limit permissible delay times.  Second, the
dissent's factual allegations about California's background check regime
are contrary to the district court's finding that "Californians are denied
the Second Amendment right to buy ammunition for self-defense at least
11% of the time because of problems with the background check
system."  Given the posture of this appeal, we accept the district court's
factual findings absent clear error.  *See Indep. Training &
Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024,
1031 (9th Cir. 2013).  Third, the minimum costs exceed $1.  To complete
a $1 check as a certificate of eligibility holder, a purchaser must first pay
an annual fee of $22, Cal. Code Regs. tit. 11, § 4038(b).  To complete a
$1 Standard Eligibility Check, a purchaser must have previously paid a
DROS fee of $31.19 per firearm.  Cal. Code Regs. tit. 11,
§§ 4001(a), 4282.  A purchaser must have a valid AFS entry to complete
a Standard Eligibility Check, Cal. Penal Code § 30370(b), and the AFS
includes the DROS, absent exceptions not relevant here, *id.*
§ 11106(b)(2)(A).  Therefore, a purchaser must pay at least one DROS
fee of $31.19 per firearm to be eligible for a Standard Eligibility Check.
*Contra* Dissent at 61 n.1.

[20] *Manney*, a case relied on by the dissent, Dissent at 64–65, is not
applicable here.  In connection with an as-applied challenge to 18 U.S.C.
§ 922(a)(6), which criminalizes making a false statement about "any fact
material to the lawfulness of the sale or other disposition of such firearm
or ammunition," 18 U.S.C. § 922(a)(6), we concluded that the conduct
regulated by § 922(a)(6) is lying, and that lying is "unrelated to the
possession of a firearm."  *Manney*, 114 F.4th at 1053.  By contrast, we

a zoning ordinance that made it "virtually impossible" to open a new firearms store in unincorporated Alameda County did not violate the Second Amendment because buyers could "freely purchase firearms within the County" at ten existing stores, including one located 600 feet from the plaintiff's proposed retail location. 873 F.3d at 676, 679.**[21]** We reasoned that "gun buyers have no right to have a gun store in a particular location, at least *as long as their access is not meaningfully constrained*." *Id.* at 680 (emphasis added). In *B&L Productions*, we likewise concluded that a California law banning firearm sales on state property did not implicate the plain text of the Second Amendment, where the plaintiffs "essentially concede[d]" that the law did not "'meaningfully constrain' the right to keep and bear arms." 104 F.4th at 119 (noting that the plaintiffs did not allege "that a ban on sales on state property would impair a single individual from keeping and bearing firearms"). We explained that a restriction on firearms acquisition does not meaningfully constrain the Second Amendment right where plaintiffs can "acquire the same firearms down the street."**[22]** *Id.* We stated that while "a ban on all sales of a certain type of gun or ammunition in a region generally implicates the

---

have recognized that the conduct of acquiring firearms is entitled to Second Amendment protection, and that if it were not so entitled "the right to keep and bear firearms would be meaningless." *B&L Prods.*, 104 F.4th at 118.

[21] In *Teixeira*, the plaintiffs brought both a facial and as-applied challenge to a zoning ordinance, so we considered the zoning ordinance as applied to the plaintiffs. 873 F.3d at 676. Rhode does not bring an as-applied challenge here.

[22] We considered facts regarding the ability to purchase firearms near a particular fairground in assessing plaintiffs' as-applied challenge to a ban on firearm sales at that fairground. *B&L Prods.*, 104 F.4th at 119.

Second Amendment, as such a ban meaningfully constrains the right to keep and bear that firearm or ammunition[,] . . . a minor constraint on the precise locations within a geographic area where one can acquire firearms does not." *Id.* By contrast, *Nguyen* involved a facial challenge to a California law that prohibited most persons from buying more than one firearm in a 30-day period. 140 F.4th at 1240. We held that this law meaningfully constrained the right to keep and bear arms. *Id.* at 1243. We explained that the plain text of the Second Amendment protects the right to possess multiple firearms. *Id.* at 1242. We concluded that the government could not "temporally meter" this right by barring citizens from purchasing more than one firearm per month. *Id.* at 1243.

California's ammunition background check regime is not like the laws challenged in *Teixeira* and *B&L Productions*. On their face, the rules challenged in *Teixeira* and *B&L Productions* did not meaningfully constrain the plaintiffs' right to keep and bear arms. The challenged zoning ordinance in *Teixeira* applied to one county. 873 F.3d at 674. Though the challenged laws in *B&L Productions* applied statewide, they affected only the ability to contract for firearm sales on state property, and did not affect firearm sales on privately owned property. 104 F.4th at 110. But California's ammunition background check regime applies on its face to all ammunition transactions entered into by California residents, including transactions that occur in another state. And similar to the "one gun a month law" in *Nguyen*, California's ammunition background check regime, on its face, delays the ability of California residents to bear operable arms by requiring the completion of background checks prior to all ammunition acquisitions. Considering together the costs, delays, and geographic scope

of California's ammunition background check regime, we conclude that California's ammunition background check regime meaningfully constrains the right to keep and bear arms.**[23]**

Under the first step of the *Bruen* analysis, California's ammunition background check regime implicates the plain text of the Second Amendment. Therefore, the government must carry its burden of showing that California's ammunition background check regime "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. As such, we turn to the second step of the *Bruen* analysis.

B

To determine whether the government has met its burden at the second step of *Bruen*, we consider whether the historical analogues proffered by California are relevantly similar to California's ammunition background check regime. In doing so, we must compare the "how and why" of the historical analogues proffered by California to the "how and why" of California's ammunition background check regime. *Id.* at 29. California proposes four different historical analogues: loyalty oath requirements and loyalist disarmament provisions at the founding and during

---

[23] The dissent's reliance on out-of-circuit cases here, Dissent at 65, is misplaced. Both *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 225 (4th Cir. 2024) (en banc), and *McRorey v. Garland*, 99 F.4th 831, 839–40 (5th Cir. 2024), considered rules requiring one-time background checks on firearm purchases, as opposed to rules imposing background checks every time a citizen purchases ammunition. Moreover, unlike our precedent, neither opinion considered whether the background check requirements imposed a meaningful constraint on the right to keep and bear arms.

Reconstruction, 19th century concealed carry permitting requirements, surety laws imposed at the founding on persons who presented a danger to the community, and licensing and recordkeeping requirements imposed on vendors of gunpowder and firearms. We consider each in turn.

1

California first points to founding and Reconstruction era loyalty oaths and loyalist disarmament requirements. We conclude that these historical regulations do not have the same "why" and "how" as California's ammunition background check regime, and therefore are not relevantly similar to California's ammunition background check regime.

a

California proffers four founding era documents (from Connecticut, New Jersey, Massachusetts, and the Continental Congress) that authorized the disarmament of persons who were disloyal to the colonies or the new nation. A Connecticut law enacted in 1775 prohibited individuals who "shall libel or defame" the colonies from keeping arms and from holding "any office civil or military." Conn. Act of Dec. 1775, The Public Records of the Colony of Connecticut from May, 1775 to June, 1776 inclusive p. 193 (Charles J. Hoadly ed. 1890). Offenders could face punishment by "fine, imprisonment, or disfranchisement." *Id.* In March 1776, the Continental Congress recommended that the colonies "immediately [] cause all persons to be disarmed" who "are notoriously disaffected to the cause of America" or who refused to associate with the United Colonies "against the hostile attempts of the British fleets and armies." 4 Js. of the Cont'l Cong. 1774-1789, at 205

(W. Ford ed. 1906). Massachusetts passed an act adopting
this recommendation. Mass. Act of Mar. 14, 1776, ch. VII,
1775-1776 Mass. Acts 31. In 1777, New Jersey adopted an
act that authorized a council of safety to "apprehend and
imprison" persons "disaffected to this State," as well as to
"deprive and take from such Persons as they shall judge
disaffected and dangerous to the present Government, all the
Arms, Accoutrements, and Ammunition which they own or
possess." An Act for constituting a Council of Safety, ch.
XL, §§ 17, 20 (Sept. 20, 1777) (N.J. Act of Sept. 20, 1777,
Acts of the General Assembly of the State of New Jersey,
1777, at 89–90).

Neither the "how" nor "why" of these historical
regulations is relevantly similar to California's ammunition
background check regime. The "why" of these historical
regulations is to address the problem of disaffected persons
having access to arms that could be used against the
colonies. The "how" of addressing this problem is
permanent disarmament. Such regulations are not analogous
to California's ammunition background check regime,
where the problem is ensuring that individuals buying
ammunition are not legally prohibited from doing so, and
where California addresses the problem by requiring
ordinary citizens to undergo a background check every time
they purchase ammunition.

b

California also proffers founding era laws from Rhode
Island, Virginia, Pennsylvania, and North Carolina that
required individuals to take loyalty oaths to enjoy the
privileges of citizenship, including the right to keep arms. A
1776 Rhode Island regulation required "suspected persons in
the Colony, relative to the War with Great Britain" to declare

allegiance to the colonies. R.I. Act of 1776, 7 Records of the
Colony of Rhode Island & Province Plantations in New
England p. 567 (Bartlett ed. 1862). Rhode Island allowed
officials to take "all arms, ammunition and warlike stores"
from persons who refused to subscribe to the oath. *Id.* A
1777 Virginia law required males above a certain age to
"give assurance of [a]llegiance" to Virginia. Va. Act of May
5, 1777, ch. III, 9 The Statutes at Large, at 281 (Hening ed.
1821). The Virginia law directed justices administering
these oaths to provide a list of persons who refused to take
the oath to the county lieutenant or the chief commanding
officer of the militia, who were in turn directed "to cause
such recusants to be disarmed." *Id.* at 282. A 1777 North
Carolina law prohibited those who declined to take loyalty
oaths from voting or running for office, bringing lawsuits,
taking "Lands by Descent or Purchase," and keeping "Guns
or other Arms" in their homes. N.C. Act of 1777, ch. VI,
§ IX, 24 The State Records of North Carolina, at 89 (Clark
ed. 1905). Pennsylvania enacted a similar law in 1778,
requiring all men to take a one-time "oath or affirmation" to
enjoy the privileges of citizenship, such as the right to serve
an office of trust or prosecute a lawsuit. Pa. Act of Apr. 1,
1778, ch. LXI, § 5, Acts of the General Assembly of the
Commonwealth of Pennsylvania (1782), at 123–28. The act
provided that those who declined to take an oath would be
disarmed by the lieutenant or sublieutenants of the city or
counties. *Id.* at 126.

Again, these laws are not relevantly similar to the "how"
and "why" of California's ammunition background check
regime. In each historical case, the "why" was the problem
of persons who were not loyal to the state. The restriction
on their Second Amendment rights could be removed by the
one-time action of taking a loyalty oath. Neither the "why"

nor "how" is analogous to requiring ordinary citizens to undergo a background check every time they wish to purchase ammunition, for the purpose of ensuring that the citizens are not legally prohibited from doing so.

c

During Reconstruction, a number of states (primarily former Confederate states) required individuals to take one-time loyalty oaths before enjoying certain privileges of citizenship. But none of the historical regulations on which California relies expressly conditioned firearm ownership on taking an oath.[24]  For instance, both Virginia and West Virginia required persons to take loyalty oaths before being appointed to a government position. Va. Const. art. III, § 5; W. Va. Act of Nov. 16, 1863, ch. 106, § 1. West Virginia required persons to attest that they had "never voluntarily borne arms against the United States" and had "voluntarily given no aid or comfort to persons engaged in armed hostility thereto." W. Va. Act of Nov. 16, 1863, ch. 106, § 1. And to vote in Mississippi and Arkansas, every registered voter had to take and subscribe to a loyalty "oath which is

---

[24] As a preliminary matter, California argues that during Reconstruction, Tennessee "restrict[ed] . . . gun-access generally to those who took" a prescribed form of loyalty oath.  This statement is taken from the declaration of Michael Vorenberg, an expert witness on the history of the U.S. Civil War and Reconstruction ("Vorenberg Declaration"). The declaration based its statement about loyalty oaths in Tennessee on a single secondary source, Ben H. Severance, Tennessee's Radical Army: The State Guard and Its Role in Reconstruction, 1867-1869, 35–36 (2005).  The cited pages in this secondary source discuss how loyalty oaths were required as a condition of joining a militia, but do not assert that loyalty oaths were generally used to determine who could keep and bear arms. *Id.*  Therefore, the Vorenberg Declaration's assertion about Tennessee's loyalty oaths is not supported by a citation to any secondary or primary source.

printed at the top of each page of the precinct registration books." U.S. Congressional Serial Set, vol. 1308, at 142, "Message of President communicating correspondence on reconstruction, and opinions of Attorney General on construction of reconstruction acts" (1867). California cites no rule that required, or even endorsed, the use of Reconstruction era loyalty oaths to determine who could keep and bear arms.[25] Because the problem of ensuring that citizens are loyal to the United States by requiring a one-time loyalty oath is not analogous to California's recurring ammunition background check rules, these historical laws are not relevant.

d

In sum, California's reliance on these founding era and Reconstruction era regulations is misplaced because their "how" and "why" are not relevantly analogous to the "how" and "why" of California's ammunition background check regime.

---

[25] The sole example provided in the Vorenberg Declaration did not involve a regulation. The declaration states that in South Carolina, Joseph Crews (a private citizen) used loyalty oath records to ensure that weapons were not "purchased or seized by those known to be disloyal." The congressional records cited in the Vorenberg Declaration do not support Vorenberg's assertion that Crews used loyalty oath records for this purpose. *See* U.S. Congressional Serial Set, vol. 1529, at 554–56 (1871-72), "Affairs in insurrectionary States, pt. 1: Report and minority views." Rather, these records indicate that Crews was involved with administering elections in his role as chairman of the board of county canvassers, and that he shipped arms into the county, and supplied these arms to local militias. *Id.* at 554–55. In any event, the Vorenberg Declaration concedes that the use of loyalty oaths as a means to maintain the public safety was not codified by statute. Instead, it was a practice that was "not spelled out in statutes."

2

Next, California proffers concealed carry restrictions following the Reconstruction era as being relevantly similar to its ammunition background check regime. Specifically, California identifies several historical regulations, each of which required persons to obtain permission from a government official before they could carry concealed weapons. For example, an ordinance for the Village of Hyde Park, Illinois, enacted in 1876, provided that a person had to obtain "written permission of the Captain of Police" to carry a concealed weapon. Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws, at 64 (H. Willett ed. 1876). The City of St. Louis required persons to obtain "written permission from the mayor" to carry dangerous or deadly weapons pursuant to an 1871 ordinance. City of St. Louis Rev. Ord., art. II, ch. XXV, § 8 (1871), in The Revised Ordinance of the City of St. Louis, at 611–12 (M.J. Sullivan ed. 1881). A Salt Lake City, Utah ordinance from 1888 likewise made it a misdemeanor, punishable by fine, to carry a "concealed deadly weapon, without the permission of the mayor." Utah, ch. XXVI, § 14 (1888), The Revised Ordinances of Salt Lake City, at 283 (J. Lippman ed. 1892); *see also* The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order, at 259 (1898) (providing that the mayor could grant permission to "any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission"); Ordinances of the Mayor, Alderman and Commonalty of the City of New York, in Force January 1, 1881, art. XXVII, § 265 (providing that persons could obtain permission to carry pistols by showing the police that they were "proper and law-abiding" persons).

Many of these rules were enacted years after Reconstruction, and so are entitled to less weight. *See Bruen*, 597 U.S. at 34–35. Even giving them full weight, however, the "how" of these historical regulations is not analogous to California's ammunition background check regime. Like the "shall-issue" requirements mentioned in *Bruen*, discussed *infra* at 46–49, these historical regulations imposed one-time background checks to ensure "that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). This "how" is unlike the burden imposed by the challenged restrictions on California residents, who must undergo checks prior to each ammunition purchase. Cal. Penal Code § 30312.

3

California next proffers surety laws as a relevantly similar historical analogue. Our analysis, like California's argument, is informed by the Supreme Court's review of the history of surety laws in *Rahimi*, 602 U.S. at 695–96.

As explained in *Rahimi*, surety laws were a form of "preventive justice" that derived from the ancient frankpledge system. *Id.* at 695 (citation omitted). Under the frankpledge system, adult men organized themselves into "tithing[s]" of ten men, and the members of those tithings "mutually pledge[d] for each other's good behavior." *Id.* (quoting 4 W. Blackstone, *Commentaries on the Laws of England*, 252 (10th ed. 1787)) (bracket in original).

Over time, the communal frankpledge system evolved into an individualized surety regime. *Id.* Surety laws allowed magistrates to require an individual suspected of future misbehavior to post a bond. *Id.* (citing 4 Blackstone, 251). Failure to post a bond could lead to imprisonment. *Id.*

(citing Mass. Rev. Stat., ch. 134, § 6 (1836)). And if a person posted a bond and later broke the peace, that person would suffer forfeiture. *Id.* (citing 4 Blackstone, 253). Surety laws could be invoked to prevent all forms of violence, and sureties "often took the form of a surety of the peace," in which an individual pledged to "keep the peace." *Id.* (quoting 4 Blackstone, 252–53).

Important here, surety laws targeted the misuse of weapons. *Id.* at 696. For instance, a 1795 Massachusetts law authorized justices of the peace to "arrest[]" and require sureties of any "affrayers, rioters, disturbers, or breakers of the peace . . . [who] go armed offensively." 1795 Mass. Acts ch. 2, in Massachusetts - Acts & Laws, 436. Later, Massachusetts amended its surety law to require persons who "go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury" to post sureties for "keeping the peace." Mass. Rev. Stat., ch. 134, § 16 (1836). Such a bond could not be required for more than a six-month period, and a person could obtain an exception to use arms for a legitimate purpose, such as for self-defense. *See id.* Surety laws required individuals to post bonds only "when 'attended with circumstances giving just reason to fear that he purposes to make an unlawful of them.'" *Bruen*, 597 U.S. at 56 (quoting William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829)). The 1836 Massachusetts law was not an outlier; at least nine other jurisdictions adopted similar laws between 1838 and 1871. *Id.* at 56 & n.23.[26]

---

[26] Other jurisdictions' laws similar to the Massachusetts surety law include: 1838 Terr. of Wis. Stat. § 16, p. 381; Me. Rev. Stat., ch. 169, § 16 (1840); Mich. Rev. Stat., ch. 162, § 16 (1846); 1847 Va. Acts ch.

40          RHODE V. BONTA

In *Rahimi*, the Supreme Court concluded that surety laws were relevantly similar to 18 U.S.C. § 922(g)(8). 602 U.S. at 698–99. Under § 922(g)(8)(C)(i), after a court makes a judicial determination that an individual represents "a credible threat to the physical safety" of an intimate partner or child, it may then issue a restraining order precluding that individual from possessing a firearm for a certain period of time. *Id.* at 699 (quoting § 922(g)(8)(C)(i)). Likewise, surety laws required certain individuals to post a bond before possessing a firearm following a judicial determination of dangerousness. *Id.* at 698. Because both § 922(g)(8) and the surety laws applied to individuals "found to threaten the physical safety" of other persons, *Rahimi* concluded that the surety laws were a relevantly similar analogue to § 922(g)(8). *Id. Rahimi* focused on the fact that § 922(g)(8), like the surety laws, "involved judicial determinations of whether a particular defendant likely would threaten" one or more individuals with a weapon. *Id.* at 699. And similar to surety laws' six-month duration, § 922(g)(8) involved a temporary restriction, as it prohibited firearm possession only while a defendant was "subject to a restraining order." *Id.* (citing § 922(g)(8)).

Even assuming that the "why" of California's ammunition background check—to ensure that prohibited persons cannot access operable firearms—is relevantly similar to the "why" of these surety laws, its "how" is unquestionably different. The "how" of the surety laws was to impose a judicial process that required a person who was

---

14, § 16; Terr. of Minn. Rev. Stat., ch. 112, § 18 (1851); 1854 Ore. Stat. ch. 16, § 17, p. 220; D. C. Rev. Code ch. 141, § (1857); 1860 Pa. Laws p. 432, § 6; W. Va. Code, ch. 153, § 8 (1868). *See Bruen*, 597 U.S. at 56 n.23.

likely to engage in future misbehavior to post a bond, i.e., a type of insurance, for a time-limited period. By contrast, California's ammunition background check regime is imposed on all residents of California, without any judicial process establishing that any such resident is likely to disturb the peace in the future. Nor is California's ammunition background check regime limited in time.

That the surety laws were "comparably justified" by the problem of dangerous individuals possessing weapons further demonstrates that the unprecedented burden imposed by the "how" of California's ammunition background check regime is not "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 29, 34; *see also id.* at 26–27. California's ammunition background check regime imposes restrictions on all Californians who wish to exercise their Second Amendment rights, whereas surety laws restricted the right to keep and bear arms of individuals who were judicially determined to be dangerous. Therefore, the historical surety laws addressed a persistent problem of dangerous individuals in a manner that is not relevantly similar to California's ammunition background check regime. *See id.* at 26 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.").

4

California next proffers historical regulations requiring vendors of gunpowder and firearms to obtain licenses and keep records as being relevantly similar to the challenged regime.

a

California points to two examples of colonial rules that required vendors to obtain licenses for manufacturing or selling gunpowder. During the colonial period, both Massachusetts and Connecticut imposed licensing requirements on persons manufacturing or transporting gunpowder, which appear to be revenue-raising measures punishable only by forfeiture or fee. The Massachusetts law, adopted in 1651, required persons to obtain a license before transporting gunpowder out of Massachusetts, subject to a "penalty of forfeiting all such Powder as shall be transporting or transported, or the value thereof." The Colonial Laws of Massachusetts: Reprinted From the Edition of 1672, 126 (Whitmore ed. 1890). The Connecticut law was enacted in 1775 "for encouraging the Manufactures of Salt Petre and Gun Powder." 1775 Conn. Acts, The Public Records of the Colony of Connecticut, From May, 1775, to June 1776, inclusive, 190 (C. Hoadly ed. 1775). This law established that "no salt petre, nitre, or gun-powder made and manufactured, or that shall be made and manufactured" in Connecticut, could be exported out of Connecticut without "the license of the General Assembly or his Honor the Governor and Committee of Safety." *Id.* at 191. Connecticut could recover "twenty pounds for every hundred weight of such salt petre, nitre or gun-powder" exported without a license. *Id.* The laws are not relevantly similar to the "why" or "how" of California's ammunition background check regime, which does not impose a payment for export or transport on a manufacturer or seller, but rather imposes fees and delays on a buyer.

b

California also proffers some 19th century laws adopting licensing requirements for gunpowder manufacturing and sales that appear to be focused on public safety related to storage. But these requirements are imposed on vendors, not purchasers. For instance, a 1835 City of Cincinnati ordinance established that "it shall not be lawful for any person or persons to sell gun powder by retail within said city, without having first obtained a license from the city council for that purpose." *An Act Incorporating the City of Cincinnati, and a Digest of the Ordinances of Said City*, 57–59 (1835), Gun Powder, § 2 (Jan. 3, 1835). It required the city marshal and fire wardens to conduct examinations of buildings "where gun powder is kept or suspected to be [unlawfully] kept" and to seize gunpowder discovered. *Id.* § 4. Those licensed to sell gunpowder were required to "keep the same in tin cannisters, well secured with good and sufficient covers." *Id.* § 3. A Portland, Oregon ordinance from 1871 likewise required gunpowder vendors to obtain licenses and required secure storage of the gunpowder to prevent explosions. *See* Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations, &c. (1872), 225–26, No. 1108, §§ 1, 3–5 (Nov. 16, 1871). Numerous jurisdictions across the country imposed similar restrictions on the manufacturing and storage of gunpowder, which were aimed at preventing accidents such as fires.[27]

---

[27] *See, e.g.*, 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47 ("The City Council shall have power to license all . . . venders of gunpowder."); Acts of the General Assembly of the Commonwealth of Kentucky (1874), 332, ch. 306 § 6 (giving the board of the City of Newport the power to "prohibit the manufacture of gunpowder or other explosive, dangerous, or noxious compounds or substances . . . and to regulate their sale and storage by license").

The "why" of these historical laws is not analogous to California's ammunition background check regime, because they focus on a different problem (storing gunpowder safely). The "how" also differs, as the historical laws imposed a restraint on vendors, not purchasers, and required only that gunpowder manufacturers and sellers discharged a one-time duty to obtain a license. *See, e.g.*, 1775 Conn. Acts, at 191.

c

Long after Reconstruction, in the late 19th century, some legislatures required firearm vendors to obtain certain information from purchasers, and to keep such records available for inspection. California relies on two such examples. First, an 1881 Illinois statute required "[a]ll persons dealing in deadly weapons" to maintain "a register of all such weapons sold or given away by them." Act of July 1, 1881, 1881 Ill. Acts ch. 38, § 483(3). The register had to contain information about the quantity, price, and kind of weapons sold, the name and age of the purchaser, and the reason for the purchase. *Id.* The statute required dealers to keep the register "open for the inspection of the public." *Id.* Failure to keep an accurate register, or failure to keep a register open for examination, was a misdemeanor punishable by a fine of \$25 to \$200. *Id.* Similarly, in 1892, Congress passed a law which required weapons dealers in the District of Columbia to maintain a written register of the "name and residence" of every purchaser. Act of July 13, 1892, ch. 159, § 5, 27 Stat. 116, 117 (1892).[28]

---

[28] Some jurisdictions adopted similar laws in the early 20th century. *See, e.g.*, 1911 Colo. Sess. Laws ch. 136, § 3 (requiring firearms sellers to "keep a record of each pistol or revolver sold, rented or exchanged at retail" and to keep the records open for inspection by authorized police

These rules were put in place many years after the Reconstruction, and so are entitled to little weight in deciding whether California's ammunition background check regime are analogous to historical regulations. *See Bruen*, 597 U.S. at 35–37. And regardless, these rules are not analogous to the "how" and "why" of California's ammunition background check regime. The "why" of these laws is different in that they merely kept track of persons who purchased the firearms. By contrast, California's ammunition background check regime focuses on ammunition and requires lawful firearm owners to prove they meet specified legal requirements each time they purchase ammunition. The "how" of these late 19th century laws is also different because they were imposed on vendors, and did not require purchasers to undergo background checks or pay fees. *See* Cal. Penal Code § 30312; c*f.* Act of July 13, 1892, ch. 159, §§ 1–2 (applying to weapons such as "daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles" and not referring to ammunition).

In sum, we conclude that the historical regulations regarding gunpowder licensing and storage and firearm vendor recordkeeping are not relevantly similar to California's ammunition background check regime.

---

officers); 1911 N.Y. Laws ch. 195, § 1914 (requiring firearm sellers to keep registers containing "the time of sale, the date of sale, name, age, occupation and residence of each purchaser" of a firearm, along with a description of that firearm). Because these laws are even further in time from the adoption of the Fourteenth Amendment, they shed little light on our analysis. *See Bruen*, 597 U.S. at 35.

Because none of the historical analogues proffered by California is within the relevant time frame, or is relevantly similar to California's ammunition background check regime, California's ammunition background check regime does not survive scrutiny under the two-step *Bruen* analysis.

C

We next consider *Bruen*'s footnote stating that "nothing in [the Supreme Court's] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].'" 597 U.S. at 38 n.9. In this footnote, the Court noted certain features of shall-issue licensing regimes that differentiated them from the may-issue regimes found to be unconstitutional in *Bruen*, but added that "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.* In other words, the Supreme Court indicated that shall-issue regimes may be constitutional, but did not hold that they were per se consistent with the Second Amendment.[29]

---

[29] *Heller*'s statement that longstanding conditions and qualifications on the commercial sale of arms were "presumptively lawful," 554 U.S. at 627 n.26, was clarified in *Bruen*, which was careful to eschew any indication that background checks were entitled to a presumption of constitutionality. 597 U.S. at 38 n.9. Specifically, *Bruen* opined that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" to the extent they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id. Bruen* made clear it was not endorsing a per se rule or a presumption of

Nor did the Supreme Court address the constitutionality of other state statutes that implicated Second Amendment rights, including ammunition background check rules such as those before us here. This is not surprising, given that California was the first state to require in-person background checks as a condition of each ammunition purchase, along with a fee.**30** *See* Office of Governor Gavin Newsom, *Ahead of Implementation Date of New Gun Safety Policies in California, Governor Newsom and State Leaders Reaffirm Commitment to Ending Epidemic of Gun Violence* (June 25, 2019), https://bit.ly/3xK5QfM. Therefore, the Supreme Court did not have occasion in *Bruen* to consider how an ammunition background check regime such as that imposed by California compares to a shall-issue licensing scheme. The Supreme Court likewise has never approved an analogous restriction on obtaining a component of a firearm that is necessary to its operation.

And California's ammunition background check regime is not analogous to a shall-issue licensing regime. Among other differences, the 43 states' shall-issue licensing regimes cited in *Bruen* generally provided individuals with a license to engage in a course of conduct for a year or several years.**31**

---

constitutionality because it did not "rule out constitutional challenges to such shall-issue regimes" under other fact patterns. *Id.*

[30] After California imposed its background check regime, one other state, New York, implemented an ammunition background check regime similar to the one imposed by California. *See* N.Y. Penal Law §§ 400.02, 400.03.

[31] *See, e.g.*, Alaska Stat. § 18.65.700(d) (providing that a permit "expires on the person's birthday in the fifth year following issuance of the permit"); Ariz. Rev. Stat. § 13-3112(I) (stating that concealed-carry permits are valid for five years); Cal. Penal Code § 26220(a) (stating that concealed-carry permits are valid for two years); Idaho Code § 18-

48          RHODE V. BONTA

By contrast, California's ammunition background check regime requires an ammunition purchaser to undergo a background check prior to each ammunition transaction, regardless of when the last background check occurred. Cal. Penal Code § 30312. In short, the "how" of California's ammunition background check regime, which gives an ammunition buyer permission to buy ammunition one time, sometimes within an hours-long window, is not analogous to the "how" of a shall-issue licensing regime wherein a person receives a license that is valid for a period of years. *Cf. Md. Shall Issue, Inc.*, 116 F.4th at 217, 225 (addressing the constitutionality of a shall-issue licensing regime in which licenses are valid for a 10-year period). Accordingly, the Supreme Court's footnote in *Bruen* sheds little light on the question whether a scheme requiring background checks every time a person seeks to purchase ammunition infringes on an ordinary citizen's right to public carry.

We reject the dissent's contention that an analysis of *Bruen*'s footnote regarding shall-issue licensing regimes must precede the application of *Bruen*'s two-step framework. Dissent at 68–70. This approach gets the two-step *Bruen* inquiry backwards. Under *Bruen*, "[when] the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 24. Only after making the determination that the Constitution presumptively protects the individual's conduct do we consider whether the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulations." *Id.* Thus, *Bruen* first concluded that

---

3302K (providing for a five-year concealed-carry license); Mont. Code § 45-8-321 (same); Wash. Rev. Code § 9.41.070 (same).

the proposed course of conduct of "carrying handguns publicly for self-defense" was protected by the plain text of the Second Amendment. *Id.* at 32. Only then did *Bruen* turn to the consideration of historical evidence and address, in a footnote, the lawfulness of shall-issue licensing regimes and its determination that a shall-issue licensing regime is not per se unconstitutional. *See id.* at 38–39, 38 n.9. Our order of analysis is therefore consistent with *Bruen.*

*Bruen* made clear that it did not rule out constitutional challenges to shall-issue regimes "where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.* at 38 n.9. *Bruen*'s examples of how shall-issue licensing regimes could be abusive were not exclusive. Moreover, *Bruen* shed no light on the constitutionality of an ammunition background check regime, which is meaningfully distinguishable from a shall-issue licensing regime.

IV

Last, we consider the implications of the nature of Rhode's facial challenge to California's ammunition background check regime. Although Rhode brought a facial, rather than as-applied challenge, the nature of Rhode's challenge is largely irrelevant under both Supreme Court and Ninth Circuit precedent. Regardless whether a plaintiff brings a facial or as-applied challenge to a law alleged to violate the Second Amendment right, *Bruen*'s two-step framework applies. *See Rahimi*, 602 U.S. at 693–700. Thus, for Second Amendment challenges, our analysis is guided by the question whether a challenged law fits within the plain text of the Second Amendment and "this Nation's historical tradition." *Bruen*, 597 U.S. at 17.

A

The three leading Supreme Court cases interpreting the Second Amendment, *Heller*, *Bruen*, and *Rahimi*, all involve facial challenges to laws restricting Second Amendment rights. Although only *Rahimi* lays out the test from *United States v. Salerno*, 481 U.S. 739, 745 (1987),[32] the Supreme Court's analysis of the law at issue, in each of *Heller*, *Bruen*, and *Rahimi*, evaluated the constitutionality of the law on its face, not as applied to the appellant.

In *Heller*, the Supreme Court considered a facial challenge to Washington, D.C.'s law banning handgun possession in the home and determined that the law was facially unconstitutional. 554 U.S. at 635. In evaluating the constitutionality of Washington, D.C.'s handgun ban, *Heller* did not assess whether the law might have a constitutional application. Instead, *Heller* treated the law banning handguns in the home as facially unconstitutional, regardless whether Washington, D.C. permitted individuals to keep other firearms in the home. *Id.* at 629.

Relying on *Heller*, *Bruen* held that New York's may-issue licensing regime was unconstitutional on its face. 597 U.S. at 11, 20. *Bruen* set forth the two-step framework we apply in assessing Second Amendment challenges. *Id.* at 17–20. Applying this framework, *Bruen* held that a licensing regime that issues carry permits only to applicants who show a special need for self-defense violates the Second

---

[32] In *Rahimi*, the Supreme Court stated that a facial challenge "requires a defendant to 'establish that no set of circumstances exists under which the [law at issue] would be valid.'" *Rahimi*, 602 U.S. at 693 (quoting *Salerno*, 481 U.S. at 745). *Rahimi* also explained that in responding to a facial challenge, "the Government need only demonstrate that [the law] is constitutional in some of its applications." *Id.*

Amendment. *Id.* at 38–39. The Supreme Court did not focus on the facts of the plaintiffs' cases, nor did it discuss whether New York could lawfully implement its may-issue licensing regime in any hypothetical application. *See id.* at 38–70; *cf. Salerno*, 481 U.S. at 745. Instead, *Bruen* concluded that the New York may-issue licensing regime and the similar regimes in five other states were unconstitutional. 597 U.S. at 11.

In *Rahimi*, the Supreme Court assessed a facial challenge to 18 U.S.C. § 922(g)(8), and cited the *Salerno* test. 602 U.S. at 693. In analyzing the facial challenge to § 922(g)(8), *Rahimi* applied the two-step framework from *Bruen* uncoupled from the facts of the challenger's case. *See id.* at 693–700. *Rahimi* stated that § 922(g)(8)(C)(i) was lawful as applied to the challenger himself. *Id.* at 700. However, *Rahimi* made that clear that its analysis applied to all applications of § 922(g)(8)(C)(i) against a person determined by a court to "represent[] a credible threat to physical safety" of another person. *Id.* at 699 (quoting § 922(g)(8)). *Rahimi* broadly recognized § 922(g)(8)(C)(i) as constitutional and did not consider whether § 922(g)(8)(C)(i) could be unconstitutional in any other applications. *Id.* at 702.

## B

Our precedent is in accord with the Supreme Court. As indicated in several recent cases, we have applied *Bruen*'s two-step framework when evaluating both facial and as-applied challenges to laws alleged to violate the Second Amendment.

In *Duncan v. Bonta*, we applied *Bruen*'s two-step framework in assessing a facial challenge to California's ban on large-capacity magazines. 133 F.4th 852, 860 (9th Cir.

52          RHODE v. BONTA

2025) (en banc). *Duncan* did not cite the applicable standard
for assessing a facial challenge. Nor did it analyze whether
any specific application of the large-capacity magazine ban
violated the Second Amendment. We held broadly that
large-capacity magazine bans are constitutional. *See id.* at
872.

In *B&L Productions*, we assessed the constitutionality of
California's ban on the sale of firearms on state property
without citing *Salerno*. 104 F.4th at 110. The plaintiffs
argued that California's law barring the sale of firearms on
state property was unconstitutional on its face and as applied
to two specific state properties. *Id.* We did not separately
analyze the facial and as-applied challenges. Applying
*Bruen*, we concluded that the Second Amendment's plain
text did not cover the plaintiff's proposed course of conduct.
*Id.* at 117–18.

In *Wolford v. Lopez*, we considered the plaintiffs' facial
challenges to California and Hawaii laws that barred
firearms in certain classes of geographical locations, such as
parks, playgrounds, bars and restaurants, parking areas, and
six other locations. 116 F.4th 959, 975–76, 982 (9th Cir.
2024). Although we cited *Salerno*, we applied *Bruen*'s
analytical framework in holding that the challenged state
laws did not facially apply to each geographic place listed.
*Id.* at 976, 984. Among other conclusions, we held that
regulations barring firearms in parks were not facially
unconstitutional, given the "national historical tradition of
banning firearms at a wide array of parks." *Id.* at 984. We
rejected the plaintiffs' facial challenge to a ban on firearms
in parking areas, explaining that a ban on concealed carry of
firearms in certain areas would be constitutional under
*Bruen*'s framework. *Id.* at 990. We did not assess whether
those laws could be applied constitutionally against the

plaintiffs in such areas in specific hypothetical circumstances.

In *United States v. Duarte*, we addressed a criminal defendant's argument that 18 U.S.C. § 922(g)(1), which criminalizes the possession of firearms by felons, was unconstitutional as applied to non-violent felons like him. 137 F.4th 743, 747 (9th Cir. 2025) (en banc). We held that § 922(g)(1) was not unconstitutional as applied to non-violent felons like the defendant. *Id.* at 748. In reaching this conclusion, we applied *Bruen*'s two-step framework. *Id.* at 750–62. Although the defendant brought an as-applied challenge, our *Bruen* analysis did not reference case-specific facts, such as the defendant's criminal history. *Id.*

In sum, in our Second Amendment cases following *Bruen*, we have not considered whether challenged laws would be constitutional as applied to the facts of any particular persons' cases. We have instead considered whether applying these rules would comport with *Bruen*'s two-step framework without conducting a fact-specific inquiry.

Here, consistent with our precedent and that of the Supreme Court, we have applied *Bruen*'s two-step framework in assessing Rhode's facial challenge to California's ammunition background check regime. After doing so, we conclude that California's ammunition background check regime lacks a "plainly legitimate sweep." *Wash. State Grange v. Wash. St. Republican Party*, 552 U.S. 442, 449 (2008) (citation omitted). Although California's ammunition background check regime does not impose the same costs and delays as to all ammunition buyers, the proposed conduct of purchasing ammunition falls within the plain text of the Second Amendment in all

applications, and none of the provisions at issue is consistent with the Nation's historical tradition of firearm regulation. Nor has California shown any applications in which its ammunition background check regime is constitutional. *Cf. Rahimi*, 602 U.S. at 693.[33]

The dissent analyzes the costs and delays worked by California's ammunition background check regime on certain ammunition buyers. Dissent at 66–67 & n.7. But *Bruen* rejects this approach. *See* 597 U.S. at 17. Although these facts may bear on whether a shall-issue licensing regime is abusive, *id.* at 38 n.9, *Bruen*'s two-step framework does not generally entail a consideration of the fees and wait times placed on particular buyers.

\*\*\*

By subjecting Californians to background checks for all ammunition purchases, California's ammunition background check regime infringes on the fundamental right to keep and bear arms. Because California's ammunition background check regime violates the Second Amendment, the district court did not abuse its discretion in granting a permanent injunction.[34]

---

[33] Perhaps recognizing that *Bruen*'s two-step framework applies to both facial and as-applied challenges, the parties have not focused on the facial versus as-applied distinction in litigating this case. California's 51-page opening brief cites no authority about the burden of proving a facial challenge and how that might differ from an as-applied challenge. California mentions this issue in its reply brief, but issues raised for the first time in a reply brief are generally deemed waived. *United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006).

[34] Because California's ammunition background check regime violates the Second Amendment, we need not consider the alternative grounds

**AFFIRMED.**

---

BYBEE, Circuit Judge, dissenting:

Plaintiffs assert that California's shall-issue ammunition background check scheme facially violates the Second Amendment. California, which has administered the scheme since 2019, has shown that the vast majority of its checks cost one dollar and impose less than one minute of delay. Nevertheless, the majority concludes that the scheme violates the Second Amendment because it lacks a historical analogue. Maj. Op. at 46; *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). In reaching this conclusion—by applying *Bruen*'s historical analysis at all— the majority has broken with our precedent and flouted the Supreme Court's guidance.

The majority's Second Amendment analysis is twice-flawed. First, as I explain in Part I, the majority contorts beyond recognition our precedent applying *Bruen*'s first step. As we explained in *B&L Productions, Inc. v. Newsom*, *Bruen* first requires us to consider whether a plaintiff's proposed conduct falls within the Second Amendment's "plain text," which only covers the right to "keep" and "bear" arms. 104 F.4th 108, 117 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1958 (2025). In cases such as this one, where Plaintiffs assert an *ancillary* right, such as the right to *acquire* firearms or ammunition, we only proceed to *Bruen*'s second step—the historical analysis—if the challenged law

---

for concluding that the regime was unlawful (the dormant Commerce Clause and preemption under § 926A).

"meaningfully constrains" the right to keep and bear arms. *See B&L*, 104 F.4th at 119.

Laws regulating firearm and ammunition acquisition "meaningfully constrain" the right to keep and bear arms— and thus trigger *Bruen*'s historical test—by "imped[ing]" "access" to firearms. *See Teixeira v. County of Alameda*, 873 F.3d 670, 678, 680 (9th Cir. 2017). California's one-dollar fee and "time of purchase approval" for ammunition purchases do not "impede" ammunition "access" any more than the *Teixeira* and *B&L* regulations that we upheld. *See* Cal. Penal Code § 30370(a); *id.*; 104 F.4th at 119. The majority cannot, and does not, seriously dispute this. Instead, the majority concludes that California's law "meaningfully constrains" the right to keep and bear arms simply because it applies to every ammunition transaction in California, and because it might possibly impose "delay." Maj. Op. at 27. Not only is this logic untethered from *Teixeira*'s and *B&L*'s analytical framework, it is also irreconcilable with our precedent holding that generally applicable acquisition laws are not necessarily subject to historical scrutiny. And the majority's logic, which dwells on hypothetical "delays," contradicts the majority's own insistence that we only consider the law's text in this facial posture, and the Supreme Court's warning in a Second Amendment case that we avoid belaboring onerous "hypothetical scenarios." *See United States v. Rahimi*, 602 U.S. 680, 701 (2024).

Second, as I explain in Part II, the majority sharply departs from *Bruen*. The majority invents a new rule to exclude California's law from the realm of "presumptively lawful" licensing regimes endorsed by *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008). The majority concludes—*after* it decides that California's law is

ahistorical, and thus unconstitutional—that California's law is not "presumptively lawful." Maj. Op. at 46–49. In reaching this conclusion, the majority cites no authority; ignores the criteria that *Bruen* provided for evaluating a law's presumptive lawfulness; incompletely applies *Bruen*'s analogical mode of reasoning; and, paradoxically, punishes the government for making its "presumptively lawful" background checks more efficient.

Finally, in Parts III and IV, I turn to the Dormant Commerce Clause and preemption arguments the majority does not reach. On this record, and in this procedural posture, I would reverse the judgment of the district court. I respectfully dissent.

I

The Second Amendment of the United States Constitution protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. *Bruen* ushered in a new era for Second Amendment jurisprudence by imposing a two-step test for Second Amendment challenges. *See* 597 U.S. at 17. We recently applied *Bruen*'s first step—which considers whether a plaintiff's conduct falls within the Second Amendment's "plain text"—in *B&L Productions, Inc. v. Newsom*, in which plaintiffs analogously asserted a right to acquire firearms. *See* 104 F.4th at 117. The majority's analysis here is irreconcilable with that approach.

A

*Bruen* imposes a two-step test: first, a "plain text" analysis that considers whether plaintiffs' asserted conduct falls within the scope of the Second Amendment and, second, the historical analysis. *See*, *e.g.*, *United States v. Rush*, 130 F.4th 633, 638 (7th Cir. 2025) ("*Bruen* set forth a

58          RHODE V. BONTA

two-step test for evaluating the constitutionality of a statute under the Second Amendment." (citation omitted)); *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 218 (4th Cir. 2024) (en banc) ("[T]he Court established a new, two-step framework for evaluating Second Amendment challenges."), *cert. denied*, 145 S. Ct. 1049 (2025).

We proceed to *Bruen*'s second step—the historical analysis—only if we conclude that plaintiffs have asserted their "plain text" right to "keep and bear arms." *See Doe v. Bonta*, 101 F.4th 633, 639 (9th Cir. 2024); *accord United States v. Price*, 111 F.4th 392, 400 (4th Cir. 2024) ("*Bruen*'s first step requires us to evaluate whether 'the Second Amendment's plain text covers an individual's conduct.'" (quoting *Bruen*, 597 U.S. at 24)); *Antonyuk v. James*, 120 F.4th 941, 981 (2d Cir. 2024) ("*Bruen* instructs that history is relevant only if 'the Second Amendment's plain text covers an individual's conduct[.]'" (quoting *Bruen*, 597 U.S. at 17)); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) ("At step one, the plaintiff has the burden of establishing that 'the Second Amendment's plain text covers' either the conduct they engaged or intended to engage in." (quoting *Bruen*, 597 U.S. at 17)).

We perform the first step because "the plain text of the Second Amendment directly protects one thing—the right to 'keep and bear' firearms." *B&L*, 104 F.4th at 117 (quoting U.S. Const. amend. II). Accordingly, not all firearm-related regulations implicate the right to keep and bear arms for self-defense. Instead, "whether a regulation is covered by the Second Amendment's plain text must be tied to 'the conduct the regulation prevents [the individual] from engaging in.'" *United States v. Manney*, 114 F.4th 1048, 1052 (9th Cir. 2024) (quoting *Doe*, 101 F.4th at 639).

Sometimes, plaintiffs' conduct indisputably falls within the Second Amendment's plain text, where, for example, the government regulates the "keeping" or "bearing" of arms. This type of regulation was at issue in a trilogy of Supreme Court cases: *Bruen*, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *Heller*. In *Bruen*, the plaintiffs' "proposed course of conduct [was] *carrying* handguns publicly for self-defense." 597 U.S. at 32 (emphasis added). In *McDonald*, the plaintiffs sought to "*keep* their handguns in their homes for protection." 561 U.S. at 751 (emphasis added). In *Heller*, the plaintiff "applied for a registration certificate for a handgun that he wished to *keep at home*." 554 U.S. at 575 (emphasis added). The plaintiffs in these cases indisputably asserted their core right to keep and bear arms.

But when plaintiffs assert any conduct other than keeping or bearing arms, their conduct necessarily falls outside the Second Amendment's plain text. As we observed in *B&L*, the "Supreme Court has made clear that the Second Amendment does not speak to all restrictions that impact firearms in any way." 104 F.4th at 118 (quoting *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring)). We explained that "[a]ncillary rights," like the "right to acquire firearms," are only "protected to the extent necessary to serve [Second Amendment] purposes, [such as self-defense]; otherwise, the Second Amendment is not implicated by restraints on such rights." *Id.* (footnote omitted).

When regulations concern "implied corollary rights . . . our analysis begins one step removed from the plain text." *Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1196 (6th Cir. 2024). Accordingly, we subject these regulations to historical scrutiny if—and only if—they "meaningfully constrain" the "core right" to "keep and bear"

arms. *See B&L*, 104 F.4th at 118–19; *Teixeira*, 873 F.3d at 677; *see also Oakland Tactical Supply*, 103 F.4th at 1196 (considering whether a zoning regulation "restrict[ed] conduct necessary to effectuate" the core Second Amendment right); *Gazzola v. Hochul*, 88 F.4th 186, 197 (2d Cir. 2023) (applying *Teixeira*'s "meaningfully constrained" standard where plaintiffs challenged a law that regulated the purchase of firearms). "Under [this] approach . . . a ban on all sales of a certain type of gun or ammunition" would "meaningfully constrain[]" the right to keep and bear arms, while "a minor constraint on the precise locations within a geographic area where one can acquire firearms [would] not." *B&L*, 104 F.4th at 119.

"[A] facial challenge" to a gun regulation, such as this one, "fails if the law is constitutional in at least some of its applications." *Rahimi*, 602 U.S. at 701 n.2 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). We recently held that, when "[p]laintiffs assert a facial challenge, 'we consider only the text of the [statute].'" *Nguyen v. Bonta*, 140 F.4th 1237, 1240 (9th Cir. 2025) (quoting *Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172, 1176 (9th Cir. 2020)) (second alteration in original). To sustain Plaintiffs' facial challenge, the majority must show that California's law "meaningfully constrains" the right to keep and bear arms, and that it does so in *all* of its applications. That means that the majority must demonstrate that the law's one-dollar fee and "time of purchase" background check *categorically* violate the Second Amendment. *See* Cal. Penal Code § 30370(a). As I discuss in greater detail in the next section, the majority does not come close to satisfying that burden.

B

Our *en banc* decision in *Teixeira* clarified that regulations on firearm and ammunition acquisition do not "meaningfully constrain" the right to keep and bear arms unless they effectively constrain "*access*" to firearms or ammunition. 873 F.3d at 680 (emphasis added); *see also B&L*, 104 F.4th at 119 ("[T]he approach we took in *Teixeira*—whether a challenged regulation meaningfully impairs an individual's ability to *access* firearms—remains appropriate.") (emphasis added); *Gazzola*, 88 F.4th 186, 192, 197–98 (concluding that "New York's commercial laws regulating the sale and transfer of firearms" did not "meaningfully constrain[]" the right to keep and bear arms because plaintiffs had "relatively easy *access* to sellers of firearms") (emphasis added).    At bottom, *Teixeira* considered whether the challenged "ordinance impede[d]" plaintiffs "from acquiring firearms." 873 F.3d at 678.

California's law—which, on its face, imposes no delay, and a mere one-dollar fee[1]—is not the kind of heavy-handed regulation that meaningfully constrains the right to keep and bear arms. The law does not categorically limit the amount of ammunition that Californians may purchase, akin to the law that we recently found unconstitutional in *Nguyen*. *See* 140 F.4th at 1239–40 (concerning a California law that "prohibit[ed] most people from buying more than one firearm in a 30-day period"). Nor is California's law a "ban on all sales of a certain type of gun or ammunition," which

---

[1] The majority, which recites *Nguyen*'s admonition that "we consider only the text of the [challenged rules]," Maj. Op. at 20 (quoting 140 F.4th at 1240), insists that the Standard Check imposes a $31.19 fee. That fee applies to *firearm* registration, *see* Cal. Code Regs. tit. 11, § 4001, not ammunition purchases, and is not challenged here by the Plaintiffs.

is another type of restriction that we concluded *would* "meaningfully impair[] an individual's ability to access firearms." *See B&L*, 104 F.4th at 119. "This is not a case where [California] seeks to achieve through its [one-dollar fee] what it cannot do directly—ban all [ammunition]." *See Oakland Tactical Supply*, 103 F.4th at 1198. California's law does not "shoehorn[] restrictions on purchase into [a] functional prohibition[] on keeping." *See McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024). Accordingly, California's law does not meaningfully constrain the right to keep and bear arms.

Nor does California's imposition of a one-dollar fee and a background check for ammunition purchases "impede" Californians from acquiring ammunition any more than the *Teixeira* ordinance did. *See* 873 F.3d at 678. *Teixeira* held that an Alameda County zoning ordinance that caused individuals "to travel to other, more remote locations" to purchase firearms and ammunition did not "meaningfully constrain" the right to keep and bear arms because individuals could still *access* firearms and ammunition at those "more remote locations." *Id.* at 679. Here, California's minimal fee and "time of purchase" background check are less "meaningful" than the *Teixeira* ordinance's inducement of travel to "more remote" areas. *See* Cal. Penal Code § 30370(a); *id.* Because it would be fatuous to suggest that only a cheaper and shorter "constraint"—say, a twenty-five-cent fee and an *instantaneous* "time of purchase" approval—could pass muster under *Teixeira*, the majority has necessarily concluded that *no* regulation on firearm or ammunition acquisition could pass muster.

The majority has failed to consider whether California's law impedes *access* to operable firearms, as *B&L* and *Teixeira* instruct. Instead, the majority concludes that

California's law "meaningfully constrains" the right to keep and bear arms simply because it "regulates all ammunition acquisition by California residents." Maj. Op. 26. As the majority explains, California's "regime . . . requires California residents to pay for and complete an in-person background check before each ammunition acquisition." Maj. Op. at 26 (citations omitted). The majority has not even attempted to explain how these features necessarily "impede[]" firearm access. *Cf. Teixeira*, 873 F.3d at 678. Instead, the majority has described, in the broadest possible terms, the essential features of *any* state or federal regulation governing acquiring ammunition. Its conclusion is bereft of analysis; it describes California's scheme and announces its conclusion, as though the Second Amendment violation were self-evident.

The majority's novel standard effectively abrogates *Bruen*'s first step. It will require courts to conduct historical scrutiny of *any* regulation on acquisition that regulates all gun or ammunition purchases. State and federal governments will be compelled to produce historical analogues for laws that require gun purchasers to show proof of their age;[2] fill out a short form providing biographical details;[3] or, as we cautioned in *Manney*, even "wait a short time" at a gun store, 114 F.4th at 1052. Nor will states be able to impose regulations designed to prevent gun

---

[2] *See*, *e.g.*, 18 U.S.C. § 922(b)(1) (prohibiting the sale of handguns and ammunition to juveniles).

[3] *See, e.g.*, *Manney*, 114 F.4th at 1052 (rejecting the proposition that requiring a purchaser to attest that they are the actual purchaser of a firearm implicated the Second Amendment's plain text).

trafficking without producing a historical analogue.**[4]** All of these provisions universally regulate some aspect of firearm acquisition.

We have repeatedly rejected the majority's boundless interpretation of the Second Amendment. We did so most recently in *Manney*, which held that a federal statute that applied *nationwide* to *every* gun purchase did not implicate the Second Amendment's plain text.**[5]** We abjured the notion that "*any* regulation related to the process of purchasing firearms [is] covered by the Second Amendment's plain text, regardless of the conduct the statute regulates." 114 F.4th at 1052. That conclusion is impossible to square with the majority's assertion that California's law "meaningfully constrains" the right to keep and bear arms—and thus implicates the Second Amendment's plain text—for simply applying to all California ammunition purchases.**[6]** In fact, it

---

[4] *See, e.g.*, Cal. Penal Code § 27520(a) ("A person . . . shall not acquire . . . a firearm for the purpose of selling, loaning, or transferring the firearm . . . [with] intent to avoid . . . [t]he provisions of Section 27545."); *see also* Cal. Penal Code § 27545 ("Where neither party to the transaction holds a dealer's license . . . the parties to the transaction shall complete the sale, loan or transfer of that firearm through a licensed firearms dealer[.]").

[5] *See Manney*, 114 F.4th at 1050 (concerning a challenge to 18 U.S.C. § 922(a)(6), which "makes it a crime 'for any person in connection with the acquisition or attempted acquisition of any firearm . . . [to] knowingly to make any false or fictitious oral or written statement . . . with respect to any fact material to the lawfulness of the sale . . . of such firearm'").

[6] The majority asserts that *Manney* "is not applicable here" because it concerned conduct—"lying"—that was "unrelated to the possession of a firearm." Maj. Op. at 28 n.20 (citing 114 F.4th at 1053). The majority fails to recognize that the same principle animates both *Manney* and this case: "The plain text of the Second Amendment directly protects [only]

RHODE V. BONTA 65

is difficult to imagine a regulation on the acquisition of ammunition or firearms that would *not* "meaningfully constrain" the right to keep and bear arms under the majority's new general applicability standard. That contradicts our admonition in *B&L* that "the right to acquire firearms []only implicates the Second Amendment in limited circumstances," *see* 104 F.4th at 118, and our holding in *Teixeira* that "the Second Amendment does not elevate convenience and preference over all other considerations." 873 F.3d at 680. We should have reaffirmed those cases again here. *See* 114 F.4th at 119.

Unsurprisingly, the majority's expansive holding also breaks with our sister circuits, which have found that laws imposing far more meaningful constraints on gun purchases did not implicate the Second Amendment's plain text. *Cf. Md. Shall Issue*, 116 F.4th at 217, 227, 229 (holding that a background check law that imposed a twenty-four hour delay and initial $50 fee on firearm purchases did not "infringe" the Second Amendment); *McRorey*, 99 F.4th at 838–40 (holding that a background check law that delayed firearm purchases for ten business days was likely permissible under the Second Amendment).

C

In an attempt to shore up its sweeping opinion, the majority adopts an untenable reading of California's law that disregards the Supreme Court's and our own guidance for evaluating facial challenges. The majority stresses that "we consider only the text of the challenged rules in assessing a

---

one thing—the right to 'keep and bear' firearms." *See B&L*, 104 F.4th at 117. Just as the Second Amendment says nothing about "lying," it "says nothing about commerce." *See id.*

66                              RHODE V. BONTA

facial challenge." Maj. Op. at 28 n.19 (citing *Nguyen*, 140
F.4th at 1240). But the majority ignores its own admonition:
It asserts that "the text does not limit permissible delay
times" associated with background checks—even though the
text requires that approval occur at the "time of purchase."
Maj. Op. at 28 n.19; Cal. Penal Code § 30370(a). The
majority's reading of the statute is utterly implausible. Even
if the majority could persuasively read "time of purchase" as
contemplating some vague "delay," any speculation about
that delay would be flatly inappropriate in this facial posture.
As the Supreme Court has instructed, we must "consider the
circumstances in which" gun regulations are "most likely to
be constitutional" rather than "hypothetical scenarios
where" they "might raise constitutional concerns." *Rahimi*,
602 U.S. at 701.

    As I have pointed out, in order to conclude in a facial
challenge that California's law "meaningfully constrains"
the right to keep and bear arms on its face, the majority must
demonstrate that *all* of the law's conceivable applications do
so. So if, for example, California could show—and it can[7]—

---

[7] California's evidence reveals that the state approved tens of thousands
of ammunition purchases within just the first month of the scheme's
operation. And, according to uncontested evidence from the California
Department of Justice's Bureau of Firearms, California has approved
hundreds of thousands more since then:

> From January 1, 2023, through June 30, 2023, the
> Department processed 538,359 AFS Checks, which is
> roughly 99.2% of all ammunition eligibility checks
> during this time. It approved 480,131 (89%), rejected
> 58,087 (11%) because the information submitted by
> the purchaser did not match an AFS entry, and denied
> 141 (0.03%) because the Department's information

RHODE V. BONTA                 67

that its law overwhelmingly imposed a one-dollar fee and a
one-minute approval process, the majority must show that
this application meaningfully constrains the right to keep and
bear arms.   The majority does not even attempt such
analysis.   Instead, the majority makes repeated allusions to
hypothetical, nontextual "delays," *see, e.g.*, Maj. Op. 30, that
leave "the panel slaying a straw man," *see Rahimi*, 602 U.S.
701.

In this facial posture, and on this record, I would hold
that California's imposition of a *de minimis* delay and small
fee    for    purchasing    ammunition    cannot    possibly
"meaningfully constrain" the right to keep and bear arms.

II

Even though Plaintiffs do not assert a right that falls
within the Second Amendment's "plain text," and even
though California's ammunition background check scheme
does not "meaningfully constrain" the right to keep and bear
arms, the scheme is constitutional for an independent reason:

---

> showed the purchaser to be on the Armed Prohibited
> Persons System (APPS) list.
>
> From January 1, 2023, through June 30, 2023, AFS
> Checks were completed within 170.7 seconds on
> average.
>
> From January 1, 2023, through June 30, 2023, taking
> into account all types of ammunition eligibility
> checks—AFS Checks, Basic Checks, and COE
> Checks—more than 99% of all ammunition eligibility
> checks were completed in less than one minute, and
> more than 88% of all ammunition eligibility checks
> were approved in less than one minute.

Plaintiffs' facial challenge cannot surmount the burden of its own theory,
much less this evidence.

The Supreme Court has repeatedly recognized that objective, "shall-issue" licensing regimes—like California's—are presumptively lawful, and Plaintiffs have failed to rebut that presumption. This analysis requires approaching the Second Amendment from a slightly different angle, but the result is the same.

A

The Court's seminal decision in *Heller* characterized "laws imposing conditions and qualifications on the commercial sale of arms" as "presumptively lawful regulatory measures." 554 U.S. at 626–27 & n.26. *Bruen*, despite introducing a rigorous historical analysis, affirmed that these "'shall issue' regimes, which often require applicants to undergo a background check," are constitutionally permissible. 597 U.S. at 38 n.9. Accordingly, the government may impose certain minimum requirements on the commercial sale of arms so long as they are "narrow, objective, and definite." *Id.*

But this presumption can be overcome. Plaintiffs may "rebut[] th[e] presumption of constitutionality by showing that a 'shall-issue' licensing law effectively 'den[ies]' the right to keep and bear arms," in which case "the burden shifts to the government to demonstrate that the regulation is 'consistent with this Nation's historical tradition of firearm regulation.'" *Md. Shall Issue*, 116 F.4th at 223 (quoting *Bruen*, 597 U.S. at 17, 38 n.9). "[I]f the government does not satisfy its burden in such cases, then the 'shall-issue' licensing law violates the Second Amendment." *Id.*

The Supreme Court has not clarified where, exactly, the "shall-issue" analysis falls within *Bruen*'s two-step inquiry. In *B&L*, we held that "[t]he most reasonable interpretation of [*Bruen* and *Heller*] is that commercial restrictions

presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test." 104 F.4th at 119. I did that analysis in Part I, which explained that *Bruen*'s step one typically considers whether a *plaintiff's* putatively protected conduct falls within the Second Amendment's plain text. *See Bruen*, 597 U.S. at 24 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). By contrast, *Bruen*'s and *Heller*'s "shall-issue" analysis requires us to scrutinize the *government's* conduct. These are two discrete analyses that apply different standards to different parties. Accordingly, they invite separate consideration.

Regardless of where, exactly, the "shall-issue" analysis lives within the *Bruen* scheme, there is no dispute that it operates as a "presumption" of lawfulness. Yet the majority begins with the claim that California cannot provide "historical analogues," *Rahimi*, 602 U.S. at 700, and that its ammunition licensing scheme thus violates the Second Amendment. Maj. Op. at 31–46. But this treats *Heller*'s approval of "presumptively lawful regulatory measures," as an affirmative defense to a law's unconstitutionality. 554 U.S. at 627 n.26. This is inconsistent with *Heller* and *Bruen*.

The majority has effectively reversed the presumption, and the order of operations matters. **[8]** By the time the

---

[8] Citing *Bruen*'s footnote 9, the majority observes that "the Supreme Court indicated that shall issue regimes may be constitutional, but did not hold that they were per se consistent with the Second Amendment." Maj. Op. at 46. I agree with the majority that these regimes are not *per se* constitutional. But I lament that the majority has refused to recognize that *Bruen* created a "presumption" of lawfulness, rather than a mere *indicium* or *suggestion* of lawfulness. The majority's miserly reading of *Bruen*'s "presumptively lawful" measures is especially jarring given the

majority gets to Part III.C of its opinion, it has already concluded that "California's ammunition background check regime does not survive scrutiny under the two-step *Bruen* analysis." Maj. Op. at 46. So much for the "presumption" of constitutionality.[9] Once the majority has found that California's scheme is ahistorical, it is a short step to conclude that it must not be "presumptively lawful." Maj. Op. at 46 n.29. The majority's analysis is backwards and thus flawed from the outset.

B

The majority concludes that "the Supreme Court's footnote in *Bruen* sheds little light" on whether California's law is "presumptively lawful" because California imposes "background checks every time a person seeks to purchase ammunition," Maj. Op. at 48, rather than every other "year or several years," *id.* at 47.

The majority has invented a new criterion for evaluating the lawfulness of a background check regulation—the

---

majority's admonition that "*Bruen*'s examples of how shall-issue licensing regimes could be abusive were not exclusive." Maj. Op. at 49. Under the majority's reading of *Bruen*, shall-issue regimes are now presumptively *unconstitutional* until proven otherwise.

[9] The majority distinguishes *Bruen* by observing that its footnote 9 did not address "ammunition background check regime[s]," Maj. Op. at 49. This is true, but should be irrelevant under the majority's own logic. By divorcing ammunition acquisition restrictions from firearm acquisition restrictions, the majority has rejected a key premise of its own analysis: that the Second Amendment extends the same protection to both ammunition and firearms. Maj. Op. at 22–23. Nothing in the majority's analysis tells us why ammunition must be covered by the Second Amendment—but must be treated differently from firearms—and why *Bruen*'s footnote 9 is, consequently, "meaningfully distinguishable," Maj Op. at 49.

frequency of the check—and has ignored the two criteria that *Bruen* actually provided: cost and temporal delay. *See Bruen*, 591 U.S. at 38 n.9. There is little wonder why. The majority cannot say, with a straight face, that California's one-dollar fee is "exorbitant." Nor can it assert, with any credibility, that California's one-minute wait time is "lengthy." *See id.* Instead, the majority's sole rationale for its new anti-frequency rule is that *Bruen* only alluded to licensing regimes that permitted individuals to "engage in a course of conduct for a year or several years" rather than for a single transaction. Maj. Op. at 47. According to the majority, *Bruen* could not possibly have contemplated a licensing regime that operates with such frequency.

But this is a distinction without a difference. The majority attempts to rationalize its novel anti-frequency rule by invoking *Bruen*'s analogical mode of reasoning: It concludes that California's law is not "presumptively lawful" because it "is not analogous to the 'how' of a shall-issue licensing regime wherein a person receives a license that is valid for a period of years." Maj Op. at 48. Yet the majority makes no effort to explain the importance of this distinction. Instead, the majority effectively requires the government to concoct "a historical twin" every time that it implements a "presumptively lawful" background check regulation, despite *Bruen*'s admonition to the contrary, and despite *Bruen*'s acknowledgment that even a regulation lacking a "dead ringer . . . may be analogous enough to pass constitutional muster." *See Bruen*, 597 U.S. at 30, 38 n.9.

And, more troublingly, the majority's analogy is only half complete. *Bruen* instructed courts to focus on both "how *and why* . . . regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (emphasis added). But the majority never gets past "how." This is puzzling,

since *Bruen* explained exactly "why" a licensing law should be denied the presumption of lawfulness: for "deny[ing] ordinary citizens their right to public carry." *Id.* at 38 n.9 (citing *Heller*, 554 U.S. at 635). If the majority wishes to apply *Bruen*'s analogical reasoning faithfully, it must not only identify superficial differences, but, more importantly, also consider whether a background check law is different such that it effectively "prevent[s] 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *See id.* (quoting *Heller*, 554 U.S. at 635). The majority has not explained why conducting an inexpensive, almost instantaneous background check necessarily denies "law-abiding, responsible citizens" the right to public carry any more than the licensing laws that it cited to approvingly—some of which impose hundreds of dollars of fees and months of delay.

For example, the majority cites California's concealed licensing scheme, Maj. Op. at 47 n.31, which is administered by local governments. *See* Cal. Penal Code § 26220(b). California localities typically charge hundreds of dollars for concealed carry permits. *See, e.g.*, *Carry a Concealed Weapon Licensing – CCW*, Los Angeles Cnty. Sheriff's Dep't, https://lasd.org/ccw/ [https://perma.cc/LNV2-B33C] (last visited June 17, 2025) ("[T]he total initial [Carry Concealed Weapon] license application fee will be $216."); *Fee Schedule*, San Diego Sheriff's Off. License Div., https://www.sdsheriff.gov/home/showdocument?id=9157&t=638803105385767072 [https://perma.cc/3UNX-RDS9] (last visited June 17, 2025) (assessing a $176 fee for a concealed carry permit). The majority also cites regulations from other states that impose substantial delays. *See, e.g.*, Alaska Stat. § 18.65.700(b) (permitting the state to hold a concealed carry license application for up to 30 days); Ariz.

Rev. Stat. § 13-3112(H) (75 days); Idaho Code § 18-3302K (90 days); Mont. Code Ann. § 45-8-321(1) (60 days); Wash. Rev. Code Ann. § 9.41.070(1) (30 days).

The majority's strained logic punishes governments for making their background check systems more effective and efficient. Under the majority's anti-frequency rule, the more effectively that a background check or licensing law "prohibit[s] . . . the possession of firearms by felons and the mentally ill," the less likely that that law will pass constitutional muster. *See Heller*, 554 U.S. at 626. The majority, which complains that "California residents cannot avoid the background check requirements by taking advantage of internet or out-of-state sales," apparently believes that background check laws are unconstitutional unless they are flecked with obvious loopholes. Maj. Op. at 27.

The majority's new rule can only be justified by accepting the premise that undergoing a background check *per se*—even one that costs one dollar and takes one minute—imposes some kind of ineffable injury that must be minimized at all costs. Yet *Heller*, far from construing background checks as inherently injurious, or even presumptively suspect, instead christened them as "presumptively *lawful*." *Heller*, *554* U.S. at 627 n.26 (emphasis added).

By the majority's reasoning, any regulation of sales of ammunition is *presumptively unlawful*, unless the state can produce an identical historical twin. I doubt that any state will be able to do so, any more than a state will be able to show a strong tradition of state regulation of arms sales when the Second Amendment was adopted. The implications of the majority's analysis flatly contradict *Heller* and *Bruen*.

### III

Plaintiffs also assert that California's ammunition background check scheme violates the Commerce Clause by requiring vendors, including out-of-state vendors, to consummate ammunition transactions face-to-face in California. I would reverse the district court's judgment on this claim as well.

The United States Constitution grants Congress the power to "regulate Commerce . . . among the several states[.]" U.S. Const. art. I, § 8, cl. 3. The Supreme Court has held that the Commerce Clause implicitly preempts state regulations that disrupt interstate commerce. *See Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 98 (1994).

"Two levels of scrutiny exist for analyzing state statutes challenged under the dormant Commerce Clause." *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010) (citation omitted). First, statutes that "affirmatively discriminate against . . . [interstate] transactions" are subject to "more demanding scrutiny." *Maine v. Taylor*, 477 U.S. 131, 138 (1986). In these cases, "the burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Id.* (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). Alternatively, "statutes that burden interstate transactions only incidentally" are permissible unless the "burdens they impose on interstate trade are 'clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). In either case, it is an "antidiscrimination principle [that] lies at the very core of the [Court's] dormant Commerce Clause jurisprudence." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369

RHODE V. BONTA 75

(2023) (quotation marks and citation omitted); *see Flynt v. Bonta*, 131 F.4th 918, 923–24 (9th Cir. 2025).

California's scheme requires that all ammunition sales be consummated with state-licensed vendors in face-to-face transactions. Cal. Penal Code § 30312(a)–(b). Vendors who lack a physical location may rely, for a fee, on vendors *with* a physical location for assistance consummating sales face-to-face. Plaintiffs assert that this face-to-face requirement discriminatorily "favor[s] *in-state*, in-person transactions over in-person transactions with a vendor in another state." They also assert that "[w]hile a California vendor may sell to a Californian face-to-face, an out-of-state vendor may not[.]"

But Plaintiffs "read too much into too little." *Nat'l Pork Producers*, 598 U.S. at 373. California's face-to-face requirement does not "affirmatively discriminate" against out-of-state transactions: A California ammunition retailer faces the same burden as a Nevada or North Carolina ammunition retailer—Either operate a physical location in California or contract with a business that does. *See Taylor*, 477 U.S. at 138. This means that California's face-to-face requirement applies "even-handedly" to both in-state and out-of-state vendors. *See Day v. Henry*, 129 F.4th 1197, 1205–06 (9th Cir. 2025) (upholding Arizona's direct shipping restrictions on wine retailers because "[t]here is no clear-cut 'in-state' and 'out-of-state' divide"); *cf. Granholm v. Heald*, 544 U.S. 460, 473–76 (2005) (disapproving of Michigan and New York statutes that discriminated between in-state and out-of-state wineries in direct shipment).

Plaintiffs' argument for discrimination requires conflating "California vendors" with California brick-and-mortar vendors. As California observes, *in-state* vendors

76          RHODE V. BONTA

who lack a physical location in California cannot directly
sell ammunition to Californians, either.  This means that
neither a Los Angeles-based vendor nor a New York City-
based vendor may conduct a purely online (or telephonic, or
mail-order) transaction with a San Francisco-based
purchaser.

And Plaintiffs' assertion that "California's resident
businesses are the only businesses that may sell directly to
California consumers," belies reality:  Out-of-state
businesses sell ammunition directly to Californians at brick-
and-mortar stores in California.**[10]**  Nor do Plaintiffs identify
any law or regulation that erects a discriminatory barrier that
prevents those out-of-state retailers from obtaining licenses
to do so.  Accordingly, vendors principally located in other
states may sell ammunition to Californians "face-to-face"
under the same rules that apply to vendors principally
located in California.  And "setting up a physical storefront
in [California] is not a per se burden on out-of-state
companies and per se benefit to in-state companies."  *Day*,
129 F.4th at 1206–07 (quotation marks omitted).  There is no
discrimination here.

Because California's face-to-face requirement "regulates
even-handedly to effectuate a legitimate local public interest,

---

[10] Consider, for example, Bass Pro Shops, a Missouri-based sporting
goods retailer, *see Where is Bass Pro Shops Corporate Headquarters
Located?*, Bass Pro Shops, https://help.basspro.com/company-
information-e8cd63ea/where-is-bass-pro-shops-corporate-headquarters-
located-d15e9de5 [https://perma.cc/DS9A-AGZH] (last visited June 17,
2025), whose various California stores sell ammunition, *see*, *e.g.*, *FN 5.7
x 28mm Polymer Tip Handgun Ammo*, Bass Pro Shops,
https://www.basspro.com/p/fn-57-x-28mm-polymer-tip-handgun-
ammo [https://perma.cc/sw8p-x5m4] (last visited June 17, 2025) ("In
stock at Irvine, CA.").

RHODE V. BONTA 77

and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *See Pike*, 397 U.S. at 142 (citation omitted). Plaintiffs fare no better with this alternative balancing theory under *Pike*, which does not "depart from the antidiscrimination rule that lies at the very core of [the Court's] dormant Commerce Clause jurisprudence." *Nat'l Pork Producers*, 598 U.S. at 377 (quotation marks and citation omitted).

Plaintiffs concede that "no one denies that keeping arms out of the hands of dangerous felons is a legitimate government interest." I agree. Still, Plaintiffs argue that the face-to-face requirement imposes a burden that is "clearly excessive in relation" to these benefits by requiring out-of-state businesses to rely on "the unfettered discretion" of "in-state competitors . . . to condition their access to the California market on paying a King's ransom." Plaintiffs ignore the fact that out-of-state vendors may nonetheless sell directly to California customers if they operate a physical location, and that any burden flowing from their choosing to do so, or from their choice to contract with a business that does so, falls equally on in-state and out-of-state businesses.

I would hold that California's face-to-face requirement does not violate the Commerce Clause.

IV

Finally, Plaintiffs contend that California Penal Code § 30314, which prohibits Californians from bringing out-of-state ammunition into California, is preempted by 18 U.S.C.

§ 926A. I would also reverse the district court's judgment
on this claim. Section 926A provides in relevant part:

> Notwithstanding any other provision of any
> law or any rule or regulation of a State or any
> political subdivision thereof, any person who
> is not otherwise prohibited by this chapter
> from transporting, shipping, or receiving a
> firearm shall be entitled to transport a firearm
> for any lawful purpose from any place where
> he may lawfully possess and carry such
> firearm to any other place where he may
> lawfully possess and carry such firearm if,
> during such transportation the firearm is
> unloaded, and neither the firearm nor any
> ammunition being transported is readily
> accessible . . . .

18 U.S.C. § 926A. Congress has made clear that this
preemption provision does not "occupy the field"; it applies
only if "there is a direct and positive conflict between such
provision and the law of the State so that the two cannot be
reconciled or consistently stand together." 18 U.S.C. § 927.

Section 926A protects the interstate transportation of
firearms and ammunition. However, it only protects the
transportation of ammunition between states where the
transporter "may lawfully possess and carry" that
ammunition. *See* 18 U.S.C. § 926A. Here, California's
§ 30314(a) provides that:

> [A] resident of this state shall not bring or
> transport into this state any ammunition that
> he or she purchased or otherwise obtained

> from outside of this state unless he or she first has that ammunition delivered to a licensed ammunition vendor for delivery to that resident pursuant to the procedures set forth in Section 30312.

Cal. Penal Code § 30314(a). Because Californians may not "lawfully possess and carry" ammunition unless that ammunition first passes through a licensed vendor who can perform a face-to-face background check, § 926A does not apply here. Plaintiffs contend that California has taken advantage of § 926A's safe harbor to "regulat[e] the interstate transport of ammunition generally, which is unequivocally protected by § 926A." But this is largely a retread of Plaintiffs' Commerce Clause argument.

I would hold that § 30314 is not preempted by § 926A.

\* \* \*

For the forgoing reasons, I would reverse the judgment of the district court. I respectfully dissent.